IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 21-cr-0229-RBJ

UNITED STATES OF AMERICA,

        Plaintiff,

v.

1. DAVITA INC.,

2. KENT THIRY,

        Defendants.

**DEFENDANTS' JOINT MOTION TO DISMISS**

For the first time in the 130-year history of the Sherman Act, the government brings criminal charges, here and in a directly related case, asserting that alleged agreements between companies not to solicit each other's employees are *per se* violations of the Act. They are not, as a matter of law. What is more, the government cannot, consistent with due process, predicate liability on a novel theory for the first time in a criminal case. The Indictment—which charges only *per se* violations—must be dismissed.

Under the Sherman Act, almost all types of restraints of trade are subject to the fact-intensive "rule of reason," under which a restraint's anticompetitive and procompetitive effects on the market are carefully assessed. *Per se* antitrust liability is the rare exception, reserved for a few types of restraints that considerable judicial experience has shown to be inherently anticompetitive and without any plausible procompetitive justification. Here, far from considerable judicial experience showing that agreements between companies not to solicit each

other's employees violate antitrust law, no court has *ever* come to that conclusion; rather, the few cases that have even reached this question have subjected these agreements to the rule of reason. And even then, no court has held that mere no-soliciting agreements are unlawful in the employment context.

In a transparent effort to overcome this legal barrier, the Indictment tries to slap a "market-allocation" label on the alleged no-soliciting agreements. But although market-allocation agreements can be *per se* illegal in certain contexts, the Indictment does not allege market-allocation agreements at all: the alleged agreements do not assign employees to one employer or the other, block employees from switching employers, or prevent employers from competing for each other's employees, as the Indictment's own allegations (¶¶ 11(d)-(e), 19(d)-(e)) demonstrate. The government cannot convict on the basis of a label it has conveniently selected but that is devoid of factual support in the Indictment.

Moreover, this case could not be the occasion for the Court to declare for the first time that an employee no-soliciting agreement is *per se* illegal, for two independently sufficient reasons. *First*, agreements not to solicit employees simply do not meet the standard for *per se* illegality. The long and careful judicial experience needed to determine that such agreements are inherently anticompetitive is non-existent. To the contrary, such agreements have potential procompetitive benefits. *Second*, applying a newly announced *per se* rule in a criminal case would violate the Due Process Clause by depriving defendants of fair warning of the offense with which they have been charged.

## STATEMENT

### A. Factual Background

DaVita Inc. owns and operates medical facilities; Kent Thiry was DaVita's CEO. The Indictment charges them with two counts of conspiracy under Section 1 of the Sherman Act.

Count 1 alleges that defendants and Surgical Care Affiliates ("SCA") "agree[ed] not to solicit each other's senior-level employees." Indictment ¶ 9; *see also id.* ¶ 11. The Indictment also alleges that the companies agreed to "requir[e] senior-level employees … to notify their current employer that they were seeking other employment in order for their applications to be considered." *Id.* ¶ 11(d); *see also id.* ¶ 11(e). Count 2 alleges a nearly identical agreement between defendants and unidentified "Company B," Indictment ¶ 14, 17, 19, except the count 2 agreement allegedly covered all employees and was not reciprocal (preventing Company B from soliciting DaVita's employees but not vice versa), *id.* ¶¶ 17, 19. The Indictment claims both agreements are "*per se* unlawful." *Id.* ¶¶ 9, 17.

### B. Related Proceedings

The government indicted SCA in the Northern District of Texas for "the same conspiracy" as charged here in count 1 (and a similar conspiracy with another company). ECF 31 at 3; *see* Indictment, *United States v. Surgical Care Affiliates LLC ("SCA")*, No. 3:21-cr-00011 (N.D. Tex. Jan. 5, 2021), ECF 1. SCA moved to dismiss on grounds substantially similar to those presented here; that motion has been briefed and is awaiting decision. *See SCA* ECF 38, 44-45.

## LEGAL STANDARD

An indictment must be dismissed if it "fail[s] to state an offense," Fed. R. Crim. P.

12(b)(3)(B)(v)—*i.e.*, if its allegations, "if true, are [not] sufficient to establish a violation of the charged offence," *United States v. Pope*, 613 F.3d 1255, 1260 (10th Cir. 2010). The court must "focus[] solely on the facts alleged in the indictment and their *legal* adequacy." *Id.*

"Whether challenged conduct [under antitrust law] belongs in the *per se* category is a question of law." *Medical Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 727 (6th Cir. 2019); *see, e.g.*, 19C Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1909b (4th & 5th eds. 2021) ("the ultimate selection of a mode is entirely a question of law").

