IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 21-cr-0229-RBJ

UNITED STATES OF AMERICA,

        Plaintiff,

v.

   1.  DAVITA INC.,

   2.  KENT THIRY,

        Defendants.

_____

**DEFENDANTS' BRIEF IN SUPPORT OF
THEIR PROPOSED JURY INSTRUCTIONS**
_____

## CONTENTS

I.    Defendants' Market Allocation Instruction (No. 27) Is An Accurate Statement of the Law And Should Be Given ................................................................. 1

II.   Defendants' Elements of the Offense Instruction (No. 23) Is An Accurate Statement of the Law And Should Be Given ............................................... 11

III.  Defendants' Proposals For the Other Disputed Instructions Are Accurate Statements of the Law And Should Be Given .............................................. 12

The parties have each proposed jury instructions, many of which are undisputed. This brief addresses only the disputed instructions, and explains why defendants' proposals are legally sound and appropriate the Division's counterproposals are not.

**I.    DEFENDANTS' MARKET ALLOCATION INSTRUCTION (NO. 27) IS AN ACCURATE STATEMENT OF THE LAW AND SHOULD BE GIVEN**

As this Court has ruled, to prevail at trial, the Division "will not merely need to show that the defendants entered [a] non-solicitation agreement," but "will have to prove beyond a reasonable doubt that defendants entered into an agreement with the purpose of allocating the

market for senior executives (Count 1) and other employees (Counts 2 and 3)," and "that the defendants intended to allocate the market."  Order on Defendants' Motion to Dismiss ("MTD Order") at 18-19 (Jan. 28, 2022), Dkt. 132.  As the Tenth Circuit has explained, "the essence of a market allocation violation . . . is that competitors apportion the market among themselves and cease competing in another's territory or for another's customers."  *Midwest Underground Storage v. Porter*, 717 F.2d 493, 497 n.2 (10th Cir. 1983).

Defendants' proposed instruction conforms to this Court's ruling and the Tenth Circuit's definition of market allocation.  As set forth below, defendants' instruction includes three critical concepts: that any agreement proved to exist must have (1) been entered into with the purpose and intent to allocate a market, rather than simply to not *solicit* another's employees (i.e., a non-solicitation agreement, standing alone, does not prove the purpose and intent to allocate a market); (2) sought to allocate *a market* (here, a market for employees); and (3) sought to *apportion or divide* that market and to cause a corresponding *cessation of competition* in that market.  The Division's proposal omits these important nuances and contains numerous misleading or incorrect statements of the law.

### A. A Non-Solicitation Agreement Is Insufficient to Prove a Market Allocation Agreement

This Court made clear that not all non-solicitation agreements "allocate the market,"[1] and that only those agreements that "allocate the market" warrant *per se* treatment.[2]  Thus, as the

---

[1] MTD Order at 17 ("It does not follow that every non-solicitation agreement or even every no-hire agreement would allocate the market and be subject to per se treatment.").

[2] *See, e.g.*, *id*. at 14 ("The issue addressed by this order is whether this non-solicitation agreement has been sufficiently alleged to have *allocated the market*." (emphasis added)); *id*. at 15 ("Those [non-solicitation and no-hire] agreements have been held illegal where they are naked agreements to *allocate the market. . . . Where they have been found not to allocate the market or*

Court explained, the Division "will not merely need to show that the defendants entered [a] non-solicitation agreement," but "will have to prove beyond a reasonable doubt that defendants entered into an agreement with the purpose of allocating the market for senior executives (Count 1) and other employees (Counts 2 and 3)," and "that the defendants intended to allocate the market." MTD Order at 18-19.

As these rulings show, there are meaningful legal and factual distinctions among (1) the existence of an agreement not to solicit, (2) the existence of an agreement to allocate a market, and (3) defendants having the purpose and intent to allocate a market. It is critical that jurors, unfamiliar with antitrust law, understand these differences. Defendants' proposed instruction makes these distinct concepts easy for a layperson to understand—that is, makes clear that defendants were charged with the crime of entering into non-solicitation agreements to allocate the market for employees, and that entering into a non-solicitation agreement, standing alone, does not constitute the charged offense.

## B.    A Market Allocation Agreement Must Allocate a "Market"

The parties dispute whether the word "market" should appear in the market allocation jury instruction. Defendants contend they were charged with a "conspiracy . . . to allocate the market" for employees, whereas the Division claims that defendants were charged with a "conspiracy to allocate employees."

