```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF COLORADO

 3   Criminal Action No. 21-cr-229-RBJ

 4    UNITED STATES OF AMERICA,

 5          Plaintiff,

 6          vs.

 7    DAVITA INC. and KENT THIRY,

 8          Defendants.

 9   ----------------------------------------------------------------

10                     REPORTER'S TRANSCRIPT

11                       Motions Hearing

12   ----------------------------------------------------------------
              Proceedings before the HONORABLE R. BROOKE JACKSON,
13   Judge, United States District Court for the District of
     Colorado, commencing on the 3rd day of March, 2022, in Courtroom
14   A902, United States Courthouse, Denver, Colorado.

15
                            APPEARANCES
16   For the Plaintiff:
     MEGAN S. LEWIS, WILLIAM J. VIGEN, ANTHONY W. MARIANO, and
17   TERENCE A. PARKER, U.S. Department of Justice, 450 5th Street
     NW, Washington, DC  20530
18

19   For the Defendant DaVita Inc.:
     JOHN C. EVERETT, JR., and JOHN C. DODDS, Morgan Lewis & Bockius
20   LLP, 1111 Pennsylvania Avenue NW, Washington, DC  20004

21   JOHN F. WALSH III, WilmerHale LLP, 1225 17th Street, Suite 2600,
     Denver, CO  80220
22
     For the Defendant Kent Thiry:
23   THOMAS MELSHEIMER, Winston & Strawn LLP, 2121 North Pearl
     Street, Suite 900, Dallas, TX  75201
24
     JUANITA R. BROOKS, Fish & Richardson, 12860 El Camino Real,
25   Suite 400, San Diego, CA  92130
```

21-cr-229-RBJ      Motions Hearing     03-03-2022

 1  KEVIN P. CARLIN, RMR, CRR, 901 19th Street, Room A259, Denver,
    CO 80294, (303)335-2358
 2

 3                    P R O C E E D I N G S

 4       (Proceedings commenced at 9:05 a.m.)

 5           THE COURT:  21-cr-229, United States versus DaVita et

 6  al.  I have a sheet with your names, but for the record, please

 7  enter your appearance.

 8           MS. CLINGAN:  Good morning, Your Honor.  Sara Clingan

 9  for the United States.  Joining me at counsel table are my

10  colleagues Terence Parker, Anthony Mariano, William Vigen, and

11  Megan Lewis.

12           THE COURT:  All right.  Thank you.

13           MR. WALSH:  Good morning, Your Honor.  John Walsh for

14  DaVita.  And joining me at counsel table are Clay Everett and

15  Jack Dodds.  And we also have present Kathleen Waters, the chief

16  operator of DaVita as a client representative.

17           MR. MELSHEIMER:  May it please the Court, good

18  morning, Your Honor.  Thomas Melsheimer on behalf of Mr. Thiry.

19  And I'm joined by my partner, Juanita Brooks.

20           MS. BROOKS:  Good morning, Your Honor.

21           MR. MELSHEIMER:  And, Your Honor, Mr. Thiry is also

22  present.

23           THE COURT:  I can see that.  Good morning, sir.  All

24  right.  You have a lot of motions.  You've done what I asked and

25  honed in on those that you particularly want to argue about

21-cr-229-RBJ    Motions Hearing    03-03-2022

 1   today.  I don't care which order you take them.  If you have a

 2   preference, that's fine.  If not, I will just call them off one

 3   at a time.

 4          MS. CLINGAN:  Thank you, Your Honor.  So, we have

 5   about three to five minutes worth of remarks to round out the

 6   *James* hearing, and then my colleagues Ms. Lewis and Mr. Vigen

 7   will handle the motions in the order that they appear on the

 8   proposed joint status report.

 9          MR. WALSH:  And, Your Honor, we're amenable to that

10   approach.

11          THE COURT:  All right.

12          MS. CLINGAN:  So, we will begin with the *James*

13   hearing.  In the hours since United States received defendants'

14   narrowed set of objections to the *James* log entry, we worked to

15   identify areas where we could reach agreement.  And so with that

16   in mind, the United States is going to agree to remove *James* log

17   entries 21, 66, 120, and 121.

18          For the entries that do not appear on defendants'

19   narrowed objections list, the United States would respectfully

20   request a ruling that the entry is admissible without further

21   argument under 801(d)(2)(E).  For the remaining documents, what

22   I've endeavored to do this morning is to group defendants'

23   objections and to briefly respond to them as follows.  So, the

24   first general category of objections that defendants raised to

25   the United States *James* log is an objection to timing.

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    THE COURT:  Would you mind going to the lectern.

2    MS. CLINGAN:  Yes.

3    THE COURT:  And we have a good memory of you from last

4  time, and you're sort of on the border of being on the

5  reporter's bad list.  So, just try to keep it reasonable.

6    MS. CLINGAN:  I certainly don't want to get hurt this

7  morning, Your Honor, so I will slow it down.

8    So, the first category of objections that defendants

9  raise is an objection to timing.  And I will note there that all

10  that's required for purposes of 801(d)(2)(E) is that the

11  participants be a member of a common plan as of the time that

12  the declaration is made.  And that's because conspiracy as an

13  evidentiary rule is much broader than conspiracy as a crime,

14  because 801(d)(2)(E) is founded on principles of agency law, not

15  principles of criminal conspiracy.

16    But moreover, I would note that the indictment alleges

17  that each of the charged conspiracies commenced at least as

18  early as the date specified in the indictments.  And so the time

19  that's identified in the indictments in no way purports to be a

20  hard and fast deadline for the contours of the conspiracy.

21    The second general category of objections that

22  defendants raise is concerning instructions to recruiters or to

23  others whose adherence to the conspiracy was necessary to

24  effectuate the conspiracy.  So, defendant proposes that

25  statements offering guidance to others such as, for example, we

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    can't go directly into DaVita, or client cannot recruit from

2    DaVita, were not in furtherance of the conspiracy because

3    defendants allege those statements could have been for other

4    legitimate reasons.

5          But respectfully, that is simply implausible, because

6    the documents are clear on their face in the contextual

7    information that's provided in the *James* log about what

8    witnesses would say about those statements is that it was

9    necessary to effectuate the criminal conspiracy.

10          Moreover, defendants have offered no color as to what

11   those legitimate business reasons might be at this stage.  Plain

12   and simple, without those statements, for example the client

13   cannot recruit from DaVita, the conspiracy could not have

14   functioned.

15          I also note on this point that the United States need

16   not show at this stage that our interpretation of the documents

17   is unequivocally the correct interpretation.  That's for the

18   jury to decide.  At this stage, we need only show that our

19   interpretation is reasonable, and we have done so.

20          The final general category of objections that

21   defendants raise is that specific declarants, they argue, are

22   not members of the criminal conspiracy.  But for each individual

23   that the *James* log identifies, *James* log entries reflect that

24   the declarant either was explicitly informed of the,

25   quote/unquote, hands off, and agreed to comply with it, or the

21-cr-229-RBJ    Motions Hearing    03-03-2022

1   *James* log entries otherwise establish that the declarant

2   understood the requirements of the agreement and worked to

3   further those requirements.

4          At trial, defendants can argue that some of the

5   declarants lacked knowledge of the complete picture of the

6   conspiracy, but for purposes of 801(d)(2)(E), we've met our

7   burden, which is simply to show a common plan.  The United

8   States has nothing further on the *James* log, Your Honor.

9          THE COURT:  All right.

10         MR. WALSH:  Your Honor, I will be similarly brief on

11  this question.  First of all, pursuant to the Court's

12  instruction and on the Court's representation that the Court was

13  likely to find that enough had been shown for this purpose to

14  establish a conspiracy on each of the three counts, we narrowed

15  our remaining objections to 60 -- approximately 60 statements,

16  which we've summarized in a two-page document for the Court's

17  benefit.

18         Let me address very quickly --

19         THE COURT:  Is this what we got last night?

20         MR. WALSH:  And, Your Honor, we had not expected that

21  we would be arguing this today, and for that, I have already

22  apologized to counsel for the Government.  We did not intend to

23  put them in that position, but I think Ms. Clingan has had an

24  opportunity to focus on where we are.  Our thought was that we

25  would have further discussion about that.

21-cr-229-RBJ    Motions Hearing    03-03-2022

1      THE COURT:  Okay.  Well, probably obviously what you

2   filed last night, I haven't had a chance to digest yet.

3      MR. WALSH:  Obviously, Your Honor.  My comments will

4   be just focused on Ms. Clingan's comments, because I think it's

5   easy to address in the same categorical way.

6      First of all, the point about timing, it's a

7   statement-by-statement kind of consideration.  Certainly it's

8   true that the standard for the co-conspirator's statement

9   exception is broad, and broader than the beyond a reasonable

10  doubt standard at trial.

11      Having said that, if you look at the specific

12  statements we have identified as being outside the conspiracy

13  period, far from showing a common plan, they often show actual

14  disagreement and argument between the people involved.  For that

15  reason, when the Court goes through those statements, I think

16  the Court will agree those are not statements that can properly

17  be considered part of a conspiracy for purposes of the

18  exception.

19      Secondly, on the question of recruiters -- and a key

20  point, again, statement-by-statement, is that in a number of

21  instances, we are not talking about situations where the alleged

22  statement is from a member of the conspiracy identified in the

23  *James* log to a recruiter, but an independent statement by a

24  recruiter more generally.

25      For example, you may recall the statements that Carrie

21-cr-229-RBJ    Motions Hearing    03-03-2022

1   Mayhan put into a database last week.  Carrie Mayhan being a

2   recruiter, sort of out in the flow of traffic, articulating

3   reasons that could have been -- or failing to articulate any

4   reason why recruiting could not happen at DaVita -- into DaVita,

5   which could be explained by non-conspiratorial reasons.

6          Contrary to what Ms. Clingan said, I think we have

7   articulated what some of those bases might be.  For example, the

8   business relationship between the companies, strategic

9   partnerships, things of that sort.

10         So, for that reason, again, on a statement-by-statement

11  basis, we believe our objections to the admission of these

12  statements under the co-conspirator exception is appropriate.

13         THE COURT:  Okay.  Let me ask this:  You say business

14  partnerships, or dealings between the companies.  That raises in

15  my mind the question of whether you're going to or not going to

16  pursue an ancillary defense?

17         MR. WALSH:  And, Your Honor, Mr. Everett is prepared

18  to go into greater detail on that subject in connection with the

19  Government's motion on that.  Our -- I think it's notable when

20  you look at the evidence that will be presented, that we believe

21  should be presented at trial, there are a number of statements,

22  and there's substantial evidence indicating that in some

23  situations where companies were in business talks or in joint

24  ventures, they in fact decided to hold off on recruiting from

25  each other, and that's not alleged by the Government to itself

21-cr-229-RBJ    Motions Hearing    03-03-2022

1   be a part of the conspiracy.

2          But as I said, Mr. Everett is in a better position to

3   give you the details of our position on that.

4          THE COURT:  Okay.  So far, from what you just said, I

5   will say that I'm thinking you're not going to defend on the

6   basis that it's an ancillary agreement, but maybe you will say

7   something different.

8          MR. WALSH:  And then the third categorical point that

9   Ms. Clingan made related to specific persons who we've objected

10  to as not being part of the conspiracy.  Again, it's an

11  individual-by-individual, statement-by-statement analysis, but I

12  will give an example of the sorts of objections we've made.  A

13  gentleman by the name of Tom Usilton is not listed for count one

14  as a member of the conspiracy, and yet there are statements that

15  the Government has put forward by Mr. Usilton allegedly in

16  furtherance of the count one conspiracy that we think they

17  haven't satisfied their burden on.

18         But again, we tried to be specific in our short outline

19  that we provided the Court as to each of the statements and the

20  basis therefore.  So, that's all I have on this subject, Your

21  Honor.  And again, we certainly understand that the Government

22  didn't have time and the Court didn't have time to fully digest

23  or digest at all what we filed last night, but we did not

24  anticipate arguing this this morning.

25         THE COURT:  Okay.  All right.  Now, where are we?

21-cr-229-RBJ    Motions Hearing    03-03-2022

1          MR. VIGEN:  Your Honor, we would suggest that we move

2     on to the expert motion.

3          THE COURT:  Okay.  106.

4          MR. VIGEN:  Yes, Your Honor.

5          THE COURT:  Concerning Dr. Cremieux?

6          MR. VIGEN:  Excuse me?

7          THE COURT:  Dr. Cremieux?

8          MR. VIGEN:  Yes, Your Honor.  I don't necessarily know

9     how to pronounce his last name, but that is as good a guess as

10    mine.

11         MR. EVERETT:  That is correct, Your Honor.

12         MR. VIGEN:  So, Your Honor, this motion was filed at

13    the explicit Rule 702 deadline back in mid December.  It also

14    addressed Rule 16 issues.  At this point we're past Rule 16.  We

15    have put the defendants on notice, or they were on notice prior

16    to the deadline that they needed to meet their Rule 702

17    obligations by then, and our motion moves to exclude under Rule

18    702 for the disclosed opinions not being relevant and reliable.

19         THE COURT:  What do you mean by Rule 16 issue?

20         MR. VIGEN:  Well, whether it complies with the

21    disclosure obligations and discovery under Rule 16, the notice

22    that they --

23         THE COURT:  You're dropping that argument now.

24         MR. VIGEN:  We're past that at this point.  This is

25    now solely focused on a motion which we also moved under back in

21-cr-229-RBJ    Motions Hearing    03-03-2022

1   mid December under Rule 702.  Defendants have the burden of

2   establishing relevance and reliability.  All they have put

3   before Your Honor is the expert disclosure under Rule 16, or

4   however they want to phrase it.  That's all Your Honor has at

5   this point.

6          We submit and we explained in our motion why those

7   opinions are not relevant, why they are not reliable.  There's

8   one minor issue, which is that last night, we did receive an

9   amended disclosure.  I do have that.  It's not before Your

10  Honor.  It only adds a few sentences to each or to most of the

11  sub opinions.  I think four in total.  And it also adds another

12  sub opinion that we also believe is irrelevant.  Again, that's

13  not before Your Honor.  I would also move to exclude those, and

14  I can explain that as we get into it, but I want for context to

15  let you know that that is one of the situations that is in terms

16  of the status quo.

17         So, I want to focus on the reliability issues in the

18  disclosure.  Under *United States versus Nacchio* in the Tenth

19  Circuit, it's very clear that defendants have the burden,

20  they've been on notice since mid December that they need to

21  satisfy that.  And again, all we have is this very short

22  four-page disclosure.  They need to show to the Court's

23  satisfaction that the data used is reliable, that the method

24  used is reliable, and that the application of the method to the

25  data is reliable.

21-cr-229-RBJ     Motions Hearing     03-03-2022

1         THE COURT:  So, you have said two or three times

2    already that you only have the briefest of description as to

3    what this guy is going to say, but they have an obligation to

4    produce his report.  Where's the report?

5         MR. VIGEN:  I don't have it.  I have a summary of

6    conclusions.

7         THE COURT:  Right.  I'm kind of asking them.  Where's

8    the report?  Yes, sir?  Just say your name.

9         MR. EVERETT:  Clay Everett, Your Honor.  So, our

10   understanding is that under the criminal rules, unlike under the

11   civil rules, there is not a requirement to produce a report in

12   advance of trial.

13        THE COURT:  So, he's never prepared a report?

14        MR. EVERETT:  That's correct.

15        THE COURT:  So, all you know is what he's told you in

16   some discussion or something?

17        MR. EVERETT:  So, he has done analysis.  He has not

18   prepared a formal written report.  He would not at trial --

19        THE COURT:  How do you know what he's going to say?

20        MR. EVERETT:  Based on his analysis.

21        THE COURT:  Based on his analysis?

22        MR. EVERETT:  That's correct, Your Honor.

23        THE COURT:  What's his analysis?  Is it written?

24        MR. EVERETT:  It is -- so, there is -- it's described

25   in the disclosure, Your Honor.

21-cr-229-RBJ    Motions Hearing    03-03-2022

1          THE COURT:  Is it written?

2          MR. EVERETT:  There are -- first of all, it's written

3   in the disclosure.

4          THE COURT:  If he hasn't done a report, what has he

5   done that you have seen?

6          MR. EVERETT:  Certainly, Your Honor.  So, what he's

7   done is he's analyzed data.  There's output from that analysis

8   of data.  There are visuals that ultimately we would seek to

9   introduce as demonstratives at trial that result from that, and

10  from which he draws opinions.

11         THE COURT:  Okay.  But I still haven't gotten an

12  answer.  Has he given you some sort of a memo?  Something?

13         MR. EVERETT:  No, Your Honor.

14         THE COURT:  He's just given you visuals?  Charts?

15         MR. EVERETT:  We've talked to the expert.

16         THE COURT:  You've talked to the expert?

17         MR. EVERETT:  Yes, sir.

18         THE COURT:  But he hasn't given you anything at all in

19  writing, except charts?

20         MR. EVERETT:  That's correct, Your Honor.

21         THE COURT:  Have you given the Government the charts?

22         MR. EVERETT:  We have not.

23         THE COURT:  Why?

24         MR. EVERETT:  Again, our understanding is that those

25  would be produced when demonstratives are produced in advance of

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    trial.

2              THE COURT:  If you don't give the Government the

3    charts and do it promptly, that guy will never see the light of

4    this courtroom.

5              MR. EVERETT:  Understood, Your Honor.

6              THE COURT:  Is that clear?

7              MR. EVERETT:  It is.

8              THE COURT:  When are you going to give them the charts

9    and anything else that he's given you?

10             MR. EVERETT:  So, Your Honor, I think we can give them

11   the charts in advance of trial, within the next couple of weeks,

12   certainly.

13             THE COURT:  Within the what?  The next couple weeks?

14             MR. EVERETT:  Tomorrow.

15             THE COURT:  Tomorrow.

16             MR. EVERETT:  Yes, Your Honor.

17             THE COURT:  By tomorrow, you are going to give the

18   Government everything that is written that you have received.

19             MR. EVERETT:  From our testifying expert, yes, Your

20   Honor.

21             THE COURT:  For this witness.

22             MR. EVERETT:  Yes, Your Honor.

23             THE COURT:  Do you have any other experts?

24             MR. EVERETT:  That is the only expert, Your Honor.

25             THE COURT:  All right.  Well, tomorrow you're going to

21-cr-229-RBJ   Motions Hearing   03-03-2022

 1   get some more.

 2             MR. VIGEN:  Your Honor, I greatly appreciate that,

 3   obviously.  And I do need to note, though, for Your Honor, under

 4   *Nacchio*, it is the Court's obligation prior to allowing this

 5   testimony for the Court to perform the gatekeeping function for

 6   the Court to have this information to determine whether the

 7   expert's analysis is reliable.  If the Court does not have

 8   that -- a summary chart given to us tomorrow will not establish

 9   that even for us, let alone the Court.

10             So, *Nacchio*, where the defendants did the same thing

11   that they did here, it was a white collar case, insider trading,

12   they thought that what they were doing was complying with

13   discovery.  We're not talking about discovery.  We're talking

14   about Rule 702 and reliability.  They did not establish that for

15   the Court, and the Court excluded the expert under Rule 17, and

16   that exclusion was affirmed by the Tenth Circuit.

17             THE COURT:  So, the debate here, as I understand it,

18   is the Government has taken from our order on the motion to

19   dismiss two concepts, which they -- I mean, the defendant has

20   taken from our order two concepts.  Let me start that over.  The

21   parties have taken from our order two concepts that seem to form

22   the basis for their debate.  Whether an agreement was formed,

23   and whether it was done intentionally to allocate the market;

24   right?  We see that throughout the motions.

25             And here, the dispute is that the defense says the

21-cr-229-RBJ     Motions Hearing     03-03-2022

1   opinions of this guy are relevant to those two points; right?

2   That's their argument.

3           MR. VIGEN:  I would agree that's their argument.

4           THE COURT:  And your argument is, no, they're really

5   trying to show reasonableness, which is the argument that the

6   Government doesn't have to show in a per se case; right?

7           MR. VIGEN:  Yes, Your Honor.  That's on the relevance

8   point.  So, for example, opinion F, we believe is irrelevant to

9   an ancillary defense.  That's where he states that these types

10  of agreements, quote/unquote, may help other joint economic

11  activity, but under the ancillarity --

12          THE COURT:  I can't hear you.  You're just not

13  speaking loudly enough.

