IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 21-cr-0229-RBJ

UNITED STATES OF AMERICA,

        Plaintiff,

v.

    1. DAVITA INC.,

    2. KENT THIRY,

        Defendants.

_____

**DEFENDANTS' NOTICE OF SUBMISSION OF EXPERT REPORT BY
DR. PIERRE-YVES CREMIEUX**
_____

During the March 3, 2022 general motions hearing, Defendants agreed to provide an expert report from Dr. Cremieux, the sole expert disclosed by Defendants DaVita, Inc. and Kent Thiry. Defendants hereby produce Dr. Cremieux's report. That report details the methodologies Dr. Cremieux employed and the data he relied upon in support of his disclosed opinions. Defendants respectfully submit that Dr. Cremieux's anticipated testimony as disclosed, outlined, and explained in the submitted report is both relevant and reliable, satisfies the requirements for admission under Federal Rule of Evidence 702, and that Dr. Cremieux should be permitted to testify at trial.

As detailed in the enclosed report, Dr. Cremieux's approach "is based on the scientific method, using real-world observations and data to test the [Government's] claim that there were labor market allocation agreements between DaVita and each of the three companies." Cremieux Report at ¶18.

1

- Dr. Cremieux analyzed employee movement between the companies at issue both during and outside of the alleged conspiracy period, finding that employee movement between the companies at issue in the indictment during the conspiracy period was inconsistent with the existence of a labor market allocation agreement. Cremieux Report at ¶¶36-40.  Identification of employee movement through application of similar data has been found in the economic literature to be an indication of competition. *Id*. at ¶36 n.53.

- For Dr. Cremieux's opinion that "economic evidence is inconsistent with the suppression of turnover that would be expected if there were labor market allocation agreements" (*Id*. at ¶¶41-45), he "first examine[d] the annual job-to-job turnover rate for executives and managers in the U.S. healthcare industry,[1] which serves as an industry benchmark" then took "the average of this annual benchmark rate over the 2009–2011 period,  prior to any of the alleged conspiracy periods, as well as over the years in each of the alleged conspiracy periods." *Id*. at ¶42. Dr. Cremieux then used DaVita's compensation data and termination data,[2] as well as LinkedIn data, to calculate the annual job-to-job turnover rate for senior-level DaVita employees, averaged those annual rates over available years prior to the conspiracy periods, and over the years in each conspiracy period. *Id*. at ¶43.  Finally, he calculated the difference between the DaVita's average job-to-job turnover rate and the benchmark rate. *Id*. at ¶44.  This analysis of an outcome of interest during and outside the

---

[1] The US Census Bureau's Annual Social and Economic Supplement (ASEC) of the Current Population Survey data is used as a benchmark for industry-wide separation rates.  The use of a benchmark such as this is common in a "difference-in-differences" approach. *See* Cremieux Report at ¶41 n.59.

[2] The compensation data was used to determine (A) median compensation and (B) termination timing. The data is used by the company for its own internal business purposes, including human resources and payroll. The use of this data is consistent with how professional economists determine "prices" in both "before-during-after" approaches and "difference-in-differences" approaches. *See* Cremieux Report. at ¶47 n.64, 65.

conduct period, relative to a benchmark, is known as the "differences-in-differences" approach, which is well-accepted in the economics and antitrust literature. Cremieux Report at ¶41 n.64 (citing academic sources).

- Dr. Cremieux employed a similar methodology to reach his opinion that the economic evidence is inconsistent with the suppression of compensation that would be expected if there were labor market allocation agreements. *Id*. at ¶¶46-47.  Dr. Cremieux's analysis looked at senior-level DaVita salaries over time using DaVita's internal compensation data used by the company, then examined how the difference between the DaVita salaries and the benchmark changed during the alleged conspiracy periods.[3] Dr. Cremieux explains that his analysis of salaries over time is a type of analysis, well-accepted in economics, is often known as a "before-during-after" approach. *Id*. at ¶47 n.69 (citing academic sources).[4]  Dr. Cremieux's examination of the difference between senior-level DaVita salaries and the national benchmark is a "difference-in-differences" approach, which is also well-accepted in economics. *Id*. at ¶47 n.70 (citing academic sources).[5]

---

[3] Bureau of Labor Statistics, Occupational Employment and Wage Statistics data is used as a benchmark for industry wide compensation rates. The use of a benchmark such as this is common in a "difference-in-differences" approach. *See* Cremieux Report.at ¶47 n.65.

