IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge R. Brooke Jackson

Criminal Case No. 1:21-cr-00229-RBJ

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. DAVITA INC.
2. KENT THIRY

    Defendants.

### ORDER RESOLVING DISPUTES ON PROPOSED JURY INSTRUCTIONS

The parties submitted a joint set of proposed jury instructions. ECF No. 174 (hereinafter "Proposed Instructions"). The Proposed Instructions highlighted ongoing disputes, and the parties submitted briefs articulating their positions on the disputed instructions. ECF Nos. 175 (defendants' brief), 178 (government's brief). The Court's usual practice is to return comments in track changes. Here, however, the parties dispute and have fully briefed multiple complex legal questions. This order resolves some of those disputes and provides the Court's preliminary opinions on other issues. The primary purpose of this order is to create a record of the Court's resolution of important issues. The parties should incorporate this order into their next proposed set of jury instructions. If they deem it necessary, the parties may present further arguments as they approach a final version of the jury instructions.

## I. RESOLUTION OF BRIEFED DISPUTES

### A. Language With Which to Describe the Unlawful Alleged Conduct

The government alleges that defendants entered into an unlawful agreement. The parties dispute the proper language to describe such an agreement. The government offers the language "conspiracy to allocate employees." *See, e.g.*, Instructions at 49; *see also id.* at 58 (using the term "employee-allocation conspiracy"). Defendants prefer the term "conspiracy . . . to allocate the market for employees across the United States." *See, e.g., id.* at 50.

The parties should use the term "a conspiracy to allocate the market for employees.[1]" This language is consistent with the Court's order denying defendants' motion to dismiss the indictment. ECF No. 132 (hereinafter MTD Order). In that order, the Court said that "at trial, the government will not merely need to show that the defendants entered the non-solicitation agreement and what the terms of the agreement were. It will have to prove beyond a reasonable doubt that defendants entered into an agreement with the purpose of allocating the *market* for senior executives (Count 1) and other employees (Counts 2 and 3)." *Id.* at pp. 18–19 (emphasis added).

The government's objections to using the word "market" do not persuade me to depart from the MTD Order's language. The government first contends that describing a market allocation agreement without using the term "market" would be consistent with instructions given in cases alleging agreements to allocate customer markets. In *United States v. Suntar Roofing, Inc.*, 709 F. Supp. 1526 (D. Kan. 1989), *aff'd*, 897 F.2d 469 (10th Cir. 1990), the court informed the jury that "[e]ach defendant has been indicted for the crime of conspiracy to allocate

---

[1] For Count 1, the proper language is "a conspiracy to allocate the market for senior executives" or "senior-level employees." For convenience, I will use the term "employees" throughout this Order, but for instructions dealing specifically with Count 1 the language "senior executives" or "senior-level employees" should be used.

customers for new roofs in the Kansas City, Kansas, metropolitan area." *Id.* at 1536; *see also United States v. True*, Trial Tr. 2085–86, No. 4:97-cr-11 (W.D. Ky. Sept. 17, 1998), ECF No. 246 ("The indictment charges that . . . the defendant and his co-conspirators participated in a conspiracy to . . . allocate customers.").

The novelty of this case persuades me to depart from the instructions of customer-allocation cases. The government's cited customer-allocation instructions reflect a settled principle of antitrust law: allocating customers is a horizontal market allocation, which is a per se violation of the Sherman Act. By contrast, the government admits that this is among the first ever criminal prosecutions for allocating a labor market. *See* Transcript of Oral Argument on MTD, ECF No. 90. Further complicating matters is the government's theory that a market allocation agreement was effectuated by utilizing a non-solicitation an agreement. As I previously held, non-solicitation agreements are not per se violations of the Sherman Act, but non-solicitation agreements aimed at allocating markets are. MTD Order at 16–17. The cited customer-allocation instructions did not have to navigate such a fine line between permissible and per-se illegal agreements. *See True*, Trial Tr. 2092 ("Customer allocation exists, for example, where two or more competitors agree not to solicit [another's customers]."). I am conscious and careful in this case not to enlarge the traditional "market allocation" per se category. Including the word "market" in descriptions of the offense ties the government's burden to the traditional per se category.

The government next contends that including the word "market" would incorrectly characterize the superseding indictment, which alleged a conspiracy to "allocate employees." ECF No. 74 at ¶18. I disagree. Although the superseding indictment alleges an agreement "to allocate employees," its characterization of the agreement as a per se unlawful restraint of trade

implies the allocation of a market for employees consistent with the per se category "market allocation agreement." I denied defendants' motion to dismiss on this basis. *See* MTD Order.

