1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO
2

Civil Action No. 21-cr-00229-RBJ
3

UNITED STATES OF AMERICA,
4
     Plaintiff,
5

vs.
6

1. DAVITA INC., and
7  2. KENT THIRY,

8      Defendants.
   _____
9

10                  **REPORTER'S TRANSCRIPT**
                  TRIAL TO JURY – DAY FIVE
11
   _____
12

13         Proceedings before the HONORABLE R. BROOKE JACKSON,

14  Senior Judge, United States District Court for the District of

15  Colorado, continuing at 9:02 a.m., on the 8th day of April,

16  2022, in Courtroom A902, United States Courthouse, Denver,

17  Colorado.

18

19

20

21

22

23

24              THERESE LINDBLOM, Official Reporter
               901 19th Street, Denver, Colorado 80294
25          Proceedings Reported by Mechanical Stenography
               Transcription Produced via Computer

1          **A P P E A R A N C E S**

2          MEGAN S. LEWIS, WILLIAM JEFFERSON VIGEN, SARA MICHELLE
CLINGAN and ANTHONY WILLIAM MARIANO, Attorneys at Law, U.S.
3   Department of Justice, Antitrust Division, Washington Criminal
II Section, 450 5th Street N.W., Washington, DC, 20530,
4   appearing for the Government.

5          JOHN C. DODDS, Attorney at Law, Morgan Lewis & Bockius
LLP, 1701 Market Street, Philadelphia, Pennsylvania, 19103,
6   appearing for Defendant DaVita.

7          JOHN F. WALSH, III, Attorney at Law, WilmerHale LLP,
1225 17th Street, Suite 2600, Denver, Colorado, 80220,
8   appearing for Defendant DaVita.

9          THOMAS MELSHEIMER, Attorney at Law, Winston & Strawn
LLP, 2121 North Pearl Street, 9th Floor, Dallas, Texas, 75201,
10  appearing for Defendant Thiry.

11         JUANITA ROSE BROOKS, Attorney at Law, Fish &
Richardson, 12860 El Camino Real, Suite 400, San Diego,
12  California, 92130, appearing for Defendant Thiry.

13                    *   *   *   *   *

14                  **P R O C E E D I N G S**

15         (In open court at 9:02 a.m.)

16         *THE COURT:*  Good morning.  Have a seat.  So today is

17  Opening Day, and one of the jurors has tickets and is planning

18  to go to the game if possible with his son, and I'd like to

19  make that happen.  He needs to be out of here at least by 1:30.

20  Can we make that work?

21         *MS. CLINGAN:*  Your Honor, we can make that work.  The

22  United States may not rest today, but we have no problem with

23  that.

24         *MR. WALSH:*  No objection from the defense.

25         *MR. MELSHEIMER:*  Does he have good seats, Your Honor?

1      *THE COURT:*  Actually, he has an extra seat and wanted

2   to invite you, Mr. Melsheimer.

3      *MR. MELSHEIMER:*  I'm in.

4      *THE COURT:*  But I told him that he would never get to

5   watch the game; you would be yapping at him the entire time.

6      *MR. MELSHEIMER:*  Maybe I could go through some of

7   those exhibits, Your Honor.

8      Thank you, Your Honor.

9      *THE COURT:*  Now, the other thing that the jurors

10  wanted to know --

11     How many are staying in hotels?

12     *COURTROOM DEPUTY:*  Four.

13     *THE COURT:*  In terms of reserving hotel rooms next

14  week, do you anticipate that we'll go the entire week?

15     *MS. LEWIS:*  Not from the United States' perspective,

16  Your Honor.

17     *MR. WALSH:*  We don't believe so either, Your Honor.

18     *THE COURT:*  Okay.  When do you think the evidence will

19  be finished?

20     *MS. LEWIS:*  Your Honor, I think most likely the

21  United States would rest on Monday given, now, the truncated

22  day today.

23     *MR. WALSH:*  Without knowing, of course, what the

24  government might do in terms of any rebuttal case, I would

25  think the end of the day Tuesday, and we would be done.

1          *THE COURT:* With the evidence?

2          *MR. WALSH:* Maybe Wednesday -- I'm sorry -- to be

3    safe.

4          *THE COURT:* So we'd get to the jury Thursday?

5          Does everybody agree?

6          *MS. LEWIS:* Your Honor, just, we may have a rebuttal

7    witness. I want to reserve that, depending on the case they

8    put on.

9          *THE COURT:* Right. And do you still want your *Daubert*

10   hearing?

11         *MR. VIGEN:* Yes, Your Honor.

12         *THE COURT:* Seriously?

13         *MR. VIGEN:* Yes. We believe two of the opinions have

14   serious reliability issues.

15         *THE COURT:* Oh. You're not trying to keep him off the

16   stand, just reduce him a bit?

17         *MR. VIGEN:* Yes, Your Honor.

18         *THE COURT:* Which two opinions are they that you don't

19   think he can do?

20         *MR. VIGEN:* I believe it's Sections 5 and 6, which

21   relate to his analysis of turnover and compensation data in

22   terms of the national benchmark. I intend to show that the

23   national benchmark is unreliable and should not be used.

24         *THE COURT:* Is that a critical part of your expert?

25         *MR. MELSHEIMER:* Your Honor, if you're asking me to

761

1    just agree to not do that, I can't do that right now.  But I

2    think it is an important part of our expert, Your Honor.  And

3    so we're happy to visit and confer about it, but I'm not

4    prepared --

5         THE COURT:  I'm not saying you should -- I'm not

6    saying you should give up on that.  I'm just trying to figure

7    out what I need to do over the weekend to prepare for the

8    hearing.

9         MR. MELSHEIMER:  I think very little.

10        THE COURT:  Just go ahead and exclude it?

11        MR. MELSHEIMER:  Well, if that's what you're inclined

12   to do, I wish you wouldn't.  But -- look, Your Honor, you said

13   you have a liberal view of that sort of evidence; and so I

14   think you're going to find this is going to be consistent with

15   that liberal view.

16        What we could do, Your Honor, if it wouldn't burden

17   the Court, is maybe provide you something -- we'll look at that

18   during the day.  And if there is something we can cut back or

19   carve back, we'll alert the Court.  How about that?

20        THE COURT:  All right.  That's fair.

21        In terms of today, if we're going to be recessing at

22   least by 1:30, do you want to power through the lunch hour, or

23   do you just want to stop at noon?

24        MS. LEWIS:  Your Honor, I think we'd defer to the

25   jurors, if they have an inclination.

1          MS. BROOKS:  I think our preference would be, if okay

2     with the jurors, that we power through until 1:30.

3          THE COURT:  All right.  I sense some dissent in the

4     group there.

5          MS. BROOKS:  I think that's because Mr. Melsheimer is

6     not anticipating having an opportunity to speak today, Your

7     Honor.  So, hence, he'd like to get the day over with as

8     quickly as possible.

9          MR. MELSHEIMER:  May I address that briefly?

10          THE COURT:  All right.

11          (Jury in at 9:08 a.m.)

12          THE COURT:  Good morning, ladies and gentlemen of the

13     jury.  Who is the lucky juror who has got tickets today?  Are

14     you going to invite me to go?

15          JUROR:  Next time.  I'm taking my son.

16          THE COURT:  We've conferred, and everybody believes,

17     as I do, that that's important.  So we won't interfere with

18     that.

19          JUROR:  Thank you, everybody.  I appreciate that.

20          THE COURT:  So everybody else on the jury gets the

21     benefit of your tickets.

22          Would it be acceptable to maybe go through the lunch

23     hour and let out around 1:00, 1:15, something like that?  Would

24     that work for everybody?

25          JUROR:  Yes, sir.

Richard Whitney – Direct

1          THE COURT:  In terms of those who are in hotel rooms

2     and were wondering about next week, the parties think that they

3     will be finished with the evidence on Wednesday.  If that is

4     the case -- maybe even sooner.  If that is the case, then the

5     case will get to you on Thursday, and so I don't -- I think

6     there is a decent chance that you won't have to be here Friday.

7     And it looks like you're not going to have to be here next --

8     the following week, unless it takes longer for you to

9     deliberate.  So we'll try to keep you updated on that.

10          Ready to go?

11          JUROR:  Ready as we'll ever be.

12          THE COURT:  Let's do it.

13          MS. CLINGAN:  United States calls Rich Whitney.

14          THE COURT:  Good morning, sir.

15          THE WITNESS:  Good morning.

16          (**RICHARD WHITNEY, GOVERNMENT'S WITNESS, SWORN**)

17                        **DIRECT EXAMINATION**

18     BY MS. CLINGAN:

19     Q.  Good morning, Mr. Whitney.

20     A.  Good morning.

21     Q.  Could you please state and spell your name for the record.

22     A.  Richard Whitney.  W-H-I-T-N-E-Y.

23     Q.  What's your current title?

24     A.  Chairman and CEO of Radiology Partners.

25     Q.  How long have you been at Radiology Partners?

Richard Whitney – Direct

1   A.   Since its founding in 2012.

2   Q.   Before that, what did you do?

3   A.   I was a healthcare investor.  And prior to that I worked at

4   DaVita on and off for about 17 years.

5   Q.   Can you just walk us through the positions you held at

6   DaVita during the some odd 17 years you worked there.

7   A.   From memory, director of corporate development, vice

8   president of corporate development, vice president of

9   international, chief financial officer, and then at various

10  times, senior adviser.

11  Q.   While you were at DaVita, did you have a relationship with

12  Kent Thiry?

13  A.   Yes.

14  Q.   What was that relationship?

15  A.   He was my boss.

16  Q.   And at times did you report directly to him?

17  A.   Yes.

18  Q.   Did you enjoy a personal relationship with him, as well?

19  A.   Yes.

20  Q.   When you left DaVita, what terms did you leave on?

21  A.   Good terms.

22  Q.   And were you on good terms with Mr. Thiry?

23  A.   Yes.

24  Q.   Do you continue to have a personal relationship with

25  Mr. Thiry?

Richard Whitney - Direct

1    *A.*  Yes.

2    *Q.*  Mr. Whitney, has Radiology Partners applied for leniency in

3    connection with this case?

4    *A.*  Yes.

5    *Q.*  And as part of that leniency agreement, are you hoping that

6    you will not be prosecuted as part of this investigation?

7    *A.*  Yes.

8    *Q.*  Let's talk about Radiology Partners for just a minute.

9    What does it do?

10   *A.*  Provides radiology services to hospitals and outpatient

11   centers around the country.

12   *Q.*  You said just a moment ago you've been there since it was

13   founded in 2012.  Who founded it?

14   *A.*  I did.

15   *Q.*  With anybody else?

16   *A.*  Dr. Anthony Gabriel.

17   *Q.*  And how did you get the money to get Radiology Partners off

18   the grounds?

19   *A.*  We raised it through an investment firm called New

20   Enterprise Associates.

21   *Q.*  And did Mr. Thiry give you some money, as well?

22   *A.*  He invested.  Yes.

23   *Q.*  Could you just give us a quick summary -- and I want to

24   focus on the years roughly 2013 through 2019.  If Radiology

25   Partners was looking to hire an employee during that period,

Richard Whitney - Direct

1   how would Radiology Partners go about finding a candidate to

2   fill that role?

3   A.  Any number of ways.  Working our networks or the networks

4   of people that were at Radiology Partners, internal recruiters,

5   external recruiters, word of mouth, advertising for positions,

6   things like that.

7   Q.  During that period, to what extent would you rely on active

8   solicitation of a candidate?

9   A.  It would often be part of our recruiting process.

10  Q.  To what extent?

11  A.  Often.

12  Q.  During that period, would you have wanted to consider

13  DaVita employees as candidates at Radiology Partners?

14  A.  Could you repeat that, please?

15  Q.  During the period 2013 to 2019, would you have wanted to

16  consider DaVita employees as candidates to hire at Radiology

17  Partners?

18  A.  Yes.

19  Q.  Did Radiology Partners in fact actually hire some DaVita

20  employees between 2013 and 2019?

21  A.  Yes.

22  Q.  Okay.  At some point did you reach an agreement with

23  Mr. Thiry concerning hiring?

24  A.  Yes.  I agreed to not recruit people who were -- that I

25  believed were not otherwise looking to leave DaVita.

Richard Whitney - Direct

1   Q.  Did this render employees who you didn't know were actively

2   looking to leave DaVita off limits?

3   A.  I guess it did.  Yeah.

4   Q.  Can you just tell us how that agreement came into place.

5   A.  In the fall of 2013, I received an email from Kent that

6   said, "Targeting our employees," with a question mark, and

7   asked to have a phone call about it.

8   Q.  Can you tell us about that phone call?

9   A.  Sure.  Apparently Kent had heard from others within his

10  organization that people at RP may have been targeting DaVita

11  employees.  And we had at that point in time already hired a

12  handful of DaVita executives, and I reassured Kent that we

13  were -- the people that we had hired were people that we

14  believed were already looking at other opportunities outside of

15  DaVita and -- and I -- in that call, I committed that I would

16  continue doing recruiting from DaVita in that way.

17  Q.  Okay.  You said this conversation initiated with an email

18  from Mr. Thiry, "Targeting our teammates."

19          Ms. Cabrera, could we take a look at Government

20  Exhibit 159.

21          We'd like to move this into evidence per stipulation.

22          THE COURT:  Admitted.

23          (Exhibit 159 admitted.)

24  BY MS. CLINGAN:

25  Q.  Mr. Whitney, is this the email you were just describing?

768

Richard Whitney – Direct

1    A.   Yes.

2    Q.   Can you read your response to Mr. Thiry?

3    A.   "By the way, we are definitely not targeting, but we'll

4    talk next week."

5    Q.   Did you understand that Mr. Thiry would be upset if you had

6    been targeting DaVita teammates?

7    A.   I assumed that he would be.

8    Q.   Okay.  Now, you said at this point in time, before you had

9    the conversation with Mr. Thiry, you had hired a number of

10   DaVita individuals.  Can you just name the individuals who you

11   recall had been hired from DaVita before you had the

12   conversation with Mr. Thiry?

13   A.   I'm not sure I can name a complete set of them, but I could

14   certainly name some.

15   Q.   Sure.

16   A.   So, of course, Anthony Gabriel, Philip Reger, Jeff Long,

17   Tom Usilton.  Those are the ones that I can think of off the

18   top of my head.

19   Q.   Okay.  Do you think that the number of individuals you

20   hired from DaVita before your conversations with Mr. Thiry was

21   fewer than ten?

22   A.   I would guess it was fewer than ten.

23   Q.   Okay.  And Mr. Thiry was upset by that?

24   A.   Well, he did reach out wanting to talk about the fact that

25   people had told him we were targeting DaVita employees; so,

Richard Whitney – Direct

1   yes.

2   *Q.*  Okay.  After this email that we're looking at here,

3   Government Exhibit 159, you testified you did have a

4   conversation with Mr. Thiry.

5           Please get Government Exhibit 160.

6           Your Honor, we'd move this, as well, per stipulation.

7           *THE COURT:*  All right.  Admitted.

8           (Exhibit 160 admitted.)

9   *BY MS. CLINGAN:*

10  *Q.*  Mr. Whitney, what is this document?

11  *A.*  This is a calendar appointment for a phone call between

12  Kent and me.

13  *Q.*  Remind us who initiated this phone call.

14  *A.*  Kent had asked for the phone call.

15  *Q.*  And looking at the start date of this calendar invitation,

16  when was the call with Mr. Thiry to take place?

17  *A.*  October 30 at 2:30 p.m.

18  *Q.*  Okay.  You started to testify a little bit about the phone

19  call.  What did you offer to Mr. Thiry during that phone call?

20  *A.*  That I would continue to recruit only those people at

21  DaVita that I believed had worked -- were considering

22  activities outside of DaVita.

23          *MS. CLINGAN:*  Let take a look at Government

24  Exhibit 166, which I believe is already admitted.

25          *THE COURT:*  Yes.

770

Richard Whitney – Direct

1  *BY MS. CLINGAN:*

2  *Q.*  Mr. Whitney, you just testified that the phone call with

3  Mr. Thiry was scheduled for October 30.  Where in time does

4  this email thread fall relative to your call with Mr. Thiry?

5  *A.*  The day before.

6  *Q.*  Okay.  So at this point were you aware that you were going

7  to have a conversation with Mr. Thiry?

8  *A.*  Yes.

9  *Q.*  Okay.  The subject of this email is "offer."  And

10  Dr. Gabriel's email at 10:41 on the very first page, says,

11  "The below is for Eddie Robles."  Who is Mr. Robles?

12  *A.*  Eddie is an IT support person.

13  *Q.*  Is this another individual who was hired from DaVita?

14  *A.*  Yes.

15  *Q.*  And had Radiology Partners initiated his hiring process

16  before your conversation with Mr. Thiry?

17  *A.*  Yes.

18  *Q.*  Okay.  Let's look at your email at the top of the first

19  page.  You say you are cool with hiring the position.  Can you

20  just read the last paragraph of your email, starting with,

21  "Finally, are we 100 percent whole."

22  *A.*  "Finally, are we 100 percent whole on this one in terms of

23  believing he is leaving DaVita in any event and that we aren't

24  encouraging him to leave?  I am about to make that commitment

25  to Kent, so we really need to be sure that we are living up to

1    it, or I shouldn't say it."

2    Q.  Does this basically summarize the agreement that you

3    ultimately reached with Mr. Thiry?

4    A.  Yes.   That's what I committed in that phone call.

5    Q.  Are you agreeing to compete with DaVita for employees less

6    forcefully than you otherwise would have?

7    A.  Yes.

8    Q.  Did you ultimately compete for DaVita employees as hard as

9    you would have absent your agreement with Mr. Thiry?

10   A.  No.

11   Q.  Are there any other companies with whom you had this

12   gentlemen's agreement with?

13   A.  No.

14          MS. CLINGAN:  All right.  Let's take a look at

15   Government Exhibit 169-1.

16          Your Honor, we'll move this in pursuant to

17   stipulation, as well.

18          THE COURT:  All right.  It's admitted.

19          (Exhibit 169-1 admitted.)

20   BY MS. CLINGAN:

21   Q.  Mr. Whitney, who is this email from; who is it to?

22   A.  It's from me to Kent.

23   Q.  And what's the date of the email?

24   A.  November 5, 2013.

25   Q.  Can you just read the first paragraph of your email to

Richard Whitney – Direct

1    Mr. Thiry.

2    *A.*  "Good catching up with you the other day.  I have had a

3    chance to think about our conversation and discuss it with key

4    people at RP.  Where I am coming out is that the requirement of

5    any teammate talking to their boss before pursuing discussions

6    with RP about possible opportunities probably works just fine

7    in many cases, but in other cases, that isn't really reflective

8    of how the person is likely to leave DaVita.  The following is

9    a bullet-point list of ground rules that we would be

10   comfortable with as being fair to both RP and DaVita.  This is

11   not meant to create any kind of legal agreement but, instead,

12   to serve to create clarity around what we hopefully can both

13   agree is a fair way to treat each other out of respect for our

14   long-term relationships while maintaining our ability to meet

15   our responsibilities to our shareholders and other company

16   constituents."

17   *Q.*  You write here, "this is not intended to create any type of

18   legal agreement."  What type of agreement was it intended to

19   create?

20   *A.*  More of an informal one.

21   *Q.*  Would you describe it as a gentlemen's agreement?

22   *A.*  I think you could call it that.

23   *Q.*  All right.  Let's take a look at the first ground rule in

24   your email.  You write, "We nor our recruiters will initiate

25   contact with DaVita teammates about positions at Radiology

773

Richard Whitney - Direct

1   Partners."  Did you intend to follow this term?

2   A.  At the time that I wrote that, yes.

3   Q.  To your knowledge, are you aware of any instance in which

4   Radiology Partners hired a DaVita candidate in violation of

5   this provision?

6   A.  I don't personally know of such a situation.

7   Q.  Okay.  Had you become aware of such a situation in which

8   there was a violation, would you have done something to stop

9   that?

10  A.  Yes.

11  Q.  All right.  Let's take a look at paragraph 2B.  You write,

12  "For DaVita teammates who contact us, we will not pursue

13  possible employment opportunities for them with Radiology

14  Partners unless they either represent to us that they are

15  actively pursuing other opportunities outside of DaVita --

16  e.g., they are interviewing or have offers, et cetera -- or

17  that they have had a specific conversation with their boss

18  telling him/her that they are interested in pursuing

19  opportunities outside of DaVita."

20          When you wrote this term, this ground rule, did you

21  intend to follow it?

22  A.  Yes.

23  Q.  And to your knowledge, are you aware of any instance in

24  which Radiology Partners hired an employee at DaVita in

25  violation of this term?

Richard Whitney - Direct

1    *A.* No.

2    *Q.* All right. Now, 2B contains a boss-notification provision.

3    Did you want to agree to that?

4    *A.* Did I want to agree to that, is that what you said?

5    *Q.* That's the question. Yes.

6    *A.* No.

7    *Q.* Why not?

8    *A.* Because I felt like in some cases that that would be fine,

9    and that's how people often leave their jobs, with a direct

10   conversation with their boss about what their future is at that

11   company and what other opportunities they might be interested

12   in. And in other cases, that's not how people leave. And so I

13   didn't want to be in the situation where if someone was not

14   comfortable with that, that I wouldn't be able to compete for

15   that person.

16   *Q.* So you were afraid that the boss-notification provision

17   would disadvantage Radiology Partners?

18          *MS. BROOKS:* Objection. Leading.

19          *THE COURT:* Sustained.

20   *BY MS. CLINGAN:*

21   *Q.* Were you concerned that the boss-notification provision

22   would disadvantage Radiology Partners?

23   *A.* Yes.

24   *Q.* Now, in your experience, as an executive who is responsible

25   for hiring, are there certain categories of employees who might

Richard Whitney – Direct

1    be uncomfortable with boss notification?

2    *A.*   I'm sure there are some people that are comfortable with it

3    and some people that are not.

4    *Q.*   Might people at the low end of the pay scale feel less

5    empowered to have difficult conversations with their bosses?

6    *A.*   I think that's a reasonable hypothesis.

7            *MS. CLINGAN:*  Okay.  Let's take a look at Government

8    Exhibit 172, which is admitted.

9            *THE COURT:*  172?

10           *MS. CLINGAN:*  Yes.

11           *THE COURT:*  It's not in evidence yet.

12           *MS. CLINGAN:*  Apologies.  I move it in evidence, per

13   stipulation.

14           *THE COURT:*  I will do that if you will slow down.

15           *MS. CLINGAN:*  Certainly.  Fair agreement.

16           *THE COURT:*  Admitted.

17           (Exhibit 172 admitted.)

18   *BY MS. CLINGAN:*

19   *Q.*   Mr. Whitney, this is an offshoot of your ground rules

20   email to Mr. Thiry.  Take a look at --

21           Ms. Cabrera, if we could please get both pages of this

22   exhibit, or just the first two pages.

23           I want to focus your attention on Mr. Thiry's

24   response, which starts at the bottom of the first page and

25   continues to the top of the second page.  Can you just read

776

Richard Whitney – Direct

1   Mr. Thiry's response?

2   A.  "Am not comfortable with this, as it is fundamentally

3   asymmetrical to our disadvantage.  How might you propose to

4   deal with this?"

5   Q.  Did you understand what he meant by that?

6   A.  I didn't.

7   Q.  Can you read your response?

8   A.  "I don't understand what you mean by asymmetrical."

9   Q.  Okay.  You forward this email thread to Dr. Gabriel.  And

10  you write, "Fun and games."  Can you take a look at

11  Dr. Gabriel's response.

12          I'll give you a second to read it.  Just let me know

13  when you've had a chance.

14  A.  Yeah, I'm good.

15  Q.  Did you understand Dr. Gabriel to be being tongue in cheek

16  here?

17  A.  I think he was being sarcastic.  Yes.

18  Q.  Okay.  After this email thread, did you behave as though

19  the gentlemen's agreement was in place?

20  A.  Yes.

21  Q.  Did Mr. Thiry behave as though the gentlemen's agreement

22  was in place?