## ARGUMENT

Section 1 of the Sherman Act "prohibits only *unreasonable* restraints of trade." *National Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2161 (2021). "Most restraints challenged under the Sherman Act … are subject to the rule of reason, which [is] a fact-specific assessment of market power and market structure aimed at assessing the challenged restraint's actual effect on competition—especially its capacity to reduce output and increase price." *Id.* at 2155 (quotation marks omitted). Here, however, the Indictment neither invokes nor purports to satisfy the rule of reason. For example, the Indictment contains no allegations defining the market, let alone establishing the structure of the market, defendants' power in it, or the alleged agreements' anticompetitive effects on it. *See id.* at 2160; *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2284-2285, 2287 (2018); *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885-886 (2007).

Instead, the Indictment alleges only that the agreements are illegal *per se*. Indictment ¶¶ 9, 17. "At the other end" of the "spectrum" from agreements subject to the rule of reason are "agreements [that] so obviously threaten to reduce output and raise prices that they might be

4

condemned as unlawful *per se*," *Alston*, 141 S. Ct. at 2155, though "'considerable inquiry into market conditions' may be required before the application of any so-called 'per se' condemnation is justified," *California Dental Ass'n v. FTC*, 526 U.S. 756, 779 (1999) (quoting *National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 104 n.26 (1984)). The Indictment here, however, fails to allege a type of business arrangement that is actually subject to a rule of *per se* illegality. Therefore, the Indictment must be dismissed. *See Diaz v. Farley*, 215 F.3d 1175, 1177, 1182 (10th Cir. 2000) (dismissing *per se* claim because court determined alleged agreement was governed by rule of reason); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 317 (3d Cir. 2010) (*per se* claim "will be dismissed" if court determines that alleged restraint is governed by rule of reason).

### I.   *PER SE* ANTITRUST LIABILITY IS LIMITED TO THE MOST PERNICIOUS RESTRAINTS

"Determining whether a restraint is undue for purposes of the Sherman Act presumptively calls for … rule of reason analysis." *Alston*, 141 S. Ct. at 2151 (quotation marks omitted). "Certain practices, however, [are] deemed to be so pernicious as to fall outside of this analysis and be conclusively presumed to violate Section 1" of the Sherman Act. *Drury Inn-Colorado Springs v. Olive Co.*, 878 F.2d 340, 342 (10th Cir. 1989). "*[P]er se* liability is a rare exception" to the rule of reason. *In re Processed Egg Prods. Antitrust Litig.*, 962 F.3d 719, 730 (3d Cir. 2020). "Resort to *per se* rules is confined to restraints … that would always or almost always tend to restrict competition and decrease output," that "have manifestly anticompetitive effects," and that "lack any redeeming virtue." *Leegin*, 551 U.S. at 886 (cleaned up); *see also, e.g.*, *Diaz*, 215 F.3d at 1182 ("*Per se* analysis is reserved for agreements or practices" that have a "pernicious effect on competition and lack of any redeeming virtue" (quotation marks omitted)).

5

"[T]he core per se offenses" are "horizontal price-fixing (including bid rigging) and horizontal market-allocation." *United States v. Heffernan*, 43 F.3d 1144, 1145-1146 (7th Cir. 1994) (quotation marks omitted).

## II.   AGREEMENTS LIKE THOSE ALLEGED HERE ARE NOT SUBJECT TO A *PER SE* RULE

No court has held that an agreement between (alleged) competitors not to solicit each other's employees is *per se* illegal.[1]  In fact, the only decision resolving the question concluded that the agreement was **not** *per se* illegal, but rather must be evaluated under the rule of reason. *See Yi v. SK Bakeries, LLC*, 2018 WL 8918587, *4 (W.D. Wash. Nov. 13, 2018).[2]

The government tries to shoehorn the alleged no-soliciting agreements into the category of market-allocation agreements, *see* Indictment ¶¶ 10, 18, presumably because courts have deemed naked market-allocation agreements *per se* illegal in certain circumstances, *see Leegin*, 551 U.S. at 886.  But the Indictment's factual allegations do not show that the "market allocation" label properly applies to defendants' alleged agreements; quite to the contrary, they