The jury should be instructed on the crime at issue—a conspiracy to allocate a *market*. This Court held that the Indictment stated an offense only because it alleges "a naked horizontal

---

to be ancillary, courts have not found no-hire agreements to be inherently anticompetitive." (emphasis added); *id*. at 17 ("[I]f naked non-solicitation agreements or no-hire agreements *allocate the market*, they are per se unreasonable." (emphasis added)).

market allocation agreement."  MTD Order at 7; *see id.* at 6 ("Though the indictment does not use the phrase 'horizontal market allocation agreement,' it does allege the agreement was one."); *id.* at 4-5, 8.  Indeed, naked horizontal market allocation is the only category of *per se* illegal agreement that the Indictment invoked, and was the basis on which the Court found it survived the motion to dismiss: "[T]he government sufficiently alleged that this non-solicitation agreement falls under the umbrella of an existing category subject to per se treatment: horizontal market allocation agreement."  *Id.* at 12.  And in fact, in opposing the motion to dismiss, the Division itself described its case in exactly the same way.  *See, e.g.*, Dkt. 67 at 18-19 ("a naked horizontal market allocation between competing employers is exactly what the Indictment alleges here").

Further, as the category's name suggests, an agreement is a market-allocation agreement subject to the *per se* rule only if it allocates a "market."  *See, e.g., Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 47, 49 (1990) (per curiam) (agreement assigning "Georgia market" for "bar review courses" to one conspirator and "remainder" of United States to the other conspirator was *per se* illegal).  For example, in *Smalley & Co. v. Emerson & Cuming, Inc.*, the Tenth Circuit affirmed summary judgment against the plaintiff's "market allocation claim" because the plaintiff had "too narrowly defined the relevant product market."  13 F.3d 366, 368 (10th Cir. 1993).  Specifically, the plaintiff "define[d] the relevant product market as the sale of a single product . . . to a single customer," who was in fact only "one of many customers" of that product. *Id.*  Similarly, in a case involving a claimed *per se* illegal horizontal market-allocation agreement, the Eleventh Circuit observed: "Where the relevant market is so much larger than that portion which may be influenced by certain horizontal competitors, it cannot be seriously

contended that whatever restrictions are imposed in fact appreciably stifle competition."

*Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 711, 720 (11th Cir. 1984).  Thus,

the court concluded: "Because there is no evidence here that the territorial allocation made by

Waffle House even under the circumstances alleged by the plaintiff, has the tendency to reduce

interbrand competition, reduce the availability of services within the relevant market area, or

artificially maintain prices, a rule of reason analysis is appropriate."  *Id.* at 721.  *Smalley* and

*Midwestern Waffles* make clear that a horizontal market allocation agreement violates the

Sherman Act only when the agreement affected an actual "market" (or had the intent to do so).

Indeed, in *Roman*, the Tenth Circuit explained that "[a]ntitrust law addresses employer

conspiracies controlling employment terms *precisely because they tamper with the employment

market*."  *Roman v. Cessna Aircraft Co.*, 55 F.3d 542, 544 (10th Cir. 1995) (emphasis added).

And, in *Bogan*, the Second Circuit held that an agreement does not qualify as one to "allocate the

market" subject to the *per se* rule if it does not cover "the entire set of suppliers of their

services," i.e., the market for employees of the identified type.  *Bogan v. Hodgkins*, 166 F.3d

509, 515 (2d Cir. 1999).

In sum, antitrust jurisprudence is clear that an agreement is a market-allocation

agreement subject to the *per se* rule only if it allocates an actual "market."[3]  Having represented

---

[3] Courts have also repeatedly made this clear in the context of antitrust standing in cases
involving employees, where they have required that no-hire agreements harm competition in the
*employment market* as opposed to individual employees.  *See, e.g.*, *Feldman v. Am. Dawn, Inc.*,
849 F.3d 1333, 1331 (11th Cir. 2017) (finding that plaintiff lacked bring an antitrust action
because he failed to "challenge a conspiracy *premised on restraining the employment market*,"
and further noting: "That one laborer suffered injury does not convert the conspiracy into one
aimed at restraining competition in the labor market."); *Eichorn v. AT & T Corp.*, 248 F.3d 131,
140-41 (3d Cir. 2001), *as amended* (June 12, 2001) (finding that plaintiff *did* have standing to
challenge a no-hire agreement among competitors because the complaint adequately pled an

to the Court that it has charged "a naked horizontal market allocation" scheme, the Division now seeks to have this Court instruct the jury as if that were not so—to the point of deleting any use of the word "market." Defendants' proposed instruction directly quotes this Court's order on the motion to dismiss, which itself is based on Supreme Court and Tenth Circuit precedent, and should be given to the jury.  *See* MTD Order at 18-19.