14          MR. VIGEN:  Under the ancillarity doctrine, it's not

15  sufficient for it to -- it may help joint economic activity.

16  The restraint or the agreement needs to be subordinate to an

17  actual economic activity.

18          THE COURT:  I think they're not going for the

19  ancillary defense.

20          MR. VIGEN:  It appears that way to me, and so in that

21  case, opinion --

22          THE COURT:  Their submitted jury instructions didn't

23  have an instruction on that.

24          MR. VIGEN:  I agree.  So, for that point, I would say

25  that opinion F with the expert is irrelevant, because he's

21-cr-229-RBJ    Motions Hearing    03-03-2022

 1  purporting to talk to ancillarity issues.

 2          THE COURT:  But some of his opinions arguably are

 3  relevant to whether there is an unlawful agreement, and whether

 4  they intentionally entered into it; right?  That's their

 5  argument, and I think I agree with that.

 6          MR. VIGEN:  Well, Your Honor, in fairness, that is why

 7  I started with the reliability issue and your gatekeeping

 8  function.  We don't have the data.  We don't have whether he

 9  performed a statistical analysis, whether in the literature that

10  is typically done by an economist, whether --

11          THE COURT:  You will have that tomorrow.

12          MR. VIGEN:  I don't know if I will know that tomorrow,

13  and Your Honor will not have that tomorrow to perform the

14  gatekeeping function.

15          THE COURT:  When they give it to you, they will give

16  it to us.

17          MR. VIGEN:  Okay.  I would ask Your Honor to reserve

18  the right to file an additional motion on that point if we

19  believe what we receive is insufficient under *Daubert* and Rule

20  702.

21          THE COURT:  You can file it, but let me tell you, I'm

22  in trial right now.  Not today, but Tuesday, Wednesday, and

23  tomorrow.  They won't agree that the trial is finished.  We'll

24  have a lot of dispute about that tomorrow around 5 o'clock.  I

25  start another trial Monday, three weeks.  And then your trial.

21-cr-229-RBJ    Motions Hearing    03-03-2022

1   So, you can file motions, but I can't promise that I will have a

2   lot of time to look at them.

3           MR. VIGEN:  I certainly appreciate that, Your Honor.

4   I would just note for the record that we will be raising this at

5   some point before they put on their expert at trial.  Your Honor

6   will need to perform a gatekeeping function on reliability, and

7   we will see what they give us tomorrow.

8           THE COURT:  And then the weirdest thing is, with

9   respect to motion 106, you make these arguments, and then you

10  say, but the Government requests a *Daubert* hearing if the motion

11  is denied.  When are we going to hold a *Daubert* hearing, if not

12  today?

13          MR. VIGEN:  Well, I agree, Your Honor.  And *Nacchio*

14  speaks to that.  There wasn't time for one.  In that case they

15  did not hold one, and the Court excluded it because the

16  defendants did not meet their burden.

17          THE COURT:  The other time to do it is during the

18  trial.  We interrupt the trial and do a *Daubert* hearing.

19          MR. VIGEN:  That would be one option for Your Honor to

20  consider.

21          THE COURT:  Why didn't you schedule a *Daubert* hearing

22  before now?

23          MR. VIGEN:  With respect, Your Honor, the defendants

24  opposed it, which is why we filed that as an alternative relief

25  in our motion in December.

21-cr-229-RBJ    Motions Hearing    03-03-2022

1          THE COURT:  All right.  Anyway.

2          MR. VIGEN:  Thank you, Your Honor.

3          THE COURT:  All right.  I guess he's finished.  Now,

4  what's your response on 106?  He's finished because he doesn't

5  have anything to argue about, practically, because you haven't

6  shown him much.

7          MR. EVERETT:  Yes, Your Honor.  So, first of all, we

8  will produce those charts as indicated tomorrow.  We are happy

9  if it would be useful to the Court to prepare an actual written

10 report as one would in civil litigation.  You know, it's our

11 understanding that that's not typically done, but -- in criminal

12 cases, but we're happy to do that.

13          But, Your Honor --

14          THE COURT:  You're happy to do that?

15          MR. EVERETT:  Well, "happy" may not be exactly the

16 right term, but we are certainly willing to do that if it would

17 be helpful for the Court.

18          THE COURT:  Who would prepare it?  This Dr. Cremieux?

19          MR. EVERETT:  Yes, Your Honor.

20          THE COURT:  He can prepare a report.  When is he going

21 to do that?

22          MR. EVERETT:  That will take, I would say a week,

23 rather than tomorrow, because he doesn't have anything prepared.

24          THE COURT:  Well, all right.  So, he's going to

25 prepare a report, and the Government is going to have that

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    information, and then you're going to want a *Daubert* hearing,

2    maybe, sometime.  When are we going to do that?

3              MR. EVERETT:  So, that is the question, Your Honor.

4    So, I expect, frankly, that you should be able to assess

5    reliability based on the papers, that an actual hearing will not

6    be necessary.

7              THE COURT:  Possibly, but unless they're willing to

8    waive a hearing -- and maybe they will be once they have the

9    report.  Maybe they will just say, Judge, you decide.  But isn't

10   the hearing mandatory if they want one?

11             MR. EVERETT:  I don't believe so, Your Honor.  I

12   believe that's -- it's completely in your discretion how to

13   exercise your role as the gatekeeper for expert testimony.

14             THE COURT:  I think that if a party that is opposing

15   an expert on Rule 702 grounds wants a hearing, the party is

16   entitled to it.  Most of the time, in my experience, people will

17   say, we don't need the hearing.  Read the report.  Read our

18   brief.  You decide.  But I think they're entitled to the

19   hearing.

20             MR. EVERETT:  If necessary, we can have a hearing

21   before Dr. Cremieux testifies in the middle of the trial.

22             THE COURT:  Well, we may have to do that.

23             MR. EVERETT:  Understood, Your Honor.

24             THE COURT:  I mean, I tend to agree with you.  I think

25   some of his opinions probably are relevant to those two issues.

21-cr-229-RBJ    Motions Hearing    03-03-2022

1          MR. EVERETT:  And so that's really, frankly, where I

2   would structure my argument, if you're -- if you'd like to hear

3   about it.  So, I'm happy to walk through his opinions if it

4   would be helpful.  I do think that the opinions are uniformly

5   relevant, either to the issue of whether there was in fact a

6   market allocation agreement here, and/or whether there was a

7   purpose to allocate markets.

8          So, there are two of his opinions that are disclosed

9   that relate to the effects that an economist would typically

10  expect to see in the market, if there was in fact a market

11  allocation agreement.  And Dr. Cremieux has analyzed data on

12  employee separation rates to determine whether those rates were

13  depressed during the periods of the alleged conspiracies.

14         And in particular, what he's done is compared rates of

15  turnover, rates of separation for DaVita against national

16  benchmarks which we've identified for the Government that are

17  produced by the Bureau of Labor Statistics, both inside and

18  outside the conspiracy.

19         So, and typically, what an economist would expect if

20  there was in fact an agreement to allocate markets that was

21  focused on labor markets, is that a goal and expected outcome of

22  that would be depressed separation rates.  And in fact, he

23  doesn't see that.  So, we think that that -- that opinion is in

24  fact relevant to the underlying question of whether there was an

25  agreement.  I'd note --

21-cr-229-RBJ     Motions Hearing     03-03-2022

1       THE COURT:  When you say separation rates, do you mean

2    separation that resulted in movement to the other party?

3       MR. EVERETT:  So, separation -- and there is an

4    opinion that relates specifically to movement to the other party

5    here as well, but this is more generally.  So, separation rates

6    at DaVita, people who left DaVita for other employers, and what

7    the rate of those were at the director and above level over

8    time.

9       THE COURT:  So, he's -- your theory -- or his theory

10   is that if they didn't resign any more often or any less often

11   than average, then that shows something?

12      MR. EVERETT:  Or more specifically, that they didn't

13   move away from DaVita more or less often, and that is suggestive

14   that in fact there was not a market allocation agreement.

15       Likewise, another effect that an economist would expect

16   to see if there was a market allocation agreement that was

17   focused on labor markets is a depression in salary or wages.

18   And so Dr. Cremieux has analyzed the salary information of

19   DaVita, and in particular calculated median annual salaries for

20   DaVita director and above employees over time, and likewise

21   compared those to a benchmark that's prepared by the Bureau of

22   Labor Statistics about the salaries of senior executives at

23   outpatient healthcare companies.

24       And likewise, his conclusion, his opinion is that the

25   pattern of the salaries does not show that they were in fact

21-cr-229-RBJ   Motions Hearing   03-03-2022

1    depressed, which he opines is inconsistent with the idea that

2    there is an underlying market allocation agreement.

3           So, those are his two primary opinions that relate to

4    analysis of wages and of separation rates and how they relate to

5    the underlying question of whether in fact there was a market

6    allocation agreement.

7           I just note in this respect that focused on completely

8    different markets, and so different analysis, but this is the

9    type of analysis that Judge Brimmer admitted in the chickens

10   case, which is ongoing right now.  Which is a, you know,

11   traditional price-fixing case, but there again, Judge Brimmer

12   found that analysis of, in that case prices and price movements

13   over time was relevant to assessing whether in fact there was an

14   agreement at issue.

15          So, third opinion of Dr. Cremieux is related to the

16   issue that you mentioned before, which is movement between the

17   alleged co-conspirators.  And Dr. Cremieux has analyzed

18   information about which employees moved from DaVita to each of

19   the other alleged co-conspirators and vice versa over time, both

20   inside and outside the alleged conspiracy periods.

21          Again, there is evidence that he derives opinions from

22   that in fact there was movement during the alleged conspiracy

23   periods, which is inconsistent with the underlying idea that

24   there was a market allocation agreement to cease competing

25   between companies for employees.  So, that's his third opinion.

21-cr-229-RBJ    Motions Hearing    03-03-2022

1      Dr. Cremieux also talks about incentive.  So, this

2  relates to the underlying question of whether there was a

3  purpose to allocate markets, which is squarely, we believe, an

4  important issue for the jury to decide.  And so what

5  Dr. Cremieux analyzed here was, again, information about

6  separation by DaVita employees where those employees moved to

7  other companies, which he can identify from LinkedIn and other

8  data, and where DaVita hired from over time.

9      And again, his analysis of that suggests that there are

10 in fact hundreds of different companies from which DaVita hired,

11 and to which DaVita executives moved over time, which in his

12 opinion as an economist, it suggests that there is not an

13 economic incentive, or at least less of an economic incentive to

14 enter into a market allocation agreement with the three

15 companies that are identified as alleged co-conspirators in the

16 indictment.

17      And in that respect, I'd point the Court to the *Bogan*

18 *and Hodgkins* decision out of the Second Circuit, which looks at

19 exactly this type of evidence, and concluding in the context

20 there of an alleged agreement about the movement of Northwest

21 Mutual Life agents between general agents and Northwest Mutual

22 Life that in fact there was not a market allocation agreement,

23 because there were many other potential, in that case, employers

24 available in the market, and so it was inconsistent with the

25 idea of a market allocation agreement.

21-cr-229-RBJ    Motions Hearing    03-03-2022

1       Dr. Cremieux has opinions, again, based on his analysis

2   of incentives, which is at the heartland of what economists do,

3   that evidence about -- well, let me back up.  So, the Government

4   presumably will put on evidence -- they've already previewed

5   some of it in the *James* hearing -- about decisions that the

6   individual alleged co-conspirators made about how to approach

7   recruiting in various different respects.

8       Dr. Cremieux has an opinion that that -- those sorts of

9   actions are actually in the independent self interest of the

10  underlying companies, and therefore at least potentially it

11  doesn't support the inference that in fact there was an

12  agreement in his opinion.  So, that also goes to the underlying

13  question of whether there was a market allocation agreement.

14      And then the last of Dr. Cremieux's opinions is the one

15  that you highlighted before, which is relating to incentives

16  that companies have and that individuals may have in relation to

17  business partners or those with whom they have a business

18  relationship.  And in that case, again, they may have an

19  independent economic interest in imposing -- self-imposing

20  restrictions on perhaps their recruiting or hiring or other

21  activities in the market.

22      Again, suggesting that there may be other purposes for

23  any market behavior that may be observed, and likewise, that the

24  inference that the Department of Justice would presumably ask

25  the jury to draw, that these actions were the result of

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    agreement, can't be drawn from the economic perspective.

2         THE COURT:  Are you arguing in this case that the

3    agreement is an ancillary agreement?

4         MR. EVERETT:  So, Your Honor, we -- to be honest, I

5    don't think we've firmly decided exactly how we're going to

6    argue the issue.  I think, ultimately, as we'll talk about in

7    connection with the ancillarity motion that the Department of

8    Justice filed, that the evidence that they're seeking to exclude

9    is all relevant regardless of whether there's a formal

10   ancillarity defense asserted or not.

11        THE COURT:  Why is it that you haven't decided that

12   you're going to defend on that basis?  You've had plenty of time

13   to think about it.

14        MR. EVERETT:  That's fair, Your Honor, but we're, I

15   think, still figuring out our trial strategy.

16        THE COURT:  Huh.  Okay.

17        MR. EVERETT:  Okay.  So, those are Dr. Cremieux's

18   opinions.  We think all of them are relevant to fundamental

19   issues in the case.  I think the 702 issue that we've talked

20   about -- first of all, there's a Rule 16 issue.  As I understand

21   it, the Department of Justice is not pursuing either amendment

22   of the Rule 16 disclosures or other relief in relation to the

23   Rule 16 obligations.

24        With regard to 702, you know, as we've talked about

25   already, we will provide information that will supplement the --

21-cr-229-RBJ    Motions Hearing    03-03-2022

1  and allow the Court to assess the reliability of the expert's

2  testimony.

3                 THE COURT:  All right.  Thank you.  What's next?

4                 MS. LEWIS:  Thank you, Your Honor.  Next, I believe we

5  have the Government's motion in limine on excluding the

6  pro-competitive effects.

7                 THE COURT:  I can't hear you.  Go to the lectern,

8  please.

9                 MS. LEWIS:  Thank you, Your Honor.  Megan Lewis for

10  the United States.  Next we have the Government's motion in

11  limine to exclude evidence pertaining to matters such as

12  pro-competitive effects, good intentions, lack of harm, and

13  justification evidence.  That's ECF number 107.

14                 THE COURT:  Okay.

15                 MS. LEWIS:  And as part of this argument, Your Honor,

16  we may also address the issues pertaining to our motion in

17  limine to exclude the ancillarity evidence, which is ECF number

18  144, given the overlap in some of these legal concepts.

19                 THE COURT:  That's the evidence that they haven't

20  decided if they're going to put in or not.

21                 MS. LEWIS:  That's correct, Your Honor.  And our

22  position on that is that it's insufficient to meet the

23  requirements of the ancillary restraints doctrine.

24                 So, Your Honor, the evidence of the pro-competitive

25  effects, good intentions, lack of harm, and justification is

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    impermissible evidence in a per se unlawful employee allocation

2    conspiracy that is charged here.  And as we've seen from the

3    defendants' submissions, as well as what they've said in court

4    today, they have indicated that they intend to offer evidence

5    and argument that pertains to things such as employees'

6    salaries, their investments in their employees, certain

7    instances of pro-competitive benefits, and specifically business

8    transactions.

9         The Sherman Act case law is clear that under a per se

10   offense, this type of evidence is precluded as justification to

11   the per se unlawful employee allocation agreement.

12        THE COURT:  Except that their argument is that it

13   tends to show that there was not an agreement, or if there was

14   an agreement, they didn't intend that it be an agreement to

15   allocate the market.  That's kind of their omnibus or ubiquitous

16   argument.

17        MS. LEWIS:  And assuming that we all agree on the

18   basic foundational principles that that type of evidence does

19   not come in as a justification to the agreement, I would like to

20   address why it is not relevant to the elements of a Sherman Act

21   case.

22        So, the elements that we need to prove for a per se

23   unlawful employee allocation conspiracy that we have here are

24   element number one, that the conspiracy to allocate employees

25   that's alleged in the indictment existed at or about the time

21-cr-229-RBJ     Motions Hearing     03-03-2022

1    alleged.  That's element one.  Element two, as Your Honor

2    correctly noted, that the defendants knowingly, voluntarily,

3    intentionally joined that conspiracy to allocate employees.

4         The evidence that they're suggesting does not negate

5    the existence of that conspiracy or those conspiracies, and it

6    does not go to intent.  So, for example, the salary information

7    that they are saying does not make the existence of a conspiracy

8    to allocate employees less probable.  In other words, cases that

9    they are drawing from where they say price-fixing cases, that

10   type of evidence has been allowed, simply are not applicable in

11   an employee allocation case, where the intent and purpose of

12   that conspiracy was to keep the employees off limits for their

13   competing employer.

14        We have not alleged wage-fixing as part of this charge

15   in this indictment.  So, it simply has nothing to do -- it is

16   being offered as an improper justification to show that DaVita

17   wasn't that bad because they paid their employees well.

18        The same is true for these instances of purported

19   pro-competitive justifications with regard to individuals who

20   may have received a promotion or perhaps some sort of salary

21   increase as a result of the provision of the conspiracy that

22   required them to notify their current employer before they could

23   proceed seeking employment at a competing employer.

24        Not only is that not pro-competitive, we would argue,

25   because an employee is always free to do that -- they don't need

21-cr-229-RBJ     Motions Hearing     03-03-2022

1   to be forced into doing that through the operation of the

2   conspiracies -- but that type of evidence that in some instances

3   it may have resulted in a benefit to the employee is simply

4   justification evidence that is not permissible in a per se

5   unlawful conspiracy.

6           And any evidence of the defendants' sort of capital

7   investments, their investments in their employees, is likewise

8   not relevant to a per se employee allocation conspiracy.  That's

9   the type of evidence that was raised by the defendants in the

10  Fifth Circuit case of *Cadillac Overall Supply Company*, where the

11  defendants there were arguing that because they put up all of

12  this capital investment to acquire a customer, it somehow

13  justified or made reasonable their agreement not to solicit

14  customers from their competitors.

15          The Court rejected that out of hand, saying it was a

16  per se unlawful conspiracy not to solicit each other's

17  customers, notwithstanding the capital investment in those

18  customers.  We saw the same thing play out in the *United States*

19  *versus Kemp* case here in the Tenth Circuit.

20          I also want to address why this type of evidence does

21  not go to the intent element that the defendants knowingly,

22  voluntarily, and intentionally became a member of a conspiracy

23  whose purpose was to allocate employees.

24          THE COURT:  Why wouldn't the investment in the

25  employees and the desire to keep their management or other

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    employees be relevant to what their intent was?

2              MS. LEWIS:  Yes, Your Honor.  Because I think the

3    relevant intent here is the intent to allocate employees.  It

4    does not matter whether they have invested in those employees or

5    have not invested in those employees.  The intent of the

6    agreement is to keep the employees off limits from the competing

7    employer.

8              And I think that the Sherman Act case law is clear that

9    the intent to restrain trade is found in that intent to enter

10   the unlawful conspiracy to allocate employees.  That comes from

11   the Supreme Court, the Tenth Circuit in *Suntar Roofing*, and

12   other circuits across the United States that have looked at that

13   issue.  You don't need a specific intent to produce

14   anticompetitive effects when you enter a per se unlawful

15   agreement.

16             And what defendants are doing is incorrectly conflating

17   the issues of intent and purpose of the conspiracy with motive

18   and justifications of the conspiracy.  And for example, we see

19   that in connection with their purported business reasons,

20   business justifications for these conspiracies.

21             They suggested that if they entered into a conspiracy

22   to allocate employees for the purpose of entering business

23   relationships, that somehow that is negating the intent to

24   allocate employees.  That's simply incorrect, and it does not

25   comport with conspiracy law.

21-cr-229-RBJ     Motions Hearing     03-03-2022

1       And I think, Your Honor, if we take that out of the

2   white collar context, it's clear why.  Because if you have a

3   conspiracy, for example to rob a bank, the conspirators may have

4   robbed the bank because they wanted to buy new cars.  They might

5   want to feed their families.  They might want to just not

6   irritate the other members of the conspiracy.  It doesn't mean

7   that the object and the purpose of that conspiracy wasn't to rob

8   the bank.  The reasons why they did it or what they would have

9   done with the money simply isn't relevant.  And that's exactly

10  the same proposition that we have here.  It's no different in

11  the antitrust context.