[4] Courts frequently recognize the reliability of this approach. *See In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 391 (D.R.I. 2019) (finding "before-during-after" method "reliable"); *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 175 F.3d 18, 24 n.3 (1st Cir. 1999) (noting that the "before and after" method is an "accepted method[] of economic analysis").

[5] Courts frequently recognize the reliability of this approach. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 808 (7th Cir. 2012) (indicating that "economic and statistical methods used by the Federal Trade Commission … to analyze antitrust impact" include a "basic method, called 'difference-in-differences,'" and reversing the district court's denial of class certification because the expert's "difference-in-differences methodology to estimate the antitrust impact… was sufficient to show predominance under Rule 23(b)(3)."); *In re Evanston Nw. Corp. Antitrust Litig.*, No. 07-CV-04446, 2013 WL 6490152, at *6 (N.D. Ill. Dec. 10, 2013) (noting that "the Seventh Circuit expressly credited" "difference-in-differences analyses").

- For the lack of incentive opinions, Dr. Cremieux determined competitors for at issue employees by documenting employee movements using LinkedIn data.[6] This methodology for identifying competitors is well established in the literature. *Id*. at ¶36 n.53; ¶49 n.74 (identifying sources for methodology).

- For his opinions about the unilateral incentives of companies, Dr. Cremieux applied his understanding of labor economics and his experience, as well as scientific literature to reach his opinion. *Id*. at ¶¶56-60 (identifying sources).

Dr. Cremieux's report also explains his conclusions based on this data and methodology, how his experience leads to the conclusions, why his experience provides a sufficient basis for each opinion, and how his experience is reliably applied to the facts. *U.S. v. Nacchio*, 555 F.3d 1234, 1258 (10th Cir. 2009) (citing Fed. R. Evid. 702 advisory committee's note (2000)) ("An expert witness's testimony can rely solely on experience. When that is the case, however, 'the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'").

The Government will have ample opportunity to explore and test Dr. Cremieux's opinions via cross-examination at trial. *See, e.g.*, *Coffman*, 2019 WL 2614558, at *2 (Jackson, J.) (holding that the expert's potential bias and the reliability of his opinions can be explored on cross-examination and "entrust[ing] the jury with the task of evaluating counsel's arguments as to bias and reliability.").

---

[6] This data was used to identify the timing and destinations of employees changing jobs. Dr. Cremieux used data from over 10,000 profiles collected from LinkedIn. LinkedIn is the world's largest career network, and datasets derived from LinkedIn profiles are used in peer-reviewed research in part of an increased reliance on real-world evidence. Cremieux Report at ¶18, n.39, 40.

Dated:  March 14, 2022

Cliff Stricklin
King & Spalding
1401 Lawrence Street, Suite 1900
Denver, CO 80202
(720) 535-2327
cstricklin@kslaw.com

Jeffrey Stone
Daniel Campbell
McDermott Will & Emery LLP
444 W Lake St.
Chicago, IL 60606
(312) 984-2064
jstone@mwe.com

Justin P. Murphy
McDermott Will & Emery LLP
500 North Capitol Street, NW
Washington, DC 20001-1531
(202) 756-8018
jmurphy@mwe.com

*Counsel for Defendant Kent Thiry*

Respectfully submitted,

/s/ John F. Walsh III

John F. Walsh III
Wilmer Cutler Pickering Hale & Dorr LLP
1225 17th Street, Suite 2600
Denver, CO 80220
(720) 274-3154
john.walsh@wilmerhale.com

John C. Dodds
Morgan Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
(215) 963-4942
john.dodds@morganlewis.com

J. Clayton Everett
Morgan Lewis & Bockius LLP
1111 Pennsylvania Avenue NW
Washington, DC 20004
(202) 739-5860
clay.everett@morganlewis.com

*Counsel for Defendant DaVita Inc.*

**CERTIFICATE OF SERVICE**

I certify that on March 14, 2022, I filed the above document with the Clerk of the Court using CM/ECF, which will send electronic notification thereof to all registered counsel.

/s/ John F. Walsh III

John F. Walsh III