The government also objects that including the word "market" would erroneously increase the government's burden of proof by requiring them precisely define a "market" or prove that the entire market was allocated. ECF No. 178 at pp. 8–10. Any such concerns can be addressed by properly defining "allocate the market for employees" in a subsequent instruction. *See infra* (ruling on the parties' dispute about Disputed Instruction No. 27).

Finally, defendants' proposal to add the words "across the United States" should be denied for improperly characterizing the superseding indictment. Describing the unlawful alleged conduct as an "agreement to allocate the market for employees across the United States" implies that the market allocated needed to be national. The superseding indictment alleges that the no-solicitation agreement extended "across the United States," ECF No. 74 at ¶10, but it does not say that the market allegedly allocated was a market across the United States. To avoid confusion, the geographical language should be dropped.

### B. Disputed Instruction No. 27 — Allocation

Given the above discussion, this instruction should define a conspiracy "to allocate the market for employees." As discussed below, I think it would be clarifying to focus this instruction solely on the definition of such a conspiracy and leave the intent and/or purpose elements for later instructions. The remainder of this subsection will focus on three disputes: (1) whether the government needs to define the "market"; (2) the extent to which market allocation requires cessation of competition; and (3) whether the defendants must have conspired to allocate an entire market.

The government does not need to define the "market" allegedly allocated to carry its burden of proof. Market allocation agreements between horizontal competitors — actual or

potential competitors at the same level of the market structure — are per se unreasonable restraints of trade in violation of the Sherman Act. *United States v. Topco Associates, Inc.*, 405 U.S. 596, 608 (1972). By contrast, market allocation agreements by *vertical* competitors are not always per se unreasonable. *Key Fin. Plan. Corp. v. ITT Life Ins. Corp.*, 828 F.2d 635, 640 (10th Cir. 1987) ("This circuit applies a per se rule to vertical restraints of trade only if they include price-fixing motives."). Analyzing vertical market allocation agreements thus requires a precise definition of the market so that a court can apply the rule of reason. The same is not true of horizontal market allocation agreements — their anticompetitive effects may be inferred from their existence. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 n.17 (2018) ("Given that horizontal restraints involve agreements between competitors not to compete in some way, this Court . . . did not need to precisely define the relevant market to conclude that these agreements were anticompetitive. . . . Vertical restraints . . . cannot be evaluated unless the Court first defines the relevant market.").

Defendants offer no contrary precedent. In their principal case, *Smalley & Co. v. Emerson & Cuming, Inc.*, 13 F.3d 366 (10th Cir. 1993), the Tenth Circuit affirmed summary judgment on a plaintiff's market allocation claim because the district court had "correctly applied the law of [that] circuit." *Id.* at 368. The Tenth Circuit affirmed the district court's decision that the alleged restraints were "vertical, not horizontal" and noted that the district court had mentioned that the plaintiff had not properly defined the relevant market "[a]s a separate basis for summary judgement." *Id.* The district court's decision makes clear that plaintiff was required to define the relevant market only because the court had concluded that the restraint was vertical and thus subject to rule of reason analysis. *Smalley & Co. v. Emerson & Cuming, Inc.*, 808 F. Supp. 1503, 1510–11 (D. Colo. 1992), aff'd, 13 F.3d 366. The court said that "under the

5

rule of reason analysis," "[p]laintiff cannot prove an adverse effect on competition without a properly defined relevant product market." *Id.* at 1511. This requirement to define the relevant market for a rule of reason analysis does not apply to a horizontal market allegation agreement like the one alleged here.[2]

Second, I find that a horizontal market allocation requires cessation of "meaningful competition" in the allocated market. This standard requires the government prove actual employee allocation (or, in this case, a conspiracy to actually allocate), but it does not allow defendants to disprove the government's case by showing that switching employers is theoretically possible or occurred in a few exceptional cases. This instruction is consistent with authority relied upon by both parties. The government cites a Fifth Circuit case holding that an agreement allocating customers in one phase of business is illegal even if competition in other areas of business remains. *United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1088 (5th Cir. 1978) ("Suppose for illustration, that appellants had allocated the Bronx to Consolidated, Brooklyn to General, and Queens to Modern Silver, reserving the right to compete with each other in Manhattan. Clearly this hypothetical division of markets would be unreasonable per se, notwithstanding the open competition in Manhattan."). Defendants' cases