23  A.  Yes.

24          MS. CLINGAN:  Let's take a look at Government

25  Exhibit 176-1.  I move this pursuant to stipulation.

777

Richard Whitney – Direct

 1   *BY MS. CLINGAN:*

 2   *Q.*  Mr. Whitney, what's the subject of this email?

 3          *COURTROOM DEPUTY:*  The judge has not admitted it yet.

 4          *THE COURT:*  I was just looking at it.  176-1 -- I'm

 5   trying to slow you down -- is admitted.

 6          (Exhibit 176-1 admitted.)

 7          *MS. CLINGAN:*  Sorry, Your Honor.  I hear somebody has

 8   Opening Day tickets.

 9          *THE COURT:*  You say you'll slow down, and you don't.

10   *BY MS. CLINGAN:*

11   *Q.*  Mr. Whitney, what is the subject of this email?

12   *A.*  "Stuff."

13   *Q.*  Let's take a look at paragraph 7 -- actually, let's start

14   with paragraph 1.

15          Mr. Thiry writes, "Appreciate the high-quality

16   conversations with both of you yesterday."  Did you have an

17   understanding of what conversations Mr. Thiry was referring to

18   here?

19   *A.*  As it pertains to me, it would have referred to a

20   conversation that I had sometime within a few days before this

21   email.

22   *Q.*  Were those the conversations concerning the gentlemen's

23   agreement?

24   *A.*  Yes.

25   *Q.*  Let's take a look at paragraph 7.  Can you just read

Richard Whitney - Direct

1    paragraph 7?

2    A.  "I know you guys are sincere about the relationships as

3    well.  I really do.  So I am just asking you to step back and

4    think about how humans actually work.  Life is long and

5    healthcare is a small community.  I am at peace now after our

6    conversations and am content to sit back and just see what you

7    guys actually do and how you explain it.  I don't really have

8    any choice, so this is not a particularly shrewd move."

9    Q.  All right.  If you could read paragraph 8, as well.

10   A.  "I close as I closed our phone conversation yesterday,

11   Rich.  Let me know if I can do anything for you.  I hope I

12   always feel like ending a conversation that way, as I do with

13   many other CEOs, executives, business school professors, U.S.

14   senators, et cetera."

15   Q.  Mr. Thiry references connections to CEOs, executives,

16   business school professors, U.S. senators, et cetera.  Does

17   friendship with Mr. Thiry come with access to these

18   individuals?

19   A.  Yes.

20        MS. CLINGAN:  Let's take a look at Government

21   Exhibit 178.

22        This, Your Honor, I believe is admitted.

23        THE COURT:  Yes.

24   BY MS. CLINGAN:

25   Q.  Mr. Whitney, who is this email with?

Richard Whitney - Direct

1    *A.*   Basak Ertan.

2    *Q.*   And who is Ms. Ertan?

3    *A.*   She is the chief revenue officer of Radiology Partners.

4    *Q.*   And did she have any sort of special relationship with any

5    of the founders of Radiology Partners?

6    *A.*   She's the wife of Anthony Gabriel.

7    *Q.*   All right.  What is the subject of this email?

8    *A.*   "Re KT call tomorrow morning."

9    *Q.*   In your own words, can you just explain what is going on

10   here?

11   *A.*   We had hired Ms. Ertan.  She was having a short call with

12   Kent the next morning, and she's asking me if there is anything

13   that I wanted her to emphasize or reinforce.

14   *Q.*   Let me ask, had you initiated the hiring process with

15   Ms. Ertan before or after your conversations with Mr. Thiry?

16   *A.*   Before.

17   *Q.*   Okay.  What do you ask Ms. Ertan to reinforce?

18   *A.*   That we weren't the reason she was exploring opportunities.

19   *Q.*   And why did you write this email?

20   *A.*   Because of the commitment that I made to Kent, and I wanted

21   to reinforce that I was living up to that.

22   *Q.*   Was it important to you to demonstrate your commitment to

23   the gentlemen's agreement to Mr. Thiry?

24   *A.*   It was important to me to -- yes, that I was living up to

25   the commitment that I made to him.

Richard Whitney – Direct

1   *Q.* All right.  Let's talk about a specific hiring incident.

2   Do you know who Guy Seay is?

3   *A.* Yes.

4   *Q.* Who is he?

5   *A.* He is a person who was a senior finance executive at DaVita

6   around this time.

7   *Q.* Did you or Dr. Gabriel know him well?

8   *A.* Yes.

9   *Q.* Were you interested in hiring him?

10  *A.* At some point in time, we were.  Yes.

11  *Q.* In the absence of the gentlemen's agreement with Mr. Thiry,

12  would you have extended a formal offer to Mr. Seay?

13  *A.* I don't know if we did or didn't extend a formal offer

14  during that process to Mr. Seay.

15  *Q.* All right.  In the absence of the gentlemen's agreement,

16  though, would you have extended an offer to Mr. Seay?

17  *A.* Yes.  I think we would have.

18  *Q.* Okay.  Did the gentlemen's agreement affect how you

19  recruited Mr. Seay?

20  *A.* It did -- it did impact the process by which we recruited

21  Mr. Seay.  Yes.

22       *MS. CLINGAN:* Let's take a look at Government

23  Exhibit 181.

24       *THE COURT:* Admitted.

25       *MS. CLINGAN:* And if we could please get both pages,

Richard Whitney - Direct

1   Ms. Cabrera.

2   *BY MS. CLINGAN:*

3   *Q.*  Mr. Whitney, if you could look at the second page, near the

4   top.  On December 27, 2013 at 5:24 p.m., there is an email that

5   is labeled -- that is from you that is labeled "Draft."  Can

6   you just summarize what this is a draft of.

7   *A.*  It's a draft that I eventually -- of an email I eventually

8   sent to Kent, raising the idea that Guy -- that we might be

9   replacing our CFO and that Guy Seay might be a good candidate

10  for that position.

11  *Q.*  Okay.  We'll look at the final email that you sent to

12  Mr. Thiry in just a moment.  First, let's take a look at

13  Mr. Usilton's email on the first page at 11:17 p.m.  He

14  writes, "Looks good.  I believe he says no even though this

15  would be good for Guy."  Who is "he"?

16  *A.*  Kent Thiry.

17  *Q.*  And what does "no" refer to?

18  *A.*  I think what he's saying is that he thinks there is a

19  chance that Kent would ask us not to talk to Guy.

20  *Q.*  All right.  Let's take a look at your email just above

21  that.  You write in pertinent part, "I think you are right.

22  Still a good chance he says no."  And you continue in a moment,

23  "He will have to conjure up something in his head to convince

24  himself as to why it is better for Guy to stay."

25          Would it be fair to say that Mr. Thiry was given a

Richard Whitney - Direct

1  right of first refusal over Guy Seay?

2  A.  I think I gave him that.  Yes.

3  Q.  Did this email reflect that understanding?

4  A.  I'm not sure I understand the question.

5  Q.  Does this email reflect your understanding that you were

6  going to be giving Mr. Thiry a veto power or a right of first

7  refusal over Mr. Seay?

8  A.  Yes.  I was asking for permission to talk to him.

9       MS. CLINGAN:  All right.  Let's take a look at

10  Government Exhibit 184-1.

11       THE COURT:  It's admitted.

12       (Exhibit 184-1 admitted.)

13  BY MS. CLINGAN:

14  Q.  Mr. Whitney, is this the final email that you sent to

15  Mr. Thiry concerning Guy Seay?

16  A.  Yes.

17  Q.  And are you asking his permission to talk to Mr. Seay?

18  A.  Yes.

19  Q.  I would just ask, if Mr. Seay had worked for another

20  company -- say Aetna -- would you have asked for his current

21  employer's permission to talk to him?

22  A.  No.

23       MS. CLINGAN:  Let's take a look at the third paragraph

24  of this email.

25       Ms. Cabrera, if we could highlight.

Richard Whitney - Direct

1    *BY MS. CLINGAN:*

2    *Q.*   You write, "I think Guy would be the exact right fit for

3    this role."  Did you believe that?

4    *A.*   I thought he would be a strong candidate.  Yes.

5    *Q.*   Now, I think you testified earlier that you and Dr. Gabriel

6    had worked with Mr. Seay for some time.  Did you have an

7    understanding of what his career goals were?

8    *A.*   In general, I wasn't in as close contact to him at this

9    point in time.

10   *Q.*   Did you know whether or not he was interested in remaining

11   in a CFO role?

12   *A.*   Sorry.  Could you repeat that question?

13   *Q.*   Do you know whether or not Guy Seay wanted to be in a CFO

14   role?

15   *A.*   I don't know that I knew either way at this point in time.

16   *Q.*   Did you believe that coming to Radiology Partners as CFO

17   would have been a good opportunity for Mr. Seay?

18   *A.*   I felt like it could be.  Yes.

19   *Q.*   All right.  Let's take a look at the next paragraph.  You

20   write, "Let me immediately say that neither I nor anyone on my

21   team has talked to Guy about this nor will we without your

22   buy-in.  Further, we have not in any way hinted to him or

23   otherwise indicated there might be an opportunity.  Zero.

24   Nothing.  In fact, none of us have talked to Guy about anything

25   for months.  And you may hate this idea.  And if that is the

Richard Whitney - Direct

1   case, we will never bring it up with him and will move on and

2   do a normal search."  Was that true?

3   A.  Yes.

4   Q.  Why did you feel the need to reassure Mr. Thiry of that?

5   A.  Because I didn't have knowledge that Guy -- whether he was

6   or wasn't considering opportunities outside of DaVita, and so I

7   felt like that was the way that I would live up to the

8   commitment that I made.

9   Q.  Okay.  You continue, "I consider him off limits,

10  particularly in light of our recent good, healthy conversations

11  on this topic."  What conversations had made Mr. Seay off

12  limits to you?

13  A.  The conversations that we were just referring to.

14  Q.  Are those the conversations with Mr. Thiry concerning the

15  gentlemen's agreement?

16  A.  Yes.

17  Q.  You continue, just under "Consider," "Guy has most likely

18  gone as far as he will go within DaVita.  He's never going to

19  be the CFO.  He's probably not going to move to Denver."  Was

20  this true when you wrote it?

21  A.  That was my hypothesis.

22  Q.  At the time you wrote this email, was it your

23  understanding that you effectively needed to convince Mr. Thiry

24  to let Mr. Seay go in order for you to talk to him?

25  A.  I was trying to convince him that it would be a good

Richard Whitney – Direct

1   thing -- a good idea.

2           MS. CLINGAN:  All right.  If we could please look at

3   the second page of this email, the very, very last paragraph.

4   BY MS. CLINGAN:

5   Q.  Take a look at that.  Let me ask you, at this time, was the

6   CFO job posted publicly?

7   A.  No.

8   Q.  So Mr. Seay could not have learned about this opportunity

9   unless Radiology Partners reached out to him about it?

10  A.  Not at this point in time.

11          MS. CLINGAN:  Let's take a look at Government

12  Exhibit 185-1.

13          THE COURT:  Admitted.

14          (Exhibit 185-1 admitted.)

15  BY MS. CLINGAN:

16  Q.  This is Mr. Thiry's response to your email.  He writes,

17  "I will talk to JR and think."  Who is JR?

18  A.  Javier Rodriguez.

19  Q.  Do you know why he was looped in?

20  A.  He was a senior executive at DaVita.  That is why, I

21  assume.

22  Q.  Can you just read the second paragraph of Mr. Thiry's

23  response to you.

24  A.  Starting with "Guy"?

25  Q.  Yes.

786

Richard Whitney – Direct

 1   A.   "Guy has known for many years he will not become the CFO of

 2   DaVita, and we have continued to expand his responsibilities,

 3   including now with international.  In addition, there may be

 4   some big stuff in HCP for him."

 5   Q.   Continue.

 6   A.   "But I will talk to JR and think."

 7   Q.   Was your understanding that Mr. Seay would remain off

 8   limits until Mr. Thiry told you otherwise?

 9   A.   That was my intention.

10        MS. CLINGAN:  All right.  Let's take a look at

11   Government Exhibit 188.

12        Your Honor, we'd move 188 into evidence.

13        THE COURT:  It's already admitted.

14        MS. CLINGAN:  Thank you.

15   BY MS. CLINGAN:

16   Q.   Mr. Whitney, you forward Mr. Thiry's response to others at

17   Radiology Partners, and you write, "We've got a shot."  Did you

18   understand that there was a chance Mr. Thiry might not let you

19   pursue Mr. Seay?

20   A.   I thought that was a possibility.

21        MS. CLINGAN:  Let's take a look at Government

22   Exhibit 192-1.

23        THE COURT:  192-1 is admitted.

24        (Exhibit 192-1 admitted.)

25

Richard Whitney - Direct

1    *BY MS. CLINGAN:*

2    *Q.*  Mr. Whitney, who are the people on this email?

3    *A.*  Kent Thiry, Dennis Kogod, Javier Rodriguez, Mike Staffieri,

4    and myself.

5    *Q.*  Let's take a look at the last paragraph of Mr. Thiry's

6    email.  He writes, "I would prefer that there be no outreach

7    for a couple of weeks as we nail down what his DaVita options

8    are.  Once again, he's free to call you at any time.  I didn't

9    ask for any restraint on that front."

10          Can you just read your response to Mr. Thiry.

11   *A.*  "Got it.  Thank you.  I am sure Guy appreciates you guys

12   looking out for him on this no matter what he ends up doing.

13   We won't contact him for a couple of weeks, as you have asked."

14   *Q.*  Did you ultimately abide by that commitment to Mr. Thiry

15   not to contact Mr. Seay for a couple of weeks?

16   *A.*  Yes.

17          *MS. CLINGAN:*  Let's take a look at Government

18   Exhibit 196.

19          *THE COURT:*  It's admitted.

20          (Exhibit 196 admitted.)

21   *BY MS. CLINGAN:*

22   *Q.*  And if we can start with the very first email in the

23   chain, which is from Dennis Kogod.  Who is Dennis Kogod?

24   *A.*  He was a senior executive at DaVita at the time.

25   *Q.*  All right.  Mr. Kogod writes here, "Appears they had John

Richard Whitney – Direct

1    Nehra call Guy to help recruit to NEA.  Guy told John he was

2    hoping to stay at DaVita and talking about a HealthCare

3    Partners and international role."  What was your understanding

4    of Mr. Kogod's email?

5    A.  My understanding is that -- that Dennis had learned that a

6    partner at NEA, John Nehra, who is also a member of the board

7    of directors of DaVita, had talked to Guy and had talked to him

8    about the role that we were talking to Guy about.

9    Q.  And looking at the "to" line, who is Mr. Kogod reporting

10   that back to?

11   A.  Kent Thiry and Javier Rodriguez.

12   Q.  Okay.  Mr. Thiry responds, "Rich, it is feeling to me that

13   you guys should stop talking to Guy.  Agreed?  I don't know how

14   anyone got the idea Nehra should be called in as a RAD

15   advocate.  How did that happen?"

16        And if you could read your response to Mr. Thiry's

17   email.  Out loud, please.

18   A.  I'm having trouble finding -- let's see.  My response to

19   Kent, I don't see it.

20   Q.  It's at March 2, 2014 at 2:26 p.m.  If it's easier to look

21   at the screen, it's blown up there.

22   A.  Okay.  That is not a response to Kent.

23   Q.  It's an email that you sent in response to Kent, internally

24   at Radiology Partners; is that right?

25        THE COURT:  Well, he just said it wasn't.

Richard Whitney – Direct

1          *MS. CLINGAN:*  I understand that it's not to Kent.

2     *BY MS. CLINGAN:*

3     *Q.*  But is the email in response to the email you received

4     from Mr. Thiry, even though it's not directed to Mr. Thiry?

5     *A.*  Yes.

6     *Q.*  Okay.  Who is it to?

7     *A.*  It looks like it's to Tom Usilton and Anthony Gabriel.

8     *Q.*  All right.  If you could just read the email.

9     *A.*  "Looks like this is backfiring on us.  Too bad.  Guy is

10    missing out on the best opportunity he is going to see."

11          Continue?

12    *Q.*  And then let's just look at the last sentence together.

13    You write, "As soon as you tell us he is off limits to us, we

14    will stop talking to him.  No problem."  Was that true?

15    *A.*  Yes.

16    *Q.*  Now, based on this email, and based on the outreach that

17    you received from DaVita following communications with

18    Mr. Seay, was DaVita monitoring how you spoke to Mr. Seay?

19    *A.*  In -- I guess in the context of, they had found out that

20    John Nehra was talking to Guy about -- yeah, was talking to Guy

21    about the RP position, I guess that would be -- the answer to

22    that would be yes.  I'm not sure I understand the question.

23    *Q.*  Were they policing who could talk to him about that

24    opportunity?

25    *A.*  I think they were upset that -- and -- that a director of

1    their own company had apparently been asked to advocate for one

2    of their employees to leave.

3    *Q.*   And, Mr. Whitney, did they ask you to stop talking to

4    Mr. Seay because of that?

5    *A.*   Yes.

6    *Q.*   Did you agree?

7    *A.*   Yes.

8         *MS. CLINGAN:*   All right.   Let's take a look at

9    Government Exhibit 197.

10   *BY MS. CLINGAN:*

11   *Q.*   If you could just take a look at your email at 9:08 p.m.

12   *A.*   Yes.

13   *Q.*   You write, "Sorry, John."   Who is John?

14   *A.*   John Nehra.

15   *Q.*   Was this email to John Nehra?

16   *A.*   I assume that this -- I assume so, yes.   It doesn't --

17   *Q.*   Let's --

18   *A.*   -- appear to be that way on here.

19   *Q.*   Let's take a look at the second paragraph of your email,

20   starting with, "As for stopping talking with him, if that is

21   what you want, that is what we will do.   As you know, we only

22   talked with him with your permission because we felt this was

23   the perfect fit for him and the type of opportunity that likely

24   won't present to him very often."   Was that true?

25   *A.*   That was my opinion.   Yes.

Richard Whitney – Direct

1   Q.  All right.  And you continue in the email, "We'll move

2   on."

3            Let's take a look at Government Exhibit 199.

4            THE COURT:  199 is admitted.

5            (Exhibit 199 admitted.)

6   BY MS. CLINGAN:

7   Q.  All right.  Let's take a look at the very top email --

8   actually, the second from the top email.

9            Ms. Cabrera, if you would call out the first -- top

10  two emails.

11           Let's take a look at the March 3, 2014, email from

12  you at 12:37 p.m. -- a.m.  Could you read your email.

13  A.  "And why the F did Guy tell Kogod that Nehra called him?

14  Very bad judgment.  I am moving on."

15  Q.  Continue.

16  A.  "We need a great CFO, and this one is just not worth the

17  brain damage, both with Thiry, but also with Guy not being able

18  to be decisive about an opportunity that he will see but once

19  in his career."

20  Q.  All right.  You write, "This is just not worth the brain

21  damage."  Can you read Mr. Usilton's response?

22  A.  "Totally agree.  This is dead to us."

23  Q.  Is it true that as of this date, recruiting Guy Seay was

24  dead to Radiology Partners?

25  A.  We did stop recruiting him.  Yes.

Richard Whitney - Direct

1   *Q.*  Did you move on in your search?

2   *A.*  Yes.

3   *Q.*  Did you ultimately interview other candidates to fill that

4   CFO role?

5   *A.*  Yes.

6   *Q.*  Did you actively solicit those candidates?

7   *A.*  We had hired a retained search firm.  So, yes.

8   *Q.*  And did you ask permission of those candidates of their

9   bosses before you gave them an offer?

10  *A.*  No.

11  *Q.*  All right.  Let's talk about another individual from

12  Radiology Partners, Cameron Cleeton.  Did you ultimately hire

13  Mr. Cleeton?

14  *A.*  Yes.

15  *Q.*  From where?

16  *A.*  From DaVita.

17  *Q.*  Did you and others at Radiology Partners know Mr. Cleeton

18  well?

19  *A.*  I knew him a little bit.  Others at Radiology Partners knew

20  him well.

21  *Q.*  Did Dr. Gabriel know him well?

22  *A.*  Yes.

23  *Q.*  Dr. Gabriel was a founding partner of Radiology Partners?

24  *A.*  Yes.

25  *Q.*  Did the gentlemen's agreement cause you to back off

Richard Whitney - Direct

1   consideration of Cameron Cleeton for some period of time?

2   *A.*   At one point in time, we slowed down our discussions with

3   him as a result.  Yes.

4         *MS. CLINGAN:*   All right.  Let's take a look at

5   Government Exhibit 205.

6         *THE COURT:*   205 is admitted.

7         (Exhibit 205 admitted.)

8   *BY MS. CLINGAN:*

9   *Q.*   Let's take a look at the -- your email at the start of

10  the chain, June 5, 2014.  Paragraph 2, you write, "A DaVita

11  person has reached out to us, and I need to give you the

12  heads-up."  Do you recall who this was about?

13  *A.*   I think this is about Cameron Cleeton.

14  *Q.*   Had Mr. Cleeton worked at Aetna, for example, would you

15  have wanted to give his boss a heads-up that you might want to

16  talk to him about another job opportunity?

17  *A.*   No.

18  *Q.*   Is this email consistent or inconsistent with the

19  gentlemen's agreement?

20  *A.*   I think it's consistent with the commitment that I made.

21  *Q.*   Let's take a look at the first page.  The very top email

22  is from Julie Allen.  Who is Julie Allen?

23  *A.*   Kent's assistant.

24  *Q.*   She writes, "Thanks, Rich.  Sending an invite now."  Did

25  you speak to Mr. Thiry about Cameron Cleeton?

Richard Whitney – Direct

1   *A.* I believe that I did.

2           *MS. CLINGAN:* Let's move to Government Exhibit 207.

3           *THE COURT:* Admitted.

4           (Exhibit 207 admitted.)

5   *BY MS. CLINGAN:*

6   *Q.* What's the date of this email?

7   *A.* June 10, 2014.

8   *Q.* Can you tell from the email if this is before or after

9   your call to Mr. Thiry?

10  *A.* It seems to be after.

11  *Q.* And looking at Mr. Thiry's email, 2:36 p.m., very last

12  line, what is his request of you?

13  *A.* To wait until next week, the week of the 23rd, to -- before

14  we talk to Cameron --

15  *Q.* Did you agree to that --

16  *A.* -- further.  I'm sorry?

17  *Q.* And did you agree to that?

18  *A.* I did.  Yes.

19  *Q.* Okay.  Let's talk about Keegan Scanlon.  Who is Keegan

20  Scanlon?

21  *A.* Keegan is a revenue cycle person for us at Radiology

22  Partners.

23  *Q.* Where was he hired from?

24  *A.* From DaVita.

25          *MS. CLINGAN:* Let's take a look at Government

1   Exhibit 209.

2          *THE COURT:*  Admitted.

3          (Exhibit 209 admitted.)

4          *MS. CLINGAN:*  If we could please get both pages,

5   Ms. Cabrera.

6   *BY MS. CLINGAN:*

7   *Q.*  Who is this email from, starting with the very first

8   email in the chain on the second page?

9   *A.*  Basak Ertan.

10  *Q.*  And remind us who that is.

11  *A.*  Chief revenue officer at Radiology Partners.

12  *Q.*  And who is the email to?

13  *A.*  Trae Anderson.

14  *Q.*  Do you know who that is?

15  *A.*  He was an executive at the time at DaVita.

16  *Q.*  Okay.  So Ms. Ertan writes to this executive at DaVita --

17  could you just read her email?

18  *A.*  "Trae, Edward mentioned he has been keeping you in the loop

19  regarding Keegan applying for a role at RP.  I wanted to also

20  set up time with you prior to extending an offer.  I'll

21  coordinate a time through TLP."

22  *Q.*  So in this instance, did someone at Radiology Partners

23  reach out to someone at DaVita to coordinate with them before

24  giving a DaVita employee the offer?

25  *A.*  Yes.  That looks to be the case.

Richard Whitney – Direct

1   Q.   Okay.  Let's take a look at the response from Mr. Anderson

2   on the second page.  Trae Anderson copies in Philipp Stephanus.

3   Who is Mr. Stephanus?

4   A.   Another executive at DaVita.

5   Q.   Let's take a look at Ms. Ertan's email to you at

6   10:02 a.m.  She writes, "FYI, prior to offer, escalating to

7   Philipp."  Can you just read your response to Ms. Ertan?

8   A.   "Okay.  Thanks for posting me.  It is undoubtedly going to

9   cause waves completely out of proportion, of course."