---

[1]   The Indictment casts the agreements as "naked" restraints, which in antitrust parlance contrasts with "ancillary" restraints, which are "part of a larger endeavor whose success [the restraints] promote." *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 188-189 (7th Cir. 1985); *see SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 970 (10th Cir. 1994).  Even a "naked" restraint is judged under the rule of reason unless it falls into one of the narrow categories that has been deemed *per se* illegal, but if a restraint otherwise fits a *per se* category, its ancillarity then "exempt[s it] from the per se rule," *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 214, 224 (D.C. Cir. 1986).  If the Court denies this motion to dismiss, defendants reserve the right to show at a later stage that the alleged agreements are ancillary and valid under the rule of reason.

[2]   Contrary to the government's contention, *see SCA* ECF 44 at 12-13, the district court in *In re High-Tech Employee Antitrust Litigation*, 856 F. Supp. 2d 1103 (N.D. Cal. 2012), did "not decide … whether *per se* or rule of reason analysis applie[d]," deferring "that decision" to "summary judgment," *id.* at 1122 (citation omitted); *see also Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, __ F. Supp. 3d __, 2020 WL 2553181, at *13 n.8 (S.D. Cal. May 20, 2020) (*High-Tech* "deferred ruling on whether the *per se* rule applies until summary judgment").

6

show that it does not. "The essence of a market allocation violation … is that competitors apportion the market among themselves and cease competing in another's territory or for another's customers." *Midwest Underground Storage, Inc. v. Porter*, 717 F.2d 493, 497 n.2 (10th Cir. 1983); *see Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49-50 (1990) (agreement that one company would not operate in Georgia and the other would not operate outside Georgia, which was followed by immediate significant price increase, was *per se* illegal).

The no-soliciting agreements alleged here do not describe market allocation; indeed, the Indictment's own allegations undermine the government's labeling. The Indictment (¶¶ 11(d)-(e), 19(d)-(e)) makes clear that the alleged agreements *permitted* employees to seek employment with either company and *permitted* the employers to hire each other's employees. Consequently, the agreements neither assigned nor relegated any employees to one employer or the other, nor prevented the employers from competing for each other's employees. *See Midwest Underground*, 717 F.2d at 497 n.2 (rejecting plaintiff's characterization of agreement as "market allocation"); *Anesthesia Advantage, Inc. v. Metz Grp.*, 759 F. Supp. at 638, 644 (D. Colo. 1991) (rejecting allegation that agreement assigning different doctors to different nights was "market allocation" because agreement "did not prevent the other [doctors] from working nights for which they were not scheduled").

In *SCA*, the government identified only one case holding that a mere no-soliciting agreement was a *per se* illegal market-allocation agreement: *United States v. Cooperative Theatres of Ohio, Inc.*, 845 F.2d 1367, 1371-1373 (6th Cir. 1988). But that case involved the allocation of customers, and the defendants "failed to articulate any potentially pro-competitive justification for the agreement." *Id.* at 1369. In determining whether an agreement is a *per se*

7

illegal market-allocation agreement, courts must go "further than determining the general type of 'practice' at issue" and examine "the particular practice or industry at issue." *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1051-1052 (9th Cir. 1983) (rejecting *per se* treatment premised on the contention that "the contract-responsibility clause can be viewed as a simple market-splitting device and … market-splitting devices have been held *per se* unreasonable in other contexts"). As explained below, the business context here—involving employees rather than customers—matters greatly: in short, no-soliciting agreements help employers provide training, opportunities, and specialized information to their employees, which has procompetitive benefits for employees, employers, and their customers. *See infra* pp.13-14. And even if *Cooperative Theatres* were on point, a single out-of-circuit case could not suffice to make the alleged agreements *per se* illegal.

The other cases the government cited in *SCA* involved agreements to refrain not simply from *soliciting* but also from *hiring* (or purchasing, where the market was for goods rather than labor), and sometimes to take additional significant anticompetitive steps. For example, in *United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1081, 1088-1090 (5th Cir. 1978), the agreement "called for" the competing suppliers to "active[ly] discourage[] customer[s] from changing suppliers … by means of *increased* price or the like," and to allocate the market by "meet[ing] and trad[ing] customer accounts until the volume of business exchanged was equivalent." *See also In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 471, 481 (W.D. Pa. 2019) (involving "'no-poach' agreements pursuant to which defendants agreed not to hire or solicit each other's employees"); *Markson v. CRST Int'l, Inc.*, 2021 WL 1156863, at *2, 4 (C.D. Cal. Feb. 10, 2021) (agreement "precluded persons who are 'under contract' from

working for any other trucking company, refused to release educational records, restricted employment, and suppressed compensation").[3]  The Indictment here contains no analogous allegations.