### C.      An Agreement that Allocates the Market Must "Divide" or "Apportion" the Market And Cause Conspirators to "Cease Competing"

The Tenth Circuit has explained that "the essence of a market allocation violation . . . is that competitors *apportion the market* among themselves and *cease competing* in another's territory or for another's customers." *Midwest Underground*, 717 F.2d at 497 n.2 (emphasis added).  Following suit, this Court explained that *per se* treatment is appropriate only if the restraint "stifl[es] competition," and further noted that "[a] horizontal market allocation agreement is an agreement between competitors at the same level of the market structure to allocate a market [in] order to minimize competition," which "can be accomplished by . . . allocating or dividing an employment market."  MTD Order at 5 (quotation cleaned).  Accordingly, many courts have held that an agreement does not allocate the market unless it assigns the employees (or customers) in the market to one or the other competitor and ceases all further meaningful competition in the market for employees (or customers).  Thus, if employees (or customers) are able to switch from one competitor to the other, courts recognize that some

---

injury to "the employment market," and further noting that "[w]hile employees who are precluded from selling their labor have not necessarily suffered an antitrust injury, employees may challenge antitrust violations that are premised on restraining *the employment market*."). Both cases made clear that no-hire agreements result in Sherman Act violations only where they seek to restrain competition in "the employment market."  *See Feldman*, 849 F.3d at 1341; *Eichorn*, 248 F.3d at 140-41.

meaningful degree of competition remains and therefore that the agreement is not a per se illegal market-allocation agreement.

In the context of market allocation cases relating to no-hire agreements, other courts have similarly required a "division" or "apportionment" of the market for employees, and a corresponding cessation in competition. For example, in *Bogan*, the Second Circuit held that a no-hire agreement did not allocate a market and was therefore not *per se* unlawful, reasoning that:

> [Plaintiffs] suggest that the Agreement may be a supplier allocation, but the facts do not bear this interpretation; the *Agreement permits transfers*, and experienced NML agents *do not comprise the* entire *set of suppliers of their services*. Thus, while the Agreement *may constrain* General Agents *to some degree*, it *does not allocate the market* for agents to any *meaningful extent*.

166 F.3d at 515 (emphasis added). Likewise, in *Coleman v. General Electric Co.*, the district court held that a no-hire agreement did not violate the Sherman Act. In so holding, the court found:

> "as a matter of law that *there was no stifling of competition* for the services of these employees . . . [because] the *employees were free to choose* whether they desired employment with [another company] . . . . [T]he Court cannot find there was anything more than incidental, if that much, impact on the employment market. . . . *[T]he agreement, if it did this much, only precluded the plaintiffs from selling their services to one corporation, and there is no allegation, nor any basis for one, that this prevention had anything more than a de minimis impact on the employment market in general*."

643 F. Supp. 1229, 1243 (E.D. Tenn. 1986), *aff'd*, 822 F.2d 59 (6th Cir. 1987) (emphasis added). And in *Deslandes v. McDonald's USA, LLC*, the court explained that horizontal no-hire agreements are per se unlawful where they leave employees in the market "no choice but to accept the salary set by their" employers. No. 17-C-4857, 2018 WL 3105955, at *6 (N.D. Ill. June 25, 2018).

In sum, binding Tenth Circuit precedent (*Midwest Underground*) and this Court's MTD

Order—as well as instructive no-hire cases from the Second Circuit (*Bogan*) and various district courts (*Deslandes* and *Coleman*)—make clear that no-hire or similar employer agreements do not allocate the market where (1) there is no "division" or "apportionment" of the market for employees, and (2) there is no corresponding cessation or stifling of competition.[4]

The Division cannot credibly contest that an agreement qualifies as a market-allocation agreement subject to the per se rule only if it "divides" or "apportions" the relevant market and eliminates all further competition, as described in Defendants' proposed instruction. As the Division explained in its opposition to defendants' motion to dismiss, "[t]he per se rule typically applies to horizontal restraints, such as price fixing, bid rigging, and allocating *or dividing* markets." Dkt. 67 at 4 (citations omitted). Nor could the Division credibly dispute that it must prove that the alleged co-conspirators agreed to "cease competing," as the Tenth Circuit held in *Midwest Underground.* 717 F.2d at 497 n.2. If the agreement still permits employee switching, meaningful competition is still possible and thus the agreement does not qualify for per se treatment as a market-allocation agreement. These tight requirements are appropriate because, as the Supreme Court has explained, the application of the *per se* rule is rare and confined to "restraints . . . that would always or almost always tend to restrict competition and decrease