12      And I think you can see why, because we don't allow

13  competing companies to agree to fix prices or not go after each

14  other's customers simply because they might want to engage in

15  business transactions with their competitor someday.  So, the

16  object of the conspiracy is what you intend the agreement to do

17  and what the agreement itself is doing as its function, and here

18  the object of the conspiracy is to allocate employees between

19  the employers.

20      The business deals may have been their motive for the

21  conspiracy, but they certainly don't justify the conspiracy, and

22  they certainly don't change what the object of the conspiracy

23  was.

24      And I think, Your Honor, that's absolutely consistent

25  with how the Tenth Circuit has viewed this issue, when the

21-cr-229-RBJ     Motions Hearing     03-03-2022

 1   customer allocation jury instruction was given by the district

 2   court in *Suntar*, which stated that it is not necessary to

 3   consider why the acts were committed, their effect on the

 4   industry, or any other explanatory matter.

 5           I would like to briefly address how this goes with the

 6   ancillarity issue, because they -- as they've indicated that

 7   they're suggesting that somehow maybe it's ancillary, maybe it's

 8   not.  So, I will start with the proposition of if the defendants

 9   could make a showing that they have properly met the

10   requirements of the ancillary restraints doctrine, I agree that

11   that would be a defense to a per se Sherman Act charge, but the

12   transactions that they've identified on their exhibit list and

13   what they've discussed and proposed here today simply do not

14   meet that threshold showing.

15           For a restraint to be ancillary, it has to be part of a

16   transaction, and it has to facilitate it.  In legal terms,

17   that's the subordinate, collateral, and necessary to that

18   transaction.

19           I think the classic example of an ancillary restraint

20   is when you have two competing companies that are selling

21   business units to each other, where as part of the transaction

22   docs, you might see there's a covenant by the selling company

23   not to solicit either customers or employees from that business

24   unit for a certain amount of time, and that's because that's

25   necessary to that transaction to give that business unit value.

21-cr-229-RBJ    Motions Hearing    03-03-2022

1        In other words, nobody would buy that business unit if

2   you could immediately remove all of the customers and the

3   employees that went with it.  So, again, it's subordinate to the

4   broader transaction necessary and part of it and facilitating

5   it.

6        That's very different from the CEO-to-CEO agreements

7   that we see here.  The gentlemen's agreements that we have here

8   are not time-bound.  They are not part of any business

9   transaction, and they are certainly not necessary to any

10  business transaction.  What we see is the gentlemen's agreement

11  coming first, and then we see they are later not irritating each

12  other by not soliciting each other's employees.  And that is not

13  a sufficient reason, nor should they be allowed to justify the

14  per se unlawful employee allocation conspiracy between their

15  companies by later business deals that they may have done.

16        And with that, Your Honor, I will reserve if there's

17  any time for rebuttal on that point.

18        THE COURT:  Okay.

19        MR. EVERETT:  All right.  Your Honor, again, Clay

20  Everett for DaVita.  So, the fundamental underlying flaw in the

21  Department of Justice's argument is to disregard what is

22  actually alleged here in the indictment.  So, as we briefed, as

23  we argued, as you decided, the underlying agreement that is

24  alleged to have violated the antitrust laws here, agreements,

25  are non-solicitation agreements.  It is not clear as a legal

21-cr-229-RBJ   Motions Hearing   03-03-2022

1    matter whether in fact non-solicitation agreements will amount

2    to market allocation agreements.  And ultimately, the per se

3    rule applies only if there was an agreement to allocate markets.

4         Here, a central issue in this trial will be whether in

5    fact, A, there were non-solicitation agreements, but B, also,

6    whether those non-solicitation agreements, if they are proved,

7    had the purpose of allocating the market.

8         And all of the evidence -- and frankly, as I just went

9    through in relation to the expert, is relevant to determining

10   whether in fact there was a purpose to allocate the market.  It

11   can't be inferred, as the Department of Justice is suggesting,

12   just from an argument or an allegation that there was an

13   agreement not to solicit employees.  That's a central issue in

14   this case.

15        And all of the -- the evidence about in fact what

16   happened in the market, which they're claiming is evidence about

17   harm, goes to the issue of whether in fact there was a purpose

18   to allocate the markets to interrupt competition here, or

19   whether there was some other purpose.

20        The discussions about strategic partnerships between

21   SCA and DaVita, whether they are ultimately argued as part of a

22   defense of ancillarity are nonetheless clearly relevant to the

23   question of whether there was in fact a purpose to allocate

24   markets here, or whether the underlying agreements that the

25   Government has charged, a non-solicitation agreement between

21-cr-229-RBJ    Motions Hearing    03-03-2022

1   DaVita -- or three non-solicitation agreements between DaVita

2   and three other companies had a different purpose.

3          And again, I would point the Court to case law that

4   we -- that the Court addressed in our decision on the motion to

5   dismiss, which -- the *Bogan and Hodgkins* case, which again, the

6   Court there, the Second Circuit found that there was not a per

7   se market allocation agreement, in part because of other

8   opportunities for employees to move, other employers to which

9   they could move, and other opportunities for competition.

10          So, ultimately, all of the evidence that they're

11   claiming now is irrelevant to any underlying issue.  It's

12   clearly relevant to those issues, and their attempts to elide

13   that by suggesting that in fact they've alleged something that

14   they have not, which is a market allocation agreement, can't

15   change the fact that ultimately, that's what they're going to

16   need to prove beyond a reasonable doubt.

17          So, Your Honor, just a couple of points in relation to

18   specific pieces of evidence that Ms. Lewis referenced.  So, in

19   relation to her argument that evidence about effects on salaries

20   is somehow irrelevant to the question of whether there was a

21   purpose or an agreement to allocate markets frankly just doesn't

22   make sense as a matter of economics.

23          So, ultimately, the purpose of any market allocation

24   agreement is to affect the market, and ultimately through the

25   price mechanism, which is the mechanism through which market

21-cr-229-RBJ    Motions Hearing    03-03-2022

1   transactions are mediated to affect prices.  If there's not that

2   effect -- and here again, our expert has opinions about whether

3   in fact that effect can be seen, then that would tend to

4   indicate that in fact there wasn't a market allocation agreement

5   or a purpose to allocate markets.

6           In relation to the evidence that she referenced about

7   notice effects, and in particular the fact that individuals who

8   provided notice to DaVita often received increased compensation

9   or other efforts to compete for that employee is not relevant, I

10  would just note a couple of things.

11          First of all, the underlying premise of her argument

12  that that should somehow be excluded, notwithstanding the fact

13  that it clearly goes to the question of whether in fact there

14  was an agreement to allocate markets as opposed to some other

15  sort of agreement, that fundamentally, they have not alleged

16  that in fact there was an agreement to provide notice that

17  allocated markets.

18          Their only allegation relating to notice is that notice

19  was an enforcement mechanism for the underlying agreement, which

20  they claim was an agreement to allocate markets, which was -- or

21  which were, I guess, three alleged non-solicitation agreements.

22          So, I would just note that it clearly is inconsistent

23  with the idea that there somehow was an underlying market

24  allocation agreement that the parties would set an enforcement

25  mechanism that promoted competition.  So, to suggest that

21-cr-229-RBJ     Motions Hearing     03-03-2022

1   somehow that's not relevant to the question of whether there was

2   an underlying market allocation agreement or a purpose to

3   allocate markets frankly doesn't make any sense.

4         I didn't hear a response to the evidence that we talked

5   about before, the analysis that Dr. Cremieux did about

6   separation rates between the companies.  That in fact, movement

7   between the companies is inconsistent with the idea that there

8   was a market allocation agreement, or more broadly, that there

9   was not a depression in the turnover rates or the separation

10  rates at DaVita during the alleged conspiracy period.  That

11  again is inconsistent with the idea that there was an underlying

12  market allocation agreement, which is their ultimate burden to

13  prove here.

14        In relation to the ancillarity evidence in particular,

15  again, ultimately there's a separate question about how that

16  evidence will be argued, but we believe that what they're

17  calling ancillarity evidence should be admitted regardless, that

18  it is clearly relevant to the underlying questions about whether

19  there was a purpose to allocate markets.

20        It's moreover clearly intrinsic to the underlying

21  evidence at issue here.  So, I just point out that in their

22  opposition to our motion in limine to exclude evidence of

23  pre-conspiracy conduct, the Department of Justice argues that

24  all the pre-conspiracy evidence is relevant and should be

25  admitted because it is intrinsic to understanding the underlying

21-cr-229-RBJ     Motions Hearing     03-03-2022

1  agreement, because it provides context and background that

2  explains what they allege was an agreement.

3          It's more than a little ironic that they claim that

4  such pre-conspiracy evidence before the period that they allege

5  there was a conspiracy in effect is relevant and important

6  background, but evidence about what the parties were actually

7  doing with one another, the discussions that they were having

8  about clearly legitimate business transactions and relationships

9  is somehow irrelevant or not important context.

10          THE COURT:  Is it equally ironic that you want to keep

11  out the pre-conspiracy evidence?

12          MR. EVERETT:  Well, so, I think there is a -- and I

13  think you will hear argument from Mr. Dodds about this later,

14  there is clearly some -- at least of that evidence that has --

15  that does not provide the background that the Department of

16  Justice is suggesting.

17          THE COURT:  You use the word "clearly" pretty -- it

18  flows like, what, trippingly from your tongue.  Clearly, there's

19  nothing clear about this, in my view.

20          MR. EVERETT:  Well, that may well be true, that in

21  fact -- and that I think is an important piece of context in

22  general for assessing these motions, that it is a complicated

23  underlying factual background, and there is a lot of underlying

24  factual context that ultimately is going to be relevant and

25  important for the jury to consider.

21-cr-229-RBJ    Motions Hearing    03-03-2022

1          So, in relation specifically to the evidence that

2    they're calling ancillarity evidence, which is evidence about

3    business relationships between DaVita and SCA, throughout the

4    period that they're alleging there was a conspiracy, I think

5    it's worthwhile to note that, again, there is this evidence

6    about discussions prior to 2012, when they allege there was a

7    conspiracy that started, but they allege a conspiracy period

8    beginning in February of 2012.

9          And the question is, what changed?  What happened?  And

10   the evidence will show there is exhibits on our exhibit list

11   that show emails between Mr. Thiry and the CEO of SCA on

12   January 30th, 2012, where DaVita indicates that it is willing to

13   enter into discussions about a strategic partnership or

14   relationship with SCA.

15         Likewise, the evidence will show that SCA, throughout

16   the period that is alleged to be a conspiracy, viewed DaVita as

17   an important strategic partner.  It repeatedly referred --

18         THE COURT:  There wasn't any strategic partnership.

19   Why are you saying this?

20         MR. EVERETT:  So, Your Honor, the -- again, the --

21         THE COURT:  This whole business about your ancillarity

22   defense strikes me as -- I don't know.  At best, it pulls you

23   off your main theme.  Your theme is whatever agreement there

24   was, we didn't intend it to be an allocation agreement.  That's

25   your basic argument in this case; right?

21-cr-229-RBJ    Motions Hearing    03-03-2022

 1          MR. EVERETT:  So, again, that is clearly an important

 2   argument that we will make, and that is central to the defense.

 3   It's not the only argument.  And there is a question of

 4   whether --

 5          THE COURT:  You're going to argue that there was a

 6   strategic partnership?  Really?

 7          MR. EVERETT:  So, the question is how SCA viewed it.

 8   They did view that there was a -- that DaVita was their

 9   strategic partner.

10          THE COURT:  I'm not really too sure if the question is

11   how they viewed it.  They're not the defendant here.  DaVita is.

12          MR. EVERETT:  So, the question is what motivated their

13   underlying behavior, and whether that --

14          THE COURT:  You're going to argue to this jury that

15   there was a strategic partnership between DaVita and SCA?  Yes

16   or no.

17          MR. EVERETT:  I will argue -- we will argue to the

18   jury that SCA viewed DaVita as a strategic partner, that there

19   were hundreds of discussions over the course of the conspiracy.

20          THE COURT:  So, basically you won't answer my

21   question?

22          MR. EVERETT:  So, I think that DaVita and SCA viewed

23   one another as strategic partners.  There's an email that is

24   cited in paragraph 11E of the indictment where -- that HR had --

25   of SCA very clearly indicates in response to a question -- or to

21-cr-229-RBJ     Motions Hearing     03-03-2022

1   an outreach by a DaVita employee that they were not able to

2   proceed with recruiting that employee because DaVita was a

3   strategic partner, and they did not recruit from their strategic

4   partners.

5           THE COURT:  Well, I won't tell you how to argue your

6   case, of course, Mr. Everett, but if whether you win or lose

7   depends on whether you convince a jury that there was some sort

8   of a strategic partnership that made this non-solicitation

9   agreement necessary for business purposes, I predict you will

10  lose that case.

11          MR. EVERETT:  Understood, Your Honor.

12          THE COURT:  Sometimes you get too greedy with your

13  arguments, and you get what you ask for.

14          MR. EVERETT:  So, the underlying question at this

15  point, though, is whether the evidence relating to discussions

16  and relationship between DaVita and SCA is relevant.  And we do

17  think that it is relevant to the underlying question of whether

18  there was a purpose to allocate markets.

19          THE COURT:  All right.  Thank you.

20          MR. EVERETT:  Thanks.

21          THE COURT:  What's next?

22          MS. LEWIS:  I believe, Your Honor, the next motion up

23  on the docket sheet is their motion.

24          MS. BROOKS:  Your Honor, with the Court's permission?

25          THE COURT:  You're lucky.  You can allocate all these

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    different motions to different people.  I can't.

2              MS. BROOKS:  Thank you, Your Honor.  I understand

3    that.  And thank you, Your Honor, for allowing me to appear in

4    front of the Court this morning.  This is my first time here.

5    It's a pleasure.  I will be trying the case on behalf of

6    Mr. Thiry, along with my colleague Tom Melsheimer.  Your Honor,

7    this is the defense motion --

8              THE COURT:  So, just a minute.  You are?

9              MS. BROOKS:  Juanita Brooks.

10             THE COURT:  Juanita Brooks?

11             MS. BROOKS:  Yes, Your Honor.

12             THE COURT:  Thank you.

13             MS. BROOKS:  Thank you.  Your Honor, the motion is the

14   defense motion to keep out the compensation of Mr. Thiry.  I

15   won't repeat our briefs.  The case law is clear that that kind

16   of evidence can lead the jury to have extreme bias against

17   someone they view as making --

18             THE COURT:  Oh, no.  Juries are not that shallow.  But

19   which part of the compensation evidence?  There's a lot of

20   different pieces here.  There's salary.  There's options.  There

21   is incentives.  You're trying to keep it all out, I know, but

22   don't just lump it all together.  Go piece by piece, because the

23   answer might be different.

24             MS. BROOKS:  Your Honor, I would say that hopefully I

25   can short circuit this.  The Government says that they would

21-cr-229-RBJ    Motions Hearing    03-03-2022

1   like to introduce evidence of Mr. Thiry's total compensation.

2   That would include all those different categories Your Honor

3   just mentioned.  They say they would like to do that because it

4   shows his motive for entering into a conspiracy to allocate the

5   market.

6          And they cite on page three of their brief the proxy

7   statement of DaVita, where it says that company-wide factors

8   taken into consideration by the compensation committee to

9   assess, and then there's an ellipses, contributions include but

10  are not limited to, and there's another ellipses, management

11  performance in attracting and retaining high-performing

12  employees throughout our organization and succession planning.

13          THE COURT:  Is that true?

14          MS. BROOKS:  Yes, Your Honor.  That is one of 14

15  factors that the compensation committee takes into

16  consideration.

17          THE COURT:  How can you -- how can you argue that that

18  is irrelevant to determining motive?

19          MS. BROOKS:  Oh, Your Honor, I'm not.  What I was

20  about to say is we would stipulate that that is one of 14

21  factors that the compensation committee takes into

22  consideration.  We would also stipulate to the admissibility of

23  that portion of the proxy statement, which runs from page 57 to

24  page 60, at least on the one exhibit the Government points out.

25  They have nine other proxy statements on their exhibit list.

21-cr-229-RBJ   Motions Hearing   03-03-2022

1   The page numbers might be slightly different, but we would also

2   stipulate to the admissibility of that portion of the proxy

3   statement that talks about what the company looks at in

4   determining compensation, or what they call NEOs, which are

5   named executive officers.  So, we would stipulate to all of

6   that, Your Honor.

7            THE COURT:  Is compensation already public

8   information?

9            MS. BROOKS:  The compensation would be if the jurors

10  went out and researched it, yes.  Hopefully they --

11           THE COURT:  What are you so afraid of?  You're afraid

12  that these jurors that are going to decide the fate of DaVita

13  and Mr. Thiry are so shallow that just because he's a rich man

14  that made a lot of money, they're going to find that he's

15  guilty?  Come on.  Really?

16           MS. BROOKS:  Your Honor, I've been trying cases for 42

17  years.  I totally believe in the jury system.  I totally believe

18  the jurors take their oath very seriously, and I also believe

19  they try to do Herculean work to set their prejudices outside

20  the courtroom door when they walk in.

21           But also, in the course of trying many, many of these

22  cases, we -- for example, it's not unusual to do focus groups

23  and see what motivates jurors, and one of the biggest things

24  they have the most trouble getting over is someone who makes

25  significantly more than they do, and --

21-cr-229-RBJ     Motions Hearing     03-03-2022

1      THE COURT:  Then why can't we just deal with that --

2  and I don't believe that, by the way, but why can't we just deal

3  with that with a limiting instruction?

4      MS. BROOKS:  That certainly would be helpful, Your

5  Honor, yes.  We would ask that just that number be kept out, but

6  I understand if Your Honor is saying it's coming in, then we

7  would certainly ask that a limiting instruction be given.

8      THE COURT:  What's the number?  What's the public

9  number?

10     MS. BROOKS:  I believe the number as cited in the

11  Government's paper on page three is 15.3 million for the year in

12  question, which I think was 2016.

13     THE COURT:  That's about half of what a top tier

14  quarterback makes.  The jurors see stuff like that every day.

15  What does LeBron James make?  What does Patrick Mahomes make?

16  What is Aaron Rodgers going to demand?  It's funny money, but

17  there are people out there that make that kind of money.

18  Whether they should, that's a different issue, but they do.

19  It's unfortunately maybe commonplace.  So, what's the big

20  mystery here?

21     MS. BROOKS:  There isn't, Your Honor.  We're just

22  concerned about the inflammatory effect, and there is case law

23  where the Courts have kept it out on many occasions.  The case

24  law the Government cites for where Courts have let it in, it's

25  tied much more directly to the charged action.  For example, in

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    the *Reyes* case --

2            THE COURT:  By the way, I don't really understand why

3    the Government wants it in either.  These jurors are going to

4    know that someone like Mr. Thiry gets paid a lot of money.

5    That's not going to be a surprise to them.  It would be a

6    surprise to them if he didn't.  My God, they're not stupid

7    people.

8            MS. BROOKS:  Absolutely not.  As I said, I very much

9    believe in the jury system.

10           THE COURT:  They might be shocked at how little

11   federal judges make.

12           MS. BROOKS:  I'm quite sure, Your Honor.

13           THE COURT:  Compared to lawyers that appear in front

14   of federal judges.

15           MS. BROOKS:  Understood, Your Honor.  So, Your Honor

16   asked a very interesting question.  Why does the Government want

17   this?

18           THE COURT:  Well, that's -- I don't know.

19           MS. BROOKS:  They did cite what I just said is that's

20   one of 14 factors.  So, we've agreed to stipulate to all of

21   that.  So, if we've agreed to stipulate, we would stipulate that

22   Mr. Thiry was well compensated.  We are afraid of the number

23   being inflammatory.  I would submit that the Government is

24   hoping the number will be inflammatory.

25           THE COURT:  You've got bigger issues to worry about

Case 1:21-cr-00229-RBJ Document 200 Filed 03/06/22 USDC Colorado Page 48 of 127

21-cr-229-RBJ    Motions Hearing    03-03-2022

1  than that.