---

[2] Defendants' other cited case, *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705 (11th Cir. 1984) (per curiam), is similarly inapplicable. In that case, the Eleventh Circuit summarily affirmed a district court's grant of summary judgment on a market allocation claim. *Id.* at 709. A key issue was whether the alleged allocation was horizontal or vertical. The plaintiff, a Waffle House franchisee in Illinois, sued Waffle House for allocating territory in Alabama to specific restaurant operators. *Id.* at 716–17. Waffle House has a unique business model. It owns and operates restaurants in some areas and grants franchisees exclusive rights to operate Waffle Houses in other areas. *Id.* The court had to determine whether Waffle House's owning and operating some restaurants made it a horizontal competitor of the franchisee-plaintiff or whether Waffle House's granting the plaintiff franchise rights meant that it operated vertically at a different level of the market. The court found that the vertical-horizontal distinction was "implausible" in such a case. *Id.* It loosely defined the relevant market to determine whether the restraint was better analyzed under vertical or horizontal Sherman Act-analysis. *Id.* Its decision to define the relevant market was a response to a unique situation and does not establish a general rule for horizontal market allocation agreements.

also support the "meaningful competition" standard. In *Bogan v. Hodgkins*, 166 F.3d 509 (2d Cir. 1999), the Second Circuit found that an agreement was not subject to per se treatment because it did "not allocate the market for agents to any meaningful extent." *Id.* at 515.

Defendants ask this Court to use a standard stricter than "meaningful competition" — they claim that all competition must cease for something to properly be classified a market allocation agreement. They rely primarily on a Tenth Circuit case, *Midwest Underground Storage, Inc. v. Porter*, 717 F.2d 493 (10th Cir. 1983). There, the Tenth Circuit devoted a footnote to a plaintiff's attempt to shoehorn an unobjectionable agreement into a per se category by alleging that "the conspiracy constitutes something akin to a market allocation agreement, a concerted refusal to deal, and a price fixing arrangement." *Id.* at 497 n.2. The court stated that the "essence of a market allocation" agreement is that "competitors apportion the market among themselves and cease competing in another's territory or for another's customers." *Id.* Defendants argue that this Court is bound by the Tenth Circuit's statement that market allocation agreements are characterized by competition cessation. I disagree. The Tenth Circuit may have mentioned ceasing competition, but it analyzed the agreement only for "market division." *Id.* The Tenth Circuit's actual analysis suggests that its language about ceasing competition was more illustrative than definitional. Moreover, the footnote only discusses competition for "customers" or "territory." It does not mention other markets, like employment markets, that also cannot be legally allocated. This gap further suggests that the Tenth Circuit's competition-cessation language was not intended to apply to all market allocation agreements. I therefore find that the *Midwest Underground* footnote is not inconsistent with the "meaningful competition" language I propose.

Finally, the government need not prove that defendants allocated the entire market for employees. The Tenth Circuit made this clear when it said that an agreement may be a horizontal market allocation agreement even though "the alleged agreement would only affect a small number of potential customers." *United States v. Kemp & Assocs., Inc.*, 907 F.3d 1264, 1277 (10th Cir. 2018).

## II.   PRELIMINARY OPINIONS ON ADDITIONAL ISSUES

### A.   Order of the Instructions

I think it might clarify things to re-order the instructions beginning with Instruction No. 24. The preceding instruction, Instruction No. 23, pp. 49–52, lists the elements of the offense. The following instructions should explain, in order, each phrase presented in the elements of the offense instruction.

Imagine, for example, the elements of the offense are described in Instruction 23 as follows: (1.1) a conspiracy (1.2) to allocate the market (1.3) on or about the times alleged; (2.1) knowingly entering the conspiracy (2.2) with the purpose of furthering its ends; and (3) interstate commerce. In such a case, I think the following instructions should be given in the following order: (24) conspiracy (25) market allocation (26) on or about the times alleged; (27) knowingly joining (28) purpose of allocating the market; and (29) interstate commerce.

### B.   Reorganizing the Intent Element

First, both parties' definitions of market allocation include instructions about the mens rea required for liability. *See* Proposed Instructions pp. 58 ¶5; 61 ¶¶3–4. I think it might clarify both the market allocation instruction and the intent instruction to keep the issue separate.

Second, I think it might be helpful to bifurcate the intent instruction. The Proposed Instructions deal with intent in a single "knowingly joined" instruction, number 29. Proposed Instructions pp. 69–74. In my understanding, conspiracy requires two types of intent: the intent

8

to join the conspiracy and the intent to further the conspiracy's ends. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443 n.20 (1978). The Court was referring to the second type of intent when it held that the government "will have to prove beyond a reasonable doubt that defendants entered into an agreement with the purpose of allocating the market for [employees]." MTD Order pp. 18–19. I think that splitting the intent instruction in two — one instruction focused on the "knowingly joined" element and the other on the intent to further the conspiracy's ends, described in the MTD Order as a purpose element — might help the jury better understand the government's burden on intent.