10  Q.   Who is it going to cause waves with?

11  A.   The senior team at DaVita.

12  Q.   Who did that include?

13  A.   Kent, Dennis, Javier.

14  Q.   All right.  Let's talk about another individual at

15  Radiology Partners, Cindy Pivik.  Can you remind us who

16  Ms. Pivik is?

17  A.   She's the vice president of acquisitions at Radiology

18  Partners.

19  Q.   Where was she hired from?

20  A.   DaVita.

21  Q.   Is she pretty senior at Radiology Partners?

22  A.   Vice president.

23  Q.   Did you and others know Ms. Pivik before she joined

24  Radiology Partners?

25  A.   I knew her a bit.  Others on my team knew her better.

Richard Whitney - Direct

1          *MS. CLINGAN:*  Okay.  Let's take a look at Government

2 Exhibit 173.  And we move this per stipulation.

3          *THE COURT:*  It's already admitted.

4 *BY MS. CLINGAN:*

5 *Q.*  Let's take a look at Mr. Thiry's bottom email.  Can you

6 just read the subject.

7 *A.*  "Rich, I need to book another -- "Rich and I need to book

8 another 20-minute chat next couple of weeks.  No rush.  Right,

9 Rich?  Only you would know."

10 *Q.*  Do you know what that's about?

11 *A.*  I assume -- I assumed at the time and assume now that it

12 was about Cindy Pivik.

13 *Q.*  All right.  Let's take a look at your response at 6:56 p.m.

14 You write, "Tom" -- I think this goes to Tom Usilton.  Can you

15 remind us who Tom Usilton is?

16 *A.*  Chief development officer at Radiology Partners.

17 *Q.*  You write, "Tom, I won't have another convo with him before

18 this weekend."  Who is "him"?

19 *A.*  I believe that I'm referring to Kent.

20 *Q.*  You continue, "But he has obviously seen my email.  I

21 think it's the right idea to bring up the Pivik thing live."

22 What is "the Pivik thing"?

23 *A.*  We were recruiting and eventually hired Cindy Pivik around

24 this time.

25 *Q.*  You write that you wanted to discuss it live.  What does

Richard Whitney – Direct

1  that mean?

2  A.  I think I'm suggesting to Tom that he talk to Kent live

3  about Cindy Pivik.

4  Q.  Why did that discussion need to be live?

5  A.  I don't know.

6  Q.  You continue, "Remember to stress that she called you, she

7  said she wants to leave, she has been interviewing and has at

8  least one other offer."  Why did you write that?

9  A.  Because it was true, and it was a demonstration that I was

10 living up to my commitment that I had made to Kent.

11        MS. CLINGAN:  Let's take a look at Government

12 Exhibit 175.

13        THE COURT:  Admitted.

14        (Exhibit 175 admitted.)

15 BY MS. CLINGAN:

16 Q.  All right.  Let's start with Tom Usilton's email at

17 3:05 a.m.  He writes, "Any news on Thiry and hiring?  I am

18 worried about Pivik."  At this point in time was Radiology

19 Partners worried they would not be able to hire Ms. Pivik?

20 A.  I don't have a clear memory of what he means by, "I'm

21 worried about Pivik."

22 Q.  Okay.  But he writes in this email, "I'm worried about

23 Pivik."

24 A.  Yes.

25 Q.  Anything unclear about that?

Richard Whitney - Direct

1   *A.*   He is worried about Pivik.  I don't know what -- what he is

2   particularly worried about.

3   *Q.*   All right.  Well, let's take a look at --

4   *A.*   I could guess, but --

5   *Q.*   No need.  Let's take a look at your response at 8:57 a.m.

6   You write, "No.  I have another call scheduled with him next

7   week."  Who does "him" refer to?

8   *A.*   I assume that means Kent.

9   *Q.*   Okay.  And let's take a look at your email at the very

10  top.  If you could just read your email.

11  *A.*   "That may be the way to go.  Best would be her to tell

12  Finn, I am going to move on from DaVita.  I am exploring

13  several opportunities.  I haven't accepted anything yet, nor

14  decided where I am going to end up, but I have decided that I

15  am going to leave DaVita, so I wanted to give you a heads-up

16  ahead of time."

17  *Q.*   Let me just ask, is this consistent or inconsistent with

18  the gentlemen's agreement?

19  *A.*   I think this is consistent with demonstrating that I was

20  living up to the commitment that I had made.

21  *Q.*   All right.  If you could just read the last paragraph of

22  your email.

23  *A.*   "Let's discuss, as I would like to hear the details of the

24  V mail."

25  *Q.*   All right.  And the paragraph just above that one.

Richard Whitney – Direct

1   *A.* "This approach is exactly what Kent is asking for, and it

2   gets the facts on the record, because she is exploring other

3   offers."

4   *Q.* Was it true that this approach was exactly what Kent was

5   asking for?

6   *A.* Yes.

7           *MS. CLINGAN:* Let's take a look at Government

8   Exhibit 189.

9           *THE COURT:* It's admitted.

10          (Exhibit 189 admitted.)

11  *BY MS. CLINGAN:*

12  *Q.* What's the subject of this email from Mr. Thiry to you on

13  January 6, 2014?

14  *A.* "Pivik."

15  *Q.* And could you just read his email.

16  *A.* "Let's talk live at some point.  Julie, please set up for

17  20 minutes sometime next month."

18  *Q.* Okay.  Now, to your knowledge, did Radiology Partners'

19  recruitment of Cindy Pivik comport with the gentlemen's

20  agreement?

21  *A.* Yes.

22  *Q.* All right.  Let's turn to Belinda Reynaga.  Who is Belinda

23  Reynaga?

24  *A.* She's a recruiter for Radiology Partners.

25  *Q.* And did you -- you ultimately hired her at Radiology

Richard Whitney – Direct

1   Partners.  Where did you hire her from?

2   A.  DaVita.

3   Q.  Let's take a look at Government Exhibit 216, which is

4   already admitted.

5        Let's start with the very bottom email from

6   Mr. Thiry.  Can you read the subject of this email?

7   A.  "Belinda someone."

8   Q.  Do you know who "Belinda someone" refers to?

9   A.  Belinda Reynaga.

10  Q.  He asks, "Did the process of recruiting this person fit our

11  guidelines?"  What did the "our guidelines" refer to?

12  A.  I assume he meant, was I living up to the commitment that I

13  made to him to only hire people who I believed were looking for

14  opportunities outside of DaVita.

15  Q.  Okay.  Let's take a look at your response.

16       And, Ms. Cabrera, if we could blow up his response as

17  big as we can get it, because it's a real tiny font.

18       Mr. Whitney, are you able to read that?

19  A.  Yes.

20  Q.  Can you read your response?

21  A.  "I looked into it.  And, yes, it looks like it fit our

22  guidelines.  She is a low-level recruiter.  We had the position

23  posted on job boards, and she applied, so we didn't contact

24  her.  She contacted us for a specific job posting."

25       Should I continue?

Richard Whitney - Direct

1   Q.  Please.

2   A.  "We have almost 250 people in our practice now.  I am not

3   involved in most people that we hire now.  We'll definitely

4   make sure we are staying in touch on higher level people, and

5   we absolutely won't target anyone at DaVita.  But for the lower

6   level people that respond to our job listings," dot, dot, dot.

7   Q.  When you wrote that to Mr. Thiry in this email, was it

8   true?

9   A.  Yes.

10  Q.  Okay.  Now, you explain in this email that at this point

11  in time Radiology Partners has grown, you're not as involved in

12  recruitment as you used to be.  How did recruitment at

13  Radiology Partners change?  Were you relying more on external

14  recruiters?

15  A.  I would say then, compared to the early days, yes.

16          MS. CLINGAN:  Okay.  And let's take a look last at the

17  candidate that doesn't have a name here, Government

18  Exhibit 220.

19          THE COURT:  It's admitted.

20          (Exhibit 220 admitted.)

21  BY MS. CLINGAN:

22  Q.  Let's take a look at Ms. Ertan's email to you,

23  September 8, 2016, paragraph 2.  She writes, "We have a redwood

24  from DaVita."  What is a redwood?

25  A.  It was a development program for young talent at DaVita.

803

Richard Whitney - Direct

1    *Q.* All right.  She writes that this person has applied for an

2    analyst position for RCM.  What is RCM?

3    *A.* Revenue cycle management.

4    *Q.* Would you be interested, all else being equal, in a redwood

5    from DaVita?

6    *A.* All else being equal, yes.

7    *Q.* She writes, "None of us know him.  He found the opening

8    online, and we have started initial interviews."  Based on

9    this email, had this person reached out to Radiology

10   Partners, or had Radiology Partners reached out to him?

11   *A.* It looks like he reached out to Radiology Partners.

12   *Q.* Okay.  She concludes, "My understanding, though, is he has

13   not told DaVita he is looking.  Do we have to let DaVita know?"

14          You respond, "For the redwood, I really feel that we

15   should give Kent a heads-up."

16          Mr. Whitney, do you know if Radiology Partners

17   ultimately hired this redwood from DaVita?

18   *A.* I don't know.

19   *Q.* To your knowledge, can you think of the hiring of any

20   individual from DaVita when Radiology Partners did not follow

21   the gentlemen's agreement?

22   *A.* No.

23   *Q.* If you had personally become aware of a violation of the

24   gentlemen's agreement, would you have done something to stop

25   it?

Richard Whitney – Direct

1    *A.* I believe that I would have.

2           *MS. CLINGAN:* All right. Let's take a look at

3    Government Exhibit 234, which is, I believe, in evidence.

4    *BY MS. CLINGAN:*

5    *Q.* Can you just read your email at 3:39 p.m.

6    *A.* "Please don't share. I had dinner with Kent last week,

7    gave him a full rundown on what we were doing. I just heard

8    through the grapevine that he subsequently brought RP up at a

9    town hall Thursday or Friday and was effusive in his praise for

10   what we are doing, our culture, et cetera. I think they must

11   be getting ready to lay off a lot of people because this is a

12   far cry from the circle-the-wagons approach to RP that was in

13   force earlier."

14   *Q.* All right. You refer to the "circle-the-wagons approach"

15   with RP. Who had DaVita been circling the wagons around?

16   *A.* I think what I meant by that was, in the earlier days there

17   was a concern about the number of senior executives that were

18   moving to RP, and it didn't seem to be as much of a concern

19   anymore.

20   *Q.* When you formed the gentlemen's agreement with Mr. Thiry,

21   were you in discussions with DaVita about any type of business

22   transaction?

23   *A.* No.

24   *Q.* Was the gentlemen's agreement in any way related to any

25   potential business transaction?

Richard Whitney - Cross

 1  *A.*  No.

 2  *Q.*  As between DaVita and Radiology Partners, who was the

 3  agreement intended to benefit?

 4  *A.*  DaVita.

 5  *Q.*  And what was your understanding of the purpose of the

 6  agreement?

 7  *A.*  To address Kent's concern that we were targeting his

 8  people.

 9  *Q.*  And how did the agreement address that concern?

10  *A.*  I committed to him to only hire -- I'm sorry -- to only

11  recruit those at DaVita that I believed were otherwise looking

12  for opportunities outside of DaVita.

13  *Q.*  Did that make it harder or easier for DaVita employees to

14  leave?

15  *A.*  Harder.

16  *Q.*  Okay.

17          *MS. CLINGAN:*  Nothing further, Mr. Whitney.

18          *THE COURT:*  Cross-examination.

19          *MS. BROOKS:*  Thank you, Your Honor.

20                        **CROSS-EXAMINATION**

21  *BY MS. BROOKS:*

22  *Q.*  Good morning, Mr. Whitney.

23  *A.*  Good morning.

24  *Q.*  We haven't met, but my name is Juanita Brooks.  And I,

25  along with my colleague, Tom Melsheimer, represent Kent Thiry.

Richard Whitney - Cross

1    It's nice to meet you.  Sorry under these circumstances.

2            I'd like to start where you started.  You were asked

3    whether you still had an -- not just a professional

4    relationship, but a personal relationship with Mr. Thiry.  Do

5    you recall that?

6    A.  Yes.

7    Q.  Okay.  Let's go back a little bit and see how that

8    relationship developed.  Am I right that you joined in 1995; is

9    that right?

10   A.  Yes.

11   Q.  And at that point in time, what was the name of DaVita?

12   A.  Total Renal Care.

13   Q.  Then did Mr. Thiry come in 199 -- you don't have to be

14   exact on the years, but was it approximately 1999?

15   A.  Yes.

16   Q.  And what was the economic shape of Total Renal Care at that

17   point in time?

18   A.  It was in significant distress.

19   Q.  Did Mr. Thiry, if you know, make any contribution toward

20   turning that around?

21   A.  Of course, yes.

22   Q.  Can you tell the jury about that.

23   A.  Kent over the course of many years transformed that

24   business from one that was failing financially, was at -- was

25   devoid of any significant positive culture, and was very

807

Richard Whitney – Cross

1   financially oriented, as opposed to patient oriented, into one

2   of the premier healthcare services, businesses, in the U.S.,

3   that is both successful financially and contributing

4   substantially to taking care of various sick patients.

5   Q.  Do you feel like you played a role in that too?

6   A.  I do.

7   Q.  Did you play a significant role by Mr. Thiry's side?

8   A.  Yes.

9   Q.  So let's talk about that.  You were at DaVita.  Now DaVita

10  had become DaVita.  And you, then, were appointed chief

11  financial officer?

12  A.  That's correct.

13  Q.  Can you tell the jury what a chief financial officer does.

14  A.  They're responsible for all things related to the finances

15  and financial health of the business.

16  Q.  Now, you mentioned that Total Renal Care had more of a

17  financial focus and DaVita had more of a vision, if I

18  understood you correctly?

19  A.  That's a good way to put it.  Yes.

20  Q.  As chief financial officer, were you then divorced from the

21  vision of DaVita; or was that also part of your role?

22  A.  No.  It was part of my role also.

23  Q.  Now, 2013, did you leave DaVita to start your own external

24  consulting and investing company?

25  A.  In 2013 --

Richard Whitney - Cross

1    Q.   I'm sorry.  I misspoke.  2003.

2    A.   Yes.

3    Q.   Then in 2005, did Mr. Thiry ask if you could return to

4    DaVita to assist him and DaVita in a large acquisition that

5    they were about to do?

6    A.   Yes.

7    Q.   And did you do that?

8    A.   Yes.

9    Q.   Did you do that full time or part time?

10   A.   I think it was largely full time, but it was meant to be

11   for a defined period of time.

12   Q.   And did it turn out to be for about six months; does that

13   sound about right?

14   A.   Sounds about right.

15   Q.   Do you recall the acquisition that you were helping

16   Mr. Thiry and DaVita work on?

17   A.   Yes.

18   Q.   Can you tell the ladies and gentlemen of the jury about

19   that.

20   A.   It was the acquisition of the dialysis -- kidney dialysis

21   business of Gambro Healthcare.

22   Q.   And did that turn out to be a successful acquisition?

23   Meaning, did it close?

24   A.   Yes.

25   Q.   Then once that -- your tenure was up helping with that

Richard Whitney - Cross

1   acquisition, did you return to doing outside consulting?

2   A.   Yes.

3   Q.   And now in 2008, does Mr. Thiry come back to you?

4   A.   Yes.

5   Q.   And what does he ask you to do?

6   A.   He asked me to come back as chief financial officer.

7   Q.   And did you?

8   A.   Yes.

9   Q.   What was your understanding of what your role was supposed

10  to be in returning to DaVita in 2008 as chief financial

11  officer?  Were you there for good, or what was your

12  understanding?

13  A.   Oh, I was there for -- again, for a -- what was meant to be

14  a temporary period of time.  A couple of years.

15  Q.   Do you know why it was meant to be a temporary period of

16  time?

17  A.   There had been some turnover at that position, and I was --

18  I had agreed to come back to do that -- to fill in that role

19  part time, but I was not in a position during my career to want

20  to come back to do that full time.

21  Q.   And why not?

22  A.   Permanently.  Because I had been happy investing and

23  consulting.

24  Q.   And did you want to continue, then, to do that?

25  A.   Yes.

Richard Whitney - Cross

1   *Q.*  Were you able, though, for I think a period of about three

2   years to both fill the role of the part-time chief financial

3   officer and still keep your outside consulting and investing

4   business?

5   *A.*  Yes.

6   *Q.*  You mentioned there was a -- there had been a lot of

7   turnover.  As CEO now of your own company, how does turnover,

8   particularly at the executive level, affect a company?

9   *A.*  It can be very damaging.

10  *Q.*  In what way?

11  *A.*  Well, you invest a lot of time and energy into building

12  your team and aligning your team and working together to lead

13  the organization.  And when one or more of them leave

14  unexpectedly, it's a setback.

15  *Q.*  Now, at some point you yourself ended up leaving DaVita yet

16  again to go back into full-time investing and consulting; is

17  that right?

18  *A.*  Yes.

19  *Q.*  And was that about 2011?

20  *A.*  Yes.

21  *Q.*  And did DaVita make you an offer to try to get you to stay?

22  *A.*  I believe that they did.  Yes.

23  *Q.*  Did you stay?

24  *A.*  No.

25  *Q.*  Were there hard feelings that -- over the fact that you

811

Richard Whitney - Cross

1  left?

2  *A.*  No.

3  *Q.*  So did you feel that you had a very positive end to your

4  relationship at DaVita, which had been on and off since 1995,

5  and now we're talking about 2011?

6  *A.*  Yes.

7  *Q.*  Then you mentioned early on in your direct examination that

8  you continued to be in touch with Mr. Thiry.  So you left in

9  2011, so we're eleven years later now -- eleven years later

10  now?  You're the math person.  Did I get that right?  2011,

11  we're now 2022.  Yeah, eleven years.

12  *A.*  I'm sorry.  I spaced out.  I don't know the question.

13  *Q.*  You know what, so did I.  I absolutely did.  Let's start

14  over again.  Not enough caffeine this morning.

15         Let me try this:  You've been gone from 2011 from

16  DaVita; fair?

17  *A.*  Yes.

18  *Q.*  But you remained in touch with Mr. Thiry?

19  *A.*  Yes.

20  *Q.*  And, in fact, in January or February of 2021, do you recall

21  that Mr. Thiry reached out to you to get advice from you on the

22  next stages of his career and also on his philanthropy work?

23  *A.*  Yes.  It usually was the other way around, but this time I

24  had the opportunity to mentor him.

25  *Q.*  And did you do that?

Richard Whitney - Cross

1    *A.*   I did.

2    *Q.*   Now, that was back in January or February of 2021.  Is it

3    fair to say that after Mr. Thiry was indicted in July of 2021,

4    have you essentially been unable to talk to him?

5    *A.*   Yes.

6    *Q.*   Thank you.  Let's move you back to DaVita, as CFO for a

7    moment.  Okay?

8            Now, as CFO --

9            Your Honor, if I could pull up GX262.  It's

10   stipulated.  And I would move its admission, Your Honor.

11           *THE COURT:*  GX?

12           *MS. BROOKS:*  Yes, Your Honor.  GX262.

13           *MS. CLINGAN:*  No objection.

14           *THE COURT:*  Well, it's admitted, but I don't have --

15           *COURTROOM DEPUTY:*  Your Honor, that's just the

16   Government's exhibit number.

17           *THE COURT:*  Oh, I see what you're saying.

18           *MS. BROOKS:*  I'm trying to do what I think Your Honor

19   would like us to do which is just use one number.

20           *THE COURT:*  All right.  Government's 262 is admitted.

21           *MS. BROOKS:*  Thank you, Your Honor.

22           (Exhibit 262 admitted.)

23   *BY MS. BROOKS:*

24   *Q.*   So if you could, sir -- if we can just scroll sort of over

25   the cover sheet for a moment.  If you want to go slowly, let us

Richard Whitney - Cross

1    know.

2              But are you familiar with what are called

3    Schedule 14As?

4    A.  Yes, it's an SEC filing.

5    Q.  Could you tell the ladies and gentlemen of the jury a

6    little bit about what the purpose is of a Schedule 14A.

7    A.  It is related to the -- what is called a proxy, which is

8    the information that is filed publicly that discloses the

9    compensation of the senior executives of a publicly traded

10   company.

11   Q.  And is it important since it's an SEC filing that it be

12   accurate?

13   A.  Yes, very important.

14             MS. BROOKS:  Let's turn, if we could, please, to -- I

15   think it's the fifth page in this exhibit, which is page 45.

16   There we go.

17   BY MS. BROOKS:

18   Q.  Do you see -- you mentioned executive compensation --

19             If we can blow up the elements of compensation part.

20   Let's blow up the whole thing.

21             Now, am I right, Mr. Whitney, that there is a

22   discussion here in this SEC filing, it says, "Elements of

23   compensation.  We believe it is in the best interests of

24   stockholders to attract and retain talented leaders."  Do you

25   see that?

814

Richard Whitney – Cross

1    A.   Yes.

2    Q.   Is that a true statement?

3    A.   Yes.

4    Q.   Is that a good idea?

5    A.   Yes.

6    Q.   Why is it important to a company not just to be able to

7    attract talented leaders, but retain them?

8    A.   Because businesses -- or at least well-run businesses

9    invest heavily in the development of their talent.

10   Q.   It goes on and says, "That in order to attract and retain

11   executives who are not only outstanding leaders but who also

12   embody our mission and values, we strive to provide

13   compensation that is reasonable and provides the best value for

14   our stockholders but is also sufficient to achieve our

15   recruitment and retention objectives."  Is that a true

16   statement?

17   A.   Yes.

18   Q.   Now, when -- by the way, I believe this is a proxy

19   statement for the year 2011.  So that would have been the year

20   that you left DaVita later in that year; is that right?

21   A.   That's my memory.  Yeah.

22   Q.   Okay.  When it says, then, "not only" -- "who are not only

23   outstanding leaders but who also embody our mission and

24   values," based on your experience as chief financial officer of

25   DaVita, what is this talking about?

Richard Whitney - Cross

1   A.  It was very important to us to not only have leaders who

2   were capable business people, but who also were a strong fit

3   with our culture.  And that's what that means by our mission

4   and values, that they were very aligned in terms of what we

5   were trying to achieve for our teammates, for our patients, and

6   for the healthcare industry overall.

7   Q.  So you mentioned three things, what you were trying to

8   achieve for DaVita.  Teammates; is that correct?

9   A.  Uh-huh.

10  Q.  And then for DaVita patients; is that correct?

11  A.  Uh-huh.

12  Q.  Then the third thing was for the healthcare industry

13  overall?

14  A.  Uh-huh.

15  Q.  And I'm afraid this young lady is taking down what you're

16  saying, so you're going to need to say either yes or no.

17  A.  I'm sorry.  Yes.

18  Q.  Okay.  Let's look, then, at the factors that the --

19  we'll -- tell the jury -- let's go down here where it says,

20  "The company-wide factors" --

21       MS. CLINGAN:  Your Honor, I'm going to object to this

22  document because this is actually 2012.  This is after

23  Mr. Whitney had left DaVita.

24       THE COURT:  Well, first of all, it's already in

25  evidence.  And, second, it was on your list.

1           *MS. CLINGAN:*  Fair enough, Your Honor.

2    *BY MS. BROOKS:*

3    Q.  So, Mr. Whitney, let's look at -- and just to be clear, the

4    proxy statement comes out the following -- the year following

5    the fiscal year we're talking about; does that sound right?  In

6    other words, the stockholders -- the annual meeting is going to

7    be held in 2012 to cover what happened in 2011?

8    A.  Yes.

9    Q.  Thank you.  Now, let's look at the company-wide factors

10   that are taken into consideration by the compensation

11   committee.  So based on your experience at DaVita, who is the

12   compensation committee?

13   A.  A committee of the board of directors that oversees the

14   compensation for the senior executives.

15   Q.  And who would be the senior executives that are being

16   referred to here?

17   A.  I --

18   Q.  I should say their titles, rather than their names.

19   A.  Yeah.  It's typically chief executive officer, chief

20   financial officer, chief operating officer, can be a few

21   others.  I think it's a cutoff in terms of the top X number of

22   compensated individuals.