The government's casual equation of no-soliciting agreements with no-hiring agreements—lumping both together under the "no-poaching" label, *see SCA* ECF 44 at 4, 7-9, 11-17—is unsound.  A "non-solicitation agreement is not synonymous with a no-poaching agreement" or a no-hiring agreement.  *Aya Healthcare*, 2020 WL 2553181, *13.  No-hiring and no-poaching agreements prevent one employer from *hiring* the other's employees, whereas no-soliciting agreements leave employees free to obtain employment from either employer.  *Id.*; *see also Railway Industry*, 395 F. Supp. 3d at 471.  In other words, no-soliciting agreements have a materially different, lesser effect on any competition for labor—especially where, as here, the agreement permits solicitation once the employee has given notice of intent to seek other employment.  *See infra* p.3.  Thus, precedent finding no-hiring or no-poaching agreements illegal does not apply to no-soliciting agreements.

But even if no-soliciting agreements were equivalent to no-poaching or no-hiring agreements, the Indictment still would not state legally valid *per se* charges.  Neither the Supreme Court nor the Tenth Circuit has addressed whether horizontal no-poaching or no-hiring agreements are *per se* illegal, and the weight of authority shows that they are not.  *See Nichols v. Spencer Int'l Press, Inc.*, 371 F.2d 332, 337 (7th Cir. 1967); *Bogan v. Hodgkins*, 166 F.3d 509,

---

[3]  Even farther afield is *United States v. eBay, Inc.*, which not only involved a "no-solicitation/*no-hire* agreement," but also did not "determine … the level of analysis to apply." 968 F. Supp. 2d 1030, 1039-1040 (N.D. Cal. 2013) (emphasis added); *see Aya Healthcare*, 2020 WL 2553181, *13 (*eBay* "deferred ruling on whether the *per se* rule applies").

515 (2d Cir. 1999); *Union Circulation Co. v. FTC*, 241 F.2d 652, 655-658 (2d Cir. 1957).

Thus, the alleged agreements do not fit within a recognized *per se* category.

### III. THE COURT SHOULD NOT ANNOUNCE FOR THE FIRST TIME IN THIS CRIMINAL CASE THAT AGREEMENTS LIKE THOSE ALLEGED HERE ARE SUBJECT TO A *PER SE* RULE

This is not remotely an appropriate case in which to announce for the first time that agreements not to solicit each other's employees like those alleged here are *per se* illegal. *First*, the requisite foundation for establishing a *per se* rule is absent: there is *no* judicial experience, much less the necessary considerable judicial experience, finding such agreements anticompetitive, and in fact they have quite plausible procompetitive benefits. *Second*, applying a *per se* rule for the first time in a criminal case would violate due process.

#### A. There Is No Basis for This Court to Deem the Alleged Agreements *Per Se* Illegal for the First Time

As discussed, restraints of trade are presumptively evaluated under the rule of reason; only restraints that "would always or almost always tend to restrict competition and decrease output," that "have manifestly anticompetitive effects," and that "lack any redeeming virtue" may be deemed *per se* illegal. *Leegin*, 551 U.S. at 886 (cleaned up). Overcoming this presumption is exceedingly difficult and requires extensive judicial review predicated upon careful economic analysis. *Per se* rules should not be adopted "in the context of business relationships where the economic impact of certain practices is not immediately obvious," *id*. at 887 (quotation marks omitted), or before courts "have amassed considerable experience with the type of restraint at issue and can predict with confidence that it would be invalidated in all or almost all instances," *Alston*, 141 S. Ct. at 2156 (quotation marks omitted). Moreover, "departure from the rule-of-reason standard must be based upon demonstrable economic effect

10

rather than upon formalistic line drawing." *Leegin*, 551 U.S. at 887 (quotation marks omitted). Accordingly, the Supreme Court has "been slow … to extend *per se* analysis" to new business "context[s]." *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458-459 (1986); *see also Eichorn v. AT & T Corp.*, 248 F.3d 131, 143 (3d Cir. 2001) (noting "judicial hesitance to extend the per se rule to new categories of antitrust claims"). In fact, the Supreme Court has moved decisively in the other direction, overruling precedents that previously had subjected certain categories of restraints to *per se* treatment and returning those restraints to the rule of reason. *See Leegin*, 551 U.S. at 881-882; *State Oil Co. v. Khan*, 522 U.S. 3, 7 (1997); *Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 57-59 (1977).