---

[4] Courts have similarly required these two attributes outside of the employment context. *See, e.g.*, *E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*, 357 F.3d 1, 4 (1st Cir. 2004) (noting that the "per se label" applies to "'naked' price fixing, output restriction, or *division of customers or territories.*" (emphasis added)); *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995), *as amended on denial of reh'g* (Oct. 13, 1995) (noting that competitors cannot "*divide markets, thus eliminating all competition among them.*" (emphasis added)); Jury Instructions, Dkt. 1232, *In re: Wholesale Grocery Products Antitrust Litigation*, 0:09-md-02090-ADM-TNL (D. Minn Apr. 20, 2018) (instructing the jury that "[a]llocate means to divide"); *Compact v. Metro. Gov't of Nashville & Davidson Cty., TN.*, 594 F. Supp. 1567, 1576 (M.D. Tenn. 1984) ("A horizontal allocation of markets is characterized by . . . *an elimination of competition in the market* serviced by the conspirators." (emphasis added)).

output" and that "have manifestly anticompetitive effects." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,* 551 U.S. 877 at 886 (cleaned up).

###### D.  The Division's proposed jury instruction is wrong as a matter of law

The Division's proposed instruction, which is a modified version of the ABA model jury instruction, departs from the applicable law in multiple ways.

*First*, the Division's proposed instruction omits any requirement that defendants have intended to allocate a market in agreeing not to solicit employees.  This Court has correctly held that the Division must prove such intent, but the Division would have this Court instruct the jury as if that were not so, instead suggesting that a non-solicitation agreement standing alone is sufficient.  *See* Dkt. 174, Disputed Instruction No. 27: Conspiracy to Allocate Employees (Offered by the Division) ("An employee-allocation conspiracy can take various forms.  Such a conspiracy exists, for example, where two or more competitors agree to not solicit each other's existing or prospective employees for purposes of allocating employees.").

*Second*, as mentioned above, the Division's proposed instruction omits the word "market" entirely.  Instead, the Division's proposed instruction defines the offense as "a conspiracy to allocate *employees*" and declares that such an agreement exists where employees agree "not to compete with one another for the services of *an employee or set of employees.*"  *Id.* This proposed language would permit conviction even if the jury finds only an agreement to allocate a *single* employee or whatever individual employees were covered by the agreement (if any).  As explained above, this would contradict precedent requiring that the agreement allocate a *market*—here, the market for senior executives (Count 1) and other employees (Counts 2 and 3).  *See* Section I.B., *supra* (A Market Allocation Agreement Must Allocate "the Market").

*Third*, the Division's proposed instruction does not adequately inform the jury of what constitutes market *allocation*.  As explained above, an agreement allocates a market for purposes of per se antitrust liability only if the co-conspirators agree to "divide" or "apportion" the market and cease competing; if the agreement permits transfers, and hence, competition does not cease (or is not intended to cease), it does not allocate the market.  The Division's proposal contains no instruction on this point.  *See* Section I.C., *supra* (An Agreement that Allocates the Market Must "Divide" or "Apportion" the Market And Cause Conspirators to Cease Competing).

*Finally*, as far as defendants are aware, the Division's proposed instruction has never been used in any market-allocation case, let alone one based solely on nonsolicitation.  The Division seems to justify its proposal by reference to its own indictment and the ABA model instruction.  Neither of those sources, however, is the law or an accurate and complete representation of the law.  Like the indictment, the ABA model is the work of prosecutors—it was drafted by a small group of practitioners dominated by current and former Division attorneys.  *See* ABA model Jury Instructions in Criminal Antitrust Cases, Preface.  It was also drafted three years before the Division brought its first civil case based on a so-called no-poach agreement, seven years before the Division issued its guidance on such agreements, and twelve years before it brought its first criminal case involving such an agreement.  Predictably, then, nothing in the record of the ABA group's deliberations indicates any awareness of how the model instruction would apply to a prosecution for an employee-nonsolicitation agreement.  The only case the ABA model cites for support involved facts that were vastly different from this case: a sales-volume allocation agreement that the court found was in effect a price-fixing agreement.  *See U.S. v. Andreas*, 39 F. Supp. 2d 1048, 1059 (N.D. Ill. 1998), *aff'd*, 216 F.3d 645

(7th Cir. 2000) ("Direct price agreements and sales volume are two sides to the same price fixing coin."); *U.S. v. Andreas*, No. 96-762, Tr. of Record at 5588-89 (N.D. Ill. Sept. 8, 1998).