2          MS. BROOKS:  We do, Your Honor, but again -- this

3  isn't a hill that I'm going to die on, Your Honor.  If Your

4  Honor thinks the amount should come in, certainly with a

5  limiting instruction, we would ask -- and of course, as I said,

6  we would stipulate to that portion of the proxy statement as far

7  as the 14 factors, so at least we could show that that one is

8  only one of 14, and we could show what the other 13 are.

9          THE COURT:  Maybe the Government would like it that

10  way.  Maybe they would like a stipulation that says Mr. Thiry

11  makes boodles of money, and one factor in the boodles is that

12  factor.  Maybe they'd like it that way.  Would you?

13          MR. VIGEN:  Your Honor, we just heard this proposed

14  stipulation, but I would consider it.  But it would be something

15  that we would consider.

16          THE COURT:  If you want to consider it, consider it.

17  Answer my question.

18          MR. VIGEN:  I do think it is important for us to have

19  the relative sizes --

20          THE COURT:  Why?  Why does the jury need to know how

21  much money the guy makes?

22          MR. VIGEN:  It's the relative sizes of the defense and

23  the companies that are on the other sides of the agreements, and

24  it's motive to why they would go into the agreements, because of

25  the potential for retaliation.  That backs up what we expect the

Kevin P. Carlin, RMR, CRR
Proceedings reported by mechanical stenography; transcription

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    testimony to be.

2            THE COURT:  I don't understand that at all.  So, he

3    makes $15 million a year, and one of the factors is how well he

4    keeps people in-house?  Okay.  The jury knows that.  Now, how

5    does that help your case?  Tell me.

6            MR. VIGEN:  One of the factors is what, Your Honor?  I

7    apologize.

8            THE COURT:  One of the factors in his compensation is

9    that he gets incentives tied to count retention.  They're going

10   to stipulate to that.

11           MR. VIGEN:  That shows motive for entering into the

12   agreement.

13           THE COURT:  They don't deny that.  They deny that it

14   was a motive for entering into the agreement, but they agree

15   that it's relevant.  But why is the $15 million relevant?

16           MR. VIGEN:  The $15 million is relevant as a relative

17   comparator to the other co-conspirators and what they made.

18           THE COURT:  So, the president of SCA didn't make

19   15 million?

20           MR. VIGEN:  That's correct.

21           THE COURT:  How much did he make?

22           MR. VIGEN:  I do not have the specific number to

23   provide, Your Honor.

24           THE COURT:  Then how do you know that it's different?

25           MR. VIGEN:  From going in terms of what we expect the

21-cr-229-RBJ     Motions Hearing     03-03-2022

1   testimony to be, we do expect the testimony in terms of relative

2   size of the co-conspirator companies and the defendants to be --

3   have been a factor in their motivation to enter into the

4   agreement.

5          THE COURT:  But you're not talking about relative

6   size.  You're talking about the compensation of the senior

7   executive.  How much does the president of SCA make?  How much

8   does the president of the B and C companies make?  You don't

9   even know.  So, how could you tell me that it's the relative

10   comparison of salaries that makes Thiry's salary relevant?

11          MR. VIGEN:  In terms of the specific number, that's

12   not our concern.  Our concern is the relative size.

13          THE COURT:  Oh.  So, now you don't care about the

14   number anymore?

15          MR. VIGEN:  I believe our brief stated that the

16   relative size is what was the motivating factor, and that's

17   something --

18          THE COURT:  So, how about we just instruct the jury

19   that -- if it's true, and you don't even know if it's true --

20   that Thiry made more money than the presidents of these other

21   companies?

22          MR. VIGEN:  If we could allow the witnesses as well to

23   testify in terms of the relative size.  We don't need to get

24   into a specific number, but we would be willing to stipulate to

25   that, so long as our --

21-cr-229-RBJ     Motions Hearing     03-03-2022

1          THE COURT:  We don't know the relative size.  I just

2    asked you what it was, and you said you didn't know.

3          MR. VIGEN:  With respect, Your Honor, I don't know the

4    specific number, but I do know the relative sizes that the

5    defendants are larger than the co-conspirator companies.

6          THE COURT:  How much larger?

7          MR. VIGEN:  I don't have an --

8          THE COURT:  You don't know.  You're going to know by

9    trial.  You're going to have some witness that will know?

10          MR. VIGEN:  Yes.

11          THE COURT:  And so this whole argument of yours is

12    based on relative size is going to await the trial, and then

13    we're going to hear that the president of SCA made 14 million,

14    or made 5 million.  Why does it matter?

15          MR. VIGEN:  The specific number, I agree, Your Honor,

16    we would be happy to not go there.  But we do want to have those

17    percipient witnesses who made the agreement with the defendants,

18    they will testify to the motivating factors of entering into

19    that agreement, one of which was fear of retaliation, and behind

20    that is the relative size of the companies.

21          THE COURT:  The relative size of the companies.  We've

22    been talking about Mr. Thiry's compensation package.

23          MR. VIGEN:  Well, both defendants, in terms of their

24    influence on the industry and the effects of retaliation for

25    hiring.

21-cr-229-RBJ     Motions Hearing     03-03-2022

1        THE COURT:  Well, if you're depending on showing that

2    Thiry was highly compensated to win your case, I don't want to

3    buy futures in your case.

4        MR. VIGEN:  That is not the focus of our case.  This

5    is a very small point in terms of what we are attempting to

6    elicit from the witnesses in terms of relative size and also

7    motivation for the defendants based on how Mr. Thiry was

8    compensated at DaVita for --

9        THE COURT:  So, you're at least admitting that it's

10   not one of your bigger arguments?

11       MR. VIGEN:  Yes, Your Honor.

12       THE COURT:  All right.  I agree with that.  I don't

13   think their fear about it is very persuasive either.  Anyway.

14   You're definitely willing to stipulate that whatever he made was

15   a lot of money, and one of the factors in that was incentives

16   tied to talent retention?

17       MS. BROOKS:  Well, Your Honor, I'm not sure we would

18   characterize it as a lot of money, since that's relative to

19   something else, but -- a lot compared to what, I don't know.

20   But as far as what the Government has now said, if all they want

21   to do without using numbers is show through Mr. Hayek that he

22   considers himself half the executive of Mr. Thiry or

23   Mr. Whitney, something like that, I guess we will wait and see

24   what their offer of proof is at trial with the Court's

25   permission, and see whether we object or not, and as far as

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    the -- we do want the ability to introduce the fact that this is

2    only one of 14 factors that an executive is considered for

3    compensation.

4                THE COURT:  Okay.

5                MS. BROOKS:  Thank you, Your Honor.

6                THE COURT:  Maybe you should have Mr. Thiry come to

7    trial wearing like a Good Will suit and unshined shoes and

8    looking kind of like Red Skelton used to look in some of his

9    sets, the hobo look.

10               MS. BROOKS:  Your Honor, I'm embarrassed to say I

11   remember that well.

12               THE COURT:  Well, my law clerks don't know what I'm

13   talking about.  I know that.

14               MS. BROOKS:  I think a lot of people in the courtroom

15   may not, but I remember it very well.  Thank you, Your Honor.

16   We will take that under consideration.

17               THE COURT:  Okay.

18               MS. BROOKS:  Thank you.

19               THE COURT:  Tell me that the next argument isn't

20   Mr. Kogod's affairs --

21               MR. DODDS:  That's after this one, Your Honor.

22   Unfortunately, I did not get that one.  Mr. Melsheimer will be

23   talking to Your Honor about that.

24               THE COURT:  Okay.

25               MR. DODDS:  John Dodds for DaVita, Your Honor.  This

21-cr-229-RBJ    Motions Hearing    03-03-2022

1   motion is our supplemental motion in limine number three, which

2   relates to the Government's intention to call Special Agents

3   Hamel and/or Timens as summary witnesses.  I will try to

4   shortcut this for the Court and just make clear what it is we're

5   concerned about and what we're not concerned about.

6        We have no objection in the abstract to the Government

7   calling a summary witness for proper purposes.  Our concern,

8   Your Honor, is that their intention with either of the agents or

9   both of them is to do some things that we think are not proper

10  purposes under the rules of evidence.

11       They have in response to our motion identified really

12  three things that they say they want to do with the agents'

13  testimony.  One is to offer documents.  Assuming the documents

14  are otherwise admissible, we don't necessarily have a dispute or

15  a beef, if you will, Your Honor, there.

16       Second is offering background testimony about the roles

17  of authors of the documents.  There, we would have an objection,

18  Your Honor, if it was more than just to say that for example the

19  author of this document is Kent Thiry, Kent Thiry was the CEO of

20  DaVita during the relevant time period.

21       If, however, they intend to do something like what we

22  saw Agent Timens do at the *James* hearing, which is to testify

23  about this person's role in the conspiracy, we have an objection

24  to that, because we think it's beyond the proper purpose of a

25  summary witness, and really it is argument for the Government to

21-cr-229-RBJ    Motions Hearing    03-03-2022

1   make to the jury based upon other evidence that's properly

2   admitted.  So, we would have an objection to that.

3          The third thing the Government says it intends to do is

4   offer through the agents summary exhibits of documents that are

5   already entered into evidence.  Now, in that respect, Your

6   Honor, and I don't think we have to take this up now, but we

7   don't think that there are going to be documents in this case

8   that are going to be sufficiently voluminous or of the type or

9   nature of the kinds of documents that are usually put in through

10  a summary witness: telephone records, financial records, those

11  kinds of things.

12         This is a case, really, Your Honor, about emails, and

13  like most cases, while we have --

14         THE COURT:  Well, your own expert is going to be

15  wanting to put in summary exhibits.

16         MR. DODDS:  Fair enough, Your Honor.  Exhibits that

17  describe data that the expert relied upon to reach their

18  opinions, and I do understand that.  I think this type of

19  summary evidence would be -- would be different, because the --

20         THE COURT:  Maybe we ought to hold you in check and

21  see what it is that they do want to do.

22         MR. DODDS:  Happy to do that, Your Honor.

23         THE COURT:  All right.

24         MR. VIGEN:  Your Honor, I actually don't think there's

25  much of a dispute here.

21-cr-229-RBJ     Motions Hearing     03-03-2022

1              THE COURT:  Go up there to the lectern.

2              MR. VIGEN:  Yes, Your Honor.

3              THE COURT:  I mean, basically, my question is do you

4   intend to have your FBI agent do what she did during the *James*

5   hearing?

6              MR. VIGEN:  No, Your Honor.  So, on the first point on

7   gathering documents, there's no dispute.  On the second point,

8   on the background, what the defendants indicated they would be

9   willing to allow us to do is what we expect to do, which is

10  explain who sent the email to who, and what those persons'

11  titles were.  We are not going to have, like Agent Timens did,

12  state this person was a co-conspirator.  That is not our

13  intention.  So, I do not believe there is a dispute with respect

14  to that.

15             On the summary exhibits, there does appear to be a

16  dispute.  And let me just very briefly explain what we would

17  propose to do with the agent with respect to summary exhibits

18  under Rule 611(a).

19             So, we have thankfully reached a stipulation on the

20  vast majority of the documents to be authenticated.  One of the

21  documents that we did not reach an agreement on authentication

22  are the text messages that you saw at the *James* hearing that

23  laid out the comment bubbles to and from.

24             We do have an authentication stipulation on the

25  forensically collected text-by-text messages, and how those come

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    to us is each text is a separate piece of paper, and it has a

2    to, from, and a time in the body of the text message, but it's

3    just one piece of paper after another with different timestamps.

4         So, what we would have the agent do is with a Rule

5    611(a) demonstrative that we would admit into evidence to put

6    those text messages into a format that the jury can readily

7    understand and read.

8         THE COURT:  Which is the bubbles?

9         MR. VIGEN:  Exactly, Your Honor.

10        THE COURT:  They won't stipulate to that?  Yes, they

11   will.

12        MR. DODDS:  Your Honor, I can make it simple.  If

13   that's what they intend, we will stipulate to that.  What we're

14   concerned about is the agent testifying to what those texts

15   mean, what the declarants --

16        THE COURT:  Look at him.  He's shaking his head.

17   We're not going to do that.

18        MR. DODDS:  Then we have no issue, Your Honor.

19        THE COURT:  And by the way, I don't want you to just

20   stipulate to authenticity.  I want you to stipulate to

21   admissibility, unless you have some bona fide objection to it.

22   I don't want to waste a lot of trial time going through the

23   drill of how you get an exhibit admitted if there's not going to

24   be any objection; right?

25        MR. DODDS:  That's correct, Your Honor.  We fully

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    intend to do what Your Honor expects us to do.

2            THE COURT:  So, those bubbles, unless you have some

3    legitimate objection to them, just stipulate to them.

4            MR. DODDS:  Absent a legitimate objection, Your Honor,

5    we will do that.

6            THE COURT:  Okay.  Good.

7            MR. VIGEN:  Unless there are any other questions, I

8    believe that resolves our issues.  Thank you, Your Honor.

9            THE COURT:  What's next?  All right.  The gentleman

10   from Texas is next.

11           By the way, just so that you know for planning

12   purposes, by the time your case comes to trial, we won't have a

13   mask mandate, I don't think.  In fact, as soon as Judge Brimmer

14   issues the newest general order, we aren't going to have a mask

15   mandate, I don't think, but I think what you should anticipate

16   is that, although -- well, let's assume that COVID doesn't take

17   another turn for the worse.  If there's no mask mandate, the

18   individual judges of course will have the right to require masks

19   in their discretion, which I don't necessarily intend to do.

20           And it's not going to depend on whether you're

21   vaccinated or not.  The tricky thing is what to do about the

22   jurors.  And it seems to me that if there are jurors -- or if

23   there are people who aren't jurors who don't feel comfortable

24   being in the courtroom unless everybody is masked, we need to at

25   least know who those people are, and maybe if they're jurors,

21-cr-229-RBJ    Motions Hearing    03-03-2022

1   they're excused.  I don't know.

2          But we follow the CDC guidelines, pretty much, and I

3   think we're at a point in Colorado -- in Denver, not in

4   Colorado, in Denver where I think we're going to be able to see

5   your faces during the trial.  We will keep you up to date on

6   that.  You can keep up to date on that just by looking at the

7   website.

8          MR. MELSHEIMER:  Thank you very much, Your Honor.  I

9   hope you aren't disappointed when you allow us to take our masks

10  down.

11         THE COURT:  And vice versa.  Only John Walsh knows for

12  sure, and vice versa.

13         MR. MELSHEIMER:  Your Honor, may it please the Court,

14  this is actually the Government's motion to exclude something

15  that I don't think is really the issue in our examination of

16  Mr. Kogod.  So, if I might give a little background, Mr. Kogod

17  is an important Government witness.  He's a former senior

18  executive at DaVita, former chief operating officer of DaVita

19  Healthcare Partners, and a former CEO of DaVita International.

20         According to the Government, he claims to have personal

21  knowledge of the alleged conspiracies, and took actions to

22  enforce them.  And as we learned last week, the Government

23  apparently seeks to have Mr. Kogod testify about certain alleged

24  codewords or phrases used by Mr. Thiry in the course of the

25  alleged conspiracy.

21-cr-229-RBJ    Motions Hearing    03-03-2022

1        We do not seek via cross examination to undermine and

2    challenge Mr. Kogod's credibility on the basis of marital

3    infidelity standing alone.  The cases cited by the Government

4    and the ones we have found stand for the proposition that

5    marital infidelity standing alone is not probative of

6    truthfulness under Rule 608.  So, we're not doing that.

7        THE COURT:  All right.  You're not doing that, but now

8    you're going to tell me how you're going to do it.

9        MR. MELSHEIMER:  I'm going to try to, Your Honor.  But

10   we're not going to argue his marital infidelity standing alone.

11   So, the underlying fact -- so, this is all about 608 cross

12   examination.  And the underlying facts which we seek to cross

13   examine him about are not a matter of dispute.  Many of them are

14   already in the public record in a Nevada Supreme Court opinion

15   which is cited in the brief.

16       THE COURT:  Now, this guy is a former DaVita guy?

17       MR. MELSHEIMER:  Yes, sir.

18       THE COURT:  And now he's one of the star witnesses for

19   the Government?

20       MR. MELSHEIMER:  He has a starring role in their case,

21   Your Honor.  Yes.

22       THE COURT:  So, now DaVita is going to seek to

23   undermine their own former executive?

24       MR. MELSHEIMER:  Well, if I have anything to say about

25   it, yes, Your Honor.  We are.

21-cr-229-RBJ    Motions Hearing    03-03-2022

1          THE COURT:  And as part of their undermining, they're

2    going to -- you're going to bring up that this guy had two

3    marriages going at once, and he was untruthful to both of the

4    women?

5          MR. MELSHEIMER:  And he was untruthful to the company,

6    Your Honor.

7          THE COURT:  If he was untruthful to the company,

8    that's something else.

9          MR. MELSHEIMER:  And that's why I say this is

10   different.  So, for example -- and again, there is a

11   salaciousness about this, we admit, but that doesn't make it

12   irrelevant to credibility under 608.  So, for example, he had

13   two children by the wife Nadya.  He represented to the company

14   that those were his grandchildren that he had adopted from his

15   daughter, because among other things, she was a -- his adult

16   daughter, that she was a drug addict who could not care for her

17   own children.

18         THE COURT:  Why is it even relevant to what he said to

19   the company?  Why does the company need to know that?

20         MR. MELSHEIMER:  Well, Your Honor, let me say this:

21   It's not about whether the company needs to know it.  It's about

22   his conduct in falsely representing what he was doing and how he

23   was living.

24         THE COURT:  This is really ugly.  You're -- I can see

25   you're taking Kogod on because he's testifying against DaVita,

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    and saying he's wrong or he's got a motive, he's got an ax to

2    grind, whatever.  But to get into this kind of stuff?  Really?

3    This could backfire on you so badly.

4            MR. MELSHEIMER:  So, Your Honor --

5            THE COURT:  It already is backfiring on you with me,

6    but I'm not -- how I feel about it doesn't matter.

7            MR. MELSHEIMER:  Your Honor, you raise a good point.

8    It may well be that we decide not to endeavor on this cross

9    examination, but I'm being asked to argue it for the

10   Government's motion to exclude it from even being considered.

11   Our point is that you may well be right.

12           THE COURT:  What evidence is it that you want to put

13   in?

14           MR. MELSHEIMER:  Your Honor, it's not evidence under

15   608.  It's questions that I have a good-faith basis to ask the

16   witness that go to his credibility.

17           THE COURT:  Okay.

18           MR. MELSHEIMER:  Did you lead a double life?  Did you

19   lie to DaVita about whether or not you had children or

20   grandchildren?  Did you lie about setting up -- did you lie to

21   your wife about working in California and having to live in

22   California for your child when in fact you were living there

23   with a second family?

24           I think these are all relevant things to his

25   credibility.  He set up trusts using a false identity in

21-cr-229-RBJ    Motions Hearing    03-03-2022

1   California to hide assets from his wife.

2           Now, again, Your Honor, you're totally right.  Back at

3   the hotel we may be thinking, hey, do we really want to get into

4   this?  Look at that jury.  Maybe we decide we don't want to

5   bring this stuff up.  I get that, but this is an in limine

6   motion.  And so all I'm suggesting is under 608, these kinds of

7   facts, this conduct, this deceptive, fraudulent conduct, is

8   something that can be inquired on in cross examination under

9   608.

10          Now, of course, under 608, we're stuck with the answer.

11  So, this fella could deny certain things, and we would be stuck

12  with that, but do I have a good-faith basis to ask them?  I do.

13  Does it go to his credibility and trustworthiness?  I think it

14  does.  And so whether or not we do it or not is a different

15  question.  They're trying to prevent us from even considering

16  it.

17          THE COURT:  I'm trying to?

18          MR. MELSHEIMER:  No.  They are, Your Honor, in their

19  motion.

20          THE COURT:  I'm trying to wonder how it was that you

21  drew the short straw to be the guy to have to ask the question.

22          MR. MELSHEIMER:  You know, how this worked out, Your

23  Honor, last week you said -- you expressed some skepticism about

24  this and why we couldn't agree on it, and they all got together

25  and they said, hey, Melsheimer, you argue that motion next week.