### C. Adding an Instruction Clarifying the "Purpose" Element

Bifurcating the intent instruction as suggested above would create space for an instruction sharply focused on the Court's statement about defendants' "purpose" in entering into the alleged agreements. On my read, such an instruction could help resolve the parties' dispute about defendants' desire to introduce evidence of positive effects of the alleged agreements — things like increased salaries and promotions received by employees who notified their supervisors as required by the agreements. *See* ECF Nos. 107, 127. Defendants claim that evidence of salutary effects shows that the *purpose* of the alleged agreement was not to allocate the market but to do something else like, for example, increasing compensation for dissatisfied employees. The government contends that defendants seek to introduce such evidence to *justify* the market allocation agreements, which would be impermissible given the nature of per se rules. The government argues in the alternative that the evidence would be irrelevant even if it showed that a partial purpose of the agreement was to increase compensation because such a purpose is not incompatible with the purpose of allocating a market.

I agree with the government that it would be impermissible to introduce evidence to justify the market allocation agreement. Per se rules cut through the rule of reason — if

9

defendants entered into an agreement that violates the Sherman Act per se, it is immaterial whether such an agreement was actually good for the company or even good for the market as a whole. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 220–21 (1940) (holding per se treatment appropriate even though a price fixing scheme plausibly prevented a complete collapse of the domestic oil market and was very similar to actions the U.S. Government had itself taken).

I also agree with defendants that evidence of salary increases and other beneficial effects are relevant to disprove that the purpose of the agreement was to allocate a market. Such evidence might plausibly show an alternative purpose of the agreement, which would make it less likely that the defendants' purpose was to allocate the market. *See* Fed. R. Evid. 401.

However, the government is correct that an alternative purpose for the agreement is not inconsistent with a guilty verdict. The government does not need to prove that the *sole* purpose of the conspiracy was to allocate the market. Moreover, the government is reasonably concerned that evidence of an alternative purpose might be used by defendants to argue that agreement was justified.

The challenge is thus to permit defendants to introduce evidence of the agreement's salutary effects without the jury interpreting such evidence as either potential market-based justifications for the agreement or an alternative purpose of the agreement that would necessarily exonerate the defendants even if it were consistent with an unlawful purpose. I found the government's bank robbery example illuminating here: suppose someone with starving children conspired to rob a bank in order to feed his or her family. If precedent established that bank-robbing conspiracies were illegal regardless of why the defendant needed the money, then evidence of the starving family should not be introduced to justify the conspiracy. Nor would

such evidence be properly construed as establishing an alternative purpose to the conspiracy — feeding the family — the existence of which would necessarily exonerate the defendant. The bank-robbing conspiracy would have had at least two purposes: (1) robbing the bank; and (2) feeding the family. The fact that one of the purposes was illegal makes the conduct illegal, even though the agreement had another benign purpose.

I think a jury instruction dealing squarely with the question of an agreement's purpose could be helpful. Such an instruction would explain (1) that an agreement may have multiple purposes, but a guilty verdict could be appropriate if one of the purposes was to allocate a market; and (2) whether a market allocation agreement is justified should have no bearing on the question of whether it existed. I have proposed language below. My proposed language could be a standalone instruction or part of an instruction on the second part of the intent element. This proposed language is a first draft and not binding.

> The second element of the crime requires the government prove beyond a reasonable doubt that the defendants entered into an agreement with the purpose of allocating the market for senior employees (Count 1) and/or employees (Counts 2 and 3).
>
> A conspiracy can have multiple purposes. Allocating the market need not have been the conspiracy's sole purpose for you to conclude that it was the conspiracy's purpose.
>
> You need not conclude that the conspiracy was unreasonable, unjustified, or harmful to find that its purpose was to allocate the market. It is not for you to decide whether the conspiracy had good intentions or good results. You must decide only whether a conspiracy with the purpose of allocating the market existed.

### D. Intent to Restrain Trade

The next set of instructions may include a statement that defendants need not have intended to unreasonably restrain trade. This is the heart of the per se rule. The government

proposed some language on page 69 of the Instructions. I would find that language acceptable with the edits suggested below:

> As I have already instructed you, ~~an employee-allocation conspiracy~~ <u>a conspiracy to allocate the market for employees</u> is in itself an unreasonable restraint of trade and illegal; the government does not have to prove that the defendants specifically intended to <u>unreasonably</u> restrain trade or produce anticompetitive effects. The intent to <u>unreasonably</u> restrain trade is satisfied with the finding of intent to allocate <u>the market for</u> employees.

### III.   ORDER

The parties are hereby directed to submit a revised set of proposed jury instructions not inconsistent with this opinion.

DATED this 25th day of March, 2022.

BY THE COURT:

*[signature: Brooke Jackson]*

R. Brooke Jackson
Senior United States District Judge