23   Q.  Thank you.  Now, it goes on to say that, "The factors that

24   are taken into consideration by the compensation committee

25   include but are not limited to the following."  Do you see

Richard Whitney – Cross

1    that?

2    *A.*   Yes.

3    *Q.*   Let's go to the next page -- and we're going to go through

4    all the factors pretty quickly here.  But if we look at from

5    the bullet points one, two, three, four bullet points up,

6    "Management performance" -- "management performance in

7    attracting and retaining high-performing employees throughout

8    our organization and succession planning."  Is that your

9    recollection, that that was one of 14 factors that were looked

10   at for executive compensation?

11   *A.*   I do remember that that was an important factor at DaVita.

12   I don't remember the -- all the details of this proxy; but,

13   yes.

14   *Q.*   And we already talked about why it's important to try to

15   retain high-performing employees, but what about succession

16   planning?  What's that talking about?

17   *A.*   Well, what is succession planning?

18   *Q.*   Yes.

19   *A.*   It is the process by which executives develop the talent on

20   their team to ensure that at the point in time that they leave

21   the business, that there is someone that is fully capable to

22   take over their role, in order to minimize disruption of the

23   business.

24   *Q.*   And so if an executive simply leaves with no notice, an

25   important executive, what does that do to succession planning?

818

Richard Whitney - Cross

1    A.   If they haven't done a good job of succession planning, is

2    that the question?

3    Q.   Yes.

4    A.   It -- it's very disruptive.

5    Q.   Now, let's just look at a couple of other of the factors.

6    If we stay here on this page, one, two, three, four bullet

7    points up -- I'm sorry -- "improve clinical outcomes."

8    "Improve clinical outcomes, vaccination rates, and fistula

9    utilization."  What is that talking about?

10   A.   That's talking about the outcomes, essentially, the

11   improvement of health of the patients that we care for.

12   Q.   Why is that important to DaVita?

13   A.   It was very important to the overall mission and objectives

14   of the business, to transform the way that we were taking care

15   of kidney dialysis patients.

16   Q.   What about below the one we've highlighted, "Implementation

17   of successful public policy efforts."  What kind of public

18   policy efforts was DaVita engaged in?

19   A.   Public policy efforts to -- could have been a number of

20   different fronts.  But ones that I remember, it would include

21   moving the reimbursement system from a fee-for-service type of

22   methodology to more of a value-based one, where providers that

23   delivered better results for patients got paid more.

24   Q.   Why would one want to pay someone more for delivering

25   better service to a patient?

Richard Whitney – Cross

1   *A.*  That's just a more aligned way of organizing healthcare

2   reimbursement.

3   *Q.*  Let's look at the one below that, "Good corporate

4   citizenship."  Based on your experience at DaVita, what kind of

5   traits would a good corporate citizen have?

6   *A.*  Lots of different things.  They might -- one -- one measure

7   might be how they -- in terms of how they behaved on the team

8   and in their role, and was it consistent with the values that

9   we had all agreed were important to people that worked at

10  DaVita.

11  *Q.*  And what are the values?  You've mentioned values and

12  mission.  What were they?  What was the mission?  What was the

13  value?

14  *A.*  The values were service, integrity, team, continuous

15  improvement, accountability, and fun.

16  *Q.*  And fun?  And when you were at DaVita, did you try to

17  embody those values?

18  *A.*  I tried, yes.

19  *Q.*  And based on your interactions with Mr. Thiry all of these

20  years, did he try to embody those values?

21  *A.*  Yes, definitely.

22          *MS. BROOKS:*  Thank you.

23          Your Honor, is this a good stopping point?  I'm going

24  on to another section.

25          *THE COURT:*  Ladies and gentlemen, how much time?

1              JUROR:  15 minutes.

2              THE COURT:  15?  10:45.

3              (Recess at 10:30 a.m.)

4              (In open court at 10:49 a.m.)

5              THE COURT:  Okay.

6              MS. BROOKS:  Thank you, Your Honor.  May I proceed?

7              THE COURT:  Yes.

8              MS. BROOKS:  Thank you.  If we could put back up --

9         I wasn't quite accurate, Mr. Whitney.  I'm sorry.

10   There was one more page I wanted to show you in Government

11   Exhibit 262, and that is page 42.

12             If we could blow up where it says "Market

13   competitiveness."  And this is in the same Schedule 14A, the

14   proxy statement.

15   BY MS. BROOKS:

16   Q.  It says here, "We evaluate the overall competitiveness of

17   our executives' total direct compensation each year in order to

18   assist in executive retention."  Are you familiar with that

19   concept, where you see whether or not DaVita is being

20   competitive in their compensation for their executives?

21   A.  Yes.

22   Q.  Is this a good thing or a bad thing for the employees, the

23   executives?

24   A.  I would --

25             MS. CLINGAN:  Your Honor, I object to the relevance of

 1   this.  Again, this is 2011, it predates --

 2           *THE COURT:*  Overruled.

 3   *BY MS. BROOKS:*

 4   *Q.*  You may answer, Mr. Whitney.

 5   *A.*  Can you repeat the question?

 6   *Q.*  Whether looking at other peer companies to see what they're

 7   paying their executives, is that a benefit or a burden to the

 8   employees or executives at DaVita?

 9   *A.*  I would think it would be a benefit.

10   *Q.*  Why would that be?

11   *A.*  Because it ensures that the compensation being offered is

12   fair and competitive.

13   *Q.*  Let's look at how DaVita went about that.  For 2011, the

14   next sentence, "The compensation committee retained Compensia,

15   an independent national compensation consulting firm, to

16   perform a comprehensive market analysis of our executive

17   compensation programs and pay levels."

18           And I don't -- I don't know the answer to this,

19   Mr. Whitney.  Are you familiar with Compensia.

20   *A.*  Yes.

21   *Q.*  Can you tell the ladies and gentlemen of the jury what

22   Compensia does.

23   *A.*  It's a compensation consultant that does market surveys to

24   provide information about the competitiveness of a company's

25   compensation programs.

Richard Whitney - Cross

1   Q.  And if we go to the next page, there appears to be a chart

2   that was put together by Compensia of peer groups.  It's

3   referred to as --

4           Maybe we can make sure we can see the top here.

5           So we don't have to go back, I'll just read what it

6   says on the previous page.  "In addition to public executive

7   compensation data, the compensation committee" -- then we'll go

8   here -- "reviewed the compensation practices of our comparator

9   peer group for purposes of benchmarking and to understand

10  general compensation practices of our peers."  And it says,

11  "Consisting of the following companies," and then you see a

12  list.  Do you see that, Mr. Whitney?

13  A.  Yes.

14  Q.  What's the purpose of this?  Why pull together this sort of

15  peer group data?

16  A.  Again, I think the process is one in which you're comparing

17  your compensation practices to others in the -- in similar

18  markets, others that you might be competing with for talent, to

19  understand where you sit relative to compensation levels and

20  structure, different kinds of programs, et cetera.

21  Q.  Thank you.

22          Okay.  Now we can go to the next subject.  So speaking

23  of executive retention, did you sit during your years in

24  DaVita -- were you present at many interviews with Mr. Thiry --

25  many interviews of potential executive candidates?

823

Richard Whitney - Cross

1    *A.*  Yes.

2    *Q.*  Were hiring and talent retention important to Mr. Thiry?

3    *A.*  Yes.

4    *Q.*  Was he unique as a CEO, in finding that talent and talent

5    retention was -- hiring and talent retention was important?

6    *A.*  No.  It's a -- most if not every CEO would be concerned

7    about that and place importance on it.

8    *Q.*  Why is that?

9    *A.*  It -- one of the most valuable parts of your business are

10   your people.

11   *Q.*  And when you say "people," in other words your employees;

12   right?

13   *A.*  Right.

14   *Q.*  Now, did Mr. Whitney, if you know, with all of your

15   experience dealing with him, place importance on employee

16   development?

17   *A.*  I think you mean Mr. Thiry, but --

18   *Q.*  Did I say --

19   *A.*  I think you may have said Mr. Whitney.  But the answer is

20   yes in both cases.

21   *Q.*  I'm sorry.  My apologies.  Let me start again because there

22   is a transcript, and it's going to be all messed up thanks to

23   my misspeaking.  So let me try again.

24   *A.*  Okay.

25   *Q.*  Did Mr. Thiry place importance on employee development, if

Richard Whitney - Cross

1    you know?

2    *A.*  Yes, very much so.

3    *Q.*  What about succession planning?

4    *A.*  Yes.

5    *Q.*  And how do you know that?

6    *A.*  From personal experience, working with and for him for many

7    years.

8    *Q.*  Have you heard of a concept called village values?

9    *A.*  Yes.

10   *Q.*  And were village values -- did village values include

11   integrity?

12   *A.*  Yes.

13   *Q.*  Teamwork?

14   *A.*  Yes.

15   *Q.*  Continuous improvement?

16   *A.*  Yes.

17   *Q.*  Accountability?

18   *A.*  Yes.

19   *Q.*  And fulfillment?

20   *A.*  Yes.  Oh, I got it wrong before.

21   *Q.*  How long have you been gone from DaVita?

22   *A.*  Quite a while.

23   *Q.*  Do you --

24   *A.*  I had the right letter, though.

25   *Q.*  Even in your role as CEO, though, at Radiology Partners, I

Richard Whitney - Cross

 1   assume you've imported a lot of those values to Radiology

 2   Partners?

 3   A.   Yes.

 4   Q.   And did you try to live by those values when you were at

 5   DaVita?

 6   A.   Yes.

 7   Q.   And did Mr. Thiry try to live by those values when he was

 8   CEO of DaVita?

 9   A.   Yes.

10   Q.   Now, there was some discussion -- I'm going to show you

11   just on your screen Exhibit A380.

12           That's A380, Your Honor.  It is not yet in evidence.

13           There is at the bottom of it, sir -- it's an email

14   from Kent Thiry to you, and it's about -- it starts with, "I

15   brought up your job with Guy."  Do you see that?

16   A.   Yes.

17   Q.   Okay.  And earlier, when the prosecutor was questioning

18   you, I think this part of an email string was shown to you.  Do

19   you remember that?

20   A.   Yes.

21   Q.   Okay.  Let's go up to your response.  Is there a response

22   from -- there we go -- Rich Whitney to Kent Thiry, Monday

23   January 13.  Do you see that?

24   A.   Yes.

25   Q.   And then if we go up one more, is there a response back

Richard Whitney - Cross

1    from Mr. Thiry to several people on that one?

2    A.  Yes.

3              MS. BROOKS:  Your Honor, we would move A380 into

4    evidence.

5              MS. CLINGAN:  No objection.

6              THE COURT:  Admitted.

7              (Exhibit A380 admitted.)

8    BY MS. BROOKS:

9    Q.  What I'd like to do, Mr. Whitney, is look at your response

10   to Mr. Thiry.

11             If we could blow up that -- it's very small print.

12   Let's see if we can blow up that email that you sent to

13   Mr. Thiry.

14             It's kind of long, but could you -- let's start with

15   the very first sentence there.  What does it say?

16   A.  "By the way, I woke up this morning thinking that I just

17   have to drop you this quick note and then, coincidentally, I

18   saw your email regarding Guy.  My note, however, is on a

19   totally different subject."

20   Q.  And then the first sentence of the next paragraph, what

21   does that say?

22   A.  "We just held our first Radiology Partners leadership

23   meeting on Friday and into the weekend."

24   Q.  Was this a big occasion for you, Mr. Whitney?

25   A.  Yes.

Richard Whitney - Cross

1   *Q.* Why is that?

2   *A.* Because it was the first of what would become many

3   physician and other -- meetings of physician leaders and other

4   leaders in our organization.  And that was an important

5   component of building culture at our organization.

6           *MS. BROOKS:* And let's go now to the next paragraph,

7   "I left the meeting."  Let's blow that up.  The whole -- that

8   whole paragraph there.

9   *BY MS. BROOKS:*

10  *Q.* What do you say to Mr. Thiry here?

11  *A.* "I left the meeting with a feeling of tremendous excitement

12  and, interestingly, as CEO, an equally intense feeling of

13  responsibility to this team to make all of the aspirational

14  statements made by us and by them come true.  I remember you

15  speaking at many times and in many different ways of this

16  burden of responsibility, but I never fully appreciated it

17  until I drove away from the meeting on Saturday afternoon."

18  *Q.* Then what do you tell him next?

19  *A.* "Anyway, why am I telling you all of this?  Basically to

20  thank you for all of the mentorship over the years.  After the

21  meeting, it was 100 percent clear to me that I could not have

22  been anywhere near prepared to lead this organization to engage

23  on such an important and potentially impactful journey without

24  the time spent working with you.  And for that, I owe you a

25  very big thank you."

Richard Whitney - Cross

1    *Q.*  How do you sign off?

2    *A.*  "With enormous gratitude and respect."

3    *Q.*  Did you mean it at the time, Mr. Whitney?

4    *A.*  Yes.

5    *Q.*  Is it still true today?

6    *A.*  Yes.

7    *Q.*  And that is despite your interactions with Mr. Thiry

8    regarding how to or not to get employees from DaVita to go to

9    Radiology Partners?

10   *A.*  Yes.

11   *Q.*  You still feel the same way as you did back on

12   January 2014?

13   *A.*  Yes.

14   *Q.*  And then Mr. Thiry answers back.  He says, "Team victory,

15   meaning all of us as a team, sending ripples."  Are you

16   familiar with that term, "ripples"?

17   *A.*  Yes.

18   *Q.*  Can you explain to the ladies and gentlemen of the jury

19   what the term that Mr. Thiry would use "ripples," what did that

20   mean?

21   *A.*   It's short form for a phrase that we would often use, and

22   Kent in particular would often use, which was, "sending ripples

23   throughout the healthcare community."  And what it meant was

24   that DaVita had become quite a unique developer of talent,

25   quite a unique mission-driven patient-oriented culture, and was

Richard Whitney - Cross

1   therefore developing lots of highly capable leaders that had

2   the potential to impact other parts of the healthcare field for

3   the benefit of the patients.  And when an executive left DaVita

4   and went on to do that, the idea was that sent ripples from

5   DaVita throughout the rest of the healthcare community, and

6   that that was a good thing.

7   Q.  So it was viewed positively if an executive left DaVita and

8   took those DaVita values and instilled them in another

9   corporation?

10  A.  Yes.

11  Q.  So once you were inside the village wall, you were still

12  able to get out?

13  A.  Yes.

14  Q.  Nobody stopped you?

15  A.  No.

16  Q.  Are you proud of the work you've done at Radiology

17  Partners, Mr. Whitney?

18  A.  Very.

19  Q.  And was part of your ability to do that lessons that you

20  learned from Mr. Thiry?

21  A.  A huge part.  Yes.

22  Q.  Let's look at another one, A500.  This is an email string,

23  and we'll start at the top, to show that you are a recipient.

24          Is this an email at the top from you to -- and there

25  is several people here listed on the "to" line.  Do you see

Richard Whitney - Cross

 1   that?

 2   *A.*   Yes.

 3   *Q.*   Now, let's go to the original email.  And the date on

 4   this is August 23, 2014.  So you would have already been at

 5   Radiology Partners at that point; right?

 6   *A.*   Yes.

 7   *Q.*   And is this email from a Josh Golomb?

 8   *A.*   Yes.

 9   *Q.*   Do you know Josh Golomb?

10   *A.*   Yes.

11   *Q.*   Did you work with him at DaVita?

12   *A.*   Yes.

13   *Q.*   And do you know where he went after he left DaVita?

14   *A.*   I don't any longer recall.

15   *Q.*   Okay.  Does Hazel Healthcare ring a bell at all?

16   *A.*   I know that he has been CEO of Hazel Healthcare.  I don't

17   know if that's where he went directly after leaving DaVita.

18         *MS. BROOKS:*  Okay.  Your Honor, we would move A500

19   into evidence.

20         *MS. CLINGAN:*  No objection.

21         *THE COURT:*  It's admitted.

22   *BY MS. BROOKS:*

23   *Q.*   So let's look at what Mr. Golomb says -- we won't ready the

24   whole -- we can read the whole thing, if you'd like, and please

25   take your time.  But I wanted to point out where it starts, the

Richard Whitney - Cross

1    paragraph, "And in the middle of it, Julia said something to

2    the effect" -- can you read that paragraph to us, please.

3    A.   "And in the middle of it, Julia said something to the

4    effect of, I hope you realize how lucky you are.  Most people

5    have to choose between something that they really want to do

6    and finding something they can get a good paycheck at, and you

7    found something you loved doing and were able to do it so well

8    that you earned a great paycheck."

9    Q.   And then Mr. Golomb says -- what does he say next?

10   A.   "She said it perfectly.  Thanks for believing in me to lead

11   Rx, investing in me to do it well and rewarding me for the

12   clinical and business value we were able to create.

13   Ridiculously grateful.  Josh."

14   Q.   And he sends this email to Mr. Thiry; is that right?

15   A.   Yes.

16   Q.   With the subject, "Thank you again"?

17   A.   Yes.

18   Q.   Now, at this point in time, if we go down to his signature

19   space, where is Mr. Golomb?

20   A.   It looks like he's still at DaVita.

21   Q.   And do you know -- and I'm not sure timing-wise if you were

22   still there.  Do you know what DaVita Rx, Paladina Health is?

23   A.   Those were two divisions of DaVita.

24   Q.   And according to this -- at least his signature space, it

25   looks like Mr. Golomb had been named president of DaVita Rx and

Richard Whitney - Cross

1   Paladina Health at this point; is that right?

2   A.   Yes.

3   Q.   Let's go to Mr. Thiry's email, then, of how Mr. Golomb's

4   email got to you.  What did Mr. Thiry say when he forwarded

5   this email to several people, and you being one of them?

6   A.   "I know you will" -- I -- "I know you will all enjoy this.

7   The tree we nurtured has many branches and many flowers."

8   Q.   And what did you respond to Mr. Thiry?

9   A.   "Very cool on so many levels.  Proud to have been a small

10  part of planting the seeds."

11  Q.   What did you mean by that?

12  A.   I was agreeing with him that over the years, DaVita had

13  developed quite a number of talented executives that were going

14  to have an important impact in healthcare.

15  Q.   And why was that important to you, that there would be

16  talented executives that were developed at DaVita, having an

17  impact on healthcare?  What difference does that make?

18  A.   Because when you spend your whole career in the healthcare

19  services field, unless you're -- well, let me just say, when

20  you spend your whole career in the healthcare services field,

21  many of us believe that the most important thing that we're

22  doing is having an impact on the patients that we serve and on

23  the healthcare system overall.

24  Q.   Thank you.  Let's now go to -- I'm sorry.

25           Sorry, Your Honor, I have an inquiry as to what

Richard Whitney - Cross

1    exhibit number that was.  It was?

2            THE COURT:  A500.

3            MS. BROOKS:  Apparently Mr. Dodds is more on top of it

4    than I am.  So --

5    BY MS. BROOKS:

6    Q.  All right.  Let's go to now the commitment that you made to

7    Mr. Thiry.  Do you recall talking quite a bit about that during

8    your direct examination?

9    A.  Yes.

10   Q.  Now, was the purpose of the commitment that you made to

11   Mr. Thiry -- well, let me back up.  Let's talk about, as far as

12   you could tell, what was on Mr. Thiry's mind?

13           Was Mr. Thiry concerned about losing DaVita employees;

14   is that fair?

15   A.  I think that's fair.

16   Q.  And in this point in time, when you made this commitment to

17   Mr. Thiry, had there been a lot of DaVita employees that had

18   gone from DaVita to Radiology Partners?

19   A.  There had been a number.  I -- I have not been refreshed as

20   to how many it was at the time.

21   Q.  Well, Mr. Usilton, did he come from Radiology Partners?

22   A.  Yes.

23   Q.  And Mr. Gabriel?

24   A.  Yes.

25   Q.  And Mr. -- let's see if I can find the rest of the list

Richard Whitney - Cross

1   here.  There were several.

2   *A.*  Several.

3   *Q.*  Is that right?

4   *A.*  Yeah.

5   *Q.*  Okay.  But in addition to being concerned about losing

6   DaVita employees, were both you and Mr. Thiry also committed to

7   treating each other fairly in the recruitment process?

8   *A.*  Yes.

9   *Q.*  Now, in trying to treat each other fairly, were you going

10  to therefore treat the employees unfairly?

11  *A.*  That was not my intent.

12  *Q.*  What was your intent?

13  *A.*  My intent was to maintain the relationships that I had with

14  Kent and others at DaVita, within the context of having hired a

15  number of executives and the belief that I was likely to hire a

16  number of additional executives going forward.

17  *Q.*  Now, I believe that the prosecutor asked you, well, did you

18  make this kind of commitment to any other CEO?  Do you remember

19  that?

20  *A.*  Yes.

21  *Q.*  And you said no?

22  *A.*  Yes.

23  *Q.*  Well, was the backdrop to your commitment to Mr. Thiry that

24  Mr. Thiry was a mentor and a friend?

25  *A.*  Yes.

Richard Whitney - Cross

1   Q.   Did the two of you want to be respectful and fair to one

2   another?

3   A.   Yes.

4   Q.   And was the fundamental premise of the commitment that you

5   made to Mr. Thiry that if people are going to leave, that

6   Mr. Thiry agrees he'd rather they go with you -- the ripples go

7   with you than go with some other company that may not have the

8   same values?

9   A.   Yeah.  I think that was part of our conversation and part

10  of what I believed, too.

11  Q.   And is that a benefit or a burden to the employee?

12  A.   I'm not sure --

13  Q.   Let me rephrase it.

14  A.   -- that it's either -- I don't know.

15  Q.   Let me rephrase it.  If one of your former DaVita

16  colleagues who shared the same values as you --

17  A.   Yes.

18  Q.   -- ends up at Radiology Partners, is that good for them or

19  bad for them?

20  A.   Oh, I see your question.  I think that's good for them,

21  because they're going to a place where there is consistent

22  approach, consistent focus on a mission-driven culture,

23  focusing on the patients first, ahead of profits, and, you

24  know, similar leadership style, similar culture, et cetera.

25  Q.   So then you set out some ground rules; is that fair?

1    *A.*  You're referring to the email we looked at before?

2    *Q.*  Yes.

3    *A.*  Yes.

4            *MS. BROOKS:*  Let's pull that up, Government

5    Exhibit 172.

6            And let's go through your email to Mr. Thiry.  There

7    we are.

8    *BY MS. BROOKS:*

9    *Q.*  Now, I want to go slowly through this, Mr. Whitney, because

10   it's very important.

11   *A.*  Okay.

12           *THE COURT:*  But please try not to just repeat things

13   that the jurors have already heard.

14           *MS. BROOKS:*  I will, Your Honor.  In fact, I want to

15   point out some things they haven't yet heard.

16   *BY MS. BROOKS:*

17   *Q.*  So let's look at No. A.  Do you see that?

18   *A.*  Yes.

19   *Q.*  Now, this you've already been asked about, before exploring

20   possibilities, opportunities, and so on.

21   *A.*  Yes.

22   *Q.*  Now, let's go to B.  You were asked about this, but I want

23   to go through this just a little bit more with you,

24   Mr. Whitney.  Did you physically type this?

25   *A.*  I assume that I did.

Richard Whitney - Cross

1   *Q.*   Okay.   There is a reason I'm asking.   Is the word "or" in

2   caps in this?

3   *A.*   Yes.

4   *Q.*   Why did you put the word "or" in caps?

5   *A.*   Because I wanted it to be clear that what I was suggesting

6   was either/or.

7   *Q.*   So not -- in other words, not that they both have to be --

8   the employee has to be actively pursuing other opportunities

9   and they've got to tell their boss, but if either/or; is that

10  fair?

11  *A.*   Yes.

12  *Q.*   Why was that important to you?

13  *A.*   Because, as I think I said before, I felt like in some

14  circumstances an employee would naturally be having

15  conversations with people at their current employer about their

16  career and their long-term opportunities within that company

17  and about other options they might be interested in.   And in

18  other cases, that might not be the case.   And I didn't want to

19  be at a disadvantage relative to other companies and competing

20  for talent that was at DaVita.