Here, the foundation for declaring agreements not to solicit employees *per se* illegal is entirely absent.[4] There are no judicial decisions finding such agreements in violation of the Sherman Act, whether under a *per se* rule or the rule of reason. The closest the government has come to identifying such a decision is *Cooperative Theatres*. But as noted, the agreement there

---

[4] This conclusion is confirmed by the government's own statements. In 2016, the Department of Justice and the Federal Trade Commission jointly announced (without citation): "An individual *likely* is breaking the antitrust laws if he or she … agrees with individual(s) at another company to refuse to solicit … that other company's employees." Antitrust Guidance for Human Resources Professionals 3 (Oct. 2016) (emphasis added), https://www.justice.gov/atr/file/903511/download. "Likely" is not the stuff of *per se* illegality. Tellingly, the Department announced it would pursue criminal charges only for agreements that began or continued after the guidance issued. Andrew C. Finch, Principal Deputy Assistant Attorney General "Trump Antitrust Policy After One Year" (Jan. 23, 2018), https://bit.ly/3j1O1la. That qualification would have been unnecessary if agreements not to solicit employees were an obvious instance of market allocation. In its brief in *SCA* the government disclaimed any reliance on the 2016 guidance, *SCA* ECF 44 at 29-30, and for good reason: neither the guidance nor any investigation or prosecution of employee no-soliciting agreements could make new law subjecting such agreements to a *per se* rule, *Aya Healthcare*, 2020 WL 2553181, *13 ("DOJ's policy is not binding authority").

11

arose in the customer context, not the employee context. Moreover, the court deemed the agreement a market-allocation agreement without any empirical evidence showing the agreement's actual effects on the market. *See* 845 F.2d at 1371-1373. Thus, *Cooperative Theatres* is dubious on its own terms and insufficient—as a distinct, isolated, unsubstantiated decision—to justify a *per se* rule for no-soliciting agreements in the employment context.[5]

By contrast, in the employment context, it is very unlikely that agreements like those alleged here would even have anticompetitive effects. The Indictment does not claim that the alleged agreements fixed wages or suppressed output (*i.e.*, jobs). Nor, as explained above, do the alleged agreements divide the market by allocating employees to one company or the other—indeed, the alleged agreements *permitted* the employers to hire each other's employees. *See* Indictment ¶¶ 11(d)-(e), 19(d)-(e); *Cayman Expl. Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1361 (10th Cir. 1989) (declining to declare restraint *per se* illegal where plaintiff "failed to allege any facts" showing that restraint had "an anti-competitive market effect"). This is especially so with respect to the agreement alleged in count 2, which was not even reciprocal.

And on the other side of the ledger, there are "plausible" *procompetitive* effects of such agreements, which "rules out … abbreviated review." *California Dental*, 526 U.S. at 771, 775-

---

[5]   In *SCA*, the government also cited *Anderson v. Shipowners' Association of Pacific Coast*, 272 U.S. 359 (1926), but that agreement among associations that "controlled substantially all the merchant vessels" on the Pacific coast went far beyond prohibiting employers from soliciting each other's employees; it sought to comprehensively "control the employment … of all seamen upon the Pacific Coast" by "compel[ing]" "every seaman seeking employment … to register, receive a number, and await his turn according to the number, before he can obtain employment," which "frequently prevented" "well qualified" seamen from obtaining employment; by "assigning [each seaman] to a specified employment"; and by "fix[ing] the[ir] wages." *Id*. at 361-362.

776, 778; *see also Diaz*, 215 F.3d at 1183-1184 ("a plausible argument that the agreements in question actually enhanced competition … counsels against use of the *per se* approach"); *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1155 (9th Cir. 2003) ("When a defendant advances plausible arguments that a practice enhances overall efficiency and makes markets more competitive, *per se* treatment is inappropriate ….").[6]

First, agreements like those alleged here can stimulate competition for employees. The Indictment alleges that, under the agreements, "employees … who applied to the other company [had] to notify their current employer that they were seeking other employment in order for their applications to be considered." Indictment ¶ 11(d); *see also id.* ¶ 19(d). That arrangement allowed employees to pit their current and prospective employers against each other, potentially triggering a bidding war between the two employers.