## II.   DEFENDANTS' ELEMENTS OF THE OFFENSE INSTRUCTION (NO. 23) IS AN ACCURATE STATEMENT OF THE LAW AND SHOULD BE GIVEN

Defendants propose an Elements of the Offense instruction that accords with the law and this Court's MTD Order:

> [A]t trial, the government will not merely need to show that the defendants entered the non-solicitation agreement and what the terms of the agreement were. **It will have to prove beyond a reasonable doubt that defendants entered into an agreement with the purpose of allocating the market** for senior executives (Count 1) and other employees (Counts 2 and 3). . . . Similarly, [] the government will have to prove more than that defendants had entered into a non-solicitation agreement—**it will have to prove that the defendants intended to allocate the market** as charged in the indictment.

MTD Order at 18-19.  Defendants' description of the first two elements of the offense follows this Court's language almost verbatim, and thus, is the proper instruction to the jury.

In addition, defendants' inclusion of the word "market" in the instruction is appropriate and consistent with antitrust jurisprudence.  *See* Section I, *supra* at 1 (Defendants' Arguments Regarding Instruction No. 27: Market Allocation).  Likewise, the instruction quotes "across the United States" from the charging portions of the Superseding Indictment, *see* ECF No. 74 at ¶ 10, and, thus, it is proper language for a jury instruction.  By contrast, the Division's attempt to blindly follow the ABA model should be rejected not only because the model is not law or binding precedent, but because it disregards this Court's prior decision in this very case.  The ABA model instructions are not one-size-fits-all, and certainly not well-suited for a case in which the Division alleges non-solicitation agreements with the purpose of allocating labor markets.

Finally, this Court found that it "cannot subject . . . conduct to per se treatment until it finds that the conduct was naked, i.e. it had 'no purpose except stifling competition,'" MTD Order at 9 (quoting *Topco*, 405 U.S. at 608), and that defendants "could choose to challenge the government's allegations that this was a naked agreement to escape a per se designation." *Id.* at 18.  Defendants anticipate that the Division will fail to prove in its case-in-chief that the charged restraints were naked, and in that event, defendants will ask the Court to rule that the conduct at question here is not governed by the per se rule, and to dismiss the charges pursuant to Rule 29. To the extent the Court determines that there remain open factual issues that the jury should decide concerning whether the alleged restraints had "no purpose except stifling competition," defendants reserve the right to request a jury instruction on "nakedness" before the jury is charged.

## III.   DEFENDANTS' PROPOSALS FOR THE OTHER DISPUTED INSTRUCTIONS ARE ACCURATE STATEMENTS OF THE LAW AND SHOULD BE GIVEN

### A.   Disputed Instruction No. 1: Preliminary Jury Instruction[5]

The parties dispute (1) the descriptions of the charges, (2) the first two elements of the offenses, and (3) whether this instruction should be substantive. *First*, defendants' request that "market" and "across the United States" appear in jury instructions is wholly appropriate. *See* Section I, at 1 (explaining that "market" is appropriate and consistent with antitrust jurisprudence); Section II, at 11 (explaining that "across the United States" is in the Superseding Indictment). *Second*, defendants' description of the first two elements of the offense is proper because it follows this Court's MTD Order. *See* Section II.

---

[5] The Division also describes the charged conduct in Disputed Jury Instruction No. 22: Section 1 of the Sherman Act and the Charge (Offered by the Division).  Because defendants describe the charged conduct in Disputed Jury Instruction No. 1: Preliminary Jury Instruction (Offered by Defendants), defendants do not address this additional instruction separately, and instead address the parties' dispute regarding the description of the charged conduct in this section.

*Third*, the preliminary jury instruction in *United States v. Penn*, 1:20-cr-00152 (D. Colo. Dec. 16, 2021) (hereinafter, *Penn*), is an appropriate model to follow because it is consistent with this Court's practice standards:

> My view is that [preliminary jury instructions] give[] you the opportunity, if you wish, to address what [the government] ha[s] to prove as you are summarizing what you anticipate the evidence will be. I also believe that if jurors understand the elements of the claims and defenses up front, they can better understand the possible significance of the evidence as it comes in.