21-cr-229-RBJ     Motions Hearing     03-03-2022

1          THE COURT:  Good for them.

2          MR. MELSHEIMER:  So, Your Honor, I'm going to conclude

3     that we've got cases cited in our brief about false identities

4     being relevant to truthfulness.  I think this gentleman did

5     live -- lead a false identity.  He led a false life.  And I

6     think we can inquire, if we so choose, on cross examination,

7     because I think his lies, his conduct, his deceit, and his fraud

8     goes to whether or not he's a truthful person that the jury

9     ought to be able to consider.  That's our position.

10          THE COURT:  Okay.  And I'm just dying to hear why you

11     want to keep it out.  This could -- this could turn a jury in

12     favor of the -- because I assume he's going to admit it.  He's

13     going to say, yeah, I did that.  I'm not -- I'm ashamed of

14     myself.  I shouldn't have done it.  I was not true to my wife.

15     I was not true to my other wife, whatever.  It was, you know,

16     hate me for that, but I'm telling you the truth about business

17     matters.  That's what's going to happen; right?  Does he care if

18     you can ask -- if they ask those questions?

19          MR. VIGEN:  Your Honor, we have not inquired.  We've

20     made this motion under the case law, and believe it's properly

21     excludable.  We do think it has potential to be prejudicial.

22          THE COURT:  Prejudicial to whom?

23          MR. VIGEN:  Well, to the witness and to the

24     Government's case, if the jury does take it the wrong way.  But

25     that is the assessment that we've made.  We've filed a motion.

21-cr-229-RBJ    Motions Hearing    03-03-2022

1   We think it's improper under the rules and the case law.  To the

2   extent it is salacious, as defense counsel has argued, we just

3   think that goes more to excluding it under Rule 403.  I believe

4   that unless Your Honor has any further questions, I will leave

5   it to your discretion.

6          THE COURT:  Here is my question.

7          MR. VIGEN:  Yes, Your Honor.

8          THE COURT:  Where does the expression "greasy kid

9   stuff" come from?

10          MR. VIGEN:  I do not know.

11          THE COURT:  See.  Tell him.

12          MR. MELSHEIMER:  Your Honor, I believe it's either

13   Brylcreem or Vitalis.

14          THE COURT:  Brylcreem.

15          MR. MELSHEIMER:  Thank you, Your Honor.  Is that going

16   to move you in our favor on this motion?

17          THE COURT:  I'm so old that I remember those old

18   commercials.

19          MR. MELSHEIMER:  Your Honor, can I say this?  In a law

20   school class I used the term "Elmo," and someone raised their

21   hand and said, you mean like on Sesame Street?  That's where we

22   are, Judge.

23          THE COURT:  I think it's greasy kid stuff, is what I

24   think.  Use Brylcreem on your hair, not the greasy kid stuff.

25   But I hear you.  I hear you.

21-cr-229-RBJ     Motions Hearing     03-03-2022

1          MR. VIGEN:  And, Your Honor, I do just want to note

2    for the Court's information, we also had moved in the same

3    docket number 139 to exclude witnesses' criminal histories.  The

4    defendants did not oppose that.

5          THE COURT:  They stipulated to that.

6          MR. VIGEN:  Yes.  I just want to make that clear.  But

7    with that, I will sit down.  Thank you.

8          THE COURT:  Of course the truth is I used the

9    Brylcreem, and look what happened to me.

10         MR. MELSHEIMER:  Your Honor, I actually used some this

11   morning, so I'm not sure it's working.

12         THE COURT:  I get a kick out of you, Mr. Melsheimer.

13   All right.  What's next?

14         MR. DODDS:  Your Honor, I'm up again, John Dodds.

15   This is defendants' supplemental motion in limine number one to

16   exclude the 404(b) evidence, the evidence of uncharged conduct.

17         We received -- we filed this motion, Your Honor,

18   because we received on February 4th a notice -- a letter from

19   the Government telling us that they intended to offer into

20   evidence under 404(b) a set of -- a few sets of emails related

21   to four different people, four different sets of communications

22   between Mr. Thiry and these other people.

23         THE COURT:  Those are all on the *James* log; right?

24         MR. DODDS:  They are all on the *James* log, Your Honor,

25   and they're also attached -- the communications themselves are

21-cr-229-RBJ     Motions Hearing     03-03-2022

1    attached to the Government's opposition to our motion.

2           And I have actually just two things, really, to say

3    overall about this.  First is I think it's important for Your

4    Honor to understand the context of the communications themselves

5    so that we can have a discussion about their probative value.

6    And I will try to do that very briefly.

7           The first set of communications, Your Honor, are

8    between a man named Bill Hughson, another former DaVita

9    executive who went on to run a company called IntegraMed.  And

10   these are communications between Mr. Hughson and Mr. Thiry while

11   Mr. Hughson was running IntegraMed.

12          And in summary, Your Honor, the nature of those

13   communications, it's really three emails, and the nature of the

14   communications is Mr. Hughson telling Mr. Thiry that out of

15   friendship and respect, he will not proactively solicit DaVita

16   employees, Mr. Thiry responding that the way that Mr. Hughson

17   wants to approach this issue probably will not work.

18          And then some months later, Mr. Hughson saying to

19   Mr. Thiry in an email, even though I never heard back from you,

20   I have adhered to the commitment that I made that I won't

21   proactively recruit.  That's the first set of emails.

22          The second is really a single email that involves a

23   current and then board member of DaVita, who is also the CEO of

24   a company called Kindred.  And there is an email between

25   Mr. Thiry and this individual where Mr. Thiry says, I learned

21-cr-229-RBJ      Motions Hearing      03-03-2022

1   that somebody from DaVita was trying to recruit a vice president

2   from Kindred, and I stopped it.  And there's dialogue about how

3   to handle recruiting between DaVita and companies where board

4   members are executives of those companies.  That's the second

5   set of evidence.

6          The third, Your Honor, involves a man named Scott

7   Drake.  Scott Drake was another former DaVita executive.  At the

8   time of the communications he was the CEO of a company called

9   Spectranetics.  And then in this set of communications, it's two

10  emails this time, Your Honor.  Mr. Drake reaches out, apparently

11  unprompted to Mr. Thiry and says, I want you to know that our

12  system and agreement is working.  There was somebody that my

13  company was recruiting from DaVita, and I stopped the process.

14         Mr. Thiry forwards that email up the chain to other

15  people -- there's no one up the chain from him, but to other

16  people within DaVita asking whether we have had the right

17  communications internally, given that Spectranetics, Mr. Drake's

18  company, is likely a DaVita client.  And the response he gets

19  back from the HR director is from a recruiting perspective, we

20  do.  That's the third set of evidence.

21         The final set, Your Honor, involves a man named Steve

22  Priest.  Again, another former DaVita executive.  At this point

23  he's running a company called Spero Health.

24         THE COURT:  I guess DaVita didn't do a very good job

25  of keeping its executives?

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    MR. DODDS:  Your Honor, you will be hearing and the

2  jury will be hearing a fair amount about that very thing.

3  That's correct.  But Mr. Thiry sends an email to Mr. Priest

4  talking about purporting to memorialize a discussion with

5  Mr. Priest where Mr. Thiry says we agreed that if someone from

6  DaVita wants to talk to Spero about being hired, that Mr. Priest

7  would contact DaVita and let them know.

8    Mr. Priest responds, basically, fine, because it's

9  unlikely we will be hiring anybody else this year, but if

10  someone approaches, we will let you know.  And the evidence has

11  some commonality to it in sort of the nature of the

12  communications.

13    Now, there's two problems that we have with this.

14  First is the evidence itself, and second, and maybe even more

15  importantly is the way in which the Government wants to present

16  it.  The Government says that the evidence is admissible under

17  404(b), really for two purposes.  First, to show, and I'm

18  quoting, or at least summarizing the Government's brief, the

19  defendant's knowledge about how to conspire, their opportunity

20  to conspire, their motive to conspire, and their intent to

21  conspire.  That's the first justification.

22    And the second acknowledges Your Honor's holding that

23  they have to prove more than just a non-solicitation agreement,

24  that they have to prove a purpose and intent to allocate the

25  market.  And in fact, they refer to the evidence that I have

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    just described as employee allocation purpose, 404(b) evidence.

2         So, let's just sort of take those justifications, those

3    purported purposes in turn.  First of all, even if the sort of

4    litany of purposes that's recited in the rule that they recite

5    in their brief are facially valid purposes in the abstract, this

6    evidence has as close as you can get to zero probative value to

7    prove those things, and huge capacity, huge prejudicial --

8    unfairly prejudicial purpose here.  In addition --

9         THE COURT:  Well, your team has a pretty expansive

10   view of what tends to show intent and purpose until it comes to

11   this stuff, and now you've got a very conservative view; right?

12   In other words, how you justify the evidence that they're trying

13   hard to exclude that we talked about earlier in this hearing is

14   by showing -- is by arguing that it relates to the motive.

15        All this, is there a purpose to -- is there a benefit?

16   Is there a need to retain people?  Is there this or that?  You

17   say all relates to whether or not they had a motive to allocate

18   the market.  But now you're saying, well, it doesn't have any

19   tendency to show that.  I mean, it seems inconsistent to me.

20        MR. DODDS:  Your Honor, respectfully, I don't believe

21   it is inconsistent, because the type of evidence we're talking

22   about in the two occasions is different.  In the occasion that

23   you discussed with Mr. Everett and others this morning, the

24   evidence about the strategic partnership, that is all evidence

25   that goes to the fundamental question that this trial will come

21-cr-229-RBJ    Motions Hearing    03-03-2022

 1   down to, which is assuming there was an agreement not to solicit

 2   between, for example, Kent Thiry and Andrew Hayek.

 3           THE COURT:  You know, you keep saying that.  To my

 4   view, there was an agreement not to solicit.  The question is

 5   was it an agreement to allocate the market?  You keep hanging

 6   your hat on this, was there an agreement not to solicit?  Yeah.

 7   Wasn't there?  Don't you admit that?

 8           MR. DODDS:  Your Honor, whether we admit it, whether

 9   we don't contest it by the time we get to trial, that's -- I do

10   agree with Your Honor that that's not where the rubber is going

11   to hit the road in this case.  This case is going to be about

12   whatever they agreed to, whether it was a non-solicit, whether

13   it was an agreement to give notice, I don't believe we

14   contest --

15           THE COURT:  I think it was both, wasn't it?

16           MR. DODDS:  I think there were components of both,

17   Your Honor, but the point is that what this case is really going

18   to come down to is whatever the agreement was, however it's

19   characterized, however it's described, yes, there was an

20   agreement.  We might quibble over the details of it, but the

21   question is what was in their minds when they entered into that

22   agreement?  What were they intending?

23           THE COURT:  Right.  It just seems to me that if you're

24   going to defend the case on the basis that there wasn't a

25   so-called non-solicitation agreement or there wasn't this notice

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    component to it, you're setting yourself up for a fall, because

2    the Government can prove that, I think.

3         MR. DODDS:  Your Honor, I appreciate that, and we all

4    do, and understand that that's why I say that this trial is

5    going to be about what the purpose was.  What was in people's

6    minds?  What were they intending to do?  What were they trying

7    to accomplish?

8         THE COURT:  So, the challenge you've got on this

9    so-called 404(b) evidence is to explain why it doesn't tend to

10   show motive and intent.  And I think maybe the answer

11   conceivably could be different as to the four examples that you

12   gave.

13        MR. DODDS:  And that's true, Your Honor.  Let me

14   separate out the Paul Diaz Kindred example from the others.

15   That's the example that involved the member of the board of

16   directors.  That's a discussion that is simply about how do we

17   navigate the complexities that come up when we are competing for

18   talent with companies where executives of those companies, in

19   this case the CEO of the company, is on our board of directors?

20        There's nothing about that conversation, about that

21   dialogue, whatever the details of it were, that tends to prove

22   intent to allocate, purpose to allocate.  It's a sui generis

23   kind of situation that relates to a very specific circumstance.

24        The other three have more commonality to them, Your

25   Honor, because they don't have that board of director

21-cr-229-RBJ    Motions Hearing    03-03-2022

1   complication to it.  And they are, I will acknowledge,

2   conversations that look and feel very similar to the

3   conversations that the Government charged in the indictment.

4           The problem is, Your Honor, they don't --

5           THE COURT:  The first one that you went over seemed a

6   little thin to me, even in terms of was it like the ones between

7   Thiry and the three companies that are involved in the case.  I

8   don't know what to make of the first one.

9           MR. DODDS:  And by that I mean, Your Honor, that they

10  were like the communications that the Government charges in the

11  sense that they are discussions between Kent Thiry and others

12  that pertain to recruiting.

13          THE COURT:  The guy said, we're going to keep our

14  hands off your people.  And Thiry responded, that isn't going to

15  work.  And he responded later, well, we're still going to do it.

16          MR. DODDS:  Out of friendship and respect.

17          THE COURT:  I don't even know what it means when Thiry

18  says that's not going to work.  Maybe the Government can help me

19  there.  I don't even get it.

20          MR. DODDS:  And the fact that at the end of the day,

21  he says I'm going to do it anyway out of friendship and respect

22  is exactly the point.  It's not probative of any of the things

23  for which the Government is offering the testimony.

24          THE COURT:  If somebody just volunteers we're not

25  going to try to hire your people, that isn't evidence of an

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    agreement to violate the antitrust laws.  That's just some guy

2    saying, hey, Thiry, you know, I like you.  You're my friend.  We

3    play golf together.  I'm not going to try to get your people.

4    Now, what his response means, I have no idea.

5             MR. DODDS:  And I agree with Your Honor completely,

6    and I think the same thing for slightly different reasons is

7    true of the Scott Drake Spectranetics communications and the

8    Steve Priest Spero communications.

9             Let me start with the Steve Priest Spero

10   communications.  And this really transitions over, Your Honor,

11   to what may be our bigger concern about this is not just the

12   evidence itself, but the way in which the Government wants to

13   put it before the jury.  They say in their 404(b) notice to us

14   that they intend to call Special Agent Hamel and Dennis Kogod.

15   Now, neither of them are declarants to any of these

16   communications.  Kogod is CCed on a couple of them, but he's not

17   a declarant to any of them, and manifestly, Agent Hamel is not a

18   declarant to any of them.

19            The Government has interviewed every one of those

20   declarants, in particular Mr. Hughson, Mr. Drake, and

21   Mr. Priest, and they have received the proffer from counsel for

22   Kindred about the -- those emails.  And the testimony that

23   these -- the actual declarants would present to the Court and to

24   the jury if the Government tried to prove this with anybody who

25   has firsthand knowledge is that none of this had anything to do

21-cr-229-RBJ     Motions Hearing     03-03-2022

1   with allocating the market.  None of this had anything to do

2   with restricting the movement of employees.

3            And with respect to Mr. Priest, he told the Government

4   that this was entirely because at the time he had this email

5   with Mr. Thiry, he was still bound by his contractual

6   non-solicitation agreement as part of his employment agreement

7   with DaVita, and he was simply trying to find a way to talk to

8   Mr. Thiry about a way to recruit people from DaVita without

9   violating his non-solicitation agreement.

10           That's what the actual declarant would say if presented

11  to testify, but the Government does not want to bring that

12  person in to testify, and wants to present the evidence in a way

13  as if that were not true.

14           With respect to Mr. Hughson, the Government interviewed

15  Mr. Hughson, and we have the 302 for Mr. Hughson that's dated

16  September 15th, 2021.  And Mr. Hughson says -- and he's asked

17  about these communications.  And he says, what he was saying to

18  Mr. Thiry about what he would do and wouldn't do seemed fine to

19  him, because he was doing it anyway, to Your Honor's point, and

20  still hiring a bunch of people from DaVita.

21           He didn't care about giving up the ability to solicit,

22  because he didn't hire people from DaVita that way anyway.  He

23  used his own personal connections, his own network, to, as he

24  put it, put information in to DaVita, hey, I'm looking for

25  someone to fill this role, and he would get expressions of

21-cr-229-RBJ     Motions Hearing     03-03-2022

1   interest back.

2          He told the Government that he thought the notice idea,

3   give us notice, was stupid, and was likely to happen anyway

4   because of their personal relationships.  He told the Government

5   that he felt he had a free hand despite the email in recruiting

6   from DaVita, and that all of this was, as he described it, an

7   olive branch to get Mr. Thiry off his back so he could continue

8   to hire people from DaVita without being constrained in any way.

9          That's the actual evidence related to that --

10          THE COURT:  Well, tell me about the facts again.

11          MR. DODDS:  I'm sorry, Your Honor?

12          THE COURT:  Run those facts about that incident by me

13   again.

14          MR. DODDS:  Yes.  These are the three emails, Your

15   Honor.  These are between November of 2013 and May of 2014.  So,

16   beginning in November of 2013, Mr. Hughson tells Mr. Thiry that

17   he will commit -- you have my commitment not to proactively

18   recruit from DaVita out of friendship and respect, and talks

19   about handling it on a case-by-case basis.

20          Mr. Thiry writes back, and this is the one where

21   Mr. Thiry says, what you're proposing probably won't work.

22          And then months go by with nothing, and then in May of

23   2014, Hughson sends an email to Mr. Thiry responding to nothing,

24   saying, even though I never heard back from you, presumably --

25          THE COURT:  Right.  That's the one we already talked

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    about.

2              MR. DODDS:  Yes.

3              THE COURT:  I thought you had moved on to a different

4    one.

5              MR. DODDS:  I'm sorry, Your Honor.  You were asking --

6    I'm sorry.  I misunderstood what you were saying.  Thank you,

7    Mr. Melsheimer.  I like him a lot, too, Your Honor.  He helps me

8    as well.

9              The last one is a discussion between Steve Priest and

10   Mr. Thiry, Steve Priest being the CEO of Spero Health.  Is that

11   the one Your Honor was referring to?

12             THE COURT:  I think so.

13             MR. DODDS:  Thank you, Your Honor.  I apologize, Your

14   Honor.  That's the one where Kent Thiry is purporting to

15   describe a conversation between him and Mr. Priest, and he

16   writes in the email that the Government wants to admit, we

17   agreed that if someone wants to talk to Spero, someone from

18   DaVita, Mr. Priest would reach out to DaVita and let them know

19   that.

20             And Mr. Spero [sic] responds, it's unlikely that we're

21   going to be hiring anybody else in 2017.  Mr. Spero has told the

22   Government that was because he had a non-compete agreement that

23   went through October of 2017.  But if anybody approaches, I will

24   call you.  That's the one Your Honor was asking about?

25             THE COURT:  Well, the words are we agree.

21-cr-229-RBJ    Motions Hearing    03-03-2022

1        MR. DODDS:  Correct.  Correct.  But the question is,

2   again, the Government really wants to introduce this to show, to

3   Your Honor's point, why we agree.  What is it we're trying to

4   do?  And obviously they have to prove beyond a reasonable doubt

5   here that they were agreeing for purposes of allocating the

6   market.

7        Mr. Spero in his 302 tells the Government that -- first

8   of all, there's no reference to allocating anything, but tells

9   the Government it is entirely about not violating his

10  non-compete.  That incident, just like Mr. Hughson volunteering

11  not to proactively recruit out of friendship and respect, can't

12  be probative of anything that's at issue in this case.

13       THE COURT:  Why wouldn't you want that evidence to be

14  in evidence, because it fits nicely into your theory that what's

15  important here is motive and intent?  And that's a good example

16  to show that there was a completely different motive and intent.

17       MR. DODDS:  So, here is the simple answer to that,

18  Your Honor.  If the Government actually intended to call

19  Mr. Hughson, Mr. Priest, and the others to testify firsthand

20  about what this was all about, I don't think we would have a

21  problem, necessarily.  At least I wouldn't have this argument.

22  What the Government I think wants to do is have Dennis Kogod,

23  who obviously we've talked about, testify about what somebody

24  else's conversations meant and what the intention was behind

25  them.