21  *Q.*   And so the commitment that you made to Mr. Thiry was that

22  you wouldn't pursue -- that you would talk to candidates who

23  were pursuing possible employment opportunities or that had had

24  already a specific conversation with their boss; is that fair?

25  *A.*   Yes.

838

Richard Whitney - Cross

1    *Q.*   Now, under this commitment, is it true, Mr. Whitney, that

2    you're not aware of any possible DaVita candidates that

3    Radiology Partners did not consider as a result of this

4    commitment?

5    *A.*   Not to my knowledge.

6    *Q.*   And, in fact, was there a general feeling among you,

7    Mr. Usilton, and Dr. Gabriel that the agreement was something

8    that the three of you could work within and still be able to

9    hire the people that you needed?

10   *A.*   Yes.

11   *Q.*   And this commitment that you made, was the purpose of the

12   commitment, while it would inhibit you from actively soliciting

13   employees who were not looking to leave --

14   *A.*   Uh-huh.

15   *Q.*   -- it in no way hindered you in pursuing employees that

16   were looking to leave?

17   *A.*   I think that's right.

18   *Q.*   Again, is it true, sir, that you never felt there were

19   people at DaVita that you wanted to hire but could not because

20   of the agreement?

21   *A.*   I can't think of any examples where that would have been

22   the case.

23   *Q.*   Let's go to No. 3.  I don't think you were asked about this

24   yet, so let's talk about it.

25           Another commitment that you made to Mr. Thiry was, "If

Richard Whitney - Cross

 1    a DaVita teammate comes to Radiology Partners, we will always

 2    do whatever we can to ease the transition by allowing longer

 3    notice/transition periods or making the person available as

 4    reasonably needed to DaVita even after they have started with

 5    Radiology Partners.  Basically, we will work with their boss to

 6    come up with a plan that minimizes any transition issues."

 7              Why did you commit to this?

 8    A.  Because I felt like it was the right thing to do for -- in

 9    consideration of all of the relationships that I and others at

10    RP had at DaVita to do what we could in order to ease a

11    transition when someone made the decision to leave and come to

12    us, something that I would have -- was doing and would have

13    done, in any event.

14    Q.  Does that also benefit the employee, that they get to have

15    a longer transition period?

16    A.  I think it could.

17    Q.  Are you familiar with -- I don't know if they call it

18    exactly this -- but an offer that is called a now-or-never

19    offer?  Which is, here is your offer, but you've got to start

20    Monday?

21    A.  Yeah, I'm familiar with that.

22    Q.  Is that a good thing for an employee or a bad thing?

23    A.  That puts a lot of pressure on an employee to leave a

24    current organization without the proper consideration for their

25    relationships and the people they're leaving behind.

Richard Whitney - Cross

1   *Q.* And is this a commitment that you made kind of the opposite

2   or -- of a now-or-never offer?

3   *A.* I think you could probably say that.

4        *MS. BROOKS:* If I can have just one minute, Your

5   Honor.

6   *BY MS. BROOKS:*

7   *Q.* Oh, and as far as the commitment that you were making to

8   Mr. Thiry, in your mind, did this commitment focus on

9   senior-level employees at DaVita?

10  *A.* In my mind, it did. At that point in time we were quite a

11  small company, and the people that we were hiring were largely

12  senior-level employees. And, certainly, the ones that we had

13  hired up to that point in time from DaVita were senior-level

14  executives. I think that was the cause of the concern over at

15  DaVita.

16  *Q.* And as far as in your mind, a senior-level employee to you

17  would be a person whose departure might come to Mr. Thiry's

18  attention; is that fair?

19  *A.* I think that's fair. Yes.

20  *Q.* Let's go back. I forgot to ask you -- let's go back to A.

21  And I know you were asked about this before, but I have a

22  different question on this.

23        So A says -- the commitment you made was, "Before

24  exploring possible opportunities at Radiology Partners, we will

25  encourage them to consider all of their potential opportunities

Richard Whitney - Cross

1    at DaVita/HCP.  We will encourage them to fully discuss those

2    potential opportunities with their boss."

3            Did you make that commitment to Mr. Thiry?

4    *A.*  Yes.

5    *Q.*  Are you familiar with -- again, I'm not sure if you would

6    use this exact terminology -- but offers that are called

7    no-shop offers.  Where, here is your offer, but you can't shop

8    it to your current employer or anybody else.

9    *A.*  I suppose I'm familiar with that.

10   *Q.*  So it would be like a no-shop, no-tell kind of an offer; is

11   that fair?

12   *A.*  Yeah.  I don't have a lot of experience with them, but I'm

13   aware that practice exists.

14   *Q.*  And one of the reasons you don't have a lot of experience

15   with them, that's a real downside for an employee; fair?

16   *A.*  Yeah, can be.  Yeah.

17   *Q.*  And this commitment that you made to Mr. Thiry is the

18   opposite of a no-shop no-tell offer; right?

19   *A.*  I guess -- I guess it is.

20   *Q.*  Thank you.

21           I found my list of DaVita people.  I knew it was in

22   here somewhere amongst all of these papers.  So, Anthony

23   Gabriel; is that right?

24   *A.*  Yes.

25   *Q.*  Phil Reger?

Richard Whitney - Cross

1    *A.*  Yes.

2    *Q.*  Okay.  Eddie Robles?

3    *A.*  Yes.

4    *Q.*  Tom Usilton?

5    *A.*  Yes.

6    *Q.*  Jeff Long?

7    *A.*  Yes.

8    *Q.*  And then eventually or shortly thereafter, Cindy Pivik?

9    *A.*  Yes.

10   *Q.*  Okay.  Thank you.

11          You were asked in your direct about a Ms. Ertan; do

12   you remember that?

13   *A.*  Yes.

14   *Q.*  I would like to show you -- but I don't believe you were

15   shown this exhibit, let me show you B446.

16          And it's not yet in evidence, so I'm going to have to

17   lay a foundation, unless the government doesn't object, Your

18   Honor.  I would move it in.

19          *MS. CLINGAN:*  No objection.

20          *THE COURT:*  Admitted.

21          (Exhibit B446 admitted.)

22   *BY MS. BROOKS:*

23   *Q.*  Okay.  Mr. Whitney, let's start at the bottom.  We're now

24   in October 21, 2013?

25   *A.*  Uh-huh.

843

Richard Whitney - Cross

1  *Q.*  You write, "Great way to start the week by filling a key

2  void in our leadership team."  Do you see that?

3  *A.*  Yes.

4  *Q.*  Do you remember this?

5  *A.*  I don't have a memory of it, no.  This is the first time

6  I've seen this email since then.

7  *Q.*  Since then.  Okay.  Well, then, we'll go through it to

8  refresh your recollection.

9          Mr. Usilton responds, "Great news to start our week.

10  Congrats to all of us," with a whole bunch of exclamation

11  points.  Do you see that?

12  *A.*  Yes.

13  *Q.*  Then let's go to the top.  And it's another -- well, I

14  guess there is -- in the middle of it, there looks like

15  another email from a Jay Bronner.  Who is Jay Bronner?

16  *A.*  He was the chief medical officer of Radiology Partners at

17  the time.

18  *Q.*  And he says, "Excellent news.  When will she be on board,"

19  question mark.  And, finally, we can see the subject line of

20  this email string.  Up at the top, it says, "Basak just

21  officially accepted," with three exclamation points.  Do you

22  see that?

23  *A.*  Yes.

24  *Q.*  Who is Basak?

25  *A.*  Basak Ertan, who is the chief revenue officer of Radiology

Richard Whitney - Cross

1    Partners.

2    Q.  And I'm sorry.  Have I been mispronouncing it?  It's Basak?

3    A.  Yeah.

4    Q.  Sorry about that.  And was Ms. Ertan at this point at

5    DaVita?

6    A.  Yes.

7    Q.  What was her role?

8    A.  I don't remember her title at the time.

9    Q.  What was going to be her role at Radiology Partners?

10   A.  Chief revenue officer.

11   Q.  So you now lay out what the terms of her coming to

12   Radiology Partners are.  And what do you say on this email?

13   A.  "She will inform DaVita Friday, after which we will have

14   more clarity on transition.  We will be very flexible with them

15   since we have taken a lot of their top talent and since they

16   are our friends."

17   Q.  I am going to ask you what you mean by that in a moment.

18   But did you say that you haven't seen this email since 2013?

19   A.  No, I don't believe I have.

20   Q.  So in all the meetings with the Division, they never showed

21   you this one, as far as you can recall?

22   A.  As far as I can recall, I haven't seen this email.

23   Q.  Okay.  Why are you talking about being very flexible

24   regarding the transition?  What do you mean -- since we have

25   the person who wrote it finally, you tell us what you meant by

Richard Whitney - Cross

1   that.

2   *A.*   We wanted to be flexible on transition because we felt that

3   that was a fair way to treat DaVita, since we had spent a lot

4   of time there and a lot of friends there, and we wanted the

5   transition to be smooth.  If someone was going to leave DaVita

6   and come to us, we didn't want -- we wanted it to be as least

7   disruptive as possible.

8   *Q.*   And is that a benefit not just to the employee that is

9   coming to you, but to the employees who are left behind?

10  *A.*   Yes.

11  *Q.*   I'm going to show you an exhibit that was shown to you on

12  direct examination, G178.  But I'm going to ask you about a

13  part that you weren't shown.

14        So the first part is from Basak Ertan, on November 19,

15  2013, she says, "I have a short call with KT tomorrow.  Any

16  messages I can help reinforce?"  Now, you were shown this part;

17  is that right?

18  *A.*   Yes.

19  *Q.*   And then you were shown the part where you answer back.

20  But let's talk about the part you weren't shown, which is what

21  Ms. Ertan tells you after she meets with Mr. Thiry.  What does

22  she tell you?

23  *A.*   Would you like me to read it?

24  *Q.*   Yes, please.

25  *A.*   "Closing the loop" -- "closing the loop.  Conversation was

Richard Whitney – Cross

1   less than ten minutes, and he was running late.  Did not meet

2   this objective.  He was sentimental, remembering the old days

3   and focused on wishing me well.  His also emphasized the

4   importance of keeping in touch and continuing to help DaVita

5   and RP with strategic questions or executive referrals in the

6   future.  Example he used was having a potential DaVita female

7   exec call me as a DaVita reference."

8   Q.  So have you known Mr. Thiry to be sentimental when one of

9   his executives leaves the company?

10  A.  Yes.

11  Q.  And to reminisce about the old days?

12  A.  Yes.

13  Q.  Not out of character for him?

14  A.  No.

15  Q.  What about wanting to have Ms. Ertan continue to keep in

16  touch in order to help DaVita and Radiology Partners with

17  strategic questions?  What's that all about, if you know?

18  A.  I'm not sure that I know.

19  Q.  Well, let's talk about the next part, then, about executive

20  referrals.  You may not know this, Mr. Whitney; but so far

21  there has been, other than Ms. Fanning, nothing but white males

22  sitting in that chair.  Is it difficult to get females and

23  minority talent at the executive level?  Is there a lot -- is

24  there a big pool there?

25  A.  It's difficult.  Yes.

847

Richard Whitney – Cross

1   Q.   Why is that?  I personally want to know, why is that?

2   A.   I don't know.  There is a lot of reasons.

3   Q.   Well, could potentially one of the reasons be that if you

4   go somewhere and nobody looks like you, you may not want to go

5   there; is that fair?

6   A.   I think that's fair.

7   Q.   And Mr. Thiry is asking Ms. Ertan, would it be okay if

8   there was a potential female executive thinking about coming to

9   DaVita, if he referred that person to Ms. Ertan as a reference?

10  Do you see that?

11  A.   That's how I interpret this.  Yes.

12  Q.   As a CEO, do you think this is a good idea or a bad idea?

13  A.   A very good idea.

14  Q.   And why is that?

15  A.   Because, as you pointed out, it is -- it is difficult to

16  attract and retain sufficient numbers of female executives.

17  And having a reference from someone who feels good about their

18  time at DaVita, would speak very highly of the leadership team

19  and the culture and how female executives have the ability to

20  succeed there would be a positive reference for recruiting this

21  hypothetical female executive.

22  Q.   And do you know whether or not diversity was one of the top

23  priorities for Mr. Thiry?

24  A.   It was a priority.  Yes.

25  Q.   Thank you.  All right.  Let's stick with Ms. Ertan, but a

848

Richard Whitney - Cross

1    slightly different subject, which is Keegan Scanlon.

2         So you were shown Government Exhibit 209 in your

3    direct examination, so let's pull that up.  And if we go to the

4    last email and trace backward, it's on the second page -- and

5    I don't want to reinvent the wheel here.  I just need to make

6    one point.

7         Ms. Ertan is writing to a Trae Anderson, and it says,

8    "Touch base regarding Keegan."  Do you see that?

9    A.   Yes.

10   Q.   Now, am I correct that Ms. Ertan, she's now at Radiology

11   Partners, was she attempting to recruit Mr. Keegan from --

12   Mr. Scanlon from DaVita?

13   A.   Yes.

14   Q.   Then if we go to Mr. Anderson's -- so Mr. Anderson -- he's

15   at DaVita; is that right?

16   A.   Yes.

17   Q.   And so he says, "Thanks, Basak.  Your conversation is more

18   appropriately with Philipp.  Copying him so the two of you can

19   connect.  Also copying Chad for his information."

20        Now, let me ask you, if you know, when Ms. Ertan left

21   DaVita, did she still have a contractual nonsolicit in place?

22   A.   I haven't been refreshed on that, but I would assume, just

23   from general knowledge of DaVita employment agreements, that

24   that would have been the case.

25   Q.   So in all of your meetings at the Division, they didn't

Richard Whitney - Cross

1  share with you whether Ms. Ertan had the standard nonsolicit

2  agreement in her contract?

3  A.  No.

4  Q.  Okay.  Assume for me, if you will, that she did --

5  actually, I have found -- this may help.  We found a document,

6  thanks to my colleagues, that is another part of Ms. Ertan's

7  recruitment of Mr. Scanlon.  So I'll put it up on the screen.

8       And it's A555.  It would help if I told you the

9  number, wouldn't it?

10      And let's see the subject line.  Just for you right

11  now.  "Checking in and Keegan."  And is that from Basak Ertan?

12 A.  Yes.

13      MS. BROOKS:  And, Your Honor, we would move A555 into

14 evidence.

15      MS. CLINGAN:  What's the exhibit number?

16      MS. BROOKS:  A555.

17      MS. CLINGAN:  This is hearsay --

18      MS. BROOKS:  Oh, Your Honor, it's been stipulated to

19 as admissible.

20      MS. CLINGAN:  All right.  No objection.

21      THE COURT:  It's admitted.

22      (Exhibit A555 admitted.)

23 BY MS. BROOKS:

24 Q.  Let's start at the end, Mr. Whitney, which is actually the

25 first email.  So this appears to be an email from Ms. Ertan

Richard Whitney - Cross

1  to an Edward Lim.  And Mr. Lim is at -- as far as you know is

2  at DaVita?

3  *A.*  As far as I know.

4  *Q.*  The paragraph right here, "Keegan mentioned he spoke to

5  you" -- so this is Keegan Scanlon apparently spoke to Mr. Lim

6  at DaVita -- "about a manager position at Radiology Partners

7  and that you" -- meaning Mr. Lim -- "were supportive of him

8  applying.  I" -- meaning Ms. Ertan -- "wanted to personally

9  reach out to you and verify you are okay with us interviewing

10 him.  We would only proceed if you were okay."  Do you see

11 that?

12 *A.*  Yes.

13 *Q.*  Now, let's see what Mr. Lim responds to Ms. Ertan.  It

14 starts on the next page, but then spills back over.  So if we

15 can cut and paste, we'll start with Basak -- there we go.  And

16 then if we can do the rest of the email that appears on the

17 following page.

18         Okay.  So let's see what Mr. Lim -- and we can see

19 down at the bottom, it says, "Edward Lim, DaVita director,

20 Revenue Operations."  So let's see what Mr. Lim said to

21 Ms. Ertan about Keegan Scanlon.

22         He says, "As for Keegan, I did speak briefly with him

23 last week about his interest around a position at Radiology

24 Partners that he came across.  Assuming that he was not

25 recruited, I am supportive with him exploring this

Richard Whitney - Cross

1   opportunity."  Do you see that, Mr. Whitney?

2   A.   Yes.

3   Q.   Did the Division show you this email in all of your

4   meetings with them?

5        MS. CLINGAN:  Objection, Your Honor.

6        THE COURT:  Sustained.  I don't think we need to keep

7   doing that, please.

8        MS. BROOKS:  All right, Your Honor.

9   BY MS. BROOKS:

10  Q.   Let's go on.  "As a leader, I would never block an

11  opportunity for someone to grow.  It gives me gratification

12  when I am able to help others grow and develop, both

13  professionally and personal."  Do you see that, Mr. Whitney?

14  A.   Yes.

15  Q.   And it goes on to say, "Keegan has a tremendous amount of

16  leadership potential and is on a fast track to be promoted to

17  the next level manager at DaVita."  Do you see that?

18  A.   Yes.

19  Q.   "In fact, I've been having ongoing discussions with Trae

20  and Chad on when the right time is to promote Keegan to the

21  next level and how do we keep him continuous engaged and

22  challenged."  Do you see that?

23  A.   Yes.

24  Q.   Then he says, "At the end, it is Keegan's decision."  Was

25  that your experience, Mr. Whitney, that at the end of the day,

Richard Whitney - Cross

1  at DaVita and Radiology Partners, it's the employee's decision

2  whether they want to stay or go?

3  A.  Of course.  Yes.

4  Q.  "If he chooses to leave DaVita, this will have a

5  significant impact to Nautilus rollout, as he currently plays a

6  critical role.  If even possible, I would request a very long

7  transition, something similar to my engagement."

8          Is it unreasonable for DaVita to ask for a long

9  transition time for a critical employee like Mr. Keegan?

10  A.  Not given our relationship, no.

11  Q.  And, again, this is the opposite of a now-or-never offer?

12  A.  Yes.

13  Q.  And again at the very end it is reiterated, "It will be

14  Keegan's decision on whether or not to pursue this, as this is

15  an external position."  Do you see that?

16  A.  Yes.

17  Q.  So do we now have the full picture of what happened with

18  Keegan Scanlon, as best you can tell?

19  A.  As best -- we have a more complete picture.  Yes.

20  Q.  You're right.  We don't know if we have the full picture.

21  You're right.  We have a more complete picture now as to what

22  happened with Keegan Scanlon; is that fair?

23  A.  Yes.

24  Q.  Okay.  Let's go to Guy Seay.  You were shown in your direct

25  exam Government Exhibit 185-1.  And this is your email -- it

Richard Whitney - Cross

1    starts with your email to Mr. Thiry about Guy Seay?

2    A.   Yes.

3    Q.   Now, I don't want -- again, I don't want to repeat what has

4    already been asked of you; but I do want to cover what wasn't.

5           The second paragraph, "As I mentioned in a previous

6    email" -- this is you writing -- "I have an important idea

7    that I would like to ask you to consider.  Confidentially, it

8    doesn't look like my CFO is going to make it.  Gosh darnit.  I

9    hope I am not going to have the same trouble hiring the right

10   CFO here that you and I have had together over the years," and

11   you do a smiley face.  Why the smiley face?

12   A.   I don't know why I put a smiley face there.

13   Q.   Okay.  Well, were you referring to your -- you had been the

14   CFO over the years at DaVita, so were you joking --

15   A.   I had been the CFO over the years at DaVita.  I had helped

16   Kent in hiring my replacement.  And then several other CFOs

17   over the years, there had been some turnover.  And Kent would

18   typically even when I was not at DaVita reach out to me and ask

19   me to be on the interview team and ask me to provide input on

20   the candidate selection.

21   Q.   Now, you were asked by the prosecutor when shown -- not

22   this paragraph, but when shown this exhibit, at this point in

23   time was the CFO position posted publicly?  Do you remember

24   being asked that?

25   A.   Yes.

Richard Whitney - Cross

1   *Q.*  And you said no.  Right?

2   *A.*  Yes.

3   *Q.*  There was a reason that the CFO position hadn't been posted

4   publicly; right?

5   *A.*  Yes.

6   *Q.*  And why was that?

7   *A.*  Because we had a CFO, and we had -- at this point in time

8   hadn't moved to terminate that person.

9   *Q.*  So if you had posted publicly that there was a CFO position

10  available at Radiology Partners, how would your existing CFO

11  have felt about that?

12  *A.*  Not good.

13  *Q.*  All right.  Now, you were also asked -- because -- let's go

14  to another paragraph you weren't shown.  I'm sorry.  I don't

15  want to repeat what you were asked.

16         Let's go to, "I know that Guy is a treasured asset at

17  DaVita."  And why don't you, since you wrote it, read us this

18  paragraph and tell us what you were getting at.

19  *A.*  "I know that Guy is a treasured asset at DaVita, and for

20  that reason, even though I, as well as TU and AG view him as a

21  very strong fit for the role, I considered him off limits,

22  particularly in light of our recent good, healthy conversations

23  on this topic."

24  *Q.*  Let me stop you right there.  First of all, before you get

25  yelled at for talking too fast -- my fault because I asked you

Richard Whitney - Cross

1   to read it.  But, secondly, when you say, "I know that Guy is a

2   treasured asset at DaVita, and for that reason, even though I

3   view him as a good fit, I considered him off limits," what do

4   you mean that he was a treasured asset at DaVita?

5   *A.*  He had been there for a long time.  He was a leader that

6   was highly represented in particular for his -- his

7   demonstration of the values of DaVita.

8   *Q.*  And is it fair to say that just -- based on that fact

9   alone, out of respect for your former colleagues at DaVita, you

10  wanted to reach out to Mr. Thiry first before talking to

11  Mr. Seay?

12  *A.*  Yes.

13  *Q.*  Now, you were also asked by the prosecutor, well, if he,

14  Mr. Seay, had worked for another company, for example, Aetna,

15  would you have asked permission to talk to him?  And you said

16  no.  Do you remember that?

17  *A.*  Yes.

18  *Q.*  Well, if Mr. Seay had worked for another company, for

19  example, Aetna, would you have even known Mr. Seay?

20  *A.*  Probably not.

21  *Q.*  How did you know about Guy Seay, a treasured asset at

22  DaVita?

23  *A.*  Because Guy worked for me for many years.

24  *Q.*  Then Mr. Thiry -- I'm not sure if you were shown this one

25  on direct, but it's already in evidence, so let's look at

Richard Whitney - Cross

1    GX284.

2            And let's look at what Mr. Thiry's response was to

3    you.  And let's look at the date.  So January 12, 2024,

4    Mr. Thiry writes, I -- I'm sorry, I misspoke again --

5    January 12, 2014.  I am terrible with numbers, Mr. Whitney.  I

6    apologize.  And if you catch me in one of those, will you

7    please -- as CFO, will you please let me know that I have

8    misspoken?

9    A.  I'll do my best.

10   Q.  Thank you.  January 12, 2014, "I brought up your job with

11   Guy so he can contact you if he wants to.  I put no qualifiers

12   on my giving him that information.  I told him you were very

13   interested in him and had reached out to me."  Is that what

14   Mr. Thiry represented to you that he had said to Guy Seay?

15   A.  Yes.

16   Q.  But he did go on and talk about what had been happening

17   with Mr. Seay internally at DaVita, where he says, "Serious

18   conversations had already started with Guy, however, prior to

19   your email because JR and Mike's needs are much different

20   than Dennis', and so his job was going to change no matter

21   what.  That is one of the reasons I decided to raise your

22   interest to Guy immediately."  Do you see that, Mr. Whitney?

23   A.  Yes.

24   Q.  So if we look at what was written at the time, Mr. Thiry

25   said, we're already talking with Guy about changing his role,

857

Richard Whitney - Cross

1   and now you've told me about this opportunity for him -- CFO

2   opportunity for him at Radiology Partners, so I went to him --

3   I, Mr. Thiry, went to him immediately and told him about it.

4   Is that right?

5   A.   Yes.   That's what this says.

6   Q.   Then he has one small favor of you.   He asks, "I would

7   prefer that there be no reach-out to him for a couple of weeks

8   as we nail down what his DaVita options are.   Once again, he is

9   free to call you at any time.   I did not ask for any restraint

10  on that front."   Do you see that?