Second, even if agreements like those alleged here could be shown to hinder employee mobility between the companies to the agreement, they provide the procompetitive benefit of enabling employers to invest more in their employees, to support them with additional training and professional opportunities, and to entrust them with valuable trade secrets. As a result, employers—and the consumers of their goods and services—gain the benefits of superior employee performance, and employees gain more satisfying careers and greater value in the broader labor market. Courts have long recognized that "preserving trade secrets and protecting

---

[6] The government has argued that "considerations" of "procompetitive benefits … are categorically foreclosed by the per se rule." *SCA* ECF 21. That is irrelevant here because the question is *whether* the restraint *is even subject to* a *per se* rule. *Leegin*, *Diaz*, and other cases cited above make clear that in resolving *that* question, courts must consider whether the *type* of agreement has the *potential* for procompetitive benefits.

investments in personnel" are "legitimate" interests precluding *per se* invalidation. *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 900 (9th Cir. 1983); *see also, e.g.*, *Polk Bros.*, 776 F.2d at 189 ("Knowing that he is not cutting his own throat by doing so, the employer will train the employee, giving him skills, knowledge, and trade secrets that make the firm more productive."); *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 281-282 (6th Cir. 1898), *aff'd*, 175 U.S. 211 (1899).

Because, to say the least, it is far from "immediately obvious" that the alleged agreements adversely affect competition, they cannot be deemed categorically illegal.

>   **B.   Using a Criminal Case to Apply a *Per Se* Rule to Employee Non-Soliciting Agreements for the First Time Ever Would Violate Due Process**

Moreover, announcing and applying a *per se* rule to agreements like those alleged here for the first time would violate defendants' right to "fair warning" under the Due Process Clause. *United States v. Lanier*, 520 U.S. 259, 266 (1997). That is particularly troubling with respect to Mr. Thiry, who could be deprived of his liberty based on a *per se* application of the Sherman Act that no statute or court decision has ever endorsed.

"To satisfy due process, a penal statute must define the criminal offense … with sufficient definiteness that ordinary people can understand what conduct is prohibited." *Skilling v. United States*, 561 U.S. 358, 402 (2010) (cleaned up). The Sherman Act itself, however, "does not, in clear and categorical terms, precisely identify the conduct which it proscribes." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 438 (1978). "[C]larity at the requisite level may be supplied by judicial gloss on" the Sherman Act, *Lanier*, 520 U.S. at 266, and courts often do so by identifying "conduct regarded as *per se* illegal because of its unquestionably anticompetitive effects," *Gypsum*, 438 U.S. at 440. But "due process bars courts from applying a novel

construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Lanier*, 520 U.S. at 266. "[T]he touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id*. at 267.

Defendants here certainly had no fair warning. There is no precedent holding that an agreement merely not to solicit another's employees violates the Sherman Act, under any standard of review. *Supra* pp.6-9. Indeed, the only judicial decision addressing the issue, *Yi*, 2018 WL 8918587, *4, which was decided after the period covered by the Indictment, concluded that such agreements are ***not*** *per se* illegal.

This is not an instance in which the government seeks to apply a preexisting *per se* rule—namely, that naked market-allocation agreements are *per se* illegal—to an agreement with minor or immaterial differences from those previously found illegal.[7] Rather, as explained, the agreements alleged here are *not* market-allocation agreements at all and therefore not subject to that *per se* rule. *Supra* p.7. Nor does *Cooperative Theatres*—which, again, held that an agreement not to solicit *customers* was *per se* illegal—provide adequate warning. When the Indictment itself makes clear that the alleged agreements did not allocate employees or prevent competition over employees, invoking the mantra of "market allocation" is unavailing. And, as described above, the dynamics of labor markets are such that no-soliciting agreements plausibly

---

[7] *Cf., e.g.*, *United States v. Andreas*, 216 F.3d 645, 666-667 (7th Cir. 2000) ("that the lysine producers' scheme did not fit precisely the characterization of a prototypical *per se* practice does not remove it from *per se* treatment" because the agreement "was a conspiracy to limit the producers' output"); *United States v. Cinemette Corp. of Am.*, 687 F. Supp. 976, 977-979 (W.D. Pa. 1988) ("split agreements" were *per se* illegal "bid rigging" because they were agreements "to submit collusive, non-competitive bids").

have procompetitive benefits that are absent from no-soliciting agreements in markets for customers. *Supra* pp.13-14.