Judge Jackson, Practice Standards at 6. To that end, defendants propose describing the three charged conspiracies consistent with the language in the Superseding Indictment—as further explained in this Court's MTD Order. *See* Super. Indict. at ¶¶ 9-10 (Count One); ¶¶ 17-18 (Count Two); ¶¶ 25-26 (Count Three). From the outset of the case, the jury should understand that this case involves three alleged conspiracies, each involving different parties and different time periods so that they can "better understand" this case and the "possible significance" of upcoming testimony and witnesses. Judge Jackson, Practice Standards at 6. The Division's proposed instruction, which follows the ABA model, fails to provide any context about the case and what the Division must prove, and thus, is unhelpful to the jury.

### B.    Disputed Instruction No. 8:  Statements by Defendants

Defendants' proposed instruction (1) follows the law, (2) has been given in other cases, and (3) appears in the pattern instructions for other Circuits. Thus, it is a proper jury instruction.

### C.    Disputed Instruction No. 10:  Impeachment by Prior Inconsistencies

The Division's proposed instruction is incomplete at this stage of the litigation. For example, if at trial a witness is impeached with grand jury testimony, the inconsistent statement is admissible for the truth of the matter asserted. *See* Fed. R. Ev. 801(d)(1)(A). Defendants

therefore believe that the substance of this instruction should be revisited after all testimony has

been heard at trial to ensure the instruction is complete and does not mislead the jury.

### D.      Disputed Instruction No. 11:  Immunity

With the exception of names relating to this case, defendants follow verbatim the

instruction given in *Penn*, Dkt. 921 at 12, and thus, their instruction is proper.  By contrast, the

Division points to no court adopting its modification to the Tenth Circuit Pattern Instructions

(i.e., Pattern does not have the second sentence or a variation thereof) in a jury instruction.  Thus,

such additional language should be rejected.

### E.      Disputed Instruction No. 12:  Expert and Opinion Testimony

The parties agree on the language of the instruction.  The dispute relates to whether

defendants' economic expert, Dr. Pierre-Yves Cremieux, should be allowed to testify at trial.

Because this dispute is subject to a pending motion *in limine*, defendants do not address it here.

### F.      Disputed Instruction No. 17:  Multiple Defendants – Multiple Counts

Defendants dispute the agency language in this instruction because it misleadingly

summarizes the elements of corporate agency in one sentence, and thereby misstates the law.

Furthermore, corporate agency law is accurately provided in a separate, standalone instruction.

Finally, the Division points to no cases adopting its proposed instruction.

### G.      Disputed Instruction No. 24:  On or About

With the exception of the conspiracy dates, defendants' proposed instruction follows the

Tenth Circuit Pattern verbatim, and thus, is proper for a jury instruction.  By contrast, the

Division points to no cases adopting its proposed instruction.

### H.      Disputed Instruction No. 32: Statute of Limitations

With the exception of defendants' names and conspiracy periods, defendants' proposed

instruction follows verbatim the instruction given in *Penn*, Dkt. 921 at 29, and is a proper instruction.

### I.   Disputed Instruction No. 26: Evidence of Similarity

Parallel conduct, without more, is not sufficient to establish a Sherman Act violation. *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 554 (2007) ("[P]roof of a §1 conspiracy must include evidence tending to exclude the possibility of independent action"); *Theatre Enters. Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 540-41 (1954) ("parallel business behavior" is insufficient to prove a Sherman Act offense). Independent action and parallel conduct instructions are therefore common in antitrust cases. *See e.g.*, *Penn*, Dkt. 921 at 22-23; Jury Instructions, Dkt. 6036 at 11, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 3:07-md-01827-SI (N.D. Cal.) (Horizontal Price Fixing – Evidence of Similarity). Defendants' proposed instruction follows the instruction given by Chief Judge Brimmer in *Penn*, with slight modifications to reflect that this is a labor market case. Defendants believe the Division will introduce evidence that defendants and their co-conspirators made similar business decisions (e.g., not recruiting one another's employees) and ask the jury to infer an agreement. Defendants contend that this conduct was the result of independent decision-making based on legitimate business reasons. Thus, the Court should adopt the defendants' proposed instruction to explain to the jury that similarity of business practices in and of itself is not illegal.