21-cr-229-RBJ    Motions Hearing    03-03-2022

1       THE COURT:  Well, now, you do have the right -- no
2   obligation, of course, but you have the right to call witnesses
3   on your own behalf.  You could call these guys as witnesses to
4   explain, if you wanted to.
5       MR. DODDS:  We could, Your Honor.
6       THE COURT:  You don't have to.
7       MR. DODDS:  Correct.
8       THE COURT:  You're presumed innocent.  You don't have
9   to present any evidence, but you do have that right if you want.
10      MR. MELSHEIMER:  But two things, Your Honor.  And Your
11  Honor's point is exactly the problem here.  The Government is
12  trying to present what it is presenting as evidence without the
13  actual evidence, without the declarants, by having Mr. Kogod
14  testify about it, and then presumably having the case agent,
15  Agent Hamel testify about what these emails mean.  There's no
16  other way they could present that testimony through those two
17  witnesses.
18      And they are purposely deciding not to call the actual
19  declarants, the people with firsthand knowledge, because they
20  don't like what they would say, because what they would say is
21  there's no conspiracy here.
22      Now, if Your Honor were to allow that, obviously I
23  would hope, at least, we would have the right to cross examine
24  Mr. Kogod and the agent with the fact that during their
25  interviews with the Government, these people all said none of

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    that is true.

2         But the problem is by allowing the Government to do it

3    that way, I think you would be doing something that would call

4    the fairness of the trial into question, because you would be

5    putting on us the burden to prove a negative, the burden to

6    disprove something that the Government has presented,

7    misleading.

8         And the nugget, Your Honor, of my argument on here is

9    really under Rule 611.  Rule 611 gives Your Honor the right to

10   control the order and mode of proof, says that the Court has the

11   right and the responsibility to do that reasonably for various

12   purposes.  One of those purposes, and I would submit to Your

13   Honor the most important purpose is to make sure that evidence

14   is presented in a way that facilitates learning of the truth.

15        That's obviously what's at issue here.  And the way the

16   Government wants to do this would -- and if Your Honor were to

17   allow them to do that, you would be allowing them to present

18   evidence in a way that is contrary to the discernment of the

19   truth, and then placing on us the burden of having to prove

20   something we shouldn't have to prove, and elongating the trial

21   for us to call witnesses that we shouldn't have to call.  That's

22   my argument, Your Honor.

23        THE COURT:  Okay.  Now, Kevin, I'm sorry that I

24   haven't asked for a break earlier, but I'm going to do a break

25   now.  I know you've been going for two hours.  So, let's take

21-cr-229-RBJ    Motions Hearing    03-03-2022

1   about ten minutes here, folks.

2          (Recess at 11:01 a.m., until 11:22 a.m.)

3          THE COURT:  All right.  What do we have next?

4          MR. VIGEN:  Thank you, Your Honor.  William Vigen on

5   behalf of the United States, responding to defendants' motion in

6   limine related to 404(b).

7          Just to slow us into this argument, I want to make two

8   points for the Court's convenience.  One is there was a

9   statement made by defense counsel that all of these documents

10  were on our *James* log.  That is only true with respect to the

11  IntegraMed and Spectranetics documents.

12         MR. DODDS:  That's correct, Your Honor.  I was

13  mistaken.  I apologize.

14         THE COURT:  I was the one that suggested it, so I was

15  the one that was mistaken.

16         MR. VIGEN:  So, with respect to the Kindred and the

17  Spero, those were not included on the *James* log, not because we

18  don't believe that there was a conspiracy that the United States

19  can show with a preponderance of evidence, but because those

20  specific documents are statements of the defendant himself

21  rather than the co-conspirator, so we did not need to rely on

22  the co-conspirator exception for those statements.

23         The second point I would like to make just procedurally

24  or what's on Your Honor's docket is there is on the joint

25  conference statement item number eight, which is the United

21-cr-229-RBJ     Motions Hearing     03-03-2022

1   States motion at docket number 101 that is the motion for a

2   pretrial subpoena of these documents that relate to the

3   privilege issue.

4          More than half of those relate to this 404(b) issue.

5   So, to the extent those documents are provided to the United

6   States, we would like to reserve our opportunity to use those as

7   404(b).  Of course we don't know what's behind the privilege,

8   but --

9          THE COURT:  You're going too fast.  I am not following

10  what you're saying.

11         MR. VIGEN:  Sure.  So, the motion that the parties

12  agreed we could rest on the papers was for a pretrial subpoena

13  of documents that the defense or DaVita specifically has

14  withheld under claims of privilege.  I believe there are 15 such

15  documents.

16         THE COURT:  Which documents?

17         MR. VIGEN:  They are articulated in the motion which I

18  have a copy for.  I can go through the specifics.  But more than

19  half of them relate to this 404(b) issue.  So, it starts with

20  the documents we actually include in our 404(b), but then get

21  forwarded on internally at DaVita with privilege claims.

22         So, it's those that we're challenging.  So, we do want

23  to reserve the right to use those documents, regardless of

24  whether we received those -- if we receive them -- whether we

25  receive them in time for the 404(b) notice to be --

21-cr-229-RBJ    Motions Hearing    03-03-2022

1         THE COURT:  What you're saying, then, is you're not

2    arguing on the 404(b) stuff.  You're saying that in case we get

3    some documents we would like to have, we might have more 404(b)

4    stuff?

5         MR. VIGEN:  I did just want to remind the Court for

6    the record on that point, on the 404(b), which I can tell I

7    should move on to.  Counsel made a number of factual arguments

8    based off 302s they received, or witness proffers about what

9    these other individuals may or may not say, but what is in our

10   *James* notice is that Dennis Kogod, we expect him to testify as

11   to -- at least substantively as to the IntegraMed, Kindred, and

12   Spectranetics issues.

13         And his personal knowledge for that comes from the

14   defendant himself.  So, while he may not be on every email, he

15   is on some of these emails.  While he may not be on every email,

16   he does have personal knowledge because the defendant,

17   Mr. Thiry, told him about it.  So, we would posit that that

18   provides, along with the documents themselves, enough of an

19   evidentiary basis by a preponderance of the evidence to use this

20   under 404(b).  And under 404(b), they are relevant for two

21   reasons.

22         THE COURT:  Which are the ones that Kogod could

23   confirm?

24         MR. VIGEN:  IntegraMed, Kindred, and Spectranetics.

25         THE COURT:  All of them?

21-cr-229-RBJ    Motions Hearing    03-03-2022

1           MR. VIGEN:  Yes, Your Honor.

2           THE COURT:  Now, he argued that -- your opponent

3     argued that in fact, you know good and well that the individuals

4     involved in those communications deny the implication that you

5     are drawing from them.

6           MR. VIGEN:  Well, I disagree with that

7     characterization that they flatout deny the implication.

8           THE COURT:  So, then why don't you call them?

9           MR. VIGEN:  Well, Your Honor, as you know, the

10    witnesses, in terms of their willingness to cooperate, always

11    vary.  We don't need to lard up this trial with additional

12    testimony.  We have Mr. Kogod, who will already be speaking to

13    the substantive counts, and we would intend to put these few

14    emails in along with his statement about the other 404(b)

15    agreements.  And that would be sufficient.  We're not trying to

16    make this a longer trial than necessary.

17          THE COURT:  Are you going to put before the jury the

18    fact that these individuals have been interviewed by the

19    Government and deny the implication that you're suggesting?

20          MR. VIGEN:  I'm not sure how we would do that, but no.

21    We do not intend to do that.

22          THE COURT:  Well, the Government's obligation is to

23    seek the truth, but you want to put in what somebody else says

24    happened without putting in the testimony of the actual person

25    who participated?

21-cr-229-RBJ    Motions Hearing    03-03-2022

1          MR. VIGEN:  Well, we do have the --

2          THE COURT:  And that's seeking the truth.

3          MR. VIGEN:  What we have are the emails that actually

4    reflect in real time what these witnesses said.  So, what they

5    say through their counsel or what they say to an FBI agent

6    trying to shield themselves from an investigation is a separate

7    matter, but what we're trying to seek to admit are the actual

8    emails, the actual evidence of what was said in time, that

9    include such statements as we agreed, and our system slash

10   agreement is working.

11          And I would assert that that goes to the relevance of

12   whether on the charged counts there was an actual agreement,

13   because what the defense intends to argue, I believe -- they're

14   not going to stipulate to an agreement.  What I intend that they

15   will -- anticipate that they will argue is that perhaps there

16   wasn't a complete meeting of the minds, or that on count three,

17   Rich Whitney suggested what he would be willing to do, but

18   Mr. Thiry did not agree to that.

19          We have contrary evidence.  The witnesses will say

20   there was an agreement, but they are going to put that into

21   issue.  And so the fact that there are other similar former

22   DaVita executives who reached similar agreements, and in those

23   emails they used the word "agree" with Mr. Thiry, and Mr. Thiry

24   also used similar language, we would assert that that is helpful

25   to the jury to interpret what actually happened between the

21-cr-229-RBJ    Motions Hearing    03-03-2022

1   charged counts.

2        It also goes directly to intent, which as we learned

3   today, and everyone understands, defendants are going to put

4   directly at issue, and I want to call out two specific documents

5   on that point.

6        THE COURT:  Why don't you talk about that first one

7   that I exchanged conversation with Mr. Dodds about.  And you

8   explain to me how the former DaVita executive's statement, I'm

9   not going to solicit your people, and Thiry's response, that

10   doesn't work, and his later response, well, I didn't hear from

11   you, but I did it anyway, now, you explain to me what that

12   shows, what inference you want the jury to draw from that.

13        MR. VIGEN:  With respect to the IntegraMed documents,

14   I think there's two important things that were overlooked by

15   counsel's statements -- or summary of the evidence.  So, on

16   Exhibit B3, you have Mr. Hughson's statement to the defendant,

17   Mr. Thiry, I will respect your proposed process with regard to

18   people who come to me looking for opportunities.

19        And he reiterates that later on.  And Mr. Thiry, in

20   response in Exhibit B2, said, all I said was you could expect

21   fierce competition if you pursue our people.  And Mr. Hughson

22   responds, as I said, I will never pursue people who work at

23   DaVita.  Combined with Mr. Kogod's anticipated testimony, that

24   is enough by a preponderance of the evidence to show that an

25   agreement was made and reached with respect to IntegraMed.

21-cr-229-RBJ    Motions Hearing    03-03-2022

1          THE COURT:  Really?

2          MR. VIGEN:  Well, we have a percipient witness who

3    learned it directly from the defendant who is on trial that this

4    agreement existed, and we have the corroborating documents to

5    show it.

6          THE COURT:  Okay.

7          MR. VIGEN:  I also want to highlight Exhibit B1, which

8    goes specifically to this issue of intent.  And this is where

9    Mr. Thiry forwarded one of Mr. Hughson's emails, and a DaVita

10   executive, Phillip Stephanus, responds, this underscores the

11   importance of the rule that you, Mr. Thiry, were insisting on

12   with Rich, Rich being Rich Whitney in count three.  Namely that

13   they must not engage in any discussion unless the person's

14   supervisor at DaVita has been informed first.  Without that, we

15   will always hear the excuse that he/she was already talking to

16   others.

17         THE COURT:  Yes.  That one is a little better for you

18   than the first one.

19         MR. VIGEN:  Another document that I believe goes to

20   intent with respect to the Spero is one that due to an

21   oversight, we noticed yesterday to the defense, in fairness.  I

22   have a copy of that document.  It will be, I hope, Government

23   Exhibit 283.  And in that, in response to Mr. Priest --

24         THE COURT:  You're going to put in 283 exhibits?

25         MR. VIGEN:  No, Your Honor.  Out of an abundance of

21-cr-229-RBJ     Motions Hearing     03-03-2022

1    caution, we were overinclusive, given the early disclosure

2    deadline with defendants, and we have just kept those numbers.

3    Just as with our *James* log, we may not intend to use every

4    single statement.  Out of abundance of caution given the timing

5    and our state of prep, we were overinclusive.

6              THE COURT:  Which ones do you intend to use?  That

7    will make my job simpler.

8              MR. VIGEN:  I would intend to use the Stephanus

9    documents and the 283.  I know that for a fact.

10             THE COURT:  Okay.  So, this is one that you didn't

11   tell them about that now you're telling me about?

12             MR. VIGEN:  Yes, Your Honor.  And so in response to

13   Mr. Priest reassuring Mr. Thiry that I have not and am not

14   recruiting anyone at DaVita, Mr. Thiry writes, as we have found

15   in the past, the key is they have to be willing to go in to

16   their boss and say that they are looking -- that they are going

17   to look at outside opportunities, all caps, before there is any

18   substantive conversation about a role.  Otherwise, the whole

19   paradigm becomes a farce.  Is that what happened here?

20             That goes directly to the intent to allocate employees.

21   It also repeats what Mr. Stephanus had said in the other

22   document, the IntegraMed.  And it supports the allegation in the

23   indictment that the notice mechanism was an enforcement

24   mechanism to ensure that there was no competition and outreach

25   amongst these competitors.

21-cr-229-RBJ    Motions Hearing    03-03-2022

1          And then as we noted in our brief, the United States

2    would not oppose a limiting instruction for any of this 404(b)

3    evidence.  Unless Your Honor has any further questions, that is

4    what I planned to address.

5              THE COURT:  All right.  Thank you.

6              MR. VIGEN:  Thank you.

7              THE COURT:  Next?

8              MR. DODDS:  Your Honor, again, John Dodds for DaVita.

9    I'm here to talk about our supplemental motion in limine to

10   preclude the admission of pre-conspiracy information.  But if

11   Your Honor will permit me just a few comments on what Mr. Vigen

12   just said before I get to that, I will save you time on the

13   other motion, if I can just have a moment to make a few more

14   remarks on the 404(b) motion?

15             THE COURT:  Okay.

16             MR. DODDS:  Your Honor asked Mr. Vigen, why don't you

17   just call the actual witnesses here?  And Mr. Vigen said

18   something about, you know, witnesses' willingness to testify.  I

19   would note that two of the declarants to these alleged

20   agreements, Bill Hughson and Steve Priest, are on the

21   Government's witness list.  So, they could call them.  They

22   apparently are making a decision not to call them.

23          And I think the fair inference, Your Honor, is that

24   it's for the reason I said.  The testimony they give will refute

25   the things the Government says it's trying to prove.

21-cr-229-RBJ   Motions Hearing   03-03-2022

1       The second thing I would note is that I didn't hear any

2   real denial that the witnesses in fact would say the things that

3   I represented from the 302s and the attorney proffer that they

4   would say.  Mr. Vigen said what they may or may not say.  That's

5   what they would say, and the Government knows it.

6       And putting aside any question about the probative

7   value of this information -- I don't think any of it is

8   probative for any purpose other than one thing.  He did it a

9   lot.  He did it all these other times.  He did it here.  The

10  "it" that this proves is agreements not to solicit.  Nothing

11  about it adds to their proof that the agreements not to solicit

12  were entered into for the purpose of allocating labor markets.

13      And so it is cumulative at best, elongates the trial in

14  all the ways we've talked about, and does not accomplish their

15  basis for their justification for trying to have it admitted.

16      THE COURT:  Speaking of elongating the trial, how long

17  is the trial going to take?

18      MR. DODDS:  Your Honor, realistically, we have asked

19  the Court for three weeks.  We are optimistic, and we can't tell

20  how long the Government's case in chief is going to go on.  And

21  obviously whether -- whether and to what extent we present a

22  defense depends on how all of that goes.

23      THE COURT:  Are you aware that somebody from the

24  defense side of the case, as I have been told, contacted

25  chambers yesterday to ask questions about when the case could be

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    reset in the future?

2          MR. DODDS:  I'm aware that that phone call was made,

3    Your Honor.  I wasn't party to the phone call, but what we

4    understood and what we were trying to find out was we were

5    trying to be responsive to Your Honor's question before about

6    whether this trial was going to go forward on the 28th.

7          THE COURT:  Well, is it?

8          MR. DODDS:  The answer, Your Honor, is yes, because

9    what we understand is Your Honor has no other near-term space in

10   your schedule to reschedule it, and the company and certainly

11   Mr. Thiry would like to get this matter behind them as quickly

12   as possible.

13         So, we were thinking about whether if there were a few

14   weeks that could be saved where that could give Your Honor some

15   relief in light of all the challenges you told us about, that

16   that might be something that would work, but we were advised

17   that's not possible.  So, from our standpoint, it's going

18   forward on the 28th, because it needs to.

19         THE COURT:  Well, my judicial assistant was trying to

20   tell me during the break that she thinks she possibly could

21   find -- figure out a way to make two weeks available in the

22   middle of May.  But if two weeks isn't enough, then we can't do

23   that.

24         MS. CLINGAN:  Your Honor, I'm frankly surprised to

25   hear that defense counsel has proposed a continuance.

21-cr-229-RBJ    Motions Hearing    03-03-2022

1          THE COURT:  I can't hear you.

2          MS. CLINGAN:  This is the first that the United States

3   is learning of it.  We would obviously oppose such a

4   continuance.  And just to give the Court some color on our

5   anticipated timeline --

6          THE COURT:  I still can't hear you.

7          MS. CLINGAN:  Should I --

8          THE COURT:  Yes.  I'm not suggesting that you continue

9   their case.  I'm just saying that somebody asked about that.

10         MS. CLINGAN:  Yes, Your Honor.  And the United States

11  is surprised to hear that somebody has proposed a continuance,

12  because this hasn't been proposed to us.  I see Mr. Walsh

13  shaking his head.  The United States would oppose any

14  continuance.

15         And just to give the Court some color, the United

16  States anticipates that assuming cross examination lasts as long

17  as direct examination, we would be able to wrap up our case in

18  chief in eight days.

19         THE COURT:  In what?

20         MS. CLINGAN:  Eight days.

21         THE COURT:  Okay.  Well, you don't have to continue

22  your case.  The thing is, I don't know how I'm going to deal

23  with all this, but --

24         MR. DODDS:  And, Your Honor, just to be clear, we

25  haven't proposed a continuance.  We were just trying to find out

21-cr-229-RBJ    Motions Hearing    03-03-2022

1   what else might be possible.  That's it.

2        THE COURT:  Yeah.

3        MR. DODDS:  So, Your Honor, the final motion that I

4   have to speak to Your Honor about is our supplemental motion in

5   limine number two, which again goes to the pre-conspiracy

6   events.

7        And I will make this simple for the Court in light of

8   previous discussion.  The Government proposes -- proposes two

9   bases for admitting this evidence.  The first basis has to do

10  with their burden to prove that whatever happened, the purpose

11  was to allocate markets.  And we don't think that the

12  pre-conspiracy evidence is probative of that.

13       But I'm not going to -- this is not, to use Ms. Brooks'

14  phrase, a hill that I'm prepared to die on here or take the

15  Court's time with, because they propose a second basis, which

16  is, as Mr. Everett alluded to this morning, that all of that

17  evidence is background context, it's intrinsic to the whole

18  story here.

19       And I think the point Your Honor made when I first

20  stood up, that if that evidence -- if the evidence that we want

21  to put in fits that description, this evidence fits that

22  description too.  Now, I could quarrel with that, but I won't,

23  because I do think that when it comes to what happened here, the

24  jury should hear the whole story.

25       And as Your Honor has pointed out, the critical

21-cr-229-RBJ     Motions Hearing     03-03-2022

1   question -- because this motion really goes to count one, the

2   count related to SCA, the critical point is this:  Under the

3   Government's theory and under the evidence, SCA and DaVita were

4   competing for talent and competing fiercely up until February of

5   2012, which is when the Government says the conspiracy started.

6          THE COURT:  They said at least by.

7          MR. DODDS:  On or about, but I'm just using that date

8   because that's the date in the indictment.  But even if it's

9   sometime around there, something changed.  And they changed the

10  way they were interacting, and they reached agreements about the

11  way --

12         THE COURT:  I don't know if something changed, but the

13  period of their indictment is at least by --

14         MR. DODDS:  Understood, Your Honor.  And I'm sorry if

15  I'm not being clear, but that's not the point I'm making.  The

16  point I'm making is the question is going to be squarely put

17  before the jury here, and that is what this case is going to be

18  about, and truly is the basis on which we're going to defend is

19  when they reached the agreements they reached, whatever that

20  date was, why?