11  A.   Yes.

12  Q.   So this is January 12, 2014.

13          Now let's go to A498.   This is an email from you to

14  Mr. Thiry, cc'd Tom Usilton.   "Update re Guy."

15          I would move A498 into evidence, Your Honor.

16          *MS. CLINGAN:*   No objection.

17          *THE COURT:*   Admitted.

18          (Exhibit A498 admitted.)

19  *BY MS. BROOKS:*

20  Q.   So you tell Mr. Thiry on February 9 -- and the previous

21  email from Mr. Thiry is January 12 -- you say, "He contacted

22  us after your conversation with him."   Do you see that?

23  A.   Yes.

24  Q.   Who is the "he" you're talking about in this email?

25  A.   Guy Seay.

Richard Whitney - Cross

1   *Q.*   So by February 9, you -- Mr. Seay had reached out to you;

2   is that fair?

3   *A.*   That seems to be the case.   Yes.

4   *Q.*   And you then detail for Mr. Thiry what you talked about

5   with Guy Seay.   You say, "We discussed with him at length the

6   opportunity for him as our CFO, including compensation.   He

7   seems very interested, as I think he should be."

8            Obviously, you wanted Guy Seay to come to Radiology

9   Partners; right?

10  *A.*   At that time.

11  *Q.*   And -- yeah.   We're going to get to that, by the way, about

12  the fried brain in a moment.   But right now, at this point in

13  time, February 9, 2014, you really want Guy Seay to come to

14  Radiology Partners?   Is that fair?

15  *A.*   We're recruiting him hard.

16  *Q.*   And you're recruiting for him hard.   Competing for him

17  hard; fair?

18  *A.*   Yes, sir.

19  *Q.*   So you had already made him an offer, including

20  compensation.   Now, in the next paragraph you say, "Hopefully

21  your team has had the opportunity to consider and discuss with

22  him his available paths at DaVita so that everyone can make an

23  informed decision and feel very good about it one way or

24  another."   Is that what you said, Mr. Whitney, to Mr. Thiry?

25  *A.*   Yes.

Richard Whitney - Cross

1  Q.  So we've got over here, Radiology Partners competing hard

2  for Guy Seay; right?

3  A.  Uh-huh.  Yes.

4  Q.  Sorry about that.  And then we've got over here DaVita, as

5  you say, hopefully also having the opportunity to consider and

6  discuss with Guy his available paths at DaVita; fair?

7  A.  Yes.

8  Q.  Both companies competing for Guy Seay?

9  A.  Uh-huh.  Yes.

10  Q.  Now, let me ask you a third thing about offers.  Have --

11  are you familiar with the concept of an exploding offer?

12  A.  Yes.

13  Q.  Can you tell the ladies and gentlemen of the jury what an

14  exploding offer is.

15  A.  It's when you make an offer of employment to someone and

16  tell them that it's only good for a relatively short period of

17  time.  If they don't accept it quickly, then the offer is

18  rescinded.

19  Q.  Is that what you did with Mr. Seay?

20  A.  No.

21  Q.  Gave him plenty of time?

22  A.  Yes.

23  Q.  And this is during the time that you had made this

24  commitment to Mr. Thiry about how you would go about recruiting

25  from DaVita; is that right?

Richard Whitney - Cross

1    A.   Yes.

2    Q.   Is an exploding offer a good thing for an employee, when

3    they don't have the time to go talk to other companies, talk to

4    their existing company?  Is that a benefit or a burden?

5    A.   I think a burden.

6    Q.   And I take it you did not engage in that kind of activity;

7    right?

8    A.   No.

9    Q.   No, I'm not right; or no, you didn't?

10   A.   No, I didn't.

11   Q.   My fault.  I phrased it badly.

12           Now let's get to -- because you said that on

13   February 9, 2014, you were still very much in favor of Guy Seay

14   coming.

15           Now let's go to GX199.  I don't believe it's admitted,

16   but it is stipulated to, Your Honor, so I would move it into

17   evidence.

18           THE COURT:  Admitted.

19           (Exhibit 199 admitted.)

20   BY MS. BROOKS:

21   Q.   And I don't know if it's in your binder or not, so let's

22   just take a moment, because this is important.  I want you to

23   feel comfortable -- actually, the top part I think we have

24   seen.  But this is a different iteration where there is someone

25   else that gets involved in the chain.  So let's start with the

Richard Whitney - Cross

1  last part of this exhibit, the first email at the -- from

2  Dennis Kogod.

3            So this is just internal, as you can -- can you tell

4  from -- internal at DaVita.  We've got Dennis Kogod writing to

5  Kent Thiry and Javier Rodriguez.  Do you see that?

6  *A.*  Yes.

7  *Q.*  And it says, "Appears they had John Nehra call Guy to help

8  recruit to NEA.  John was under the impression Guy had already

9  made decision to leave DaVita.  Guy told John he was hoping to

10  stay at DaVita and talking about an HCP and international

11  role."  Do you see that, Mr. Whitney?

12  *A.*  Yes.

13  *Q.*  Now, I take it you wouldn't have been privy to this email

14  because this is internal -- at least until it got forwarded to

15  you because this was internal to DaVita; is that right?

16  *A.*  Yes.

17  *Q.*  Then Mr. Nehra -- how -- now, how does Mr. Nehra fit into

18  all of this?  Is he a board member somewhere?

19  *A.*  He's a board member at DaVita and also at the time was a

20  partner at NEA, New Enterprise Associates, which was the main

21  investor in Radiology Partners.

22  *Q.*  Okay.  So we've introduced a new term, so let's stop for a

23  minute and talk quickly about NEA so we get all of the players.

24  NEA, you said, was a main investor of Radiology Partners?

25  *A.*  Yes.

Richard Whitney – Cross

1    *Q.*  And at that point, Radiology Partners -- at that point

2    meaning in this time period that we're looking at of 2014 --

3    Radiology Partners is still pretty small; is that right?

4    *A.*  Yes.

5    *Q.*  But NEA -- is it -- was it -- was it your biggest investor?

6    *A.*  Yes.

7    *Q.*  And in 2014, were they worth approximately $1.9 billion?

8    *A.*  Was NEA worth that?

9    *Q.*  Yeah.  Not Radiology Partners, but NEA, if you know.

10   *A.*  It's a private partnership, so I don't know that you can

11   say what they're worth.  But they -- maybe what you're picking

12   up on is that they may have raised an investment fund of

13   $1.9 billion.

14   *Q.*  Okay.

15   *A.*  If that's what you mean.

16   *Q.*  Yes, I think I do.

17   *A.*  They raised money from pension funds and insurance

18   companies and things like that, 401K providers; and they invest

19   that money in young, growing companies.  And so they had

20   billions of dollars of capital under management I think is what

21   you mean.

22   *Q.*  Yes.  Exactly.  Thank you.

23          Okay.  So let's go back, then.  So we have John Nehra,

24   who somehow gets in the middle of the Guy Seay situation.  So

25   we have John Nehra, whose one hat is, he's on the board of

863

Richard Whitney – Cross

1  DaVita; is that right?

2  A.  Yes.

3  Q.  But then he's also a partner at NEA, which is the largest

4  investor in Radiology Partners?

5  A.  Yes.

6       MS. CLINGAN:  Objection, Your Honor.  This is getting

7  really repetitive and irrelevant.

8       THE COURT:  It certainly is.

9       MS. BROOKS:  I'm sorry, Your Honor.  I was just trying

10  to set the table here.  I will move on.

11  BY MS. BROOKS:

12  Q.  The point being that -- let's just skip to your colorful

13  email on the top --

14  A.  You aren't going to make me read it again, are you?

15  Q.  No, I'll do it.  So you say, "And why the "F" did Guy tell

16  Kogod that Nehra called him?  Very bad judgment.  I am moving

17  on."  Why did you think that was very bad judgment on the part

18  of Guy Seay?

19  A.  Because it -- it created a lot of -- it created a big

20  controversy, as you can see from these emails.  We didn't

21  intend this to be the case, but it appeared that we were using

22  the relationship that we had with NEA to ask John Nehra, a

23  director of DaVita, to encourage an employee of DaVita to move

24  from DaVita to RP, which was not our intent.  But that was what

25  it looked like, and that looks really bad and inappropriate.

864

Richard Whitney - Cross

1    And so I think that was what I was referring to.

2    Q.  And, in fact, had you done that purposely, it would have

3    been an issue; right?  Because John Nehra, as a board member of

4    DaVita, had a fiduciary duty to DaVita?

5    A.  Yes.

6    Q.  Okay.  So you go on, though, and you say, "Very bad

7    judgment.  I am moving on.  We need a great CFO, and this one

8    is just not worth the brain damage."  And then you talk about

9    him not -- Guy Seay not being able to be decisive about an

10   opportunity that he will see but once in his career.

11          So at this point, what was Mr. Seay doing -- forget

12   all of the drama -- what was Mr. Seay telling Radiology

13   Partners as to whether he was coming or not coming?

14   A.  We had not been successful in recruiting Guy.  And we were

15   getting frustrated by that fact, because we thought it was a

16   great opportunity for him.  And despite many meetings and

17   conversations and discussions with our board members and the

18   like, we didn't seem to be able to convince him that it would

19   be a good decision for him.

20   Q.  So he stayed at DaVita --

21   A.  He stayed --

22   Q.  -- as far as you know?

23   A.  He stayed at DaVita, yes.

24   Q.  I'm going to go over one more on the Guy Seay front, then

25   we'll move on.  But one more exhibit that the prosecutor did go

Richard Whitney - Cross

1    over with you, GX202.  And this is an email -- we'll start with

2    your email at the bottom of the first page.

3           It's from you to John Nehra, Kent Thiry, subject, "Re:

4    Appears they had John Nehra."  So in this email, you say,

5    "Sorry, John.  You obviously didn't have all the info.  In any

6    event, I am sure that Mo was only asking that you be a sounding

7    board as Guy sorts through what he wants to do."  What are you

8    trying to convey here?

9    A.  I'm trying to convey that we were not trying to use John

10   Nehra to recruit an executive from his own company to our

11   company.  I mean, that's --

12   Q.  And because if you had done that, that would have been

13   inappropriate?

14   A.  That would have been inappropriate.

15   Q.  Then Mr. Thiry responds and says, "Sorry.  Just opened.  I

16   responded to your original idea by saying I would raise it with

17   Guy so he could think about what was best for him.  I did

18   that."

19          Let me stop there.  We already saw that in the prior

20   emails; is that right, Mr. Whitney?

21   A.  Yes.

22   Q.  "I also told him we were totally supportive of him talking

23   to you directly."  Then Mr. Thiry goes on and says, "After he

24   spoke to a bunch of folks, he told us clearly he wanted to stay

25   with the village.  Then and only then did I ask that you stop

Richard Whitney – Cross

 1   talking to him."  Is that right, Mr. Whitney?

 2   A.  Yeah, that's what it says.

 3   Q.  So at no point in the harsh competition that was going on

 4   over Guy Seay did Mr. Thiry ask you to stop talking to Mr. Seay

 5   until he's told DaVita that he clearly wanted to stay with the

 6   village; is that fair?

 7   A.  Yeah.  I think that's what this indicates.

 8   Q.  And then you say back to Mr. Thiry, "Sounds good.  We have

 9   already moved on with our search.  Hopefully things will work

10   out great for Guy."

11          MS. CLINGAN:  Objection, Your Honor.  This is so

12   cumulative.

13          THE COURT:  What did you say?

14          MS. CLINGAN:  This is cumulative.

15          MS. BROOKS:  I didn't realize --

16          THE COURT:  Sustained.

17          MS. BROOKS:  Okay.  I didn't realize this had already

18   gone over.

19   BY MS. BROOKS:

20   Q.  I don't think Mr. Thiry's response, however, was pointed

21   out to you.  So let's look at his response.  What does

22   Mr. Thiry say?

23   A.  "No stress.  Life goes on."

24   Q.  Thank you.  All right.  Let's go next to Cameron Cleeton.

25          And, Your Honor, are we going to push straight through

Richard Whitney - Cross

1       until 1 o'clock?

2               THE COURT:  Well, does anybody need a break to use the

3       restroom or anything?

4               JUROR:  I think we're good.

5               MS. BROOKS:  All right, Your Honor.  Thank you.  I

6       will keep going, then.

7       BY MS. BROOKS:

8       Q.  Let's talk about Cameron Cleeton.  Now, Mr. Cleeton was

9       recruited by Radiology Partners to come -- to come from DaVita

10      to Radiology Partners; is that right?

11      A.  Yes.

12      Q.  And the only thing that -- let's see -- let's look at

13      GX208.  You were shown parts, and I want to go over the parts

14      you weren't shown.

15              So GX208, let's first look at the first email in

16      that string.  It's an email from Mr. Thiry dated June 10, 2014.

17      And he says, "Re Cameron.  As I said, because his boss was

18      temporary and left and I am assuming a stronger biz dev role in

19      HCP temporarily, I am probably the right person to talk to

20      Cameron."  So this is Mr. Thiry offering to talk to Cameron

21      Cleeton; is that right?

22      A.  Yes.

23      Q.  And does he ask you to give him enough time to do that?

24              MS. CLINGAN:  Objection, Your Honor.  This is also

25      cumulative.  We're just rereading stuff that is already in

Richard Whitney – Cross

1    evidence.

2            *MS. BROOKS:*  I don't believe that this last part was

3    actually asked, Your Honor.

4            *THE COURT:*  Overruled.  But, really, try to avoid just

5    going over the same stuff.

6            *MS. BROOKS:*  I thought I was.

7    *BY MS. BROOKS:*

8    *Q.*  I'm trying to pin down because there was a general

9    discussion, Mr. Whitney, about, were you asked to delay talking

10   to Mr. Cleeton?  Do you remember that?

11   *A.*  Yes.

12   *Q.*  I want to pin down exactly how long Mr. Thiry asked you to

13   delay talking to Mr. Cleeton.

14           So on June 10, 2014, what did Mr. Thiry ask you as far

15   as how long he wanted you to hold off?

16   *A.*  It says, "Could you please wait until next week?"

17   *Q.*  Thank you.  And you said, "Yup.  No problem," right above

18   that?

19   *A.*  Yes.

20   *Q.*  Now let's look at the internal emails that happened after

21   that.

22           So you write in the middle here -- here we go.  So

23   you've now forwarded what Mr. Thiry said to your internal team.

24   You say, "FYI, let's have him plan to meet with some of the

25   others on the senior team when they are in MB."  What's MB

Richard Whitney - Cross

1   stand for?

2   A.   Manhattan Beach, California.

3   Q.   Okay.  "Could meet with Ryan and Mo too"; is that right?

4   A.   Yes.

5   Q.   And then Mr. Gabriel asked you, "Want me to fly him out

6   that week, June 24-25?"

7   A.   Yes.

8   Q.   So there is not a huge delay here in the plan of when

9   you're going to talk to Mr. Cleeton; is that fair?

10  A.   Yes.

11  Q.   And then we have Mr. -- you saying, "Yes.  Think others

12  will want to meet him.  And we can further define a role,

13  discuss comp, and sell him."  Is that fair?

14  A.   Yes.

15  Q.   So even though Mr. Thiry had not yet talked to Mr. Cleeton,

16  at Radiology Partners, you were planning on flying Mr. Cleeton

17  out June 24-25, defining his role, discussing his comp, and

18  trying to sell him; is that right?

19  A.   Yes.

20  Q.   I think that's it on Cameron Cleeton.  Thank you.

21          Let's go to Cindy Pivik.

22          Government -- G175.  And if it's not already in

23  evidence, Your Honor, I would move it into evidence.

24          THE COURT:  It's already admitted.

25          MS. BROOKS:  Okay.

Richard Whitney - Cross

1  *BY MS. BROOKS:*

2  *Q.* I just want to go to the top email, Mr. Whitney, which is

3  from you to Tom Usilton.  And you're talking about Cindy Pivik.

4  So you say, "Best would be" -- "best would be her to tell

5  Finn" -- who is Finn?

6  *A.* David Finn, who is an executive at DaVita at the time.

7  *Q.* Okay.  -- "I am going to move on from DaVita.  I am

8  exploring several opportunities.  I haven't accepted anything

9  yet nor decided where I am going to end up, but I have decided

10 that I am going to leave DaVita, so I wanted to give you the

11 heads-up ahead of time."  Why were you suggesting that

12 Ms. Pivik tell her boss this?

13 *A.* Because I believed that that was true and that it was a

14 demonstration that I was recruiting in the manner -- continuing

15 to recruit in the manner that I had committed that I would.

16 *Q.* In good faith?

17 *A.* Yes.

18 *Q.* I forgot to ask you one question about -- did Ms. Pivik end

19 up coming to Radiology Partners?

20 *A.* Yes.

21 *Q.* I forgot to ask you one question about Mr. Cleeton.  We

22 know that eventually he came to Radiology Partners.  And once

23 he got there, did he still have colleagues back at DaVita?

24 *A.* Yes.

25 *Q.* And once he got to Radiology Partners, did he recruit Bowie

1    Remaley, Paul Catlett, and Carrie Copeland from DaVita?

2    A.  All three of those people became Radiology Partners

3    employees.  I don't know if they were specifically recruited by

4    Mr. Cleeton.

5    Q.  And they had been at DaVita; is that right?

6    A.  Yes.

7    Q.  And they all came to Radiology Partners during the time

8    that you had this --

9            MS. CLINGAN:  Objection, Your Honor.  Asked and

10   answered and cumulative.

11           THE COURT:  Overruled on that one.

12   BY MS. BROOKS:

13   Q.  They all came to Radiology Partners during the time that

14   you had this commitment to Mr. Thiry; is that right?

15   A.  Yes.

16   Q.  Let's go just quickly, GX216.  That is Belinda Reynaga --

17   the email about Belinda Reynaga.  I just want to show,

18   because it wasn't shown, what Mr. Thiry said back to you about

19   Belinda Reynaga.  So right there.

20           What did Mr. Thiry say back to you about Belinda

21   Reynaga and Radiology Partners recruiting her?

22   A.  "Belinda thing sounds fine to me, as does your logic."

23   Q.  Thank you.  During the time that you made this commitment

24   to Mr. Thiry, would it be fair -- and I'm talking about not

25   before you made the commitment, but during the commitment --

Richard Whitney – Cross

1   would it be fair to say that approximately 30 employees moved

2   from DaVita to Radiology Partners?

3   A.   I haven't been refreshed on the number.

4   Q.   Oh, I just got a note.  Was Ms. Reynaga hired by Radiology

5   Partners?

6   A.   Yes.

7   Q.   And she was at DaVita at that point, when she was hired by

8   Radiology Partners?

9   A.   That's my memory.  Yes.

10   Q.   Okay.  And so you don't have the exact numbers, but do you

11   recall that there was many people who came from DaVita to

12   Radiology Partners during the time that you had the commitment

13   with Mr. Thiry?

14   A.   Yes.

15   Q.   Now, you were asked about GX220, so let's pull that up.

16   And this was a discussion -- this is Ms. Ertan, and she's

17   talking about number two.  And I don't want to get repetitive

18   so I'll do this quickly to set the stage.  "We have a redwood

19   from DaVita that applied for an analyst position."  What was

20   redwood?

21        MS. CLINGAN:  Objection.

22        THE COURT:  Sustained.

23        THE WITNESS:  I think I answered that before.

24   BY MS. BROOKS:

25   Q.   Oh, you did?  I'm sorry, I missed that, then.

873

Richard Whitney - Cross

1          Let me ask you this:  As far as Mr. Thiry was

2    concerned, was redwood an important program to Mr. Thiry?

3    *A.*  Yes.

4    *Q.*  Now, during the time that you were having this commitment

5    with Mr. Thiry, were there also business development activities

6    going on between DaVita and Radiology Partners?

7    *A.*  The only -- I can remember one circumstance where we were

8    working together to pursue a joint opportunity.

9    *Q.*  And tell us about that.

10   *A.*  I have not been refreshed on the dates or the timelines

11   related to that, but I know there was a period of time where

12   there was a large chain of imaging centers that was available

13   for sale.  And we were -- DaVita and Radiology Partners were

14   exploring that opportunity, considering doing it as partners.

15   *Q.*  So let me show you A339.  And does this refresh your

16   recollection if not necessarily the time, at least the name of

17   the organization?

18   *A.*  Yeah.  Yes, this would be the one I was referring to.

19          *MS. BROOKS:*  Your Honor, we would move A339 into

20   evidence.

21          *MS. CLINGAN:*  I object unless they can provide a date.

22          *MS. BROOKS:*  Okay.  I think I can.

23   *BY MS. BROOKS:*

24   *Q.*  I have been told November 17, 2018; does that sound right

25   to you, Mr. Whitney?

874

Richard Whitney - Cross

1   A.  I really don't know.

2   Q.  Okay.  You know what, it's -- was there -- did -- just to

3   close the loop, did the Polaris initiative actually come to

4   fruition?

5   A.  No.  We worked on it and decided not to pursue it.

6   Q.  Do all business deals come to fruition?

7   A.  No.  Of course, not.

8   Q.  Let me show you A385.  And this is a back and forth between

9   you and Mr. Thiry with the subject line, "I have a favor to

10  ask."  Do you see that?

11  A.  Yes.

12  Q.  And it's in the 2016 time frame.

13         Your Honor, I would move A385 into evidence, if the

14  government has no objection.

15         MS. CLINGAN:  Doesn't seem relevant but --

16         THE COURT:  Doesn't seem relevant but?

17         MS. CLINGAN:  We object to relevance.

18         THE COURT:  Well, let me take a look.

19         From what I can see on the screen that's in front of

20  me, I sustain the objection.

21         MS. BROOKS:  Your Honor, could I make an offer of

22  proof at sidebar?

23         THE COURT:  If it's that important, yes.

24         MS. BROOKS:  It is, Your Honor.  Thank you.

25         (Hearing commenced at the bench.)

Richard Whitney - Cross

 1          MS. BROOKS:  Your Honor, I could give Your Honor the

 2     whole document.  Two things are shown in the document.  One is

 3     that there was this business relationship between Mr. Whitney

 4     and Mr. Thiry --

 5          THE COURT:  That's been well established.

 6          MS. BROOKS:  Thank you, Your Honor.  But not the

 7     details of it.  One of the details is that Mr. Whitney asks

 8     Mr. Thiry to introduce him to a Harry Kraemer.  Mr. Thiry --

 9     Mr. Whitney will explain the importance of that to Radiology

10     Partners.  This goes directly to intent, why did they enter

11     into the agreement.  And this shows that one of the reasons is

12     because Mr. Thiry -- if they play nice with Mr. Thiry, he can

13     introduce them to important people.

14          The second part is discussing a purchase of a company

15     in Germany that they will partner on together.

16          MS. CLINGAN:  Your Honor, a document that is created

17     three years after the creation of the gentlemen's agreement

18     cannot speak to the intention in entering the gentlemen's

19     agreement.  And we're going to go well past Opening Day if we

20     continue this way.

21          MS. BROOKS:  Your Honor --

22          THE COURT:  We won't go past Opening Day.  The

23     objection is now overruled.

24          (Hearing continued in open court.)

25          THE COURT:  The objection is now overruled.

876

Richard Whitney - Cross

1    BY MS. BROOKS:

2    Q.   Mr. Whitney, let's start with your email to Mr. Thiry

3    dated February 4, 2016, subject, "I have a favor to ask."

4    A.   Yes.

5    Q.   Can you please -- you don't have to read the whole thing to

6    the jury, but you're asking Mr. Thiry to get Harry Kraemer to

7    vouch for the RP team.   Who is Harry Kraemer?

8    A.   Harry Kraemer was the former chairman and CEO of Baxter,

9    International, and was a person who was also involved with the

10   Advocate Health Care System in Chicago, which was a client of

11   Radiology Partners.

12   Q.   Why did you want an introduction to him?

13   A.   I knew Harry a little bit, but not very well.   And I knew

14   that Kent knew him much better.   And I was asking for --

15   essentially, for Kent to give a reference to Harry that we were

16   a high-quality organization, group of people.