Even if the alleged agreements could be equated with no-hiring or no-poaching agreements, defendants still would not have had fair warning because courts (all in other circuits) have divided on whether even *those* agreements are *per se* illegal, and the weight of authority concludes they are *not*. *Supra* p.9; *Lanier*, 520 U.S. at 269 ("disparate decisions in various Circuits might leave the law insufficiently certain even on a point widely considered" and "such a circumstance may be taken into account in deciding whether the warning is fair enough").

The Supreme Court has long recognized that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Lanier*, 520 U.S. at 265. In the absence of any on-point caselaw finding mere no-soliciting agreements illegal under *any* standard, no "ordinary" person could have foreseen that prosecutors would charge as *per se* illegal an alleged agreement involving no division of markets simply by labeling it "market allocation." *Skilling,* 561 U.S. at 402. The Indictment, at a minimum, violates fundamental notions of fairness and defendants' rights under the Due Process Clause.

## CONCLUSION

The Indictment charges solely a *per se* offense, but the type of agreement alleged—not to solicit employees—is not subject to a *per se* rule, and appropriately so, since such agreements have plausible procompetitive benefits. In any event, announcing a new *per se* rule in this criminal case would violate due process. The Court should dismiss the Indictment.[8]

---

[8] Given the paramount legal questions presented, dismissing the Indictment would also promote judicial efficiency by sparing the Court and the parties from the substantial burdens of

September 14, 2021                                    Respectfully submitted,

                                                  *s/John F. Walsh III*

SETH P. WAXMAN                           JOHN F. WALSH III
DAVID M. LEHN                             WILMER CUTLER PICKERING HALE & DORR LLP
WILMER CUTLER PICKERING HALE &    1225 17th Street, Suite 2600
DORR LLP                                        Denver, CO 80220
1875 Pennsylvania Avenue NW               (720) 274-3154
Washington, DC 20006                      john.walsh@wilmerhale.com
(202) 663-6000
seth.waxman@wilmerhale.com                HEATHER S. NYONG'O
david.lehn@wilmerhale.com                 WILMER CUTLER PICKERING HALE & DORR LLP
                                                       One Front Street, Suite 3500
JOHN C. DODDS                             San Francisco, CA 94111
ERICA A. JAFFE                             (628) 235-1007
MORGAN LEWIS & BOCKIUS LLP           heather.nyong'o@wilmerhale.com
1701 Market Street
Philadelphia, PA 19103-2921                DANIEL CRUMP
(215) 963-4942                             WILMER CUTLER PICKERING HALE & DORR LLP
john.dodds@morganlewis.com               350 South Grand Avenue, Suite 2400
                                                       Los Angeles, California 90071
J. CLAY EVERETT, JR.                        (213) 443-5300
TRACEY MILICH                            daniel.crump@wilmerhale.com
MORGAN LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave. NW
Washington, DC 20004-2541
(202) 739-5860
clay.everett@morganlewis.com
tracey.milich@morganlewis.com

*Counsel for Defendant DaVita Inc.*

CLIFFORD B. STRICKLIN                  JEFFREY E. STONE
KING & SPALDING                          DANIEL CAMPBELL
1401 Lawrence Street, Suite 1900         McDermott Will & Emery LLP
Denver, CO 80202                          444 W Lake St.
(720) 535-2327                               Chicago, IL 60606
cstricklin@kslaw.com                        (312) 984-2064
                                                       jstone@mwe.com
JUSTIN P. MURPHY                         dcampbell@mwe.com

---

preparing for and conducting trial on a legally invalid charge. The government could then immediately appeal the dismissal, if it so chose.

17

MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001-1531
(202) 756-8018
jmurphy@mwe.com

THOMAS M. MELSHEIMER (application pending)
WINSTON & STRAWN LLP
2121 N. Pearl St, Suite 900
Dallas, TX  75201
(214) 453-6401
tmelsheimer@winston.com

*Counsel for Defendant Kent Thiry*

CERTIFICATE OF SERVICE

I certify that on September 14, 2021, I filed the above document with the Clerk of the Court using CM/ECF, which will send electronic notification thereof to all registered counsel.

                                    /s/ John F. Walsh III
                                      John F. Walsh III