### J.   Disputed Instruction No. 28:  Alleged Notice and Confirmation Requirements

Defendants were charged with agreements to allocate employees "by not soliciting" employees, and the word "notice" does not appear in the relevant charging portions of the Superseding Indictment. *See* Dkt. No. 74 ¶¶ 9-10, 17-18, 25-26. Instead, the Superseding

Indictment alleges that defendants "monitored compliance" with the charged "agreement not to solicit" by requiring employees "to notify their current employer that they were seeking" employment elsewhere before they could be considered by the other employer. *Id*. ¶ 11(d) (emphasis added); *see also id*. ¶¶ 19(d), 27(e). The Court should require the Division to adhere to the Superseding Indictment's allegations by referring to the notice element in this case only as an enforcement mechanism for the non-solicitation agreement actually charged, as Defendants have requested in a pending motion *in limine*. *See* Dkt. 111. Any other approach would effectively amend the charges in the indictment, would severely prejudice defendants, and would present the risk of conviction based on something other than the actual charge.

### K.      Disputed Instruction No. 29: "Knowingly" Joining the Conspiracy

Defendants' proposed instruction follows this Court's MTD Order and is consistent with the instruction in *Penn*, Dkt. 921 at 25, with only one modification. Defendants inserted "allocating the market for senior executives (Count 1) or other employees (Counts 2 and 3)"—a direct quote from this Court's MTD Order at 19. Thus, the language is proper for a jury instruction. By contrast, the Division's proposed instruction repeatedly omits the word "market," choosing instead "employee-allocation conspiracy," which is wrong as a matter of law and inconsistent with this Court's MTD Order. *See* Section I, *supra* at 1.

Further, the Division's reliance on the ABA model should not only be rejected because the ABA model is not law. In fact, the Division's inserted language instructing the jury to ignore (a) the reasonableness of the restraint, and (b) any good motives for the alleged agreement tilt the playing field even further in favor of the prosecution than the ABA model, which is silent on these issues—and does so without support in precedent or practice. The Division's proposal

16

would also likely confuse jurors.

**L.     Disputed Instruction No. 30: Statements Indicating Consciousness of Guilt**

The Division's proposed instruction is irrelevant.  The record is devoid of "statements"

that tend to show consciousness of guilt.  To the extent the Division is requesting this instruction

based on the attorney-client privilege practices that are the subject of a motion *in limine*,

defendants disagree with the Division's characterization of that evidence, disagree that it is

evidence of consciousness of guilt, and disagree that such evidence is admissible.  Further, a

*practice* of doing something is not the same as making a *statement*, and the Division points to no

cases indicating that this instruction is appropriate where no false "statement" (alleged or

proven) has been made.  For example, in *Ingram*, the defendant lied to police, and evidence

conclusively proved the lie.  The court held the lie was "clearly intended to be exculpatory" and

therefore relevant to consciousness of guilt.  *See U.S. v. Ingram*, 600 F.2d 260, 262 (10th Cir.

1979).  Similarly, in *Smith*, the defendant "made false exculpatory statements" to the FBI, and

thus, the "statement[s] will support an inference of consciousness of guilt."  *See U.S. v. Smith*,

833 F.2d 213, 217-18 (10th Cir. 1987).  And, in *Mullins*, the Tenth Circuit upheld a jury

instruction that allowed an inference of consciousness of guilt relating to the defendant's "false

testimony."  *U.S. v. Mullins*, 4 F.3d 898, 899 (10th Cir. 1993).  By contrast, defendants in this

case have made no false statements, much less to any government authority.  Thus, this proposed

jury instruction should be rejected.

**M.     Disputed Instruction No. 31: Interstate Commerce**

Defendants' instruction is appropriate because it follows the instruction in *Penn*, Dkt. 921

at 26, without modifications.  By contrast, the Division's proposal has never been adopted by any

court. There is no reason to deviate from standard "interstate commerce" instructions.

    **N.**    **Disputed Instruction No. 13: Summary/Overview Witnesses**

Defendants have moved to exclude the Division's use of a summary/overview witness. However, if such testimony is admitted, the jury should be instructed on the limitations of that testimony. The Tenth Circuit has recognized that "overview testimony is susceptible to abuse" and can "stray into matters that are reserved for the jury, such as opinions about a defendant's guilt or a witness's credibility" and "usurp[] the jury's role in making fact-findings." *U.S. v. Brooks*, 736 F.3d 921, 930 (10th Cir. 2013). This kind of testimony "raises the very real specter that the jury verdict could be influenced by statements of fact or credibility assessments in the overview but not in evidence." *Id.* (citing *U.S. v. Casas*, 356 F.3d 104, 119-20 (1st Cir. 2004)). Summary testimony is "conceptually similar to overview testimony" and thus raises similar concerns. *Brooks*, 736 F.3d at 931. In assessing the admissibility of summary testimony, courts look to (1) the testimony's potential to aid the jury in ascertaining the truth, and (2) the "possible prejudice that may result to defendant in allowing such evidence." *Id.* (citing *U.S. v. Ray*, 370 F. 3d 1039 (10th Cir. 2004, *vacated on other grounds*, 543 U.S. 1109 (2005)). Given the risk of jury misuse or improper weight, it is critical that the jury be provided an instruction on the limitations on such testimony.