21         What were they trying to accomplish, and why were they

22  trying to accomplish it?  And all of the evidence about the way

23  in which SCA considered DaVita to be a strategic partner,

24  regardless of whether they actually reached any transactions,

25  all of that evidence is probative to why one of the

21-cr-229-RBJ     Motions Hearing     03-03-2022

1    conspirators, Andrew Hayek and SCA, would have agreed, would

2    have reached the agreement that the Government has alleged here.

3              And the evidence, Your Honor, is the volume of --

4              THE COURT:  You wouldn't be opposed to instructing the

5    jury very specifically that whether or not this was a reasonable

6    business decision is not at issue in the case, and no evidence

7    can be considered for that purpose?  The evidence can only be

8    considered if it shows that there was not an intent to allocate

9    the market.

10             MR. DODDS:  Your Honor, we have a set of jury

11   instructions that we are planning to propose to the Court at the

12   appropriate time.  I don't believe that we're asking for --

13             THE COURT:  You've already sent the jury instructions

14   over.

15             MR. DODDS:  But we're going to discuss them at some

16   time, you know, not today, I assume, Your Honor, but the answer

17   is as long as the jury is instructed that the evidence has to

18   show that the purpose and intent, what they were trying to

19   accomplish, what they were thinking was to allocate the

20   employment market, we will not oppose an instruction along the

21   lines Your Honor just described, because that's a separate

22   issue.

23             What is important is that the jury is instructed that

24   they have to discern why they reached the agreement they

25   reached, what they were trying to accomplish when they did it.

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    And all of the evidence that Mr. Everett talked about before

2    goes to that very point.  We're entitled --

3              THE COURT:  I'm trying to think about how we can

4    instruct -- you say that you think it's important for the jury

5    to know the whole story?

6              MR. DODDS:  Yes.

7              THE COURT:  Part of the story is that the Government

8    isn't -- the Government has limited the case to a per se case,

9    and there's another kind of case that they could have brought,

10   which is the rule of reason, but they chose not to bring that

11   case.  And so the only issue is did you enter into an agreement

12   to allocate the market?  And if you did it intentionally as

13   opposed to accidentally or as opposed to for some other purpose.

14             And so all this evidence that you want to put in about

15   this so-called deal with -- or joint arrangement with SCA or the

16   pro-competitive piece of it can't even be considered by the jury

17   unless it relates to one of those two points.  So, why not just

18   tell the jury that?

19             MR. DODDS:  And I apologize, Your Honor.  I'm not

20   completely following the Court's question, but --

21             THE COURT:  Probably a pretty poorly phrased question.

22             MR. DODDS:  I certainly wouldn't say that, but let me

23   make this observation, Your Honor.  And obviously it's -- I'm

24   out over my skis to tell Your Honor what you meant by what you

25   wrote in your opinion on the motion to dismiss, but at least my

21-cr-229-RBJ     Motions Hearing     03-03-2022

1   understanding of that opinion, reading it, and Your Honor closed

2   with we are going to be permitted to try our case, or words to

3   that effect.

4         My understanding of it was that Your Honor has ruled in

5   that for pleading purposes, the Government got by our motion to

6   dismiss because the Government represented that this

7   non-solicitation agreement was in fact an employee market

8   allocation agreement, and employee market allocation agreements

9   are like customer allocation agreements, and therefore could be

10   per se illegal.

11         THE COURT:  That's exactly what they say.

12         MR. DODDS:  Yes.  But they haven't shown it.  They

13   haven't shown that the agreements here are actually anything

14   like customer allocation agreements.

15         THE COURT:  Well, they've made a prima facie case, or

16   I would have granted your motion.

17         MR. DODDS:  Understood.  But at least, again, Your

18   Honor, respectfully, in my view -- and I think in our view,

19   whether the case ultimately goes to the jury as a per se case

20   depends on the evidence that they present to prove that it is in

21   fact a per se case.

22         And they have to do that here, because they bypassed

23   the mechanism by which per se cases have always been declared to

24   be per se cases, which is a long history of judicial precedent

25   showing that this particular practice is always or almost always

21-cr-229-RBJ   Motions Hearing   03-03-2022

1    anticompetitive.

2              THE COURT:  Well, if you read my order, you wouldn't

3    say that they bypassed it, because I said they didn't.

4              MR. DODDS:  Okay.  But the point is, Your Honor, it is

5    still at least our view that the question of whether this

6    ultimately goes to the jury as a per se case depends on the

7    evidence they present, and that the Court should, in order for

8    the trial to be fair, allow all of the evidence about the

9    relationships between these alleged co-conspirators that could

10   explain exactly the question Your Honor has teed up, which is

11   what were they trying accomplish.

12             THE COURT:  Okay.  I hear you.  I might be inclined to

13   agree with you, actually.

14             MR. DODDS:  Thank you, Your Honor.  I have nothing

15   else.

16             THE COURT:  Okay.  Now, what else do we have?  You got

17   your *Brady* motion.  What else?

18             MR. WALSH:  Your Honor, I think that's next on the hit

19   parade, so to speak, and I will handle that.  John Walsh for

20   DaVita.

21             Your Honor, I am going to cut to the chase on this one.

22   We have been here all morning talking about a lot of different

23   issues.  This is not a fishing expedition discovery motion.

24   It's a very focused *Brady* request that was triggered by a letter

25   from the Government on January 24th that included a host of

21-cr-229-RBJ     Motions Hearing     03-03-2022

1    information, but specifically for purposes of this motion,

2    representations about attorney proffers that have been made by

3    important witnesses in the case to the Government.

4         THE COURT:  So, let me make sure, John, that I

5    understand exactly what the dispute is.

6         MR. WALSH:  Your Honor, we are seeking --

7         THE COURT:  An attorney goes to the Government, and he

8    says, or she says, I've got a client.  Pick one.  Kogod.  Any of

9    them.  I've got a client.  My client would like to -- or is

10   willing to be a witness for the Government, and this is what I

11   think the client is willing to say.  And maybe they say, in

12   exchange for that, I want something from you, and there's some

13   negotiation.

14        And somebody, a paralegal, apparently, sits in the back

15   of the room and listens, and eventually writes a memo about what

16   the attorney proposed and what the discussion was.  Then the

17   witness in due course is actually interviewed.  The witness

18   wasn't there when the attorney was there, but the witness gets

19   interviewed, and let's say it's Kogod.  He answers the interview

20   questions.

21        They write up a report on that.  That's called the 302.

22   They produce the 302, and according to what they said in their

23   papers, they've also produced the notes that were taken by their

24   people during the interview.  So, you've got their notes, and

25   you've got the memo, the 302.

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    But the thing that they haven't produced is the notes

2    of the attorney conference that started the whole process.  They

3    produced this bullet point type summary of their interpretation

4    of what the lawyer said, but not the actual notes.  And that's

5    what you're trying to get?

6    MR. WALSH:  Your Honor, generally speaking, yes.  But

7    I can perhaps give the Court a specific example that will show

8    why we're seeking those notes, sort of beyond the scenario that

9    you're describing.

10    And I do want to be clear that our motion was narrow

11    and focused on the January 24th letter, point one, but I will

12    narrow it even a little further here for the Court's benefit.

13    We're really only seeking the notes from attorney proffers in

14    the January 24th letter related to Andrew Hayek, Josh Golomb,

15    Rich Whitney.  These are all the most important witnesses in the

16    case, and Radiology Partners, and then Mr. Kogod.

17    If it's okay, I have a quick demonstrative that I think

18    shows what triggered this motion.  And we put it up on the

19    screen.  I have previously given a copy of this to the

20    Government counsel, and you have a copy as well.

21    So, this is an excerpt of the January 24th letter.

22    This is a note of an attorney proffer by the attorney for

23    Radiology Partners.  And there are a couple of points here that

24    are highly exculpatory, because they go both to the question of

25    whether there was an agreement in the Radiology Partners

1   account, but also even if there was an agreement, what the

2   understanding of the people at Radiology Partners was, what

3   their intent, what their purpose was.

4           So, what this indicated is that counsel informed that

5   employees are coming to terms with the idea that the rest of the

6   world views this conduct differently than they do.  And it

7   describes witnesses did not perceive the understanding between

8   Whitney and Thiry to be an agreement.  No one went to an

9   attorney and asked if it was okay, and then went on -- the

10  individuals worried about non-solicitation provisions in

11  apparently their own employment agreements, et cetera.

12          And then further down, counsel informed that people may

13  have known about the steps needed to be taken when recruiting

14  from DaVita, and knew to elevate these matters to Whitney and

15  Gabriel, but then other than Tom Usilton, nobody knew about an

16  agreement between Radiology Partners and DaVita.

17          This jumped out at us because the witnesses who were

18  having trouble coming to terms with the idea that this might be

19  an agreement aren't identified.  We don't have a date for when

20  this conversation took place.  We don't have any specificity as

21  to, you know, who those witnesses might be, whether they were

22  interviewed separately or not, or what the circumstances -- what

23  follow-up or lack of follow-up the Government did.

24          It was because of this paragraph that we filed our

25  motion after consulting with the Government.  Now, granted, our

21-cr-229-RBJ     Motions Hearing     03-03-2022

1   motion was broader than just this particular request, which is

2   part of the reason I've narrowed it even further here today, but

3   we filed our motion on February 4th, so two weeks later, after

4   unsuccessfully conferring.

5          And then on February 11th, up on the screen now, the

6   Government came back to us with a supplemental disclosure that

7   indicated, as you can see, that DOJ apparently went back to

8   counsel for Radiology Partners, and it appears they were asking

9   for clarification of what had been meant in the prior -- in the

10  prior attorney proffer.

11         Counsel confirmed part of that and provided an

12  additional explanation about what they intended to convey, that

13  there was only a small group of Radiology Partners employees who

14  had direct knowledge.  And then it goes on to say something that

15  seems inconsistent with the prior note, which is counsel was not

16  intending to convey that no witnesses thought there was an

17  agreement.

18         Your Honor, we are asking for the notes of these two

19  conversations, and under the circumstances here, where at the

20  very least, there's ambiguity as to what the conversations were,

21  we think we're entitled to that.  We have asked for those

22  additional witness notes from the proffers because if -- in the

23  January 24th letter, for example, specifically counsel for Rich

24  Whitney also represented that Mr. Whitney was having -- he was

25  struggling to accept that his understanding with Mr. Thiry was

21-cr-229-RBJ    Motions Hearing    03-03-2022

1   legally unacceptable.

2           In other words, he was having trouble understanding why

3   there was a problem legally with it, and then also said they

4   didn't even understand it to be a mutual agreement or a quid pro

5   quo.

6           Our request is very focused.  We don't want to make a

7   federal case out of this subset of this federal case, but we

8   think under the circumstances, it's a reasonable request.  There

9   could be *Brady* information here that would lead us to other

10  witnesses or potential cross examination of other witnesses.

11  And for that reason, we would ask that the Court enter that

12  narrow order providing us with these notes.

13          THE COURT:  And again, the notes are just five

14  witnesses, you said?

15          MR. WALSH:  Of just those five.  It's four human

16  witnesses and Radiology Partners.

17          THE COURT:  Okay.

18          MR. WALSH:  Thank you.

19          THE COURT:  Now, explain to me why the Government

20  objects to that.

21          MS. LEWIS:  Thank you, Your Honor.  Megan Lewis for

22  the Government.  Your Honor, I think the exercise that Mr. Walsh

23  has just walked us through shows exactly what a sideshow this

24  endeavor is.

25          THE COURT:  I don't know if it's a sideshow, but I'm

21-cr-229-RBJ     Motions Hearing     03-03-2022

1   not worried about sideshows.  Tell me why the Government doesn't

2   want them to see the notes of these proffers.

3            MS. LEWIS:  Your Honor, quite simply, because these

4   are not notes of the witnesses.  I think Mr. Walsh made a

5   reference to saying they want the witness notes from the

6   proffers.

7            THE COURT:  They're notes of the attorneys.  Now, why

8   is the Government opposed to having those in the hands of the

9   defendant?  What is your reason?

10           MS. LEWIS:  Your Honor, because quite simply, it is

11  not evidence.  If I may add a little color on what these

12  attorney proffer sessions are, attorneys come in to the

13  Department of Justice, and they give us information about what

14  they think they might want to have their client say to the

15  Department of Justice in the form of a hypothetical.  They give

16  us advocacy presentations.  They give us their impressions of

17  the evidence.  None of that is evidence of what the witnesses

18  themselves would say.

19           And in fact, this explaining here --

20           THE COURT:  But you've crossed that bridge.  That's

21  what bothers me.  You've crossed that bridge.  You have given

22  them summaries of the proffers.

23           MS. LEWIS:  Your Honor, and the fact --

24           THE COURT:  So, why should they have to rely on your

25  summaries as opposed to the actual notes of somebody that was

21-cr-229-RBJ     Motions Hearing     03-03-2022

1   there?

2           MS. LEWIS:  And, Your Honor, they quite simply put do

3   not have to rely on our proffers at all, because we have

4   produced, as Your Honor noted it, the 302s from what the

5   witnesses said when they came in and spoke with the Department

6   of Justice.

7           Looking at this proffer in this memo, I had no idea

8   what the attorney was referring to, which is why we saw it, we

9   disclosed it, we went above and beyond our discovery obligations

10  by reviewing this proffered material, which is not something

11  that is routinely discoverable, but we went through and

12  exercised diligence and extracted out this type of information

13  and provided it to the defense.

14          So, in other words, the fact that they are able to even

15  put this up on your screen today shows that we have been fulsome

16  in our disclosures.  We have not tried to hide anything, and the

17  underlying notes will not add any information to this

18  discussion.

19          THE COURT:  If that's the case, then why are you

20  objecting to their seeing the notes?  If there's nothing in the

21  notes that is different from what the summary already says, then

22  why are you so concerned about it?

23          MS. LEWIS:  And, Your Honor, because the underlying

24  notes from these, I will put -- for one, not all of these have

25  underlying notes.  So, I just want to be clear about what we're

21-cr-229-RBJ     Motions Hearing    03-03-2022

1    talking about.

2              THE COURT:  Well, then we're spending time on nothing.

3              MS. LEWIS:  That's exactly right, Your Honor.  In our

4    view, this is much to do about nothing, because they have the

5    witness interviews.  They have the dates from the witness

6    interviews with the United States.  What this is is speculation

7    provided by attorneys to the Department of Justice.

8              And what else is contained in here, to the extent that

9    they are asking for something, they already have it in the form

10   of our letter disclosures.  Tenth Circuit has been perfectly

11   clear that the letter disclosure is a perfectly appropriate way

12   to satisfy the discovery obligations of the Government.

13             To the extent that there is additional information that

14   is not contained within the letter disclosures that we've made,

15   that's the type of information that may disclose, for example,

16   the Government's comments in response to, you know, attorney

17   proffers.  It may disclose discussions about subpoena compliance

18   negotiations.  It may disclose attorney advocacy for their

19   clients on particular issues.

20             That is exactly the type of information that is not

21   discoverable information.  It's not evidence.  It's not anything

22   that could be used at trial or even lead to the discovery of

23   admissible evidence at trial.

24             THE COURT:  So, you're finally answering my question.

25   I wondered if you would.  And your answer is we don't want them

21-cr-229-RBJ    Motions Hearing    03-03-2022

1   to see the notes, because that will give them a peek behind the

2   curtain in terms of what our theories are.

3           MS. LEWIS:  It may, Your Honor.  And I would also note

4   that it's --

5           THE COURT:  So, why can't you redact that part of the

6   notes?

7           MS. LEWIS:  It's quite a burden on the Government to

8   go back and find --

9           THE COURT:  I'm not even slightly concerned about the

10  burden on the Government, given the nature of this case.  Not

11  even slightly.

12          MS. LEWIS:  I appreciate that, Your Honor.  I think

13  the most direct answer is that quite simply, it is duplicative

14  information of what is contained in the proffer summaries that

15  the paralegals have drafted.

16          THE COURT:  Then you have no reason to object to it.

17  If it's just duplicative of what you've already shown, why

18  should they have to take your word for it?  You're trying to put

19  Mr. Thiry in jail.  Why should he believe you?

20          MS. LEWIS:  I'm certainly not asking them to, Your

21  Honor.  But what they should do is they should follow up with

22  the witnesses that will testify at trial to what they actually

23  said, what they actually saw, what they actually did.  That's

24  what -- they have plenty of that information available.

25          They have the agent notes.  They have the 302s.  They

21-cr-229-RBJ     Motions Hearing     03-03-2022

1   have all of the information readily available to them.  The

2   dates that those witnesses met with the Government, the

3   individuals who have agreements with the government,

4   non-prosecution agreements.  They have those agreements.  They

5   have all of the information that they are entitled to to put on

6   a full and vigorous defense.

7          THE COURT:  Okay.  Let's come back, then, to my

8   question.  What is the real honest reason that you don't want

9   them to see the notes?

10         MS. LEWIS:  Your Honor, quite simply, I think that

11  because it is duplicative information, these are paralegal

12  notes, they --

13         THE COURT:  If that's your reason, then it's not going

14  to work with me.  You gotta have something better than that.

15  You gotta have a reason, not that it's a burden on the

16  government.  Not that it's duplicative.  You gotta have a

17  reason.  There's something in those notes that you don't want

18  them to see, and they don't have a right to see.  That's what

19  I'm trying to find.

20         MS. LEWIS:  Correct, Your Honor.  And I think if -- I

21  want to be clear about whether we're talking about the

22  underlying notes that are reflective of the portions of -- the

23  factual portions of the discussions, as opposed to what a

24  paralegal might have written about what a Government attorney

25  might have said during one of those sessions or an advocacy

21-cr-229-RBJ     Motions Hearing     03-03-2022

1   presentation which, you know, Chief Judge Brimmer, when this

2   issue came up in his courtroom, concluded that was not

3   appropriate and not discoverable information.

4          THE COURT:  But you didn't suggest that you would

5   produce the notes, but redacting that specific advocacy

6   information.  You just are objecting to producing the notes,

7   period.

8          MS. LEWIS:  So, Your Honor -- so, number one, it is

9   our work product.  It may contain our mental impressions.

10         THE COURT:  You already waived the work product when

11  you produced these summaries.  You've waived the work product.

12         MS. LEWIS:  Certainly, Your Honor.

13         THE COURT:  You can't just selectively waive it.

14         MS. LEWIS:  If it is a question of redacting out

15  everything else and merely showing them the underlying notes

16  from the portions like you saw on the screen today --

17         THE COURT:  It's a question of redacting, because you

18  say that your concern was the paralegal maybe made some note

19  about something that one of your attorneys said that would

20  reveal an advocacy point, a strategy point, a tactical point.

21         Well, I could see why you would want to redact that.

22  But now you've just took what I said and turned it into

23  something else.  You've said, well, if it's a matter of

24  redacting everything except what's in the summaries, maybe we

25  could do that.  That isn't what I said.  If your paralegal wrote

21-cr-229-RBJ    Motions Hearing    03-03-2022

1   down something that reveals your trial tactics because one of

2   your lawyers revealed it to the proffer lawyer, then maybe we

3   have something to talk about.  That's the only reason you've

4   given me so far as to why you're objecting.  I think there must

5   be other reasons, but you're not telling me.

6          MS. LEWIS:  So, Your Honor, I'm certainly trying to

7   answer the Court's question.  I think the information in the

8   underlying notes that does not go to the factual portions of the

9   proffer, I think is not properly disclosable, because that may

10  reveal the mental impressions, and it may also reveal advocacy

11  by counsel, which as Your Honor may appreciate, counsel come in

12  to the Department of Justice advocating for all sorts of

13  reasons.

14          And it also, as Judge Brimmer noted, there's a

15  potential consideration of revealing all of the advocacy that

16  counsel do on behalf of their clients, people will be much less

17  likely to bring their clients in to the Department of Justice if

18  they know that all of their advocacy is going to be turned over

19  in discovery.

20          So, again, we have sought to exceed our discovery

21  obligations by combing through these attorney proffers, which

22  are not evidence.  They are not reflections of what witnesses

23  would say, to be clear.  They are the statements of the

24  attorneys as memorialized by a paralegal in the office.  These

25  are not witness statements.  But we have nonetheless gone above

21-cr-229-RBJ    Motions Hearing    03-03-2022

 1  our discovery obligations to disclose that information to the

 2  defendants here.