17   Q.   And the fact that Mr. Thiry may be able to do introductions

18   and make references or recommendations for Radiology Partners,

19   was that in your mind at the time you made the commitment to

20   Mr. Thiry about how you would go about hiring from DaVita?

21   A.   In -- I think in my mind was preserving the relationship.

22   And I guess I would say that that's really one part of what it

23   means when I say "preserving the relationship."

24   Q.   And when you -- well, what -- let me make sure I

25   understand.   What do you mean when you say "preserving the

Richard Whitney - Cross

1    relationship"?

2    *A.*  I had worked for Kent for a long time; we were friends; he

3    was a mentor; it was important to me to maintain that

4    relationship, in spite of the fact that I was hiring quite a

5    number of executives from RP -- I'm sorry -- DaVita.  And so

6    that's what I mean by that.

7    *Q.*  Then the email kind of -- email chain sort of veers off

8    in another direction.

9            And if we could go to the second page, a February 23,

10   2016, email from Mr. Thiry.  "We are soon to start a

11   consulting project wherein we look at other specialties in

12   Germany.  Radiology is one of nine on the list.  Can I get a

13   session and see some of your stuff?"  Do you remember this,

14   Mr. Whitney?

15   *A.*  I do now.  Yes.

16   *Q.*  What was that about?

17   *A.*  I think it's about what I said here.

18   *Q.*  And -- because I -- could you flesh it out just a little

19   bit for the jury.

20   *A.*  Well, my memory was, at the time DaVita had expanded

21   outside of the U.S.  And what I see from this email, what I

22   recall from the time is that they were starting to look at

23   other healthcare specialties outside of the U.S., including in

24   Germany.  I guess radiology was one of them.  And, obviously,

25   Kent knew that I was the CEO of a big radiology business in the

878

Richard Whitney - Cross

1   U.S., and so he was asking to discuss -- to discuss that

2   opportunity.

3   Q.  And were you interested in discussing that opportunity?

4   A.  I think I was.  I haven't seen this email, so --

5   Q.  So let's go to the first page.  Mr. Thiry says, "We are

6   comparing specialties" --

7           MS. CLINGAN:  Your Honor, could we briefly sidebar

8   again?

9           THE COURT:  I can't hear you when you just --

10          MS. CLINGAN:  Could we briefly sidebar again, please.

11          MS. BROOKS:  Actually, Your Honor, I can move on.  As

12  long as this A385 is in evidence, I can move on.

13          MS. CLINGAN:  May I inquire, how much longer?

14          MS. BROOKS:  With Mr. Whitney?  Your Honor, I'm just

15  about done.

16          MS. CLINGAN:  Thank you, Your Honor.

17          MS. BROOKS:  Okay.  I'll just move on, Your Honor.

18  BY MS. BROOKS:

19  Q.  Did though -- did this particular project -- if you can

20  recall, Mr. Whitney, did that come to fruition?

21  A.  It did not come to fruition.

22  Q.  Okay.  But there was discussions about it at the time?

23  A.  Yeah, at some level.  I don't remember the details.

24  Q.  One more topic, Mr. Whitney.  You were asked about a

25  leniency agreement that Radiology Partners has entered into.

Richard Whitney – Redirect

1           I don't know if the prosecutor moved it into evidence,

2    so, Your Honor, I would move G340 into evidence.  It is

3    unobjected to.

4           THE COURT:  It's admitted.

5           (Exhibit 340 admitted.)

6    BY MS. BROOKS:

7    Q.  Have you seen this before, Mr. Whitney?

8    A.  Yes.

9    Q.  And what is your understanding of this conditional leniency

10   agreement?

11   A.  That the government agrees not to prosecute Radiology

12   Partners or any of its executives if we are willing to testify

13   in this proceeding.

14   Q.  And is that one of the requirements, is that you have to

15   testify?

16   A.  Yes.

17          MS. BROOKS:  Your Honor, if I could have one moment.

18          No further questions, Your Honor.  Thank you.

19          THE COURT:  Redirect.

20                        **REDIRECT EXAMINATION**

21   BY MS. CLINGAN:

22   Q.  Mr. Whitney, you were just shown some documents concerning

23   a business proposal that was contemplated in 2016.  How many

24   years after you entered the gentlemen's agreement was that

25   business relationship contemplated?

880

Richard Whitney – Redirect

1   *A.*   Three.

2   *Q.*   Did it have anything to do with your decision to enter into

3   the gentlemen's agreement?

4   *A.*   No.

5   *Q.*   All right.   You were also questioned on cross-examination

6   about the disruptive effect that it can have on a business when

7   an executive leaves.   You're the CEO of a sizable company.   How

8   large is Radiology Partners today?

9   *A.*   About two and a half billion dollars of revenue.

10  *Q.*   Two and a half billion dollars of revenue.   And how many

11  employees?

12  *A.*   About 9,000.

13  *Q.*   Remind us when you started Radiology Partners?

14  *A.*   2012.

15  *Q.*   Have you, it sounds like, been able to successfully manage

16  talent retention?

17  *A.*   Yes.   On balance, yes.

18  *Q.*   Have you done that without a no-poach agreement?

19  *A.*   Yes.

20  *Q.*   Now, you also testified that Mr. Thiry's compensation is

21  affected by his ability to keep people at DaVita.   And I think

22  you testified that that was an important factor.   Would his

23  compensation increase based on his ability to keep people at

24  DaVita?

25  *A.*   In my experience, it wouldn't be that direct.   But in the

881

Richard Whitney – Redirect

1   sense that retaining key talent is an important factor of

2   success for a business across many dimensions, then I would say

3   indirectly, it would.  Yes.

4   *Q.*  How much did Mr. Thiry make?

5        *MS. BROOKS:*  Objection, Your Honor.  Subject to the

6   motion *in limine*.

7        *MS. CLINGAN:*  They opened the door wide open on this.

8        *THE COURT:*  I agree.

9   *BY MS. CLINGAN:*

10  *Q.*  How much did Mr. Thiry make?

11  *A.*  I have no idea.

12  *Q.*  How much did you make as an executive at DaVita your last

13  year there?

14  *A.*  I have no idea.

15  *Q.*  Was it in the millions?

16  *A.*  I really don't remember what it was.

17  *Q.*  Was it north of 1 million?

18  *A.*  I would probably say -- now, I'm guessing.

19  *Q.*  Sure.

20  *A.*  I would probably say north of a million, but not millions,

21  but I do not know.

22  *Q.*  Was Mr. Thiry compensated more than you?

23  *A.*  Yes.

24  *Q.*  Okay.  Let's talk about succession planning.  Do you do

25  this at Radiology Partners?

Richard Whitney – Redirect

1    A.   Yes.

2    Q.   Without a no-poach agreement?

3    A.   We don't have a no-poach agreement at Radiology Partners.

4    Q.   I think you testified DaVita is not the only company that

5    would want to retain employees.  Is DaVita the only company

6    that asked you for a no-poach agreement?

7              MS. BROOKS:  Objection.  Leading.

8              THE COURT:  Overruled.

9              THE WITNESS:  Yes.

10             MS. CLINGAN:  If we could please get Defense

11   Exhibit A500.

12   BY MS. CLINGAN:

13   Q.   You were shown an exhibit from an individual named Josh

14   Golomb to Kent Thiry.  And in that exhibit, Mr. Golomb had some

15   pretty glowing things to say about Mr. Thiry.  Do you know why

16   Mr. Golomb might feel uniquely indebted to Mr. Thiry?

17   A.   No, I wouldn't --

18   Q.   Are you aware of any allegations against Mr. Golomb?

19             MS. BROOKS:  Objection, Your Honor.  404.

20

21

22

23

24

25

Richard Whitney – Redirect





Richard Whitney - Redirect

1

2        *THE COURT:*  Objection is sustained to that last

3    question.

4    *BY MS. CLINGAN:*

5    *Q.*  You testified on cross-examination that Mr. Golomb was able

6    to leave DaVita.  At that point in time was he a senior

7    executive at DaVita or more of a regular employee?

8    *A.*  Mr. Golomb?

9    *Q.*  Uh-huh.

10   *A.*  I believe only from seeing this email here that he was

11   the president of DaVita Rx and Paladina Health, which were two

12   divisions of DaVita.

13   *Q.*  So would that make him a senior executive?

14   *A.*  Yes.

15   *Q.*  Was Mr. Golomb close to Mr. Thiry?

16   *A.*  I believe he was.

17   *Q.*  Now, were you copied on any communications in which

18   Mr. Thiry ended his relationship with Mr. Golomb?

19   *A.*  Not to my recollection.

20   *Q.*  Now, you reviewed some language in DaVita's public

21   securities filings that DaVita tries to be competitive with its

22   salaries.  Do you remember that?

23   *A.*  Yes.

24   *Q.*  Now, do you know whether or not that is standard language

25   that is included in most publicly -- most publicly traded

Richard Whitney - Redirect

1  companies' filings or if that was unique to DaVita?

2  A.  I think discussion of those topics is included in most

3  proxy forms.

4  Q.  Now, you also reviewed some data that was in those public

5  filings concerning comparability of pay.  Do you know if that

6  data looked at all employees or just the senior executives?

7  A.  I don't remember how deep that consulting project went.

8  Q.  So is your testimony, you don't know whether or not DaVita

9  looked at the compensation of the regular employees?

10  A.  Typically, a study like that would be focused on senior

11  executives.

12  Q.  Now, defense counsel also asked you on cross-examination if

13  Radiology Partners had hired in the ballpark of about 30 people

14  from DaVita during the conspiracy period; do you recall that?

15  A.  Yes.

16  Q.  Now, defense counsel made that seem like a lot.  How many

17  people did Radiology Partners hire between 2013 and 2019?

18  A.  I don't know the answer to that question.

19  Q.  Was it in the thousands?

20  A.  We certainly increased our number of employees by

21  thousands, but we also did a lot of acquisitions, so -- a lot,

22  I guess, would be my answer; but no one has refreshed me on

23  those numbers.

24  Q.  Okay.  Do you think it's probable that absent the

25  agreement, you might have hired more than 30 candidates from

887

Richard Whitney - Redirect

1    DaVita?

2    *A.*  Can you repeat the question?

3    *Q.*  Do you think it's probable that absent your gentlemen's

4    agreement with Mr. Thiry, you would have hired more candidates

5    from DaVita?

6    *A.*  I think I would say it's possible.

7    *Q.*  Now, you also testified on cross-examination that you

8    hired -- I think the way you phrased it was -- everyone you

9    wanted to hire.  Were those people that you or another top

10   executive at Radiology Partners knew of?

11   *A.*  Many of the people that we hired from DaVita were through

12   our networks, people that we knew, or people that had come to

13   RP then had their networks.  But I can't -- I can't say

14   everyone or most or --

15   *Q.*  Now, when you say "the people that we knew," are you

16   referring to yourself, Dr. Gabriel, Basak Ertan, Tom Usilton?

17   *A.*  When you say that statement, what are you referring to?

18   Are you referring to previous testimony?

19   *Q.*  I'm asking about your statement just now.  You said, "we

20   used our connection."  Who is the "we" in that group?  Is it

21   the top people -- the close people who initially started

22   Radiology Partners?

23   *A.*  Yeah, I think that's what I'm referring to.

24   *Q.*  Okay --

25   *A.*  You got me a little confused as to what the question is.

Richard Whitney - Redirect

1    Sorry.

2    Q.   So those would be the senior executives at Radiology

3    Partners.   The top commanders; yes or no?

4    A.   I'm sorry.   I don't know what the question is.

5    Q.   Okay.   Let's try this again.   You testified on

6    cross-examination --

7    A.   Yeah.

8    Q.   -- that you hired at Radiology Partners everybody that you

9    wanted to hire.

10   A.   I think to my knowledge, hires that I was involved with or

11   aware of, I can't think of a case where there was someone that

12   I wanted to hire or that we wanted to hire that we didn't hire;

13   but I don't have visibility to every hire, even -- I don't have

14   visibility even to most hires.

15   Q.   Let's break that down a little bit.   If there was somebody

16   that you were aware of that you wanted to hire, was it somebody

17   that you knew at DaVita?   Somebody that you knew of?

18   A.   That could have been the case, or could have been someone

19   that I was aware of because of the position or because I --

20   Q.   Was --

21   A.   -- during the course of my duties was familiar with that

22   recruiting process.

23   Q.   Someone who in some way had a line to you or Dr. Gabriel or

24   Basak Ertan or Tom Usilton?

25   A.   I think many times, that was the case.

Richard Whitney - Redirect

1   Q.  Okay.  Are there many employees at DaVita who did not have

2   a line of connection to you or another top Radiology Partners

3   executive?

4   A.  Yes.

5   Q.  Okay.  Let's just walk through an example.  You testified

6   on cross-examination about the complete picture of the hiring

7   of Keegan Scanlon.  Do you know whether or not Mr. Scanlon had

8   worked closely with Basak Ertan at DaVita?

9   A.  I think he may have.

10  Q.  Do you know if he had a personal relationship with her?

11  A.  I don't know the extent of their relationship.

12  Q.  So you don't know if he had brunch with her, had dinner

13  with her and her husband at their Manhattan Beach home?

14  A.  I don't have a memory of that.

15  Q.  Okay.  Let's take a look at Defense Exhibit A555.  I think

16  you looked at this on cross-examination.  It's an email from

17  Basak Ertan to it looks like a connection that she has at

18  DaVita.  Here, was Ms. Ertan able to use that connection to

19  lobby for permission for Keegan Scanlon to be recruited by

20  Radiology Partners?

21  A.  There is a lot of context around this one.  I don't know if

22  you want me to talk about that.

23  Q.  Well, Ms. Ertan was ultimately able to hire Mr. Scanlon;

24  right?

25  A.  Yes.

Richard Whitney - Redirect

1   Q.   Okay.  And was she able to get permission from DaVita to

2   talk to him, to hire him?

3   A.   Yes.

4   Q.   And did she use her connections at DaVita to make that

5   happen?

6   A.   I think she reached out to people that she knew at DaVita

7   to do that.  Yes.

8   Q.   Okay.  Would it be fair to say that there are a large

9   number of employees at DaVita who wouldn't have that personal

10  connection to Ms. Ertan?

11  A.   Yes.

12  Q.   Now, in this email -- which you have already walked

13  through, so I don't want to belabor the point too much --

14  Ms. Ertan makes some proposals about the timing of hiring

15  Mr. Scanlon.  Did you see Mr. Scanlon copied anywhere on this

16  email?

17  A.   I don't see him copied on this.  No.

18  Q.   Okay.  Now, you also testified on cross-examination that

19  you didn't learn of anyone who you wanted to hire but couldn't.

20  I think you explained who the off-limits group at DaVita was,

21  but can you just in your own words explain for us who that

22  off-limits group is.

23  A.   Well, it would be --

24          MS. BROOKS:  Objection.  Asked and answered.

25          THE COURT:  Sustained.

Richard Whitney – Redirect

1   *BY MS. CLINGAN:*

2   *Q.*  So if we understand what the off-limits group is, let me

3   ask:  Did following the gentlemen's agreement prohibit you from

4   actively recruiting those off-limits people, including using a

5   recruiter?

6           *MS. BROOKS:*  Objection.  Asked and answered.

7           *THE COURT:*  Sustained.

8           *MS. CLINGAN:*  I'm just laying a little bit of

9   foundation to move on.

10          *THE COURT:*  Sustained.

11  *BY MS. CLINGAN:*

12  *Q.*  All right.  At some point were you relying on external

13  recruiters to learn of good candidates?

14  *A.*  Yes.

15  *Q.*  Okay.  And those external recruiters would not have had the

16  direct relationship to DaVita that you did?

17          *MS. BROOKS:*  Objection.  Leading.

18          *THE COURT:*  Sustained.

19  *BY MS. CLINGAN:*

20  *Q.*  Would the recruiters who you were relying on have had the

21  direct relationship with DaVita employees that you and the

22  other top brass at Radiology Partners had?

23  *A.*  I don't know what relationships they would or wouldn't have

24  had.  I presume they would have had some relationships, but not

25  the same as the ones we had.

892

Richard Whitney – Redirect

1    *Q.*  Not the same as the ones you had.  So unless a DaVita

2    candidate raised their hand, would the recruiter have learned

3    of those individuals?

4    *A.*  Well, to the best of my knowledge, I never told any

5    recruiters not to reach out to DaVita employees.

6    *Q.*  Mr. Whitney, would you have been the person to have those

7    conversations?

8    *A.*  Not -- not necessarily in terms of individual recruiting

9    organizations, so --

10   *Q.*  Right --

11   *A.*  That's why I said, to my knowledge.

12   *Q.*  Sure.  I think we looked at the email that you sent to

13   Mr. Thiry concerning Belinda someone.  You explained you had

14   stepped away from recruiting.  So at that point in time, were

15   you the person that was having conversations with recruiters?

16   *A.*  Only if they were senior positions.

17   *Q.*  Okay.  Now, let's talk about Guy Seay for just a moment.

18   You explained on cross-examination why the CFO role that you

19   were looking at Mr. Seay for at that point in time was not

20   posted publicly.  Over the years, were there other roles at

21   Radiology Partners that were not posted publicly?

22   *A.*  Probably.  Yes.

23   *Q.*  Okay.  Now, ultimately, Mr. Seay was able to talk to you

24   and others at Radiology Partners?

25   *A.*  Yes.

Richard Whitney - Redirect

1   *Q.* Is that because you had a personal connection to Mr. Thiry?

2   *A.* And to Mr. Seay.  Yes.

3   *Q.* And did you use your personal connection to Mr. Thiry to

4   lobby for permission to be able to talk to Mr. Seay?

5          *MS. BROOKS:* Objection.  Leading.

6          *THE COURT:* Overruled.

7          *THE WITNESS:* I did ask Kent to -- if it would be okay

8   for me to talk to Guy Seay.  Yes.

9   *BY MS. CLINGAN:*

10  *Q.* Are there other employees at DaVita who don't have a

11  personal connection to you?

12  *A.* Yes.

13  *Q.* Would those employees have received the same opportunity

14  that Mr. Seay got to have a conversation with you?

15  *A.* No.

16  *Q.* When you sent your email to Mr. Thiry asking for his

17  permission to interview Mr. Seay, did you copy Mr. Seay on

18  that email?

19  *A.* No.

20  *Q.* And we saw in Government Exhibit 202, you were informed

21  that Mr. Seay wanted to stay with the village.  Do you recall

22  who was the individual that informed you of that?

23  *A.* I don't have a clear memory of that.

24          *MS. CLINGAN:* Let's pull up Government Exhibit 202.

25

Richard Whitney - Redirect

1    *BY MS. CLINGAN:*

2    *Q.*  And let's take a look at the middle email at 12:41 a.m.

3    from Mr. Thiry.  He writes, "He told us clearly he wanted to

4    stay in the village."  So who was the individual who

5    communicated to you that Mr. Seay wanted to stay at DaVita?

6    *A.*  Kent in this email would have been one of the individuals

7    that would have told me that.  I am not sure --

8    *Q.*  In this email --

9    *A.*  Yeah.

10   *Q.*  -- who is the person that relays that information to you?

11   *A.*  In this email it would be Kent Thiry.

12   *Q.*  Is Mr. Seay copied anywhere on this communication?

13   *A.*  Not that I can see.  No.

14   *Q.*  Did Mr. Seay decide when you would stop talking to him, or

15   Mr. Thiry?

16   *A.*  I believe we had already decided to move on at this point

17   in time.  There was another email that seemed to indicate

18   that.  It's a long time ago, but that's my memory.

19   *Q.*  Sure.  That email in which you agree to stop talking to

20   Mr. Seay, does that take place before or after Mr. Thiry asked

21   you to stop talking to Mr. Seay?

22   *A.*  You'd have to show me the email again.  I'm not sure

23   which one you're referring to.

24        *MS. CLINGAN:*  Okay.  Ms. Cabrera, if we could just

25   close the callout.

Richard Whitney - Redirect

1          So looking at your email in response -- actually,

2   could we show both pages of 202.  I think that will make this a

3   little bit clearer.

4   BY MS. CLINGAN:

5   Q.  All right.  Let's look at Mr. Thiry's email on March 2,

6   2014, near the top of the second page.

7   A.  Uh-huh.

8   Q.  There Mr. Thiry says, "It's feeling to me you guys should

9   stop talking to Guy."  That's March 2, 2014?

10  A.  Right.

11  Q.  Now let's take a look at your response on the first page --

12          MR. DODDS:  Your Honor, can I object now?  This is

13  cumulative and repetitive.

14          MS. CLINGAN:  The witness testified --

15          THE COURT:  Mr. Dodds, you just came to life.

16          MR. DODDS:  Finally, I had to, Judge.  I'm sorry.

17          MS. CLINGAN:  I have two minutes left, and the witness

18  has testified that it would be helpful to him to review the

19  documents.

20          THE COURT:  Overruled.  Go ahead.  Finish up.

21          MS. CLINGAN:  All right.

22  BY MS. CLINGAN:

23  Q.  And so your email on March 26, 2014, you write, "Sounds

24  good."  That's after Mr. Thiry says, stop talking to him.  Does

25  this refresh your recollection?

Richard Whitney – Redirect

1   A.   It -- yes, I recall these emails.

2   Q.   Okay.  You agreed to do that without Mr. Seay being copied

3   on these emails?

4   A.   Yes.

5   Q.   Mr. Seay is someone with whom you had a long relationship?

6   A.   Yes.

7   Q.   Is that the way you treated Mr. Seay, someone with whom you

8   had a long-standing relationship, so that you could honor your

9   gentlemen's agreement with Mr. Thiry?

10          MS. BROOKS:  Objection.  Leading.  Argumentative.

11          THE COURT:  Rephrase the question and not be leading.

12   BY MS. CLINGAN:

13   Q.   Mr. Seay is not copied on this communication.  At this

14   point did you do that to honor your gentlemen's agreement with

15   Mr. Thiry?

16   A.   No.  I -- and this is a long time ago, but I was having

17   lots of conversations with Mr. Seay during this period of time

18   to try to recruit him to Radiology Partners.  So I didn't --

19   Q.   Sure.

20   A.   I'm assuming I didn't feel the need to include him in this

21   conversation.

22   Q.   When you entered the gentlemen's agreement, what individual

23   were you trying to please?

24   A.   The senior executives at DaVita, including Kent.

25   Q.   Okay.  You testified on cross-examination, Mr. Thiry is a

Richard Whitney – Redirect

1    friend?

2    A.   Yes.

3    Q.   He's a mentor?

4    A.   Yes.

5    Q.   Did his friendship open doors for you?

6    A.   Yes.

7    Q.   Did he introduce you to Harry Kraemer?

8    A.   Yes.

9    Q.   How much did Mr. Thiry originally invest in Radiology

10   Partners to help get it off the ground?

11   A.   I believe the number was 1 million.

12   Q.   And how many more millions did he invest over the years?

13   A.   I don't know the answer to that.  We've had subsequent

14   investment rounds, and my memory is that he's participated in

15   each one of them to his allotted amount.

16          MS. CLINGAN:  Sure.  Let's take a look at Government

17   Exhibit 245.

18          We would move this into evidence.

19          MS. BROOKS:  No objection, Your Honor.

20          THE COURT:  245 is admitted.

21          (Exhibit 245 admitted.)

22   BY MS. CLINGAN:

23   Q.   Okay.  Mr. Thiry asks, what's his 3 million invested worth

24   today?  Could you read your response to Mr. Thiry.

25   A.   From the top?

Richard Whitney - Redirect

1    *Q.*  Yes.

2    *A.*  "So I checked" -- "so I checked, and first, the funny thing

3    is you think you invested 3 million between the two of you.

4    Who is keeping track of that pile of money, Thiry?  Here are

5    the numbers, subject to some rounding.  KT has invested 5.4" --

6    want me to read all of this?

7    *Q.*  Yes.

8    *A.*  "$1 million at $1 a share, 2.1 million at 5.45 a share, 2.3

9    million at 7.04 a share.  Current value is 9.98 per share, or a

10   total of 17 million."

11   *Q.*  So continue.