    **O.**    **Disputed Instruction No. 33: Defense Theory of the Case**

Defendants' proposed instruction is proper because it follows the structure and level of detail commonly given in antitrust cases, including *Penn*. *See, e.g.*, Final Jury Instructions, *Penn*, Dkt. 921 at 35-44; *U.S. v. Lischewski*, 3:18-cr-00203 (N.D. Cal. Dec. 2, 2019), Dkt. 626 at 25 (Instruction No. 22 Theory of Defense); Jury Charge, *U.S. v. Usher et. al*, 1:17-cr-00019

(S.D.N.Y Nov. 8, 2018), Dkt. 239 (Tr. at 2459:24-2460:6).

### P. Disputed Instruction No. 38: Modified *Allen* Instruction

A modified *Allen* instruction is inappropriate unless there is certainty that the jury is "deadlocked" or that "it [is] apparent that [they won't] change [their] minds." *Shea v. Raemisch*, No. 15-CV-2354-WJM, 2016 WL 8577462, at *16 (D. Colo. Sept. 16, 2016) ("no basis for a modified-*Allen* instruction" where the jury had not unambiguously indicated that they were "deadlocked."). Here, the Division's insistence on preparing for the jury to have difficulty reaching a unanimous verdict is telling, but speculative. Because defendants (and the Division) cannot predict if or under what circumstances a modified *Allen* instruction may be appropriate, defendants believe this issue should be resolved if and when it arises at trial.

### Q. Disputed Instruction No. 39: Partial Verdict Instruction

The Division's proposed instruction is premature. "A judge is not required to inform the jury in every case that it may return a partial verdict, nor does he become obliged to do so at the first sign of disagreement among the jurors." *U.S. v. Moore*, 763 F.3d 900, 911 (7th Cir. 2014). "Whether and when to advise the jury that it may return a partial verdict . . . and at what point during deliberations . . . are necessarily discretionary and fact-dependent decisions." *Id*. at 910. A premature partial verdict instruction is highly prejudicial to defendants. *See, e.g.*, *Moore*, 763 F.3d at 908 (7th Cir. 2014) (vacating verdicts after district court "erred in inviting a partial verdict before the jury indicated that further deliberations would be fruitless as to any unresolved counts"); *U.S. v. Araiza*, 449 F. App'x 671, 672 (11th Cir. 2011) (vacating conviction because "there was insufficient justification to take a partial verdict"); *U.S. v. Benedict*, 95 F.3d 17, 20 (8th Cir. 1996) (vacating conviction after district court "abused its discretion by instructing the

jury to announce verdicts on three counts before it had ended its deliberations on one closely-related count").  Because defendants cannot predict if or under what circumstances a partial verdict instruction may be appropriate, defendants believe this issue should be resolved if and when it arises at trial.  Accordingly, the Division's jury instruction should be rejected.

Dated:  February 22, 2022                    Respectfully submitted,

Jeffrey Stone                              /s/ *John F. Walsh III*
Daniel Campbell                            John F. Walsh III
McDermott Will & Emery LLP                 Wilmer Cutler Pickering Hale & Dorr LLP
444 W Lake St.                             1225 17th Street, Suite 2600
Chicago, IL 60606                          Denver, CO 80220
(312) 984-2064                             (720) 274-3154
jstone@mwe.com                             john.walsh@wilmerhale.com

Justin P. Murphy                           John C. Dodds
McDermott Will & Emery LLP                 Morgan Lewis & Bockius LLP
500 North Capitol Street, NW               1701 Market Street
Washington, DC 20001-1531                  Philadelphia, PA 19103-2921
(202) 756-8018                             (215) 963-4942
jmurphy@mwe.com                            john.dodds@morganlewis.com

*Counsel for Defendant Kent Thiry*          *Counsel for Defendant DaVita Inc.*

## CERTIFICATE OF SERVICE

I certify that on February 22, 2022, I filed the above document with the Clerk of the Court using CM/ECF, which will send electronic notification thereof to all registered counsel.

/s/ *John F. Walsh III*
John F. Walsh III