 3          And so that is the basis for why we think we have gone

 4  beyond our discovery obligations and disclosed this, but it does

 5  not follow that the information that is -- in these underlying

 6  memos to file is properly disclosable.  As Judge Brimmer put it,

 7  the mere fact that sometimes we go beyond to the defendants'

 8  advantage beyond our discovery obligations does not open the

 9  floodgates, does not open the doors to every piece of paper in

10  the Government's files being discoverable.

11          THE COURT:  Well, maybe Judge Brimmer should be trying

12  this case.

13          MS. LEWIS:  Your Honor, I will refrain from comment

14  for that in consideration of my colleagues appearing before

15  Judge Brimmer, but we certainly respect Judge Brimmer as we do

16  Your Honor as well.

17          THE COURT:  All right.  Thank you.  Mr. Walsh, any

18  response?

19          MR. WALSH:  Your Honor, just two quick points.  First

20  of all, we don't necessarily have the 302s of the witnesses that

21  are referenced in the materials I was just showing the Court,

22  because there's no identification of the witnesses who

23  apparently did not perceive.

24          THE COURT:  Well, that's true on this Radiology

25  Partners.

21-cr-229-RBJ     Motions Hearing    03-03-2022

1      MR. WALSH:  That's correct.  Secondly, the -- that's

2   why I specifically focused the Court in, and because it's what

3   triggered our concern.

4      The second point that I would make is that if in fact

5   the underlying notes are duplicative, there's no prejudice to

6   the Government here.  We're not --

7      THE COURT:  I understand that, but what about her

8   point, that I had to pull teeth to get out of her, and that is

9   she thinks maybe -- and she knows the answer, if she's taken a

10  look at these things, but she says, well, what if a paralegal

11  wrote down something that the attorney said?  Like, you know, we

12  think we're going to try this approach to this issue, whatever.

13     MR. WALSH:  Your Honor, we could --

14     THE COURT:  Why should you get to see that?  They're

15  not able to look at what your strategy and tactics are.

16     MR. WALSH:  Correct, Your Honor.  A couple of thoughts

17  on that.  First of all, we could debate whether by discussing it

18  with an outside party, the attorney who is making the proffer,

19  there was a waiver there, but put that aside.

20     I don't think -- that's not really what we're seeking,

21  Your Honor.  We're seeking the underlying representations of the

22  proffering attorney as to the facts that are reflected in these

23  documents and in these summaries.

24     So, as the Court said, we are not simply relying on

25  what the Government says was the back and forth, because as we

21-cr-229-RBJ    Motions Hearing    03-03-2022

1   can see in the example I gave, there's some ambiguity here.

2   Otherwise, counsel for the Government would not have felt they

3   needed to go back and have a further conversation.  Nothing

4   inappropriate about that, but it just shows why the defense

5   should have access to that factual information, which is really

6   what we're seeking.

7        I would also note that I disagree respectfully with the

8   Government that this is going above and beyond their discovery

9   obligations.  These statements are clearly *Brady*.  They're

10  clearly *Giglio*, depending on who the witnesses turn out to be.

11  They had an obligation to produce this.  And in fact the trust

12  division's own policy manual specifically counsels the antitrust

13  attorneys to go through their attorney proffer notes to make

14  sure that they're identifying and potentially disclosing *Brady*

15  or *Giglio* information.

16       THE COURT:  So, why would you suspect that these

17  lawyers didn't do their job?

18       MR. WALSH:  Your Honor, there's no accusation being

19  made here on behalf of the defense.

20       THE COURT:  Well, they're representing that anything

21  that was exculpatory they provided to you by their summaries.

22       MR. WALSH:  Well, as this example, I think, shows,

23  it's not clear -- well, two points.  One, there's ambiguity

24  about what was said that apparently required clarification, as

25  reflected by the follow-up conversation.  Given that, we think

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    we're entitled to see those underlying notes.

2              Secondly, what may be relevant from the Government's

3    point of view, as we've been debating all morning, and what the

4    defense may consider relevant are two different things.  And

5    there are things --

6              THE COURT:  Don't use the word "relevant."  Use the

7    word "exculpatory."  That's what *Brady* is about.

8              MR. WALSH:  Yes.  Correct, Your Honor.  In other

9    words, our strategy and our understanding of what might be

10   exculpatory almost certainly extends beyond what the Government

11   thinks, and we should have an opportunity to review the notes to

12   verify what we believe is exculpatory.

13             THE COURT:  So, this example you picked out is a

14   pretty good one for you, because it's -- you can't even tell

15   what witnesses they're talking about.

16             MR. WALSH:  Correct, Your Honor.

17             THE COURT:  But you had four others, and they're not

18   like this; right?

19             MR. WALSH:  No.  They're not as ambiguous.  That's

20   correct, Your Honor.  And the others that I identified were

21   because of the example this gives, we are narrowing our request

22   to the other key witnesses.  In other words, Hayek, Golomb,

23   Whitney, and Kogod.  Mr. Whitney's proffer in the January -- his

24   attorney's proffer in the January 24th letter is the comment

25   about he was struggling to understand why this was legally

21-cr-229-RBJ   Motions Hearing   03-03-2022

1   unacceptable.

2          For that reason, we would like to see those notes at

3   the very least, but I will tell you that, you know, the

4   underlying notes to this example and to the Whitney proffer are

5   the most important things to us.  We would like to see the other

6   ones.  We think we have a basis for the Court to order the

7   Government to produce them, but these are the ones that really

8   matter to us.

9          THE COURT:  Okay.

10          MR. WALSH:  Thank you, Your Honor.

11          THE COURT:  Thank you.  Now, is there anything else

12   that you've singled out for argument today that we haven't

13   talked about?

14          MS. LEWIS:  Your Honor, I think we'd like to address

15   briefly our motion in limine to exclude improper use of these

16   attorney proffers, which is the ECF, I believe 141, since

17   obviously it also relates to the discussion that we just had.

18   So, my understanding, Your Honor, is that the defense intends to

19   try to use these attorney proffer -- paralegal summaries of

20   attorney proffers in order to impeach witnesses at trial.  And

21   that is patently --

22          THE COURT:  I don't think they said that.

23          MS. LEWIS:  That is what they have represented to us.

24   And so basically, these are not the statements of witnesses.

25   And I think the Tenth Circuit has been clear as --

21-cr-229-RBJ    Motions Hearing    03-03-2022

1        THE COURT:  I don't disagree with you there.

2        MS. LEWIS:  Okay.  I just want to understand that, you

3   know, our position is that the defense should not be allowed to,

4   for example, at trial, ask a witness whether or not their

5   attorney did or didn't say something to the Department of

6   Justice.  There's no --

7        THE COURT:  They can't do that.

8        MS. LEWIS:  Thank you, Your Honor.  My understanding

9   is that they intend to attempt to do that, and may in fact

10  attempt to either put the proffer up on the screen as they tried

11  to do at the *James* hearing, or they may attempt to read out loud

12  from these proffer memos to suggest to the jury that these are

13  statements of the witness.  We think that's improper, and we

14  would ask to exclude --

15       THE COURT:  I would be surprised if that's what

16  Mr. Walsh said to you.

17       MS. LEWIS:  Thank you, Your Honor.

18       THE COURT:  But maybe he can clarify how he thinks

19  he's going to use these notes.  I thought he wanted the notes

20  just to see if there was something exculpatory that they would

21  lead him to.

22       MR. WALSH:  Your Honor, with respect to the motion

23  that we were just discussing, that's exactly correct.  We want

24  those notes, because we think they could easily end up leading

25  us to admissible evidence.

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    Part of the -- I'm not sure that we actually disagree

2  that much with the Government on this last motion in limine.

3  Part of our concern was that the motion seemed to encompass not

4  only attorney proffers, but 302s.  And that obviously cross

5  examination of the witness on a 302 is routine.

6    THE COURT:  Yes.  I don't think they're trying to say

7  you can't do that.

8    MR. WALSH:  Well, the motion is somewhat ambiguous,

9  which is part of the -- and we tried to address that, but the --

10  I think the bottom line --

11    THE COURT:  Let's ask her.  Are you trying to keep him

12  from using the 302s?

13    MS. LEWIS:  So, Your Honor, in terms of the proper use

14  of a 302 for impeachment purposes, I think that is what the

15  Court has addressed in the *U.S. v. Hill* case, as well as in the

16  *Santistevan* case that they have addressed, that a witness cannot

17  be impeached with another person's statement unless it's an

18  adopted or substantially verbatim statement.  These witnesses

19  have not adopted these 302s.  They have not reviewed these 302s.

20    I am certainly not contesting that Mr. Walsh may get up

21  and ask a witness whether or not he or she made a particular

22  statement during an interview.  However, the proper mode to

23  impeach on that is not to then read out loud the 302 or suggest

24  that the statement in the 302, which of course is the agent's

25  statement, was in fact the witness' statement.  The proper mode

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    to impeach would be to call the agent to testify as to what the

2    witness said during that interview.  That's what we want to

3    preclude.

4            THE COURT:  And I'm not sure Mr. Walsh is saying

5    anything inconsistent with that.

6            MS. LEWIS:  And I hope not.  My understanding was that

7    Mr. Walsh was suggesting that he could impeach using the 302

8    itself, as if it were the witness' own statement, which it is

9    not.

10           THE COURT:  I guess Mr. Walsh can speak for himself.

11   You guys are asking me to make rulings on things that haven't

12   happened and might never happen, and I haven't seen them myself.

13           MS. LEWIS:  Yes, Your Honor.  And our understanding is

14   based on what counsel --

15           THE COURT:  And you're not sure what each other's

16   motive is here.  How are you going to use the 302s?

17           MR. WALSH:  Your Honor, we're going to use the 302s

18   consistent with the *Santistevan* case, and the way that it's

19   normally done.  We're not planning to put 302s into evidence

20   absent some really unusual circumstance that the Court would

21   have an opportunity to rule on.

22           This is a perfect example of a motion we did not think

23   it needed to be argued today, because we think this is exactly

24   the place where if there's a legitimate objection to how we're

25   cross examining, the Court is at the moment completely able and

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    highly experienced in granting and sustaining objections.

2             So, I don't know that we need to resolve this today,

3    and that was our position coming in.  I think as a practical

4    matter, we intend to cross examine consistent with the federal

5    rules of evidence, which I don't think is inconsistent with what

6    the Government is saying.

7             I will say one other point, and I think this is

8    important, the vast majority of the 302s in this case -- and I

9    believe attorney proffers, although we haven't seen who wrote

10   notes on attorney proffers, were by the case agent of the case,

11   FBI Agent Matt Campbell.  He's on the witness list.

12            The circumstance and the exact sequence of events that

13   we were just hearing from Ms. Lewis is a real one that there may

14   be an opportunity for us to ask the agent about what was said to

15   the agent by way of proving up a prior inconsistent statement.

16   And that could happen in the context of an attorney proffer, if

17   that agent was present.

18            THE COURT:  So, let's do a hypothetical and see.  In

19   one of these interviews -- memos, the 302, it says Mr. Whitney

20   told us that Mr. Thiry insisted that we would have an agreement

21   to allocate the market.

22            Whitney is on the stand, and the question is, didn't

23   you say that Thiry confessed to you that he wanted to have an

24   allocation of the market?

25            No.  No.  I didn't say that.

21-cr-229-RBJ     Motions Hearing     03-03-2022

1           Now, he's got the 302.  He's ready to challenge.  How

2   does it work?

3           MS. LEWIS:  So, Your Honor, he can certainly ask, did

4   you tell the FBI on such and such date --

5           THE COURT:  Yes.  And the witness says no.

6           MS. LEWIS:  And if the witness says no, then he says,

7   thank you very much.  And then he calls Special Agent Hamel, and

8   he asks Agent Hamel, did Mr. Whitney tell you this statement in

9   this interview?  But he cannot read out loud the statement from

10  the 302 with Mr. Whitney, for example, on the stand.

11          THE COURT:  And the reason is because that's just the

12  agent's impression of what the witness said.

13          MS. LEWIS:  Correct.

14          THE COURT:  I don't think Mr. Walsh disagrees with you

15  in general.

16          MR. WALSH:  In general, no.

17          MS. LEWIS:  If Mr. Walsh is agreeing with me on proper

18  cross examination, then we have no issue, and I assume he's

19  willing to concede our motion in limine.

20          MR. WALSH:  Your Honor, where I would contest is I

21  don't think there needs to be an advanced ruling on this.  I

22  think the Court is quite able to regulate at trial.

23          THE COURT:  Okay.  What else today?  Anything?

24          MS. LEWIS:  Your Honor, we do want to take up our

25  request for a preliminary jury instruction.

21-cr-229-RBJ    Motions Hearing    03-03-2022

1          THE COURT:  Preliminary jury instruction on what?

2          MS. LEWIS:  Yes, Your Honor.  On the elements of the

3   Sherman Act.

4          THE COURT:  On the what?

5          MS. LEWIS:  On the elements of the Sherman Act.  In

6   other words, the preliminary instruction that would tell the

7   jurors what the elements are of a Sherman Act offense that they

8   will be hearing at trial in order to properly orient them to

9   that.

10         THE COURT:  I don't have any problem with that at all,

11  as long as the parties and the Court can reach an agreement on

12  how that's worded.

13         MS. LEWIS:  And, Your Honor, I think there is the rub.

14  So, where the parties disagree, I think they have a fundamental

15  disagreement about what the indictment charges and what the

16  proper characterization of that is.

17         THE COURT:  Can't be any disagreement about what the

18  indictment charges.  It says what it says.

19         MS. LEWIS:  That's absolutely right, Your Honor.

20  Nonetheless, we seem to have a disagreement.  Our view is that

21  the plain language of the indictment --

22         THE COURT:  I can read the indictment to the jury.

23  That's a commonly done thing.  I don't mind doing that.

24         MS. LEWIS:  Absolutely.  And what the indictment

25  charges is a conspiracy to allocate employees.  What the

21-cr-229-RBJ    Motions Hearing    03-03-2022

1   defendants would have read into that is that there's a

2   conspiracy to allocate a, quote, market, employment market,

3   across the United States.  That is simply an incorrect

4   characterization of both the indictment, and an incorrect

5   characterization of Your Honor's ruling on the motion to

6   dismiss.

7          THE COURT:  You're charging an agreement to allocate

8   the market of the employees that might be employed by these

9   companies.

10         MS. LEWIS:  And, Your Honor, what we are charging --

11         THE COURT:  That's the market; right?

12         MS. LEWIS:  So, if I may, what we have to prove for a

13  horizontal conspiracy, that is a market allocation, as Your

14  Honor found it was, a per se unlawful market allocation, the

15  market showing that we need to make is that they were horizontal

16  competitors at the same level of the market structure, and that

17  they agreed not to compete.

18         THE COURT:  I don't even know what that means.

19         MS. LEWIS:  Well, Your Honor --

20         THE COURT:  When you start resorting to antitrust

21  lawyer lingo, you're going to lose the jury and me at the same

22  time.  I'm not an antitrust lawyer.  So, speak in English.

23         MS. LEWIS:  Yes, Your Honor.  And so, again, I think

24  perhaps it may be helpful to indicate what the Tenth Circuit

25  found in the *Suntar Roofing* case when it was confronting this

21-cr-229-RBJ    Motions Hearing    03-03-2022

1    exact issue.  It found that an agreement to allocate or divide

2    customers between competitors within the same horizontal market

3    is what constitutes the per se violation of the Sherman Act.

4         And the instruction that the Court in *Suntar*

5    approvingly indicated from the district court was that a

6    conspiracy to allocate customers is an agreement or

7    understanding between competitors not to compete for the

8    business of a particular customer or customers.  So, again, this

9    concept that there needs --

10        THE COURT:  But this doesn't have to do with

11   customers.  This has to do with employees.

12        MS. LEWIS:  That's correct, Your Honor.  And so our

13   proposed instruction on the substantive instruction is that it

14   would be an agreement to allocate employees not to compete for

15   employees between the relevant competitors.  That I think is

16   very different than what the defendants would suggest that we

17   need to prove, which has something to do with a broader

18   employment, quote/unquote, market in the United States.

19        THE COURT:  Well, I don't know what they're thinking,

20   but my understanding of the case is consistent with what you

21   just said.

22        MS. LEWIS:  Thank you, Your Honor.  And I think what

23   we would ask in the preliminary instruction is what we have

24   submitted to Your Honor and on the ECF, that merely recites the

25   three elements of the Sherman Act at a high level.

21-cr-229-RBJ    Motions Hearing    03-03-2022

1         So, in other words, it would simply state that the

2    first element is a conspiracy between two or more competitors

3    for employees to allocate employees as alleged in the

4    superseding indictment at or about the times alleged.  It's a

5    very standard instruction for Sherman Act cases.

6         The second element is that the defendant knowingly,

7    that is voluntarily and intentionally joined the conspiracy.

8         And then the third element the parties have reached an

9    agreement on the wording of that, the conspiracy occurred in the

10   flow of or substantially affected interstate trade or commerce.

11   That's the preliminary instruction that we would request the

12   Court give to the jury at the outset to help frame the charges,

13   and that's what we request.

14         THE COURT:  Okay.

15         MS. LEWIS:  Thank you, Your Honor.

16         THE COURT:  Well, other than it's worded in legalese,

17   what's your objection to what she wants?

18         MR. EVERETT:  So, Your Honor, Clay Everett for DaVita.

19   So, our primary objective -- objection to the preliminary

20   instruction that's been proposed by the Department of Justice is

21   that it doesn't address what really will be at issue in this

22   trial, which as we talked about repeatedly over the course of

23   today, that ultimately -- and I think the Government

24   acknowledges they have a burden to prove beyond a reasonable

25   doubt that whatever agreements there were were entered with the

21-cr-229-RBJ     Motions Hearing     03-03-2022

 1   purpose of allocating the market.

 2            So, their proposed instruction, which again, may make

 3   sense in the context of a garden variety, say, customer

 4   allocation agreement, does not make sense in the context of this

 5   particular case, because it doesn't reference their burden to

 6   prove that there is a purpose of allocating the market for

 7   employees.

 8            THE COURT:  Okay.  I agree with that too, but you

 9   brave antitrust lawyers can't agree, so you're going to get

10   whatever instruction I decide on.  Too bad for you.

11            MR. EVERETT:  Understood, Your Honor.

12            THE COURT:  I always tell people, and I've told

13   probably you guys, that you ought to want a correct set of

14   instructions.  Otherwise, you're going to get a verdict, and

15   then someone is going to appeal, and there you go.  You ought to

16   want it to be right, but if you want to be advocates and try to

17   get your own favored version, you're going to end up with what I

18   do.  I will do the best I can with it.  That's it.  Anything

19   else today?

20            MS. CLINGAN:  Nothing from our side, Your Honor.

21            MR. WALSH:  Not from the defense, Your Honor.

22            THE COURT:  If anybody is going to want to continue

23   the trial, don't be hiding it in the weeds now.  And it really

24   isn't helpful either to be contacting chambers kind of on the

25   sly.  So, do you want it, or do you not want it?  What do you

21-cr-229-RBJ    Motions Hearing    03-03-2022

1   want?

2           MS. CLINGAN:  The United States prefers to proceed

3   with the trial date that's set.

4           MR. DODDS:  Your Honor, if the other option was

5   available as just two weeks, we can't be sure whether that would

6   be sufficient, so we will stick with the date that's set as

7   well.

8           THE COURT:  Okay.

9           MR. MELSHEIMER:  Agreed.

10          THE COURT:  Then you're just going to have to live

11  with what I can find time and the physical energy and ability to

12  do, because I am in the midst of the most difficult stretch I

13  have faced in my entire career on the bench.  Seven days a week.

14  Thank you.  Good day.

15       (Proceedings concluded at 12:25 p.m.)

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2

3

4          I, KEVIN P. CARLIN, Official Court Reporter for the

5   United States District Court for the District of Colorado, a

6   Registered Merit Reporter and Certified Realtime Reporter, do

7   hereby certify that I reported by machine shorthand the

8   proceedings contained herein at the time and place

9   aforementioned and that the foregoing pages constitute a full,

10  true, and correct transcript.

11          Dated this 6th day of March, 2022.

12

13

14

15

16                              _____
                                Kevin P. Carlin, RMR, CRR
17                              Official Court Reporter

18

19

20

21

22

23

24

25