12   *A.*  "Jrod has invested 4.1 million.  750,000 at $1 a share, 1.6

13   million at 5.45 a share, 1.7 at 7.04 a share.  Current value is

14   12.8 million.  Happy to be working for you guys.  JR, you owe

15   me a trip to Ibiza or something.  In all seriousness, fun to

16   have friends making money when you are making money.  That's

17   why the craps table is so popular."

18   *Q.*  As of May 2019, Mr. Thiry's investment in Radiology

19   Partners was worth 17 million.  Is he still a partner in

20   Radiology Partners?

21   *A.*  Yes.

22   *Q.*  Are you afraid of losing your connection to Mr. Thiry?

23   *A.*  As a result of that investment or generally?

24   *Q.*  Generally.

25   *A.*  Yes.  He is a friend and mentor.

 1    *Q.*  Is testifying against him personally painful?

 2    *A.*  Yes.

 3              *MS. CLINGAN:*  Nothing further.

 4              *THE COURT:*  All right.  Thank you.

 5              Questions from the jury?  Yes.

 6              So while we're gathering the questions, I have a

 7    question.

 8              My question is, is there anybody in the courtroom

 9    whose birthday it is today?

10              Well, what a surprise.  A little birdie told me.

11    Happy birthday.  Probably when you look back over years, you

12    don't remember where you were on your birthday, you might

13    remember where you were on this one.

14              (Hearing commenced at the bench.)

15              *MS. BROOKS:*  Shall we read one and then swap, to make

16    it quicker?

17              *MR. DODDS:*  No objection, here, Your Honor, on that

18    one.

19              *THE COURT:*  No objection from 22 from either party?

20              *MS. CLINGAN:*  No objection.

21              *MS. LEWIS:*  No objection.

22              *THE COURT:*  Or 23?

23              *MR. DODDS:*  Correct, Your Honor.

24              *THE COURT:*  Here is 24.

25              *MR. DODDS:*  Thank you.  We have no objection to that

1  one.

2  THE COURT:  No objections to 25?

3  MS. CLINGAN:  No objection.

4  THE COURT:  Did you already look at this one?

5  MS. CLINGAN:  Yeah, we're good.

6  MR. DODDS:  No objection to this one, Your Honor.

7  MS. CLINGAN:  But I didn't see, there is one on the

8  back.  Fine.

9  THE COURT:  All right.  Here is 26.  Any objection to

10  26?

11  MS. CLINGAN:  No objection.

12  MS. LEWIS:  No objection.

13  MS. BROOKS:  No objection.

14  MR. DODDS:  Did you look at 27?

15  MS. CLINGAN:  No objection, and no objection to this.

16  THE COURT:  That's 27.  No objection?

17  MR. DODDS:  No objection to 28.

18  THE COURT:  Thank you.

19  MR. MELSHEIMER:  Can I raise one procedural issue?

20  Would you mind giving the jury an instruction as we break for

21  the weekend -- since we are going to be breaking for the

22  weekend, you know, the standard keep an open mind, you haven't

23  heard all of the evidence, that sort of thing?  Would you be

24  willing to do that, given the weekend break?

25  MS. LEWIS:  We don't think it's necessary, Your Honor.

1          MR. MELSHEIMER:  It's customary in my experience --

2     it's obviously up to the Court, but we would request, given the

3     end of the week --

4          THE COURT:  What if I just instruct them to give the

5     Government's case a lot of good vibes this weekend?

6          MS. CLINGAN:  We would have no objection to that.

7          MR. MELSHEIMER:  I'm worried about that, Judge.  If

8     you would consider it, I'm sure you have a standard

9     instruction --

10          MS. CLINGAN:  The last procedural thing.  We've got a

11     victim witness who flew in from out of town, we'd like to get

12     him on the stand today for a few minutes.

13          THE COURT:  Okay.  If he's short, you can do that.

14          MS. CLINGAN:  He might not finish, but we'll do our

15     best.

16          MR. MELSHEIMER:  I would also --

17          THE COURT:  We're not going past 1:30.

18          MS. CLINGAN:  But they've known this person was going

19     to testify.

20          THE COURT:  Why didn't you bring that up --

21          MS. CLINGAN:  I apologize, Your Honor.

22          MR. MELSHEIMER:  I'm sorry.  Were you finished?

23          MS. CLINGAN:  I asked Ms. Brooks earlier how long she

24     intended to go.  I should have been clearer that it's

25     because -- when I said we're coordinating witnesses, it's

 1    because we wanted to get this witness on.

 2              THE COURT:  Who is the person?

 3              MS. CLINGAN:  Elliot Holder.

 4              MR. MELSHEIMER:  Your Honor, there is two things.

 5    They originally told us that Hamel was going to be the next

 6    witness.  Now they're saying it's Holder.

 7              THE COURT:  I don't --

 8              MR. MARIANO:  And that's fine.  All I'm saying, Judge,

 9    I don't want -- I'd like to have the direct and cross completed

10    and --

11              THE COURT:  If you're not done and you need more time,

12    the person will have to come back Monday or be finished on

13    video, one or the other.  I'm not going to rush your cross.

14              MR. MELSHEIMER:  Understood.

15              (Hearing continued in open court.)

16              THE COURT:  All right.  Mr. Whitney, we have several

17    questions here for you from the jury.

18              Question:  If a DaVita employee reached out to RAD

19    Partners about a job opportunity, did RAD Partners ask the

20    DaVita employee to tell their boss or if they were looking at

21    other companies?

22              THE WITNESS:  No.  Because if the person reached out

23    to us, that was clearly evidence that they were considering

24    opportunities outside of DaVita.

25              I guess I should be directing that to the jury.

1          THE COURT:  Did RAD Partners follow up with the DaVita

2     employee in these cases if they didn't hear back?  I guess that

3     doesn't -- you already said you didn't ask them those

4     questions.

5          THE WITNESS:  Yes.

6          THE COURT:  All right.  Two -- question:  Would it be

7     typical for RAD Partners' people who are engaged in hiring

8     executive directors to know whether or not employees of the

9     other companies are conducting job searches and strongly

10     considering leaving current jobs?

11          THE WITNESS:  I think that that is something that

12     would typically come out in conversations with people, if I'm

13     understanding the question correctly.

14          THE COURT:  Right.  The question was:  Was it typical

15     for RP -- people at RP who were engaged in hiring executive

16     directors to know whether or not the employees that were --

17     they were talking to from these other companies were actually

18     conducting job searches at the time?

19          THE WITNESS:  Yeah.  I would say that that -- that is

20     typically --

21          THE COURT:  And then the question says:  Same

22     question, but specifically about DaVita employees.

23          THE WITNESS:  I would say typically, especially since

24     many of the people were known to us personally.

25          THE COURT:  Question:  Did you ever feel that by

1    following the ground rules in the gentlemen's agreement and

2    Mr. Thiry's request to stall communication with DaVita

3    employees, that you sent mixed messages to DaVita employees

4    that were engaged in exploring RAD Partners employment?

5              THE WITNESS:  I'm not aware of a situation that I can

6    think of like that, although I could imagine that's possible.

7              THE COURT:  Question:  How did you know that for a

8    DaVita employee who was already planning to leave DaVita,

9    taking a job at RAD Partners was better than taking a job at a

10   different company?

11             THE WITNESS:  We didn't know that, but that was the

12   choice of the person that was coming to join us.

13             THE COURT:  Question:  How did you assess what the

14   DaVita employee wanted in their next job?

15             THE WITNESS:  You typically learn that through the

16   interview process, asking them questions about what -- you

17   know, what they're looking for in their next role, trying to

18   determine if that's a fit with the role that we might have

19   available.

20             THE COURT:  Next question:  In your agreement with

21   Mr. Thiry, were RAD Partners employees under the same

22   guidelines as DaVita employees?

23             THE WITNESS:  No.

24             THE COURT:  Regarding the email about the guidelines

25   of the agreement, 2B gives options, where the employee doesn't

1    have to inform their boss they are looking at options.  Can you

2    be more specific about what a potential employee needed to show

3    to you to confirm that they were looking elsewhere?

4         THE WITNESS:  It could be any number of things.  In my

5    view, what I agreed to was -- I committed to only recruit those

6    employees that I believed were otherwise looking for

7    opportunities outside of DaVita.  In my mind, I didn't agree to

8    all of those things on the email that was entitled "the

9    ground rules."  There never was agreement on that, in my mind.

10   But those were a list of some of the things that might provide

11   evidence to show that I was, you know, living up to the spirit

12   of what I committed to do.

13        So -- and I think as we've seen in some of the

14   evidence, I would typically do, you know, one or more of those

15   things or even some other things that weren't on that email

16   in order to demonstrate that I was sticking to the spirit of

17   what I said I would do.

18        THE COURT:  Question:  If someone used another offer

19   to show this interest, is that late in the job search for the

20   employee to start discussions with RP?

21        THE WITNESS:  I'm sorry, Your Honor.  Could you repeat

22   that?

23        THE COURT:  Sure.  If someone used another offer to

24   show this intent -- the intent referring back to the previous

25   question about looking at outside options -- is that late in

1   the job search for the employee to start discussions with RP?

2          THE WITNESS:  I think it really depends upon the

3   circumstances.  I think the fact that they might have another

4   job offer is one of the things that we might point to, to

5   indicate the person was otherwise looking.  The other might be,

6   they might just tell us they're interested in opportunities

7   outside of DaVita.  So -- I'm not sure --

8          THE COURT:  Next question gets into the same basic

9   idea.  How would one show they are interviewing?  How would

10  someone you're talking to show that they were interviewing

11  somewhere else?

12         THE WITNESS:  We just ask them.

13         THE COURT:  All right.  Question:  Did Kent Thiry's

14  investment in RAD Partners influence your decision to engage in

15  the gentlemen's agreement?  Or was that engagement based more

16  on maintaining your relationship with Kent Thiry?

17         THE WITNESS:  It was more about maintaining the

18  relationship.  I know these seem like big numbers, but

19  Radiology Partners has raised well over a billion dollars of

20  investment.  And so the numbers that we were talking about

21  before were not material to us.

22         THE COURT:  Question:  Do you feel as if you lost

23  potential candidates due to the speak-to-your-boss rule, due to

24  the risk that an employee would have in doing so, or to the

25  extra time involved that this extra step might take?

1          THE WITNESS:  I'm not personally aware of any

2     situation like that, but I also don't have personal knowledge

3     of every hire from -- every recruitment from DaVita.

4          THE COURT:  I think maybe another way to phrase the

5     question would be, what was your problem with the

6     speak-to-your-boss rule?

7          THE WITNESS:  I was willing to commit to recruit to --

8     in a particular way from DaVita.  I was not willing to commit

9     to not recruit from DaVita, and I was not willing to commit to

10    things that I thought would put me at a disadvantage versus

11    other companies in recruiting from DaVita.  So I felt like that

12    provision would put me at a disadvantage, in some

13    circumstances.  The circumstance where a person wasn't

14    comfortable, didn't want to, for whatever reason, take that

15    step.

16         THE COURT:  Question:  Were you aware that DaVita and

17    Mr. Thiry had a similar gentlemen's agreement with other

18    companies such as SCA?

19         THE WITNESS:  Not until I learned of the Indictment of

20    SCA.

21         THE COURT:  Were you aware that SCA's agreement did

22    not have an "or" in the part about telling -- tell your boss?

23         THE WITNESS:  I really don't have much information in

24    terms of what agreements existed in that case.

25         THE COURT:  So you didn't know whether they did or

1   didn't?

2           THE WITNESS:  Yeah, I -- I know little bits and pieces

3   of things I've heard, but I don't feel like I'm qualified to

4   answer any questions regarding what was agreed or not agreed

5   between those two businesses.

6           THE COURT:  Or whether their agreement was more

7   restrictive than your agreement?  You don't know?

8           THE WITNESS:  I know what I've heard.

9           THE COURT:  Okay.

10          THE WITNESS:  But I don't know factually.

11          THE COURT:  All right.

12          Question:  Did you ever follow up with Mr. Thiry about

13  his initial reaction that this agreement was asymmetrical in a

14  way that was unfair to DaVita?

15          THE WITNESS:  We had another phone conversation after

16  that email, where we talked about these same issues and went

17  round and round.  And, you know, essentially, just agreed to

18  disagree on, you know, the -- all of those things that were in

19  the ground rules, which I view as kind of the manner in which

20  someone would prove that -- that I was being -- living up to

21  the spirit of what I committed to do, which was, as I mentioned

22  before, to only recruit employees that were -- that I felt were

23  otherwise looking.

24          THE COURT:  Based on what he told when you were going

25  round and round, why did he think it was to DaVita's

1    disadvantage?  Why did he think that the ground rules were

2    asymmetrical?

3              *THE WITNESS:*  I'm not quite sure I ever understood.

4    Or if I did, I don't have a clear memory of it, ten years

5    later.

6              *THE COURT:*  Question:  If you didn't like the ground

7    rules of the agreement, why did you agree to them?

8              *THE WITNESS:*  So in my mind, what I agreed to was

9    specifically not to recruit DaVita employees that I didn't

10   believe were otherwise looking for opportunities outside of

11   DaVita.  The -- the email that we've been looking at, the

12   ground rules email, I don't believe we ever really had a

13   meeting of the mind on those specifics.  So it was a lot of

14   discussion about how would one -- how would you show that the

15   person was -- it easy to say that the person was looking for

16   opportunities outside of DaVita, and we never really agreed on

17   that.  It was almost like, you know, you just have to trust me

18   that -- I'm telling you this is what I've been doing, I'm

19   telling you this is what I'm going to continue doing, and

20   you're just going to have to trust.

21              Now, that said, I did use those -- some of those items

22   on that ground rules to point out in situations like the ones

23   we went through today, that -- to point out that this was

24   consistent with what I had agreed to do.  Like the person had

25   called us first, or the person had told us they were already

1    looking at opportunities, or the person had an offer, or the

2    person had already talked to their boss, or whatever the case

3    may be.

4            THE COURT:  Any other questions, ladies and gentlemen?

5    Yes?

6            (Hearing commenced at the bench.)

7            THE COURT:  Question No. 29.

8            MS. CLINGAN:  We can share.  That's fine.

9            MR. DODDS:  I'm a little bit slower than everybody.

10           MS. CLINGAN:  We're good.

11           THE COURT:  Just a minute.  Don't leave.  It's pretty

12   obvious that we're not going to get a witness on and off by

13   1:30; right?

14           MS. CLINGAN:  Yeah.

15           THE COURT:  Let's not even start.

16           MS. CLINGAN:  I think we'd like to try.

17           MR. DODDS:  Judge --

18           THE COURT:  Well, the reason I'm saying that is

19   because the big -- all of the ceremonies or stuff for opening

20   day start at 1:30.

21           MS. CLINGAN:  Oh, I see.  Agreed.

22           THE COURT:  Thank you.

23           (Hearing continued in open court.)

24           THE COURT:  Here is another question for you:  Did

25   employees at RP need to notify their boss in order to be

1    considered for a role at DaVita?

2              *THE WITNESS:*  No.

3              *THE COURT:*  Or looking elsewhere?

4              *THE WITNESS:*  No.

5              *THE COURT:*  Okay.

6              Follow-up questions by Ms. Clingan?

7              *MS. CLINGAN:*  Nothing from the United States.

8              *MR. DODDS:*  No, sir.  Thank you.

9              *MS. BROOKS:*  Me either, Your Honor.

10             *THE COURT:*  Okay.

11             Just so that you know, the parties have agreed that --

12   they were going to try to squeeze one more witness in, but

13   they're not, because they want the gentleman with the tickets

14   to go over there where his son is going to meet him and enjoy

15   the pregame stuff starts at 1:30.  So do that.  Have a good

16   time.

17             All of you enjoy the weekend, whether it's baseball,

18   whether it's golf, whether it's having nothing to do with any

19   of that.  But as I know you will, just keep an open mind on

20   this case, because, of course, we haven't heard the defense

21   side yet, other than their cross-examinations.  But we want you

22   to hear everything before you start thinking about what

23   happened.  Okay?

24             Thank you for your service.  Have a wonderful weekend.

25   We'll see you Monday at -- well, wait a minute.  We're going to

 1   start a little later with them Monday morning; right?  Let's

 2   say 9:30 Monday morning.  9:30 Monday.

 3              (Jury out at 1:05 p.m.)

 4              THE COURT:  The jury has been excused.

 5              Does the government have anything to put on the record

 6   at this time?

 7              MR. VIGEN:  Yes, Your Honor.  When we were talking

 8   earlier about the *Daubert* --

 9              MS. BROOKS:  Your Honor, could Mr. Whitney be excused?

10              THE COURT:  Oh, yes.  Of course.  You're excused.

11   Free to leave.

12              THE WITNESS:  Thank you.

13              MR. VIGEN:  When we were talking earlier about the

14   *Daubert* hearing, I mentioned that the *Daubert* hearing would

15   focus on Section 5 and 6 of the analysis, which is the one that

16   we believe is unreliable.  We did still have our motion on the

17   other parts of his opinion.  We are willing to drop our

18   objection to part 4 of his opinion.  But then part 7 deals with

19   this market issue that we think is irrelevant.  And part 8 is

20   about how SCA had an independent business rationale for

21   entering the agreement, which we believe now is irrelevant,

22   given that they have conceded the existence of an agreement.

23              THE COURT:  So what you just told me is that you want

24   to focus on Sections 5, 6, 7, and 8.

25              MR. VIGEN:  That's correct.  And 5 and 6 for the

 1 | *Daubert*.  But 7 and 8 I believe are on the papers, essentially.

 2 | THE COURT:  Are what?

 3 | MR. VIGEN:  On the motion that we had filed, we can

 4 | rest on the papers there.

 5 | THE COURT:  Well, okay.  *Daubert* -- *Daubert* is just a

 6 | case.  You're talking about Rule 702.

 7 | MR. VIGEN:  That's correct, Your Honor.

 8 | THE COURT:  And, basically, under 702, or *Daubert*,

 9 | expert opinions have to be both relevant and reliable.  So

10 | you're saying 5 and 6 are not reliable, and 7 and 8 are not

11 | relevant?

12 | MR. VIGEN:  Correct, Your Honor.

13 | MR. MELSHEIMER:  We responded on all of this, Your

14 | Honor.  We stand on our position.  We're happy to argue that on

15 | Monday.

16 | THE COURT:  Okay.  Now, Monday, we're going to have

17 | this person who unfortunately flew in today.  And I'm sorry we

18 | weren't able to accommodate that person.  And then what else do

19 | we have from your side?

20 | MR. VIGEN:  Agent Hamel.

21 | THE COURT:  Right.  Is he a lengthy witness?

22 | MR. VIGEN:  Yes.  So it's Agent Hamel and our

23 | additional witness, as well.

24 | THE COURT:  Who?

25 | MR. VIGEN:  The last person on our witness list.  We

1    have Lombardo and then --

2              THE COURT:  So you've got Elliot Holder.  He's the

3    person that you were hoping to get on today.

4              MR. VIGEN:  Right.

5              THE COURT:  He is a relatively short one.  You say one

6    hour, but you've been under your estimate on everybody, which I

7    appreciate.

8              MR. VIGEN:  Yes.  And then Lombardo.

9              THE COURT:  Then you've got Hamel.  You say four

10   hours.

11             MR. VIGEN:  It will be much less than that.

12             THE COURT:  Good.  And then you say Lombardo is your

13   last guy?

14             MR. VIGEN:  No.  I believe we might need to discuss

15   the exact order, given the timing of all -- from today.  But I

16   believe we would end with -- well, with Holder -- I'm sorry.

17             THE COURT:  You've got Hamel, Holder, Lombardo, and

18   Thurman.

19             MS. CLINGAN:  That's correct, Your Honor.

20             THE COURT:  You're going to call all four of those?

21             MS. CLINGAN:  Yes, Your Honor.

22             THE COURT:  I don't care what order you pick, as long

23   as you tell them.

24             MR. WALSH:  Your Honor, I have one point on

25   Mr. Thurman.  We were about to file a motion *in limine* to

1   exclude his testimony.  On the representation of the government

2   that he would be called only in rebuttal, we did not file that

3   motion.  And it's -- it sounds like there has been a change

4   that would affect that understanding.

5          MS. CLINGAN:  Yes.  There was a change that was made

6   at counsel table this afternoon, and so we haven't yet had an

7   opportunity to confer with defense counsel on that.  Perhaps we

8   can do so, given we're going to let out early today.  And

9   defense counsel can proceed with the motion *in limine* if they

10  believe it is appropriate.

11         THE COURT:  Who is Thurman?

12         MS. CLINGAN:  He is a former DaVita employee.

13         THE COURT:  And you told them only in rebuttal, and

14  now you changed your mind?

15         MS. CLINGAN:  In light of the testimony that was

16  elicited, yes, Your Honor.

17         THE COURT:  Well, you better confer about it.

18         MS. CLINGAN:  We intend to do so.

19         THE COURT:  And what's your *in limine* about?

20         MR. WALSH:  It's about the subject -- the relevance of

21  this testimony, based on the single 302 that we've been

22  provided, which simply does not go to the issues that are in

23  this case and does not go to any of the agreements that are

24  alleged by the government here, but even indirectly, so -- I

25  would hope that we would not need to file that motion.  We were

 1  going to file it last week, when there was more time for the

 2  Court to consider it.  And to do it under these circumstances,

 3  obviously, we're concerned about.

 4       *THE COURT:*  Well, I think maybe you two better have a

 5  little conferral and see if you can resolve this or not.

 6       *MS. CLINGAN:*  Happy to do so.

 7       *THE COURT:*  Anything else that you want on the defense

 8  side?

 9       *MR. WALSH:*  Your Honor, one last point.  We, of

10  course, got the Court's proposed instruction yesterday.  We

11  will have comments for the Court later today, and we wanted to

12  be sure you were aware of it.

13       And as I expect the Court knows, the defense does have

14  some concerns about the instruction.  And we're mindful of the

15  Court's admonition in the -- in the email that we received,

16  but we will be providing comments.

17       *THE COURT:*  Well, you can certainly do that.  But I

18  didn't just put that together willy-nilly.  I thought about it,

19  and that's what I think is the right answer.

20       I knew the government would like it; I knew you

21  wouldn't.  But that's not of concern to me, whether you like it

22  or not.  That's what I think the right answer is.

23       *MR. WALSH:*  Your Honor, we appreciate the opportunity

24  for comments, because it is a matter that is of -- as the Court

25  knows, of central importance to the defense and to where this

 1   case proceeds from here on out.  And so we'll provide those to

 2   you.

 3           THE COURT:  All right.  Well, I don't know if it's

 4   really of central importance or not.  The way the evidence has

 5   played out, I'm not sure it really matters too much anymore;

 6   but you might disagree with that.

 7           All right.  Have a nice weekend, everybody.

 8           How much time do you need for your hearing?

 9           MR. VIGEN:  Forty-five minutes, Your Honor.

10           THE COURT:  8:30 Monday morning.

11           (Recess at 1:13 p.m.)

12                          **I N D E X**

13   **Item**                                                      **Page**

14     RICHARD WHITNEY
             Direct Examination By Ms. Clingan              764
15           Cross-examination By Ms. Brooks                806
             Redirect Examination By Ms. Clingan            880
16

17                    DEFENDANTS' EXHIBITS

18   Exhibit        Offered  Received  Refused  Reserved  Withdrawn

19   A498                       858
     A555                       850
20   B446                       843

21

22

23

24

25

1                        GOVERNMENT'S EXHIBITS

2    Exhibit       Offered   Received   Refused   Reserved   Withdrawn

3    159                       768
     160                       770
4    169-1                     772
     172                       776
5    175                       799
     176-1                     778
6    184-1                     783
     185-1                     786
7    189                       801
     192-1                     787
8    196                       788
     199                       792
9    199                       861
     205                       794
10   207                       795
     209                       796
11   220                       803
     245                       898
12   262                       813
     340                       880
13   A380                      827

14

15

16                      REPORTER'S CERTIFICATE

17          I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
18
            Dated at Denver, Colorado, this 9th day of April,
19   2022.

20

21                              _Therese Lindblom_

22                              _____
                                Therese Lindblom,CSR,RMR,CRR

23

24

25